MILES STERLING BENCH
Oklahoma DOC No. 713261
Oklahoma State Penitentiary
McAlester, Oklahoma

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **MILES STERLING BENCH,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. CIV-22-66-G** |
| | ) | |
| **JIM FARRIS, Warden,** | ) | **(Capital Case)** |
| **Oklahoma State Penitentiary,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## PETITION FOR WRIT OF HABEAS CORPUS
## PURSUANT TITLE 28, UNITED STATES CODE, SECTION 2254

ROBERT S. JACKSON, OBA # 22189
1300 NW 10th St.
Oklahoma City, OK 73106
Telephone: (405) 602-8614
Facsimile: (405) 400-2167
bob@bobjacksonlaw.com

ALYSSA DONOVAN FARRELL, OBA # 32304
P.O. Box 52192
Tulsa, OK 74152
Telephone:  (405) 439-1264
alyssa.d.farrell@gmail.com

COUNSEL FOR PETITIONER, MILES STERLING BENCH

December 22, 2022

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

ATTACHMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

<u>Ground One</u>          Oklahoma is without jurisdiction to prosecute Mr. Bench
                     because he is an Indian, and the crime occurred in Indian
                     Country. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.          The state court decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

II.         *McGirt* did not announce a new rule, but instead was premised upon
            clearly established federal law such as *Solem v. Bartlett*, 465 U.S. 463
            (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III.        Given the unique timing of Mr. Bench's jurisdictional claim, granting
            him habeas relief would not require the same result in other cases  23

IV.         The OCCA's application of its *Teague*-based procedural rule is
            insufficient to bar this Court's review . . . . . . . . . . . . . . . . . . . . . . 27

<u>Ground Two</u>          Mr. Bench's Sixth, Eighth, and Fourteenth Amendment rights
                     were violated through the ineffective assistance of trial counsel
                     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

I.          The state court decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

II.         Guilt Stage Ineffectiveness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

            a.          Failure to object to instances of prosecutorial misconduct
                        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    b. Failure to Impeach state's expert witness Terese Hall . . . . . 33

    c. Failure to utilize available information to cross-examine Melissa Lynn . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

  III. Sentencing Stage Ineffectiveness . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    a. Failure to properly utilize and present mitigation specialist, David Musick, Ph.D. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

    b. Failure to present mental illness evidence through an appropriate expert . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    c. Failure to present neuro-imaging evidence to further substantiate Mr. Bench's mental illness . . . . . . . . . . . . . . . . . . . . . . . . . . 54

    d. Failure to present evidence that Mr. Bench's family members valued his life . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

  IV. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

**Ground Three**  Appellate counsel was ineffective in violation of Mr. Bench's rights under the Sixth, Eighth, and Fourteenth Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

  I. The state court decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

    a. Appeal counsel failed to obtain a more specialized MRI to support the claim raised on appeal . . . . . . . . . . . . . . . . . . . . 60

    b. Appeal counsel failed to raise the jurisdictional/Indian Country claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

    c. Appeal counsel failed to raise the trial court's error in answering the jury's question about a life without parole sentence . . . 65

    d. Appeal counsel failed to raise the issue that Mr. Bench's statements to Deputy Short were erroneously admitted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

  III. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

**Ground Four**          The trial court's refusal to instruct on a lesser included offense deprived Mr. Bench of Due Process and a fundamentally fair trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

I.        The state court decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

II.       *Beck* required a second-degree murder instruction be given . . . . . . 70

III.      The OCCA unreasonably determined the facts did not support a second-degree murder instruction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

**Ground Five**          The trial court erroneously admitted custodial statements in violation of Mr. Bench's rights under the Fifth, Sixth, and Fourteenth Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

I.        The state court decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

II.       Mr. Bench's statements to Deputy Short and Officer Brown, each made while he was in custody, were involuntary and elicited without *Miranda* warnings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

**Ground Six**           Prosecutorial misconduct deprived Mr. Bench of his rights to Due Process and a fundamentally fair trial . . . . . . . . . . . . . . 79

I.        The state court decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

a.    Shifting the burden of proof for the insanity defense to Mr. Bench . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

b.    Improper bolstering of Dr. Hall's testimony with hearsay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

c.    Arguing facts not in evidence with respect to the cash register receipts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

d.    Misstating evidence concerning the crime scene and Mr. Bench's interactions with his Grandfather following the homicide . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

e.    Improper impeachment of Dana Huff . . . . . . . . . . . . . . . . . . 86

        f.    Improper invocation of sympathy for the victim . . . . . . . . . 87

   II.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

Ground Seven    The Heinous, Atrocious, or Cruel aggravating circumstance is Constitutionally vague; and insufficient evidence supports the jury's finding of the aggravator . . . . . . . . . . . . . . . . . . . . . . 89

   I.    The state court decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

        a.    The OCCA never considered whether Oklahoma's current application of HAC is unconstitutionally vague and over broad . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

        b.    The OCCA's finding on sufficiency of the evidence . . . . . . 91

   II.    The OCCA's current application of HAC is unconstitutional . . . . . 92

   III.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

Ground Eight    Insufficient evidence supports the jury's finding of the continuing threat aggravating circumstance . . . . . . . . . . . . 94

   I.    The state court decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Ground Nine    Mr. Bench must be spared from execution due to his young age . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

   I.    The state court decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

Ground Ten    Cumulative error violated Mr. Bench's rights under the Sixth, Eighth, and Fourteenth Amendments . . . . . . . . . . . . . . . . . . 98

REQUEST FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

## <u>TABLE OF AUTHORITIES</u>

### Federal Cases

*Ake v. Oklahoma*, 470 U.S. 68 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 61

*Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007) . . . . . . . . . . . . . . . . . . . . 28, 47, 58

*Andrews v. Deland*, 943 F.2d 1162 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Apodaca v. Oregon*, 406 U.S. 404 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Arave v. Creech*, 507 U.S. 463 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Aycox v. Lytle*, 196 F.3d 1174 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

*Beck v. Alabama*, 447 U.S. 625 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Bell v. Cone*, 535 U.S. 685 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Bench v. Oklahoma*, 140 S.Ct. 56, *cert. denied* (October 7, 2019) . . . . . . . . . . . . . 4, 6, 18

*Brecheen v. Reynolds*, 41 F.3d 1343 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . 28, 38, 80

*Brecht v. Abrahamson*, 506 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Brown v. Sanders*, 546 U.S. 212 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92, 97

*Byrd v. Workman*, 645 F.3d 1159 (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . 58, 81, 99, 100

*Chaidez v. United States*, 568 U.S. 342 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Clark v. Arizona*, 548 U.S. 735 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Coleman v. Thompson*, 501 U.S. 722 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*Cone v. Bell*, 556 U.S. 449 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Darks v. Mullin*, 327 F.3d 1001 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 70, 99

*Davis v. Alaska*, 415 U.S. 308 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Doak v. Nunn*, 2022 WL 1228813 (W.D. Okla. Jan 21, 2022). . . . . . . . . . . . . . . . . . . . 26

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974). . . . . . . . . . . . . . . . . . . . 33, 80, 81, 83, 85

*Edwards v. Vannoy*, __U.S.__, 141 S.Ct.1547 (2021) . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Fairchild v. Workman*, 579 F.3d 1134 (10th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . 97

*Fairres v. Elhabte*, 2022 WL 3586214 (W.D. Okla. Aug. 22, 2022). . . . . . . . . . . . . . 26

*Fero v. Kerby*, 39 F.3d 1462 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Fisher v. Gibson*, 282 F.3d 1283 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 42

*Fulminante v. Arizona*, 499 U.S. 279 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Gardner v. Florida*, 430 U.S. 349 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Godfrey v. Georgia*, 446 U.S. 420 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Hagen v. Utah*, 510 U.S. 399 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Harris v. Dinwiddie*, 642 F.3d 902, (10th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Harris v. Poppell*, 411 F.3d 1189 (10th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Harris v. Reed*, 489 U.S. 255, 262 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Hogan v. Gibson*, 197 F.3d 1297 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . 71, 73

*Hooks v. Ward*, 184 F.3d 1206 (10th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . 28, 69, 70

*Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012) . . . . . . . . . . . . . . . . . . 54, 55, 56, 67

*Hooper v. Mullin*, 314 F.3d 1162 (10th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*In re Morgan*, No. 20-6123 (unpub.) (10th Cir. Sep. 18, 2020). . . . . . . . . . . . . . . . . . . 20

*Jackson v. Virginia*, 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91, 95

*Johnson v. Mississippi*, 486 U.S. 578 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Le v. Mullin*, 311 F.3d 1002 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Lewis v. Jeffers*, 497 U.S. 764, 782-83 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

*Littlejohn v. Crow*, 2021 WL 3074171 (N.D. Okla. July 20, 2021) . . . . . . . . . . . . . . . 21

*Maes v. Thomas*, 46 F.3d 979 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*Mahorney v. Wallman*, 917 F.3d 469 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . 80

*Mayes v. Gibson*, 210 F.3d 1284 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 36, 50

*Maynard v. Cartwright*, 486 U.S. 356 (1988) . . . . . . . . . . . . . . . . . . . . . . . . 90, 92, 93, 97

*McGirt v. Oklahoma,* 591 U.S. __, 140 S. Ct. 2452 (2020) . . . . . . . . . . . 6, 16, 20, 22, 27

*Medlock v. Ward*, 200 F.3d 1314 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Miller v. Pate*, 386 U.S. 1 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

*Miranda v. Arizona*, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

*Moore v. Gibson*, 195 F.3d 1152 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Murphy v. Royal*, 875 F.3d 896 (10th Cir. 2017) . . . . . . . . . . . . 16, 19, 20, 21, 23, 64, 65

*Neil v. Gibson*, 278 F.3d 1044 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 67

*O'Neal v. McAninch*, 513 U.S. 432 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Pachecco v. El Habti,*  48 F.4th 1179 (10th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Pavatt v. Royal*, 859 F.3d 920 (10th Cir. 2017) (*en banc*) . . . . . . . . . . . . . . . . . . . . . . . 94

*Penson v. Ohio*, 488 U.S. 75 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Phillips v. Workman*, 604 F.3d 1202 (10th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . 70

*Ramos v. Louisiana*, 590 U.S. _, 140 S.Ct.1390 (2020) . . . . . . . . . . . . . . . . . . . . . . . . 21

*Rhode Island v. Innis*, 446 U.S. 291 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Richmond v. Lewis*, 506 U.S. 40 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

*Robison v. Maynard*, 829 F.2d 1501 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Romano v. Gibson*, 239 F.3d 1156 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Rompilla v. Beard*, 545 U.S. 374 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Roper v. Simmons*, 543 U.S. 551 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Sanders v. Pettigrew*, 2021 WL 3291792 (E.D. Okla. Aug. 2, 2021) . . . . . . . . . . . 21, 22

*Sandstrom v. Montana*, 442 U.S. 510 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Sharp v. Murphy*, 591 U.S. __, 140 S.Ct. 2412 (2020) . . . . . . . . . . . . . . . . . . . . . 6, 16, 19

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58, 83

*Solem v. Bartlett*, 465 U.S. 463 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 64

*Spaziano v. Florida,* 468 U.S. 447 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

*Stouffer v. Reynolds*, 168 F.3d 1155 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 36, 56

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . . . 31, 36, 39, 42, 43, 56, 63

*Sullivan v. Louisiana*, 508 U.S. 275 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

*Taylor v. Kentucky*, 436 U.S. 478 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Taylor v. Workman*, 554 F.3d 879 (10th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . 70, 71, 73

*Teague v. Lane*, 489 U.S. 288 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 30, 64

*Thomas v. Gibson*, 218 F.3d 1213 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

*Trop v. Dulles*, 356 U.S. 86 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*United States v. Cronic*, 466 U.S. 648 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61, 63

*United States v. Cuch*, 79 F.3d 987 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. Fields*, 949 F.3d 1240 (10th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . 56

*United States v. Rivera*, 900 F.2d 1462 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . 99

*Voyles v. Crow*, 2022 WL 954993 (W.D. Okla. Mar. 14, 2022) . . . . . . . . . . . . . . . . . . 21

*Wellons v. Hall*, 558 U.S. 220 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Whorton v. Bockting*, 549 U.S. 406 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Wiggins v. Smith*, 539 U.S. 510 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Williams v. Taylor*, 529 U.S. 362 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 51, 71

*Willis v. Crow*, 2022 WL 576559 (W.D. Okla. Feb. 25, 2022) . . . . . . . . . . . . . . . . . . . 26

*Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Wood v. Allen*, 558 U.S. 290 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Yellowbear v. Wyoming Atty. Gen.*, 525 F.3d 921 (10th Cir. 2008) . . . . . . . . . . . . . . . . 20

**State Cases**

*Arizona v. Pandeli*, 394 P.3d 2 (Ariz. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Bench v. State*, 2021 OK CR 12, slip op. (May 6, 2021) . . . . . . . . . 4, 6, 16, 17, 18, 23, 25

*Bench v. State*, 431 P.3d 929 (Okla. Crim. App. 2018) . . . 4, 6, 32, 33, 35, 36, 38, 42, 43, 44, 45, 46, 49, 50, 51, 53, 55, 56, 57, 58, 65, 69, 70, 76, 78, 79, 80, 81, 82, 84, 85, 86, 88, 89, 90, 91, 95, 96, 99

*Bench v. State*, 495 P.3d 670 (Okla. Crim. App. 2021) . . . . . . . . . . . . . . . . . . . . . . 4, 6, 18

*Bench v. State*, 504 P.3d 592 (Okla. Crim. App. 2021) . . . 4, 6, 18, 27, 30, 59, 61, 62, 63, 64, 65, 66, 79, 97, 100

*Bosse v. State*, 484 P.3d 286 (Okla. Crim. App. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Bosse v. State*, 499 P.3d 771 (Okla. Crim. App. 2021). . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Cheney v. State*, 909 P.2d 74 (Okla. Crim. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Cole v. State*, 492 P.3d 11 (Okla. Crim. App. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Cole v. State*, 499 P.3d 760 (Okla. Crim. App. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Cudjo v. State*, 925 P.2d 895 (Okla. Crim. App. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 93

*Fears v. State*, No. F-2004-1279 (unpub.) (Okla. Crim. App. July 7, 2006) . . . . . . . . . . 37

*Ferrell v. State*, 902 P.2d 1113 (Okla. Crim. App. 1995). . . . . . . . . . . . . . . . . . . . . . . . . 29

*Logan v. State,* 293 P.3d 969 (Okla. Crim. App. 2013) . . . . . . . . . . . . . . . . . . . . . . . 59, 64

*Munn v. State*, 658 P.2d 482 (Okla. Crim. App. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . 82

*Murphy v. State*, 124 P.3d 1198 (Okla. Crim. App. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 23

*Neasbitt v. State*, No. PR-2021-1478 (unpub.) (Okla. Crim. App. Nov. 4, 2022) . . . 29, 30

*Nicholson v. State*, 421 P.3d 890 (Okla. Crim. App. 2018) . . . . . . . . . . . . . . . . . . . . . . . 66

*Ryder v. State,* 489 P.3d 528 (Okla. Crim. App. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Ryder v. State*, 500 P.3d 647 (Okla. Crim. App. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*State ex rel. Matloff v. Wallace*, 497 P.3d 686 (Okla. Crim. App. 2021) . 6, 17, 18, 19, 22, 23, 25, 28, 29

*Thomas v. State*, 811 P.2d 1337 (Okla. Crim. App. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 93

**Statutes**

18 U.S.C. § 1153. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

28 U.S.C. § 2244. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 27

28 U.S.C. § 2254. . . 1, 18, 32, 33, 35, 36, 38, 42, 43, 45, 46, 49, 51, 53, 55, 58, 60, 64, 66, 69, 77, 81, 82, 86, 88, 91, 95, 100

Okla. Stat. tit. 21, § 152 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

Okla. Stat. tit. 21, § 701.7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Okla. Stat. tit. 21, § 701.10a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Okla. Stat. tit. 21, § 701.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Okla. Stat. tit. 22, § 894 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Okla. Stat. tit. 22, § 1089 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 16, 97

## Other Authorities

*American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, reprinted at 31 Hofstra L. Rev. 913, 1000 (2003). . . 47, 52, 57

American Bar Association, Resolution 111 (February 2018). . . . . . . . . . . . . . . . . . . . . 98

Rule 9.7, *Rules of the Oklahoma Court of Criminal Appeals*. . . . . . . . . . . . . . . . 6, 16, 24

## <u>ATTACHMENTS</u>

*Bench v. State*, 2021 OK CR 12, slip op. (May 6, 2021) (subsequently withdrawn from publication) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Choctaw Nation Membership Verification Form . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Official Map of Chickasaw Nation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Neasbitt v. State*, Order Denying Extraordinary Relief, No. PR-2021-1478 (unpub.) (Okla. Crim. App. Nov. 4, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## INTRODUCTION

Petitioner, Miles Sterling Bench, was convicted of First Degree Murder and sentenced to death in the District Court of Stephens County, Oklahoma. The conviction and sentence were affirmed on appeal. However, because Mr. Bench is an Indian, and the offense occurred within Indian Country, the Oklahoma Court of Criminal Appeals granted Mr. Bench post-conviction relief due to Oklahoma's lack of jurisdiction. But, that relief was subsequently withdraw by the OCCA by operation of a newly created procedural rule. Mr. Bench's conviction and sentence stand in violation of his rights under the United States Constitution. Pursuant to 28 U.S.C. § 2254, he petitions this Court for relief. This is Mr. Bench's first Petition for Writ of Habeas Corpus.

Mr. Bench acknowledges the senseless and tragic nature of his offense. Yet, many errors occurred at trial which call into question the reliability of the conviction and resulting death sentence. Mr. Bench respectfully contends that any of the grounds asserted herein are sufficient to warrant relief; however, some aspects of Mr. Bench's case are especially compelling and an overview will be provided here.

Mr. Bench was just 21 years old at the time of his offense. He had a difficult childhood, both at home and at school. The family dynamics were dysfunctional and complex, with Mr. Bench and his stepfather having a very strained relationship. Mr. Bench was labeled a dummy and bullied at school where he was in special education classes. He worked hard and was eventually able to get out of the special education program and attend regular classes. But, social interactions remained difficult for Mr. Bench. Upon graduating

high school, Mr. Bench enlisted in the Navy.

Mr. Bench and his family thought the Navy would fix him, but unfortunately Mr. Bench failed terribly during basic training.  He was just not mentally there and couldn't handle even simple tasks required by the Navy.  He went AWOL, and that's when his behavior and mental health took a turn for the worse.  He was having delusions about being a special ops soldier and having the CIA after him.  He was so ill that his family attempted to take him for mental health treatment on multiple occasions, but due to various reasons he was unable to be admitted at those facilities.

At trial, Mr. Bench asserted a not guilty by reason of insanity defense.  A defense expert diagnosed Mr. Bench with schizophrenia and opined that he was unable to appreciate the wrongfulness of his conduct.  However, defense counsel was woefully inadequate in supporting and corroborating the NGRI defense.  And, counsel was inadequate in countering the state's expert, who wrongfully cast Mr. Bench as a faker who was exaggerating his mental illness.  Further exacerbating these circumstances was that the prosecution engaged in much misconduct aimed at discrediting the NGRI defense.  Most notably, the state engaged in an impermissible burden shifting argument and told jurors that Mr. Bench had to prove his insanity beyond a reasonable doubt.

Once convicted, the ineffectiveness continued during sentencing.  Counsel abandoned its mitigation specialist at the last moment and left the jury with a disjointed presentation of numerous lay witnesses who testified to little bits of Mr. Bench's life without any one witness tying together the whole of his background and existence.  Counsel also failed to

carry forward the compelling and mitigating evidence of Mr. Bench's severe mental illness, schizophrenia, into the sentencing stage. Despite all this, the jury was not set on a death sentence and sent out a note requesting more information about the life without parole option. One is left to wonder, but for the numerous errors that occurred, would at least one juror have struck a different balance and would Mr. Bench not have been sentenced to death?

## PROCEDURAL HISTORY

### A.    State Conviction (CF-2012-172):

Court:        District Court of Stephens County, State of Oklahoma.

Case No.:    CF-2012-172.

Charge:      First-Degree Murder (21 O.S. § 701.7);  Date of Offense: 6-6-2012.

Plea/Result:  Not guilty by reason of insanity.    Trial: By jury.    Verdict: Guilty.

Trial:        Jury trial 2-5-2015 through 3-5-2015.      Defendant did not testify.

Guilty:       Guilty Verdict: 2-26-2015. Sentencing Verdict (death): 3-5-2015.

Sentence:    Sentenced 5-13-2015 (death sentence by lethal injection).

Judge:        District Judge G. Brent Russell.

Counsel:     Mitchell Solomon and Shea Smith with OIDS.
             Oklahoma Indigent Defense System
             Capital Trial Division
             P.O. Box 926
             Norman, OK 73070-0926

### B.    Direct Appeal (D-2015-462):

Court:        Oklahoma Court of Criminal Appeals.

Case No.:    D-2015-462            No evidentiary hearing received.

3

Opinion:    *Bench v. State*, 431 P.3d 929 (Okla. Crim. App. 2018).

Result:    Affirmed (10-4-2018).

Certiorari:    *Bench v. Oklahoma*, 140 S.Ct. 56, *cert. denied* (October 7, 2019).

Counsel:    Traci J. Quick and Katrina Conrad-Legler with OIDS.
Oklahoma Indigent Defense System, Homicide Direct Appeal Division
P.O. Box 926
Norman, OK 73070-0926

### C.    Post-Conviction (PCD-2015-698):

Court:    Oklahoma Court of Criminal Appeals.

Case No.:    PCD-2015-698        Evidentiary Hearing received.

Result:    Relief Granted, Case Dismissed for Lack of Jurisdiction, *Bench v. State*, 2021
OK CR 12, slip op. (May 6, 2021) (subsequently withdrawn from publication)
(attached hereto as Att. 1).

Order Vacating Relief and Withdrawing Opinion, *Bench v. State*, 495 P.3d 670
(Okla. Crim. App. Aug. 31, 2021).

Denied,  *Bench v. State*, 504 P.3d 592 (Okla. Crim. App. 2021).

Counsel:    Virginia Sanders and Kristi Christopher with OIDS.
Oklahoma Indigent Defense System, Capital Post Conviction Division
P.O. Box 926
Norman, OK 73070-0926

Mr. Bench has no other petition, application, motion, or appeal currently pending in

any other state or federal court.  References to transcripts and records will be designated as

follows: The 14-volume Jury Trial Transcripts, conducted from Feb. 9, 2015 through Mar.

5, 2015, will be referred to as "Tr." followed by the volume and page number (i.e. Tr. IV 77);

the May 13, 2015 Sentencing Transcript will be referred to as S. Tr.; other hearing transcripts

will be referred to as "Tr. month/day/year" followed by page number; the Original Record from the state district court will be referred to as "O.R." followed by the page number; and the attachments to this Petition as Att. __ followed by the attachment number.

## STATEMENT OF THE CASE

Miles Sterling Bench was charged by Information in the District Court of Stephens County, Case No. CF-2012-172, on June 11, 2012, with first-degree murder pursuant to Okla. Stat. tit. 21, § 701.7. O.R. 1-2. The state alleged the following statutory aggravating circumstances: 1) The murder was especially heinous, atrocious, or cruel; and 2) here existed the probability that the defendant would commit further acts of violence that would constitute a continuing threat to society. O.R. 124-126.

Mr. Bench was tried by a jury before the Honorable G. Brent Russell, District Judge, in Stephens County from February 9 to March 5, 2015. O.R. 1461-1462; Tr. I to Tr. XIV. At trial, Mr. Bench entered a plea of not guilty by reason of insanity. Tr. V 16, 25. At the conclusion of the first stage, the jury found Miles Bench guilty.

Upon concluding its sentencing deliberations, the jury found the aggravating circumstances that the murder was heinous, atrocious, or cruel, and that Mr. Bench posed a continuing threat to society. O.R. 1456. And, despite its concerns about the sentencing options, the jury imposed a sentence of death. O.R. 1379, 1456-1457, 1461-1462; Tr. XIV 178-180. On May 13, 2015, the trial court sentenced Mr. Bench to death in accordance with the jury verdict. O.R. 1571-1574, 1595-1596; S. Tr. 10-14.

Mr. Bench timely appealed his conviction and sentence to the Oklahoma Court of

Criminal Appeals.  The OCCA affirmed the conviction and sentence via a published opinion on October 4, 2018.  *Bench v. State*, 431 P.3d 929 (Okla. Crim. App. 2018).  Mr. Bench then filed a Petition for Writ of Certiorari in the United States Supreme Court which was denied on October 7, 2019.  *Bench v. Oklahoma*, 140 S.Ct. 56.

Mr. Bench timely sought post-conviction relief in the Oklahoma Court of Criminal Appeals.  Pursuant to Okla. Stat. tit. 22, § 1089, and Rule 9.7(2), *Rules of the Oklahoma Court of Criminal Appeals*, Mr. Bench filed his Application for Post-Conviction Relief (APCR) in the OCCA on March 15, 2018, while his direct appeal remained pending in that court.  *Inter alia*, the APCR raised the claim that the State of Oklahoma lacked jurisdiction to prosecute Mr. Bench because he is an Indian and the crime occurred within Indian Country.  Following the Supreme Court's decision in *McGirt v. Oklahoma,* 591 U.S. __, 140 S. Ct. 2452, on July 9, 2020, and its affirmance of habeas corpus relief in *Sharp v. Murphy*, 591 U.S. __, 140 S.Ct. 2412, on the same date, the OCCA granted post conviction relief by vacating Mr. Bench's conviction and sentence.  *Bench v. State*, 2021 OK CR 12, slip op. (May 6, 2021).  However, the OCCA then vacated relief and withdrew its published opinion. *Bench v. State*, 495 P.3d 670 (Okla. Crim. App. Aug. 31, 2021).  The basis for vacating relief was the OCCA's decision in *State ex rel. Matloff v. Wallace*, 497 P.3d 686 (Okla. Crim. App. 2021), which held that *McGirt* announced a new rule of criminal procedure which was not available to cases in which the conviction was final at the time *McGirt* was announced.  *Id*. Ultimately, the OCCA denied Mr. Bench's APCR via published opinion on December 22, 2021.  *Bench v. State*, 504 P.3d 592 (Okla. Crim. App. 2021).

6

## STATEMENT OF THE FACTS

Just before midnight on June 6, 2012, Deputy Quinton Short, on patrol along Interstate 40 in Custer County, Oklahoma, overheard a "be on the look-out" (BOLO) for a vehicle out of Stephens County. Tr. VI 114-15, 122, 138. The BOLO indicated the driver had a possible "history of mental health illness." Tr. IX 47. The vehicle belonged to a murder victim, and the driver was Miles Bench. Mr. Bench was a convenience store clerk who went missing shortly before 9:00 p.m. Tr. VI 118. Deputy Short initiated a traffic stop and instructed Mr. Bench to get out of the vehicle and lay on the ground. Mr. Bench fully complied and responded to Short's questions. *Id*. at 118, 120-121. According to Deputy Short, Mr. Bench stated, "I think I fucked up. I may have killed somebody." *Id*. at 124. Mr. Bench's only memory of the encounter was "having a dog present and having a guy with fury [sic] hair being involved somehow in the apprehension." Tr. X 40. Mr. Bench was arrested and booked into the Custer County Jail for murder.

Prior to the traffic stop, Mr. Bench had come home to his grandparents' house around 8:45 or 8:50 p.m., despite his shift not ending until 9:00 p.m. Tr. VI 38. Mr. Bench's grandfather, Stanley Bench, was home but in bed. *Id*. at 38. Stanley asked whether Mr. Bench quit or had been fired, to which Mr. Bench simply answered, "yes." *Id*. at 39. His grandfather recalled Mr. Bench holding "long-handles" (winter underwear), peroxide, a toothbrush, and his wallet. *Id*. at 39-40. Mr. Bench said he was leaving. *Id*. at 39. Mr. Bench's grandmother was not home yet. *Id*. at 40. Knowing how much she wanted him there, Stanley told Mr. Bench he had better get going before she got home. *Id*. at 40-41. Mr.

7

Bench left, saying, "Pa, I love you." *Id*. at 43. Soon after, investigators found Braylee Henry's body on the grandparents' property. Tr. V 131, 136.

Mr. Bench was barely 21 years old at the time of the crime. Born in Oklahoma, Mr. Bench spent most of his youth in Wilmington, Illinois, where he lived with his mother, Dana Huff; his step-father, Farlan Huff; an older, half-brother and younger, half-sister. Tr. XII 77-78; Tr. XIV 41. From early childhood, Mr. Bench struggled in school, friendships and to find acceptance, even within his own family. Tr. XIV 87, 94. His mother, stepfather, and teachers recognized his early social and academic struggles, but no one knew the exact cause nor the solution. His parents wanted, and tried to teach him, to be "normal" and to stop doing things that might cause people to think he was "crazy." *Id*. at 24-27, 31, 93-94, 115. His teachers recognized his parents were "not involved with him" much of the time, and nearly everyone who knew him as a child described him as "sad." Tr. XIII at 31, 47, 56. Many remembered he was regularly bullied as a child, even by his stepfather.

In kindergarten, Mr. Bench was held back and enrolled in special education classes. Tr. X 20. His special education teacher in second grade described Mr. Bench's issue as a "processing delay." Tr. XIII 54. "It [took] him longer to understand questions or understand what the teacher was asking," she explained. *Id*. He was given unlimited time to take tests, which often had to be read to him. *Id*. at 70. Another teacher recalled Mr. Bench as "quieter. . . more withdrawn that most children. . .sad." *Id*. at 47. He was almost always "by himself [on the playground] with a basketball, shooting hoops." *Id*. at 45-46.

By late elementary school, Mr. Bench had been diagnosed with Attention Deficit

Disorder and prescribed Focalin.  Tr. XIV 28, 39.  While on the drug, Mr. Bench had difficulty sleeping and began to dwell on self-harm.  *Id.* at 88-90.  Mrs. Huff took him off the drug, but the obsession with self-harm persisted.  *Id.*  Mr. Bench once disclosed that "all he could thinking about was going to the top of [a] building and jumping." *Id.* at 90.

He remained in special ed. and was given extra support through late middle school. Tr. XIII 29-38, 44, 52, 70-79, 90.  Mr. Bench's learning disabilities and awkwardness made him especially vulnerable to teasing and harsh words from his peers.  A neighbor, Shannon Becker, remembered Mr. Bench as sweet; when they played together, he would pick up any spiders or bugs near her because she did not like them.  *Id.* at 18-19.  At school and on the bus, though, children made fun of him.  *Id.* at 19-20.  Ms. Becker and her sister recalled Mr. Bench's stepfather, Farlan Huff, as rough on Miles, yelling at Mr. Bench and calling him "stupid."  *Id.* at 13-16, 20-21.  Mr. Bench never fought or talked back; he just "put his head down and took it."  *Id.* at 16.

In eighth grade, still being bullied, Mr. Bench told a teacher, Sherry Shelly, "you know what, I want to get out of special ed.  I have this goal that I want to get out."  *Id.* at 91. Ms. Shelly recalled the tremendous effort Mr. Bench undertook to improve his math scores enough to enroll in regular courses.  *Id.* at 78-79.  His teachers shared in his pride at this accomplishment.  *Id.*  By the end of the school year, he was out of special ed. and selected to give a class speech.  *Id.* at 91.  Mr. Bench's mother recalled how she helped him with the speech, worried the speech would not "be coherent and make sense," but knowing Mr. Bench had ideas he wanted to share.  Tr. XIV 94-95.  Ms. Shelly described the speech as "a kid

rising above an obstacle and acknowledging it."  Tr. XIII 91.

In high school, Mr. Bench had a close friendship with Michael Popovich.  Mr. Popovich remembers Mr. Bench as awkward, someone people readily picked on.  Tr. XIV 10, 12, 24.  Mr. Popovich admitted even he had called Mr. Bench names like "stupid."  *Id.* at 10.  He described Mr. Bench's relationship with his step-father as "incredibly uncomfortable" – Mr. Huff berated Mr. Bench, but Mr. Bench just took it.  *Id.* at 11-12.  At school, Mr. Bench responded the same, "shut[ting] down to bullying."  "[h]e would get really upset. . . frustrated," but "[h]e just took it in."  *Id.* at 13, 24.

Mr. and Mrs. Huff "didn't understand what his problems were."  Tr. XIV 88.  But they knew " he [had] problems;" he was different: for years, Mr. Bench would wash his hands repeatedly, to the point they were raw; when coming down the stairs, he would "have to do a spin" before entering a room.  *Id.* at XIV 26-27, 88, 93-94.  His stepfather admonished the behavior, explaining that, if done in public, people would think he was "crazy."  *Id.* at 27.  Mrs. Huff did the same: "I would tell him he was going to have to try to stop . . . I gave him, his whole life, what I felt like was a pep talks about how to conduct himself so that he would be more accepted in society."  *Id.* at 94.  She didn't want people to think he was crazy, or to judge him for being so.  She was not sure Mr. Bench ever "really understood" what she was trying to do.  *Id.*  These peculiarities were difficult for the family to endure, especially for Mr. Huff.  *Id.* at 28.  Mr. Huff was hard on Mr. Bench: "Farlan would talk mean. That is how he is;" calling Mr. Bench names, from "dummy" to "dumb ass" and "anything in between."  *Id.* at 29, 93.

10

At some point, Mr. Bench started martial arts training to, in the words of his mother, "protect himself when [she] was not home." Tr. XIV 113. Sometime thereafter, in July of 2008, Mr. Huff confronted Mr. Bench about a chore left unfinished. Tr. XII 80, 84; XIV 91-92. Mrs. Huff told them to "duke it out." Tr. XIV 91. An altercation ensued with Mr. Bench placing Mr. Huff in a "sleeper hold." Tr. XII 80. Mrs. Huff instructed Mr. Bench to stop; Mr. Bench immediately released Mr. Huff and stood beside his mother. Tr. XIV 92. Police were called, and Mr. Bench was arrested. Tr. XII 70. Mr. Huff took responsibility for instigating it and declined to press charges. *Id*. at 71, 82, 84-85; Tr. XIV 31.

That fight shifted the family dynamic. The Huffs briefly separated, with Mr. Bench and his mother returning to Oklahoma. Tr. XIV 98. As soon as he graduated, Mr. Bench enlisted in the Navy. *Id*. at 49-50. His recruiter recalled his 100% effort in physical readiness. *Id*. at 51. He wanted to be a Navy SEAL, but he did not qualify academically. *Id*. Once at boot camp, he was trained by Chief Sutherland. Chief recalled Mr. Bench as "not mentally there." *Id*. at 64-65. He required significant additional help: he could grasp neither the Navy's attention to detail, nor the basic training curriculum. *Id*. at 61-62. Chief supplemented Mr. Bench's training – twice sending Mr. Bench to a special-education type program, and once sending him for a mental fitness assessment. *Id*. at 64. In January, Mr. Bench went absent without leave (AWOL). Tr. XII 88, 93. He left on foot and stumbled upon an old police car. *Id*. at 95. He was cold; he got in and started the car. *Id*.

Eventually, he drove to Michael Popovich's home in Wilmington. Tr. XIV 14. Mr. Popovich described the encounter: "like he was not there. He was very much disturbed."

11

*Id*. at 13.  Mr. Bench said he was in "special ops," forced to forget friends and family and leave everything behind due to the top secret nature of the mission; he claimed to be learning Russian, and then "spit out something that sounded like a Russian accent."  *Id*. at 14, 18.

A sheriff's deputy on patrol in Wilmington noticed the old police vehicle, learned it was stolen, and spoke to Mr. Bench.  Tr. XII 88, 92.  Mr. Bench, very tired and not having slept, admitted to being AWOL and taking the car.  *Id*. at 92-93.  He was arrested.  *Id*. at 94.  At the courthouse, he was recognized by a former neighbor who was shocked by his recent change in appearance and demeanor:  "he looked confused, scared, and just disoriented as to what he had done or what he was going through."  Tr. XIII 9.

Mr. Bench received a general discharge from the Navy and returned home to Oklahoma.  Tr. X 20.  Upon seeing him, his family immediately noticed he was not "the same [person] that left for the military."  Tr. XIV 32.  He was "very paranoid;" and "had a little satchel or briefcase thing that he said had some top secret papers in it."  *Id*.  He "seemed worse."  *Id*. at 97-98.  Mr. Bench's family grew increasingly concerned about his declining mental health.  Mrs. Huff hoped that, on the right medication, Mr. Bench would be alright.  *Id*. at 99.  One day, Mr. Huff became so concerned that he brought Mr. Bench to the Carl Albert Mental Health Center in Ada.  *Id*. at 32.  Even after Mr. Huff reported his concern that Mr. Bench might hurt someone, the doctors would not admit him.  *Id*. at 33, 42, 99.  Still concerned, Mr. Huff sought other options for care: first, a counseling center, but admission was denied as he had no formal diagnosis; then another counseling center where the intake doctor heard Mr. Bench describe himself as "ha[ving] a chip . . . implanted in his head," and

"scars on his head, under his hair," with "the government [] probably listening to us now." *Id*. at 33-35; 79-80.  Mr. Bench was given a return date, but before then, he ran away to his grandparents' home in Velma, where he stayed until the day of the homicide.  Tr. X 21.

In the six months he lived there, his grandmother observed increasingly irrational behavior: Mr. Bench sometimes thought he was Jason Bourne or "those spy people;" he said he had a "chip in his head like the Manchurian Candidate;" he believed he possessed a warrior gene, enabling superior performance in the military.  Tr. IX 5-6, 9.

Two weeks before the homicide, Mr. Bench secured a job as a clerk at the Teepee Totem, a convenience store.  Tr. V 104.  Around the same time, his grandmother noticed he had trouble sleeping.  Tr. IX 6-8.  He believed something or someone was after him, so he would put a chair against his door, to "keep things . . .from coming in to get him." *Id*. at 6-7, 8.  He hit the wall at night.  *Id*. at 7.  One night, he came into her bedroom, believing something was in his room, saying, "Granny, I'm scared.  Can I get in the bed with you?" *Id*. at 6. The night before the homicide, his grandmother picked up Mr. Bench from work. *Id*. at 7.  She waited nearly an hour for him to finish stacking Styrofoam cups. *Id*. When he finally got in the car, he stared at her, saying, "Granny, that man and woman came again;""[t]hey have got a hit out on me.  They are wanting to kill me." *Id*.

A cousin, Clayton Jenson, had similar observations: Mr. Bench would go days without sleeping; he was afraid to see doctors for fear he would be committed; and he "often talked about things bothering him in his room," like a demon, like he was going to be possessed. Tr. IX 18-21, 30-31.  He talked about a man and woman "tracking him, trying to find him to

kill him because he knows too much from what he done in the military" and "like how they put chips in his brain . . . like a universal soldier science project." *Id*. at 30.

The day of the homicide, Clayton drove Mr. Bench to work; all seemed normal to him. Tr. VI 18-19. Mr. Bench saw a co-worker upon arrival; all seemed normal to her. Tr. V 92-94. A customer recalled that around 5:30 p.m. Mr. Bench botched two basic pizza orders; the customer found Mr. Bench's behavior odd and disconcerting. Tr. IX 139-44. Around 8:15 p.m., another customer entered the Teepee Totem; the store was empty. Tr. V 68-71. She searched for a clerk but found only a pool of blood. *Id*. at 72.

At trial, in support of his insanity plea, Mr. Bench presented evidence of his youth and experience in the Navy, his mental condition in the months preceding the crime, and the testimony of Dr. Curtis Grundy, a licensed psychologist. Tr. X 11-102. Dr. Grundy diagnosed Mr. Bench with schizophrenia with no evidence of malingering. *Id*. at 23, 29-35. Dr. Grundy explained Mr. Bench truly believed the military was coming to get him for an experiment; to Mr. Bench, these fears were real. *Id*.

Mr. Bench reported to Dr. Grundy that a female entered the store that night. *Id*. at 36-38. He recognized her from the Navy as a special ops. recruiter. *Id*. Voices said they were coming for him. *Id*. at 37. She came at him. *Id*. He hit her and there was a struggle. *Id*. Mr. Bench then went into the stockroom. *Id*. at 38. The same "CIA lady" reached for him. *Id*. "Her eyes were green, and [he] thought there was a demon inside her." *Id*. at 38. He took the "government" or "CIA" car, "so they would not be able to follow him." *Id*. 38-39.

Dr. Grundy concluded Mr. Bench was suffering from active mental illness at the time

of the offense. *Id*. at 41-43. As a result, he did not understand the legal wrongfulness of his actions. *Id*. The state presented Dr. Terese Hall, a psychologist, who refuted Dr. Grundy's findings. *Id*. at 109. Dr. Hall concluded that, while Mr. Bench had psychological issues, "he was not sufficiently impaired to render him unable to know right from wrong." *Id*. The jury rejected Mr. Bench's insanity plea and found him guilty.

During sentencing deliberations, the jury sent a note asking if "life in prison without the possibility of parole mean[s] he will never get out of prison." Court Exh. 5. The trial court did not directly answer the question, but responded that Mr. Bench "will not be eligible for parole." Tr. XIV 175. Soon after, the jury assessed Mr. Bench's punishment at death. *Id*. at 179. Additional facts will be discussed as relevant to the grounds raised below.

**Ground One**              **Oklahoma is without jurisdiction to prosecute Mr. Bench because he is an Indian, and the crime occurred in Indian Country.**

There is no dispute that Mr. Bench is an enrolled member of the Choctaw Nation. Att. 2, Choctaw Nation Membership Verification. There is also no dispute that the Teepee Totem convenience store in Velma, Oklahoma, where the homicide occurred, is located within the boundaries of the Chickasaw Nation. Att. 3, Chickasaw Nation Official Map. Thus, pursuant to the Major Crimes Act, the United States maintains exclusive jurisdiction over an Indian, such as Mr. Bench, who is accused of committing a murder in Indian Country. 18 U.S.C. § 1153(a). The District Court of Stephens County, and the State of Oklahoma for that matter, had no jurisdiction over Mr. Bench's crime; his resulting conviction and sentence violate Due Process. The Writ must issue so that Mr. Bench may be reversed and he may

properly be charged and tried in federal court.

## I.   The state court decision.

Mr. Bench raised the instant claim as Proposition I of his APCR filed in the OCCA on March 15, 2018.  App. for Post Con Relief, Case No. PCD-2015-968, pp. 1-15.  Pursuant to the OCCA's Rules, Mr. Bench's APCR was filed while his direct appeal remained pending.  *See* Rule 9.7(A)(2), *Rules of the Oklahoma Court of Criminal Appeals*; Okla. Stat. tit. 22, § 1089(D)(1).  On March 29, 2019, the OCCA entered an Order holding Mr. Bench's APCR in abeyance pending the outcome of certiorari proceedings regarding *Murphy v. Royal*, 875 F.3d 896, 965 (10th Cir. 2017), wherein the Tenth Circuit granted habeas relief because Mr. Murphy was Native American, and the murder occurred on Indian land that had never been disestablished.  *Murphy* was affirmed by the Supreme Court on July 9, 2020. *Sharp v. Murphy*, 140 S.Ct. 2412.  On that same date, the Supreme Court issued *McGirt v. Oklahoma*, which held that the state lacked jurisdiction to prosecute a Native American whose crimes look place on the Creek Reservation. 591 U.S.__, 140 S.Ct. 2452 (2020).

On August 14, 2020, following *Murphy's* affirmance and the issuance of *McGirt*, the OCCA ordered the District Court of Stephens County to conduct an evidentiary hearing as to Mr. Bench's jurisdictional claim.  Evi. Hrg. O.R. 4-8.  An evidentiary hearing was held after which the district court issued Findings of Fact and Conclusions of Law.  Att. 1, Order Granting Post-Conviction Relief, p. 3.  The state district court made the following findings:

> [T]he State of Oklahoma and Petitioner 'stipulated that Petitioner, Miles Sterling Bench, has 1/64 Choctaw blood' and 'was an enrolled member of the federally recognized Choctaw Nation at the time of the crime.' . . . [T]he State

16

of Oklahoma and Petitioner stipulated that the crime occurred "in Stephens County, Oklahoma, at the Teepee Totem gas station located at 407 North Main Street in Velma, Oklahoma' and 'that the above - described address is within the historical geographic area of the Chickasaw Nation, as set forth in the 1855 and 1866 treaties between the Chickasaw Nation, the Choctaw Nation, and the United States.' . . . [and] that 'the parties stipulated that if the Court determines that treaties established a reservation on behalf of the Chickasaw Nation that has not subsequently been disestablished, then the crime occurred within Indian Country as defined by 18 U.S.C. § 1151(a).'

*Id*. at 4-5.  And ultimately, the state district court found as a matter of law that "the subject crime occurred in Indian Country."  *Id*. at 7.

Consequently, the OCCA found that post-conviction "relief is warranted."  *Id*. at 10. With respect to the pertinent findings under the Major Crimes Act, the OCCA held:

Petitioner has met his burden of establishing his status as an Indian, having 1/64 Choctaw blood quantum and being an enrolled member of the Choctaw Nation. We also find the District Court appropriately applied *McGirt* to determine that Congress did establish a Chickasaw Reservation and that no evidence was presented showing that Congress explicitly erased or disestablished the boundaries of the Chickasaw Nation.

*Id*. at 11.  The OCCA reversed Mr. Bench's conviction and sentence, but stayed issuance of the mandate.  *Id*. at 10, 12.  The mandate was initially stayed for 20 days, so as to allow the United States to secure custody of Mr. Bench for federal prosecution, but was eventually stayed indefinitely.  *See* Order, PCD-2015-698 (Okla. Crim. App. May 28, 2021).

On August 12, 2021, the OCCA issued its opinion in a non-capital case, *State ex rel. Matloff v. Wallace*, 497 P.3d 686, wherein the state had sought a writ of prohibition to prevent a district court from reversing a second degree murder conviction.  *Matloff* held that "*McGirt v. Oklahoma* announced a new rule of criminal procedure which we decline to apply

retroactively in a state post-conviction proceeding to void a final conviction." 497 P.3d at 688. This holding was based upon the OCCA's application, albeit incorrect, of *Teague v. Lane*, 489 U.S. 288 (1989). *Id.* (citing *Teague*). The OCCA classed *McGirt* as announcing a *new* procedural rule which could not be applied to the conviction at issue in *Matloff* because the same had become final on June 4, 2014. *Id.* at 687.

Next and following *Matloff*, the OCCA vacated from publication and withdrew its Order granting Mr. Bench post-conviction relief. *Bench v. State*, 495 P.3d 670. On December 22, 2021, the OCCA denied Mr. Bench's APCR. *Bench*, 504 P.3d 592. The OCCA applied its *Teague* analysis from *Matloff* and held that Mr. Bench's jurisdictional claim "warrants no relief" because his conviction was final[1] at the time *McGirt* was decided. *Id.* at 597; *see also id.* at 599 ("Similarly, the *McGirt* ruling did not issue until 2020, long after Petitioner's conviction became final in 2018.").

As established by the OCCA's prior Order granting post-conviction relief, Mr. Bench is an Indian and the crime was committed in Indian Country. *See* Att. 1. Oklahoma is without jurisdiction to prosecute him. The OCCA's invocation of *Teague* so as to preclude relief is contrary to and/or an unreasonable application of clearly established federal law and/or is based upon an unreasonable determination of the facts as to the circumstances and timing of when Mr. Bench asserted the instant claim. 28 U.S.C. § 2254(d).

## II. *McGirt* did not announce a new rule, but instead was premised upon clearly

---

[1] Mr. Bench's conviction became final on October 7, 2019, when certiorari was denied by the Supreme Court. *Bench v. Oklahoma*, 140 S.Ct.56. His Original APCR containing the jurisdictional claim was filed in the OCCA on March 15, 2018.

established federal law such as *Solem v. Bartlett*, 465 U.S. 463 (1984).

*McGirt* did not announce a new rule and has no place within the *Teague v. Lane* analytical framework applied by the OCCA in *Matloff*. *See Matloff*, 497 P.3d at 688. The retroactivity of the Supreme Courts's criminal procedure decisions to cases on collateral review depends on whether such decisions announce a new rule. *Teague*, 489 U.S. at 301. When the Supreme Court announces a new constitutional rule of criminal procedure, a person whose conviction is already final may not benefit from that decision in a federal habeas proceeding. *Chaidez v. United States*, 568 U.S. 342, 347 (2013). "'[A] case announces a new rule,' *Teague* explained, 'when it breaks new ground or imposes a new obligation' on the government." *Id.* (citing *Teague*, 489 U.S. at 301). Or, alternatively stated, "a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." *Id.* The most obvious example of a decision announcing a new rule is a decision that overrules an earlier case. *Whorton v. Bockting*, 549 U.S. 406, 416 (2007). Notably, *McGirt* did not overrule any prior decisions of the Supreme Court. If the rule is not new, a petitioner may "avail herself of the decision on collateral review." *Chaidez*, 568 U.S. at 347.

In *McGirt* and *Murphy v. Royal*, 875 F.3d 896, *aff'd sub nom, Sharp v. Murphy*, 140 S.Ct. 2412, the Supreme Court and the Tenth Circuit made clear neither case broke new ground sufficient to trigger *Teague's* retroactivity bar. Both *McGirt* and *Murphy* were collateral appeals of final state court convictions, with the former being a post-conviction appeal under Oklahoma law, and the latter being a federal habeas corpus appeal. In *Murphy*,

the Tenth Circuit held Congress has not disestablished the Creek Reservation. 875 F.3d at

937. The circuit court specifically addressed and dismissed any notion Mr. Murphy's claim

was subject to a *Teague* retroactivity bar.  *Id*. at 930 n. 36.  Thus, according to the Tenth

Circuit, a jurisdictional claim, such as Mr. Bench's, would require this Court's grant of relief

even if only relying on the applicable law as it existed in 2003.  *McGirt* does not form the

basis for Mr. Bench's jurisdictional claim; relief is required here, just as in *Murphy*, due to

*Solem* and related cases, discussed and applied in *McGirt*.[2]

Likewise, *McGirt* was unequivocal that it was not announcing a new rule of criminal

procedure in finding Congress had not disestablished the Creek Reservation.  *See, e.g.*, 140

S.Ct. at 2464 ("In saying this we say nothing new.").  *McGirt* did nothing more than apply

*Solem* and other related precedent to determine that the Creek Reservation remained Indian

Country for purposes of the Major Crimes Act.  In the similar context of determining whether

the *McGirt* decision could be used to trigger the AEDPA limitations period at 28 U.S.C. §

2244, Oklahoma's federal district courts and the Tenth Circuit have acknowledged what is

obvious from the face of the Supreme Court opinion - *McGirt* announced no new rules,

whether substantive or procedural.  *See In re Morgan*, No. 20-6123 (unpub.) (10th Cir. Sep.

18, 2020) ("In other words, [*McGirt*] cited well-established precedent and reviewed

---

[2] Of course, *Solem* and its progeny do not serve as an independent basis for federal habeas relief.  Instead, Mr. Bench has a federal Due Process right to be convicted in a court which had jurisdiction over his offense.  *See Yellowbear v. Wyoming Atty. Gen.*, 525 F.3d 921, 924 (10th Cir. 2008) ("Absence of jurisdiction in the convicting court is indeed a basis for federal habeas corpus relief cognizable under the due process clause.").  The *Solem* framework establishes that the State of Oklahoma lacked jurisdiction to prosecute Mr. Bench.

Congressional action to determine whether a federal statute applied.  That hardly speaks of a 'new rule of constitutional law.'"); *Pachecco v. El Habti*,  48 F.4th 1179, 1191 (10th Cir. 2022) ("*McGirt* announced no new constitutional right"); *Sanders v. Pettigrew*, 2021 WL 3291792, *5 (E.D. Okla. Aug. 2, 2021) ("*McGirt* was a mere application of, and was dictated by, existing law . . . [it] did not break any new ground or impose a new obligation on the State."); *Voyles v. Crow*, 2022 WL 954993, *3 (W.D. Okla. Mar. 14, 2022) ("[McGirt] did not recognize a new constitutional right."); *Littlejohn v. Crow*, 2021 WL 3074171, *5 (N.D. Okla. July 20, 2021) ("the Supreme Court did not newly recognize any constitutional rights in *McGirt*. Instead, the *McGirt* Court relied on established precedent"); *see also Murphy*, 875 F.3d at 929 n.36 (noting if a case is not "new," there is no need to determine whether a rule resulting therefrom qualifies as "constitutional" or "procedural" under *Teague*).

Recently, *Edwards v. Vannoy*, __U.S.__, 141 S.Ct.1547 (2021), discussed retroactivity of new rules and supports the proposition that *McGirt* did not announce a new rule.  *Edwards* determined that *Ramos v. Louisiana*, 590 U.S. _, 140 S.Ct.1390 (2020), holds a state jury must be unanimous to convict a defendant of a serious offense, announced a new constitutional rule of criminal procedure and did not apply retroactively on federal collateral review.  *Edwards*, 141 S.Ct. at 1555. In concluding *Ramos* announced a new rule, the Court in *Edwards* reasoned *Ramos's* jury-unanimity requirement was not dictated by precedent and actually renounced *Apodaca v. Oregon*, 406 U.S. 404 (1972), which allowed for non-unanimous jury verdicts in state trials.  *Edwards*, 141 S.Ct. at 1556; *see also id.* at 1555 ("The starkest example of a decision announcing a new rule is a decision that overrules an

earlier case"). Unlike *Ramos* which "plainly announced a new rule", *id.* at 1556, *McGirt* applied the existing *Solem* framework to determine the Creek Reservation had not been disestablished.

The OCCA in *Matloff* relied heavily on *United States v. Cuch*, 79 F.3d 987 (10th Cir. 1996), to support its finding that *McGirt* announced a new rule. *Matloff*, 497 P.3d at 689-91. However, contrary to the OCCA, *Cuch* actually demonstrates that *McGirt* did not announce a new constitutional rule of criminal procedure. *Cuch* addressed the retroactivity of *Hagen v. Utah*, 510 U.S. 399 (1994), which held the state of Utah had jurisdiction to prosecute Mr. Hagen because Congress had diminished the Uintah Reservation in the early 1900's. *Cuch*, 79 F.3d at 989. In reaching its decision in *Hagen*, the Supreme Court "**effectively overruled** the contrary conclusion reached in the *Ute Indian Tribe* case." *Cuch*, 79 F.3d at 989 (emphasis added). Reasoning that the *Hagen* decision "was not dictated by precedent existing at [that] time," *Cuch* considered *Teague's* retroactivity framework and then concluded *Hagen's* "holding should not provide the basis for a collateral attack." *Cuch*, 79 F.3d at 991. Unlike *Hagen*, *McGirt* did not "effectively overrule" any existing precedent of the Supreme Court to conclude the Creek Reservation had not been disestablished. Instead, *McGirt* applied the existing precedent of *Solem* and related cases. *McGirt*, 140 S.Ct. at 2464-65, 2468-69; *see also Sanders*, 2021 WL 3291792 at *5 ("*McGirt* did not break any new ground or impose a new obligation on the State.").

As demonstrated, the OCCA was wrong in finding that "like *Hagen* before it, 'the [*McGirt*] decision effectively overruled the contrary conclusion reached in [the *Murphy*]

22

case, redefined the [Muscogee (Creek)] Reservation boundaries ... and conclusively settled the question.'" *Matloff*, 497 P.3d at 691 (citing *Cuch*, 79 F.3d at 989) (alterations in original).[3] And the state court was equally wrong in holding that "*McGirt* imposed new and different obligations on the state and federal governments," and that "*McGirt's* procedural rule also broke new legal ground in the sense that it was not dictated by, and indeed, arguably involved controversial innovations upon, Supreme Court precedent." *Id*. at 692. The OCCA's finding that *McGirt* constitutes a new rule, is contrary to and/or an unreasonable application of clearly established federal law, including *McGirt*, which clearly held it announced nothing new, not to mention being contrary to and/or an unreasonable application of *Teague* and its progeny. Thus, this court may properly review the claim de novo and grant relief upon the undisputed facts that Mr. Bench is an Indian and his crime occurred within Indian Country. *See* Att. 1 at 11.

## III.  Given the unique timing of Mr. Bench's jurisdictional claim, granting him habeas relief would not require the same result in other cases.

Mr. Bench is in an unique posture with respect to the timing of his raising the jurisdictional claim. The claim was raised in his Original APCR filed in the OCCA while Mr. Bench's direct appeal remained pending in that court. Because this is a capital case, the OCCA's rules required the APCR to be filed directly with the OCCA and prior to resolution

---

[3] The OCCA apparently considers *McGirt* new because the Supreme Court "overruled the contrary conclusion" reached by the OCCA in *Murphy v. State*, 124 P.3d 1198 (Okla. Crim. App. 2005), where it denied the jurisdictional/Indian Country claim presented therein. *See Matloff*, 497 P.3d at 691 n. 5. Yet, Murphy was granted federal habeas corpus relief by the Tenth Circuit because the OCCA's decision was objectively erroneous thus rendering the same contrary to the clearly established law of *Solem*. *Murphy*, 875 F.3d at 926-28.

of his direct appeal.  *See* Rule 9.7(A)(2), *Rules of the Oklahoma Court of Criminal Appeals*;
Okla. Stat. tit. 22, § 1089(D)(1).  These rules and procedures created an anomaly in Mr.
Bench's case – *his jurisdictional claim was properly raised prior to his conviction becoming*
*final,* unlike many other Oklahoma Prisoner's who rushed out and sought relief following
*McGirt*, despite their convictions being final.  The timing of Mr. Bench's litigation in
comparison to various key Indian Country jurisdictional cases is as follows:

| Mar. 28, 2017 | Mr. Bench's Direct Appeal Brief filed in OCCA (No. D-2015-462). |
| --- | --- |
| Aug. 8, 2017 | *Murphy v. Royal*, 866 F.3d 1164 (10th Cir.) (initial opinion issued). |
| Nov. 9, 2017 | *Murphy v. Royal*, 875 F.3d 896 (10th Cir.) (amended opinion issued upon denial of rehearing en banc). |
| Mar. 15, 2018 | Mr. Bench's Original APCR containing jurisdictional claim filed in the OCCA (No. PCD-2015-698). |
| Oct. 4, 2018 | Direct Appeal denied, *Bench v. State*, 431 P.3d 929. |
| Oct. 7, 2019 | Direct Appeal Certiorari denied, *Bench v. Oklahoma*, 140 S.Ct. 56. |
| July 9, 2020 | *McGirt v. Oklahoma*, 140 S.Ct.2452, decided. |
| July 9, 2020 | *Sharp v. Murphy*, 140 S.Ct.2412 (affirming *Murphy v. Royal*). |
| May 6, 2021 | Post-conviction relief granted as to Mr. Bench's Jurisdictional Claim, *Bench v. State*, 2021 OK CR 12, slip op. (included as Att. 1). |
| Aug. 12, 2021 | *State ex re Matloff v. Wallace*, 497 P.3d 686 (applying *Teague* to bar review of jurisdictional claims for convictions that became final prior to *McGirt*). |
| Aug. 31, 2021 | Order withdrawing Mr. Bench's Post-conviction Relief, in light of *Matloff*.   *Bench v. State*, 495 P.3d 670. |
| Dec. 22, 2021 | Order denying Post-Conviction Relief, *Bench v. State*, 504 P.3d 592. |

As is apparent from the time-line, Mr. Bench's jurisdictional claim was before the
OCCA when it denied his direct appeal, where such denial served to set in motion the series

of events which eventually caused Mr. Bench's appeal to become final upon certiorari being denied by the Supreme Court on October 7, 2019 (prior to *McGirt* being decided).  *See Harris v. Dinwiddie*, 642 F.3d 902, 906-07 n.6 (10th Cir. 2011).   This timing creates a very unique posture, indeed – Mr. Bench's jurisdictional claim has been properly and timely raised under Oklahoma's capital post-conviction procedures and rules, and is properly and timely raised within the confines of the limitations period set out by 28 U.S.C. §§ 2244(d)(1)(A) and (d)(2).   Thus he is not situated like other prisoners for whom the OCCA and the federal courts have refused to consider jurisdictional claims.

In *Matloff*, the OCCA noted other capital murder convictions that had been initially granted post-conviction relief following the *McGirt* decision.  *Matloff*, 497 P.3d at 689, n.3 (citing *Bosse v. State*, 484 P.3d 286 (Okla. Crim. App. 2021), *Cole v. State*, 492 P.3d 11 (Okla. Crim. App. 2021), *Ryder v. State,* 489 P.3d 528 (Okla. Crim. App. 2021), and *Bench*, 2021 OK CR 12).   Relief in all these cases was subsequently withdrawn by the OCCA.  Of these cases, only Mr. Bench raised a jurisdictional claim prior to his conviction becoming final.  Mr. Bosse's conviction and sentences became final on Mar. 5, 2018, and he filed a *Second* Application for Post Conviction relief on Feb. 20, 2019, raising a jurisdictional claim. *Bosse v. State*, 499 P.3d 771, 773 (Okla. Crim. App. 2021).   *Bosse* was denied pursuant to the *Matloff* framework.  *Id*.  Mr. Cole's Direct Appeal was denied by the OCCA in 2007, and he raised his jurisdictional claim in 2020 via a Third Application for Post-Conviction Relief. *Cole v. State*, 499 P.3d 760, 760-61 (Okla. Crim. App. 2021).   *Cole* likewise barred the jurisdictional claim pursuant to *Matloff*.  *Id*. at 761.  Mr. Ryder's conviction became final in

2004 when the Supreme Court denied certiorari, and he raised his jurisdictional challenge in 2020 via a *Second* Application for Post Conviction Relief.  *Ryder v. State*, 500 P.3d 647, 647 (Okla. Crim. App. 2021).   Similarly, *Ryder* declined to review the jurisdictional challenge pursuant to *Matloff*.  *Id*. at 649.  Mr. Bench clearly is not in the same posture with other capital post-conviction cases to which the OCCA has applied its *Matloff* procedural mechanism.

Also, with respect to the AEDPA limitations periods at 28 U.S.C. § 2244(d), Mr. Bench is in a different posture than other prisoners who have attempted to raise jurisdictional/Indian Country claims post *McGirt*.  These other prisoners have uniformly had their petitions denied as untimely under § 2244(d)(1)(C) and (D) because *McGirt* declared nothing new and cannot be used to trigger a new limitations period.  *See, e.g. Doak v. Nunn*, 2022 WL 1228813, *3 (W.D. Okla. Jan 21, 2022) ("Petitioner cannot invoke either § 2244(d)(1)(C) or § 2244 (d)(1)(D) to secure a later deadline based on *McGirt*").  Mr. Bench would further note that his raising the instant claim and beginning an "uphill battle" with the OCCA prior to the *McGirt* decision is exactly what this Court has suggested is necessary to preserve the issue for federal review.  *Fairres v. Elhabte*, 2022 WL 3586214, *2 (W.D. Okla. Aug. 22, 2022) ("while Petitioner may have faced an 'uphill battle' arguing that the State of Oklahoma lacked jurisdiction over her crimes (because she was an Indian and the crimes were committed in Indian country) before the *McGirt* ruling, she at least 'had the opportunity to take this path.'"); *Willis v. Crow*, 2022 WL 576559, *2 (W.D. Okla. Feb. 25, 2022) (finding same).  So, the AEDPA limitations period operates to bar jurisdictional claims for

26

prisoners whose convictions are outside of the period announced at § 2244(d)(1)(A) (1 year after conviction becomes final less any period in which a post-conviction application is pending). But, Mr. Bench's jurisdictional claim was properly and timely raised within the 2244(d)(1)(A) limitations period; the instant claim isn't subject to any timeliness concerns under the AEDPA. Mr. Bench doesn't present the same situation as others, who waited until after *McGirt* was decided to first raise a jurisdictional claim. Granting the Writ for Mr. Bench wouldn't require the Court to extend the same relief to the other prisoners whose claims are untimely under § 2244(d).

## IV. The OCCA's application of its *Teague*-based procedural rule is insufficient to bar this Court's review.

Despite its earlier grant of post-conviction relief, the OCCA ultimately barred review of Mr. Bench's jurisdictional claim pursuant to its importation and application of *Teague's* retroactivity bar for *new* rules of criminal procedure. *Bench*, 504 P.3d at 597. However, whether or not a state court procedural default matures into a federal procedural bar is a federal question. *Johnson v. Mississippi*, 486 U.S. 578, 587 (1988). Also, state procedural defaults, which are imposed[4], do not bar federal review unless they are both adequate and independent. *Andrews v. Deland*, 943 F.2d 1162, 1188 n.40 (10th Cir. 1991) (procedural

---

[4] Here, the OCCA applied its *Matloff* bar to preclude review of Mr. Bench's jurisdictional claim. The OCCA applied no other rule to preclude review, despite the Supreme Court suggesting that defendants who raise challenges post-*McGirt* could face procedural obstacles. *See McGirt*, 140 S.Ct. at 2479 n.15 (discussing Oklahoma's general rule that issues which could have been raised on direct appeal are barred from post-conviction review); *see also Harris v. Reed*, 489 U.S. 255, 262, 265 n.12 (1989) (if a state court doesn't rely on a procedural bar, there is no basis for the federal court to apply one).

rules must be applied regularly, consistently, and evenhandedly to establish a bar to federal review; they must also operate independent of federal law), *overruled on other grounds by Daniels v. United States*, 254 F.3d 1180 (10th Cir. 2001); *Brecheen v. Reynolds*, 41 F.3d 1343, 1364 (10th Cir. 1994) (holding provision of meaningful opportunity for review of federal claim is also a component of the adequacy requirement). Here, the procedural rule applied by the OCCA lacks the prerequisites necessary to bar this Court's review; alternatively, Mr. Bench can demonstrate cause and prejudice to overcome any bar. Since Mr. Bench has placed adequacy and independence at issue, it is now respondent's burden to demonstrate that the *Matloff* rule may preclude this court's review. *See Hooks v. Ward*, 184 F.3d 1206, 1217 (10th Cir. 1999); *Anderson v. Sirmons*, 476 F.3d 1131, 1141 (10th Cir. 2007).

First, *Matloff's* importation and application of *Teague's* retroactivity bar is not independent of federal law merely because the OCCA says it is. *See, e.g., Matloff*, 497 P.3d at 693 ("our ***independent*** exercise of authority to impose remedial constraints under state law on the collateral impact of *McGirt* and post-*McGirt* litigation is consistent with both the text of the opinion and the Supreme Court's apparent intent") (emphasis added). The OCCA's *ipse dixit* is not enough to render its application of *Teague* an independent state law ground. "A state court finding of procedural default is independent if it is separate and distinct from federal law." *Maes v. Thomas*, 46 F.3d 979, 985 (10th Cir. 1995) (citing *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985)). Here, the OCCA simply imported and applied the federal law of *Teague* – there is no independent state law aspect to its application of *Teague's* retroactivity

bar. *Matloff*, 497 P.3d at 688-89. *Matloff's* citation to its earlier case of *Ferrell v. State*, 902 P.2d 1113, 1114-15 (Okla. Crim. App. 1995), confirms as much. *Id*. *Ferrell* did not announce a state law procedural rule; instead, *Ferrell* merely adopted the federal retroactivity analysis from *Teague*. 902 P.2d at 1114 ("Neither party has cited Oklahoma authority, and **we have found none**, that specifically establishes guidelines for determining exactly when a decision constitutes a change in the law") (emphasis added). Via its application of *Teague*, the OCCA's denial "fairly appears to rest primarily on federal law, or to be interwoven with the federal law." *Coleman v. Thompson*, 501 U.S. 722, 735 (1991) (citing *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)).

Second, as to adequacy, a state court finding of procedural default is adequate if the rule is "strictly or regularly" followed such that it is applied "evenhandedly to all similar claims." *Maes*, 46 F.3d at 986 (citing *Hathorn v. Lovorn*, 457 U.S. 255, 263 (1982)). The OCCA's *Matloff* rule is brand new and, as discussed in subpart III, above, was applied to Mr. Bench despite the unique timing of raising his jurisdictional claim prior to his conviction becoming final, unlike the other defendants who waited post-*McGirt* to bring their jurisdictional claims. Even Judges of the OCCA have observed problems with *Matloff* and that perhaps the state court has engaged in a results-driven approach to preserving its Indian Country convictions, rendering *Matloff's* procedural rule unlawful. *Neasbitt v. State*, Order Denying Extraordinary Relief, No. PR-2021-1478, pp. 9-10 (unpub.) (Okla. Crim. App. Nov. 4, 2022) (Rowland, J., dissenting) ("It seems only fair that this handful of defendants should not receive a windfall just because their post-conviction cases fell in the window of time

between *McGirt* and our *Matloff* decision.  The problem with this equitable-sounding result is simply that our law does not allow for it.") (attached hereto as Att. 4); *see also id.* at p. 27 (Lumpkin, J., dissenting) ("it is inconsistent to allow the State to re-imprison Petitioner after the lawful vacation of his conviction.  Such a result obtains only through a process of result-driven legal gymnastics based upon the questionable provenance of *Anderson* and the misapplication of *Matloff* and *Harris*.").  Given Mr. Bench raised the instant claim prior to his conviction becoming final, the OCCA's *Matloff* rule was not *evenhandedly* applied to him, as it is counsel's understanding that all other defendants to whom such bar has been applied raised their jurisdictional claims post-*McGirt* and after their convictions becoming final.  The OCCA's application of *Matloff* is inadequate to bar this Court's review.[5]

Lastly and alternatively, even when a habeas claim is defaulted on independent and adequate state grounds, a federal court may consider that claim upon a showing of "cause for the default and actual prejudice" or a fundamental miscarriage of justice.  *Coleman*, 501 U.S. at 750.  The ineffective assistance of prior counsel, as discussed in Ground Three, may serve as cause to overcome the procedural bar.  Prior counsel could and should have raised the jurisdictional claim at trial or on direct appeal.  In fact, OCCA Judge Hudson observed that had Mr. Bench raised his "Indian country jurisdictional challenge on direct appeal" then the claim would have been reviewed.  *Bench*, 504 P.3d at 604 (Hudson, J., specially concurring).  Thus, appeal counsel's failure to include the instant claim on direct appeal may serve as

---

[5] Mr. Bench is aware that the Supreme Court declined to grant certiorari review in *Matloff*; however, "the 'denial of a writ of certiorari imports no expression of opinion upon the merits of the case.'"  *Teague*, 489 U.S. at 296 (citing *United States v. Carver*, 260 U.S. 482, 490 (1923)).

cause to overcome the OCCA's *Matloff* bar.

The OCCA's application of its newly-minted *Matloff* procedural rule cannot serve to preclude this Court's review of Mr. Bench's jurisdictional claim. This Court may review the claim de novo and then grant the Writ.

| **Ground Two** | **Mr. Bench's Sixth, Eighth, and Fourteenth Amendment rights were violated through the ineffective assistance of trial counsel.** |
| --- | --- |

Criminal defendants are guaranteed the right to the effective assistance of counsel by the Sixth Amendment to the United States Constitution as incorporated against the states through the Fourteenth Amendment. *Strickland v. Washington*, 466 U.S. 668 (1984). The mechanism through which Mr. Bench must demonstrate the Constitutional violation is: (1) defense counsel's performance was deficient; and (2) he was prejudiced as result of the deficient performance. *Id*. at 687. Mr. Bench makes both showings.

This case is not a who done it, nor is there any question that Mr. Bench caused the homicide. Mr. Bench is severely mentally ill and presented an insanity defense to the murder charge. Conversely, the state presented the theory the Mr. Bench wasn't ill; instead, he was just faking his condition to avoid responsibility for the crime. *See, e.g.*, Tr. XI 31-34, 59. It was incumbent upon trial counsel to vigorously present that defense, including effectively impeaching and rebutting the state's expert who disputed that Mr. Bench was insane at the time of the offense. And, if the insanity defense failed, it was incumbent upon counsel to present a Constitutionally adequate case in mitigation, so as to persuade at least one juror to spare Mr. Bench from the death penalty. Counsel failed in both endeavors.

I.        **The state court decision.**

Mr. Bench alleged on direct appeal that trial counsel was ineffective.  He raised both

record-based and extra-record claims of ineffective assistance.  *See* Aplnt's Brief, pp. 40-51,

OCCA No. D-2015-462 (Feb. 28, 2017); Application for Evidentiary Hearing on Sixth

Amendment Claim and Exhibits, OCCA No. D-2015-462 (Feb. 28, 2017) (hereinafter App.

Evi. Hrg.).  The OCCA addressed and denied Mr. Bench's claims of ineffective assistance.

*Bench*, 431 P.3d 929, 969-81.  Mr. Bench will address the state court's decisions for each

instance of ineffectiveness alleged in the sub-propositions below.  As will be shown, the state

court's decisions were contrary to or an unreasonable application of law and/or based upon

an unreasonable determination of fact.  28 U.S.C. § 2254(d).

II.       **Guilt Stage Ineffectiveness.**

a.        **Failure to object to instances of prosecutorial misconduct.**

Counsel failed object to numerous instances of prosecutorial misconduct.  As will be

discussed in Ground Six, the prosecution engaged in egregious acts of misconduct, most

notably during closing arguments.  The misconduct to which trial counsel failed to object

included (1) shifting the burden of proof to Mr. Bench for his insanity defense; (2) bolstering

state expert Hall's testimony with hearsay; (3) arguing facts not in evidence with respect to

the convenience store register receipt; (4) misstating evidence; (5) improperly impeaching

of Dana Huff; and (6) improperly invoking sympathy for the victim.  While Mr. Bench

submits that the cumulative effect of the misconduct operated to deny him a fundamentally

fair trial, he was equally prejudiced by trial counsel's failure to object.

Trial counsel's failure to object caused the OCCA to review these instances of misconduct for plain error. *See Bench*, 431 P.3d at 963-69 (discussing substantive prosecutorial misconduct claim). The OCCA found multiple errors, but such errors did not rise to the level of plain error. *Id*.

The OCCA held as to the un-objected prosecutorial misconduct that Mr. Bench could not show a reasonable probability of a different result but for counsel's failure to object. *Id*. at 970. The OCCA's decision is unreasonable as to both law and fact. 28 U.S.C. § 2254(d). First, as will be discussed in Ground Six, the substantive prosecutorial misconduct claim, Mr. Bench was prejudiced by the misconduct. Second, the finding that the misconduct "did not deprive appellant of a fundamentally fair trial" fails to account for the OCCA's finding error as to multiple instances of misconduct, but found the same not egregious enough individually to constitute plain error. Had counsel objected, the trial court could have taken action to address the misconduct, creating a reasonable probability of a different result. Also, absent plain error review, Mr. Bench contends reversal would have been mandated under clearly established federal law. *See, e.g., Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974). Either way, Mr. Bench was prejudiced as result of counsel's failure to object.

**b.      Failure to Impeach state's expert witness Terese Hall.**

Dr. Terese Hall, a psychologist, served as the state's expert witness to rebut Mr. Bench's NGRI defense. Trial counsel should have impeached Dr. Hall in any way possible to promote the insanity defense. Mr. Bench presented strong evidence in support of the NGRI defense. Defense expert psychologist, Dr. Curtis Grundy, testified in detail about Mr.

Bench's hallucinations and delusions the day of the homicide, as well as about Mr. Bench's

strange behavior leading up to the homicide and continuing while awaiting trial in the county

jail. Dr. Grundy engaged in psychological testing and diagnosed Mr. Bench with a major

mental illness - schizophrenia. Tr. X 29-31. Dr. Grundy saw no evidence of malingering.

*Id*. at 29-30, 42. Dr. Grundy recounted how Mr. Bench was having delusions and hearing

voices on the date of the homicide. *Id*. at 36-38. Ultimately, Dr. Grundy opined that:

> [Mr. Bench] was acting in accordance with his fears and his delusions and that
> those symptoms of mental illness are associated with the primary mental
> illness of schizophrenia. And due to the symptoms of schizophrenia, I don't
> believe he understood the wrongfulness of his conduct.

*Id*. at 43.

In rebuttal, Dr. Hall testified that Mr. Bench had "some psychological issues," "[b]ut

at the time of the crime, he was not sufficiently impaired to render him unable to know right

from wrong." *Id*. at 109. Hall's opinion was based on her review of various psychological

reports, investigative materials, an interview of Mr. Bench, and witness interviews. *Id*. at

107-08. Trial counsel failed to impeach Dr. Hall in multiple respects which would have cast

great doubt on her conclusion that Mr. Bench was not insane at the time of the offense.

First, Dr. Hall relied heavily upon what Mr. Bench's cousin Clayton Jenson apparently

told her. *Id*. at 112. Hall described Clayton and Mr. Bench as engaging in normal activities

of young men – hanging out, eating pizza, going to the movies, and trying to flirt with

women. *Id*. Clayton picked up Mr. Bench and drove him to work on the day in question, but

told Dr. Hall that Mr. Bench was "fine" and "seemed to be doing ok that day." *Id*. Hall's

testimony about what Clayton told her stands in stark contrast to his trial testimony.

Clayton testified that Mr. Bench felt like he was going to get possessed, talked about a demon being in his room, believed a man and woman were hunting him and trying to kill him, believed the military put a microchip in his head, believed he would be committed if he saw a doctor, and would go days without sleeping.  Tr. IX 30.  Clayton would just "blow [Mr. Bench] off" when he said these outlandish things, and Clayton chose not to believe Mr. Bench, for whatever reason, despite his very bizarre behavior.  *Id.* at 36.  Despite him testifying just the day before Dr. Hall, defense counsel failed to impeach Hall with Clayton's testimony regarding Mr. Bench's delusions.  Counsel only very briefly cross-examined Dr. Hall about Clayton, and mainly to ask whether she was aware that Clayton had not hung out with Mr. Bench the week before the homicide.  Tr. X 140.  Dr. Hall was not aware of this, but the line of questioning reinforces counsel's ineptness, as Clayton testified he had much contact with Mr. Bench in the two weeks leading up to the homicide.  *Id.*; Tr. IX 35.  Counsel should have asked about the bizarre statements and behavior Clayton observed, so as to undercut Hall's opinion Mr. Bench was "fine" and "ok."

The OCCA recounted Clayton's testimony as both a state and defense witness, and then unreasonably concluded, "[s]ince Jenson's testimony in defense would not have undercut his statements to Hall or his testimony in the state's case in chief, we find that counsel's conduct fell within the wide range of reasonable professional assistance."  *Bench*, 431 P.3d at 971.  The state court's finding was both contrary to law and based upon an unreasonable determination of the facts.  28 U.S.C. § 2254(d).  First, the OCCA failed to

apply the required *Strickland* two pronged analysis and instead simply held counsel's failure was "within the wide range of reasonable professional assistance." 431 P.3d at 971. This is not the applicable federal standard. *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000) (explaining how a state court violates § 2254(d)(1) by applying a standard that deviates from *Strickland*). Second, the OCCA's finding that Clayton's testimony "would not have undercut his statements to Hall" was also unreasonable. 28 U.S.C. § 2254(d)(2). The significance and power of Clayton's trial testimony is undeniable – Mr. Bench voiced obvious delusions to Clayton. *See* Tr. IX 30.

Dr. Hall needed to be asked whether she was aware Mr. Bench had made these statements to Clayton and if such statements changed her opinion about Mr. Bench being fine and ok. This was critical impeachment material which, had counsel presented it, would have created a reasonable probability of Mr. Bench's jury crediting the NGRI defense. *See Strickland*, 466 U.S. at 695. Counsel had a Sixth Amendment obligation to pursue all possible lines of defense and rendered deficient performance by not impeaching Dr. Hall. *See, e.g., Fisher v. Gibson*, 282 F.3d 1283, 1296-97, 1299 (10th Cir. 2002) (finding defense counsel cross examination "did not challenge the testimony or the witnesses' credibility in any way"); *Mayes v. Gibson*, 210 F.3d 1284, 1289 (10th Cir. 2000); *Stouffer v. Reynolds*, 168 F.3d 1155, 1167 (10th Cir. 1999).

Second, Counsel failed to impeach Dr. Hall about conflicting testimony she had given in a prior case regarding how schizophrenic people behave when experiencing delusions. Here, Hall completely discounted Mr. Bench's version of events about the victim being after

36

him and being a demon because Mr. Bench's presentation was "extremely dramatic" and a "little incredible." Tr. X 114. Hall described Mr. Bench's seemingly normal conversations with officers upon his arrest and explained that, if delusional, Mr. Bench should not have been capable of "coherent," "calm" conversation and instead should have been "looking around for the CIA to come or demons or would say things that didn't make sense." *Id*. at 116-17. Yet, in another insanity case, Dr. Hall agreed that a schizophrenic in the midst of a psychotic break could "engage in everyday behavior," including being able to:

> drive, including checking for oncoming traffic; can try to avoid recognition; can know that it is dangerous for children to play in the street; and can understand that being shot may hurt. Such a person may know where he is and what time it is. He can use proper grammar, hold a job, brush his teeth and wash his hair.

*Fears v. State*, No. F-2004-1279, pp. 32-33 (unpub.) (Okla. Crim. App. July 7, 2006) (included as Exhibit 1 to Aplnt's Brief, No. D-2015-462 (Feb. 28, 2017). In *Fears*, Dr. Hall was the only of four experts to find that Fears was not insane when engaged in a shooting spree while he believed he was being controlled by aliens. *Id*. at 5, 33. The OCCA found Hall's testimony and the trial evidence insufficient to show Mr. Fears was sane and remanded for entry of an insanity verdict. *Id*. at 43. Likewise, there is serious reason to question Dr. Hall's testimony here. Hall refused to admit that Mr. Bench was suffering from symptoms of a major mental illness and experiencing symptoms at the time of the offense. Tr. X 131. She came to this conclusion by discounting many of the very behaviors Mr. Bench engaged in as being inconsistent with a psychotic delusion despite her contradictory testimony in *Fears*. Trial counsel should have been aware of *Fears* and cross-examined Dr. Hall about

it.

The OCCA made alternative holdings with respect to this instance of ineffectiveness. First, it attempted to bar review because it declined to lend credence to its own *Fears* opinion summarizing Dr. Hall's testimony and declined to review the claim because appeal counsel had not "sought to supplement the record with the official court reporter's transcripts from that trial." *Bench*, 431 P.3d at 971. Oddly, the OCCA doesn't cite a specific statute or rule barring impeachment by this method or presentation of an appeal claim through use of that court's opinion in another case. In any event, the bar is overly technical and aimed at preventing further review, as such it is inadequate to bar this Court's review. *See Brecheen*, 41 F.3d 1343, 1364. Ostensibly sensing its procedural ruling insufficient, the OCCA then engaged in merits analysis that distinguished *Fears* from Mr. Bench's circumstances:

> The officers who arrested the defendant in *Fears* observed signs of mental illness in him and the defendant, himself, verbalized a delusion to one of the officers. These were the very circumstances which Dr. Hall cited as missing from Appellant's conversations with Clayton Jenson, Stanley Bench, Deputy Quinton Short, and Detention Officer Brown and which led her to conclude that Appellant had not suffered a psychotic break. Therefore, we are forced to conclude that Appellant has not shown that there is a reasonable probability that the outcome of the trial would have been different but for counsel's failure to use Hall's testimony from the *Fears* case.

431 P.3d at 971. This decision is premised upon an unreasonable determination of fact. 28 U.S.C. § 2254(d)(2). Contrary to the OCCA, Mr. Bench's conversations with others contained obvious delusions. Mr. Bench expressed many of his delusions to his cousin Clayton. *See* Tr. IX 30. And, Mr. Bench told Deputy Short that he had not been driving despite him being the only person in the vehicle at the time it was stopped. Tr. VI 124.

Thus, the state court's fact finding is unreasonable. Trial counsel should have confronted Dr. Hall with her contradictory testimony in *Fears*, which in turn could have resulted in a reasonable probability of a different outcome. *Strickland*, 466 U.S. at 695.

And third, trial counsel failed to impeach Dr. Hall about her opinion that Mr. Bench was faking and exaggerating his mental illness and symptoms. Hall's testimony was not only in conflict with defense expert Dr. Grundy, but also in conflict with other mental health professionals who had evaluated Mr. Bench for pre-trial competency proceedings. Counsel failed to impeach Hall with the results of these other examiners and failed to call Dr. Grundy in surrebuttal to explain why Hall incorrectly characterized Mr. Bench as a faker or cheater.

Dr. Hall administered the Minnesota Multiphasic Personality Inventory (MMPI) to assess whether Mr. Bench was validly reporting his symptoms. Two scales on the test scored "extremely high." Tr. X 125. Another psychologist, Dr. Orth administered the MMPI to Mr. Bench during a pre-trial competency evaluation. Hall testified that her MMPI results were consistent with Dr. Orth's. Tr. X 127. And, Hall testified those results both indicated Mr. Bench was feigning[6] or "grossly over-reporting his symptoms." *Id*. at 127-28. This was highly misleading.

Dr. Orth administered the previous MMPI at the Oklahoma Forensic Center. O.R. 300. Dr. Orth noted that Mr. Bench may have been over-reporting symptoms, but explained

---

[6] Dr. Hall defined feigning and malingering as the same thing – "basically means faking." This is an oversimplification. Malingering includes fabricating symptoms for a perceived benefit, while feigning is the exaggeration of symptoms regardless of intent. *See* Tr. X 56; App. Evi. Hrg, Exh. 4, ¶¶ 9-10.

the results differently than Dr. Hall.  Dr. Orth believed the results should be interpreted as

Mr. Bench "responding to items in a manner to draw attention to negative characteristics,

exaggerating his self-reported psychological turmoil as a plea for help." O.R. 300, p. 5.  Dr.

Orth described people with similar profiles as "experiencing a disconnection from reality and

[having] difficulty separating reality from fantasy," as well as feeling "not in control of their

emotions and impulses and [ ] frightened by this perceived loss of control." O.R. 300, p . 5.

Dr. Orth wasn't alone in his interpretation of the results – another psychologist, Dr. Peter

Rausch, also from the Oklahoma Forensic Center, testified at Mr. Bench's competency jury

trial and agreed with Dr. Orth's opinion as to the MMPI.  Comp. Tr. II 402.  Dr. Rausch

testified:

> In layman's terms, on the MMPI Dr. Orth provided two possible
> interpretations, and ***I tend to agree with his interpretation***.  One was that Mr.
> Bench was feigning psychological symptoms and pathology.  However, he also
> offered a possible second way to interpret the profile, so to speak, and that was
> that Mr. Bench was basically what we say calling a cry for help; that he was
> endorsing a lot of symptoms; that some of those symptoms may be legitimate;
> but he was over reporting to some extent.  Not necessarily to look overly ill but
> because he is experiencing some distress.

*Id*. at 402-03 (emphasis added).  Yet, Dr. Hall misled the jury by saying her results were

similar to Dr. Orth, but she omitted the critical distinction of their differing interpretation of

those results.  Counsel should have impeached Dr. Hall.  Instead, Mr. Bench's jury was

misled to believe Dr. Hall's finding of faking was confirmed by another doctor's testing,

when it was not.

Also, counsel could have further impeached Dr. Hall as to her opinion about

malingering by calling Dr. Grundy in surrebuttal.  Dr. Grundy administered the Structured

Interview of Reported Symptoms Second Edition test (SIRS) to assess whether Mr. Bench

was malingering.  Tr. X 29-30.  Dr. Grundy testified that the test results "would indicate that

[Mr. Bench] wasn't attempting to malinger."  *Id*. at 30.  Dr. Hall, despite having no

foundation that Mr. Bench behaved this way, testified  that the SIRS results were unreliable

because Mr. Bench could have cheated the test:

> It doesn't seem plausible he would be honest sometimes and not others.  ***The SIRS is extremely easy to fool if you have been coached.***  Word is out on the internet, I am told. I hear this all the time on my list servers and inmates pass messages, and whatever. So I don't know if he had any prior information.  I could tell you in 30 seconds how to fool it.

*Id*. at 130 (emphasis added).  Dr. Hall implied that Mr. Bench either knew or was coached,

perhaps by Dr. Grundy, how to fool the SIRS.  And Dr. Hall further represented that the

MMPI was a better instrument and more difficult to fool than the SIRS.  *Id*.  Dr. Grundy

could have contested both points if called in surrebuttal.

Mr. Bench included an affidavit from Dr. Grundy on direct appeal.  *See* App. Evi.

Hrg., Exh. 4.  As to these key points, Dr. Grundy provided:

> A definitive and specific test for feigning is the SIRS-2.  Dr. Hall's statement that the SIRS-2 is easy to fool is misleading.  An individual who attempts to appear not impaired or not mentally ill on the SIRS-2 by making all negative responses, for example, would be identified to have disengagement or indeterminate responding.  This would not inaccurately identify the defendant or the test-taker as a genuine responder or non-malinger, as Dr. Hall indicated.

> I am unaware of any data or source of information that would identify or support that Mr. Bench had been "coached" or instructed how complete psychological testing.  In her trial testimony and written report, Dr. Hall offered no data or corroborating source to support her opinion in this regard.

*Id*. at ¶¶ 12, 13.  Dr. Grundy could have provided this explanation to rebut Dr. Hall's criticisms of the SIRS.  Yet, defense counsel failed to call Dr. Grundy in surrebuttal.

The OCCA separately addressed the failure to impeach with Drs. Orth and Rausch's conflicting interpretation of the MMPI results and the failure to call Dr. Grundy in surrebuttal.  With respect to Drs. Orth and Rausch's conflicting interpretation, the state court held that Mr. Bench had not shown "counsel's performance fell outside the wide range of reasonable professional assistance," *Bench*, 431 P.3d at 972.  This decision was premised upon the OCCA's unreasonable finding that Drs. Orth and Rausch's findings as to competency were "consistent" with Dr. Hall's testimony, and contradicted Dr. Grundy's testimony.  This is an unreasonable fact determination because, as shown, Drs. Orth and Rausch's interpretation of the MMPI results actually conflicted with Dr. Hall's interpretation.  28 U.S.C. § 2254(d)(2).  The OCCA's finding of reasonable attorney conduct was also contrary to *Strickland*, or an unreasonable application thereof.  28 U.S.C. § 2254(d)(1).  Counsel were aware of Dr. Orth's competency report and Dr. Rausch's testimony;  it is unexplainable that they would not impeach Dr. Hall on her hugely critical assertion that Mr. Bench was lying about his mental illness and symptoms.  Counsel failed in their duty "to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Strickland*, 466 U.S. at 688; *see also Fisher*, 282 F.3d at 1298-99 (discussing how failure to cast doubt on state's evidence may constitute deficient performance).

With respect to prejudice, the OCCA found that Mr. Bench "has not shown a reasonable probability that the outcome of the trial would have been different had counsel

attempted to impeach Dr. Hall with Dr. Orth's competency report and Dr. Rausch's testimony from the competency trial." *Bench*, 431 P.3d at 973. This finding of no-prejudice was unreasonable. Mr. Bench need only show a reasonable probability of a different result. This is not an especially high bar, and a reasonable probability is merely enough to "undermine confidence" in the outcome. *Strickland*, 466 U.S. at 694. The OCCA's focus on other evidence tending to show Mr. Bench was sane at the time of the offense fails to take account of Dr. Hall's asserted faking and what impact impeaching that assertion would have had on the outcome of trial. *Bench*, 431 P.3d at 973 (recounting trial evidence). Had counsel impeached Dr. Hall about her representation that the MMPI established Mr. Bench was faking, there exists a reasonable probability the jury would have found him insane.

As for failing to call Dr. Grundy in surrebuttal, the OCCA was critical of Dr. Grundy's affidavit and refused to "review counsel's performance in the lens of hindsight." *Bench*, 431 P.3d at 976. The OCCA unreasonably found "the affidavit alleges that Dr. Grundy consulted with the defense team after Dr. Hall's testimony and informed them that he would not recommend his testifying in surrebuttal." *Id.* at 975; 28 U.S.C. § 2254(d)(2). Review of Dr. Grundy's affidavit reveals something different:

> Dr. Hall's testimony could have elicited further clarification by myself at surrebuttal. At the time of the trial consultation after Dr. Hall's testimony, I recall stating that I would not recommend surrebuttal ***should I only restate my findings***. However, upon further review of Dr. Hall's testimony, several of her opinions could have been addressed at the time of trial.

App. Evi. Hrg., Exh. 4, ¶ 8 (emphasis added). Thus, contrary to the OCCA, Dr. Grundy did not unconditionally recommend against his testifying in surrebuttal. It was up to defense

counsel to present Dr. Grundy to counter Dr. Hall's erroneous criticisms of the SIRS test, not simply to restate his findings. Counsel was deficient in this respect.

The OCCA further found no "reasonable probability that the outcome of trial would have been different had counsel called Grundy in surrebuttal." *Bench*, 431 P.3d at 976. This decision too was based on an unreasonable determination of fact. 28 U.S.C. 2254(d)(2). The OCCA claimed that "Grundy's testimony at trial concerning "malingering" and "faking" was consistent with Dr. Hall's trial testimony." 431 P.3d at 976. This finding is patently unreasonable. The OCCA cherry-picks excerpts of Dr. Grundy's testimony, distorting it into consistency with Dr. Hall's finding of faking. *Id*. Yet, Dr. Grundy unequivocally concluded at trial that the two tests he administered showed Mr. Bench "didn't appear to be malingering or attempting to malinger symptoms" and "he wasn't attempting to malinger." Tr. X 29-30. Dr. Grundy's testimony about malingering was not consistent with Dr. Hall's. This Court must determine whether trial counsel was ineffective in their failure to rebut Dr. Hall.

### c. Failure to utilize available information to cross-examine Melissa Lynn.

State's witness Melissa Lynn worked at the Teepee Totem and helped train Mr. Bench. Ms. Lynn painted a much different picture of Mr. Bench in her trial testimony than in her video-recorded police interview. At trial, Ms. Lynn portrayed Mr. Bench as capable employee who "learned the stuff pretty quick." Tr. V 103. She testified to working with him for three nights to ensure he completed all tasks because he was a new employee. *Id*. at 90.

However, when interviewed after the homicide, Ms. Lynn described Mr. Bench as an incompetent employee who struggled with the simplest tasks, and, if up to her, she would

have fired him.  For example, Ms. Lynn's interview indicated less frequent contact with Mr.

Bench – not more than an hour at a time and only if he needed it.  App. Evi. Hrg., Exh. 1,

6:45-7:02.  She called him an "idiot kid."  *Id*. at 17:00.  And, she was unequivocal that Mr.

Bench was a slow learner, unable to keep up with tasks even with a check-list.  *Id*. at 3:48-

4:05, 27:28-27:50.  Yet, defense counsel failed to cross-examine on these conflicting points.

Defense counsel also failed to cross-examine her as to a motive to portray Mr. Bench

as more capable than he actually was.  In June of 2014, 8 months prior to Mr. Bench's trial,

the victim's family filed a lawsuit against the Teepee Totem and Mr. Bench, alleging, *inter*

*alia*, that the Teepee Totem was negligent in the hiring of Mr. Bench.  App. Evi. Hrg., Exh.

2 (copy of civil petition).  Given the pending lawsuit, it would seem Ms. Lynn had a motive

to cast Mr. Bench as a model worker when he was not.  Yet, defense counsel didn't ask her

about the lawsuit, so the jury wasn't aware of her possible motivation.

The OCCA attributed trial counsel's failure to impeach Ms. Lynn to strategy:

> [W]e find that Appellant has not shown that defense counsel's decision could
> not be considered sound trial strategy.  Since Lynn partly attributed Appellant's
> slowness to the fact that he was young and liked to flirt with every girl that
> came into the store, we find that it was reasonable for counsel to omit this
> impeachment evidence.

*Bench*, 431 P.3d at 975.  The state court's finding of reasonable strategy is unreasonable in

light of the record.  28 U.S.C. § 2254(d)(2).  The videotaped interview shows Ms. Lynn

clarified her statement about flirting with every girl that comes in – "it wasn't really flirting,

it was just like taking forever to get their stuff."  App. Evi. Hrg., Exh. 1, 17:02-17:20.  Given

her clarification, it wasn't reasonable strategy for trial counsel to omit this line of

impeachment.

The OCCA additionally found that Mr. Bench failed to show "there is a reasonable probability that the outcome of the trial would have been different had defense counsel impeached Lynn." *Bench*, 431 P.3d at 975. This determination was unreasonable. 28 U.S.C. § 2254(d). The OCCA based this finding on the fact that defense witnesses had testified to Mr. Bench being slow, being in special education, and being unable to complete tasks requiring multiple steps. *Bench*, 431 P.3d at 975. According to the state court, this testimony "subsumed" the proposed impeachment of Ms. Lynn. However, the OCCA fails to acknowledge the significance of Ms. Lynn's testimony – she worked with Mr. Bench in the store where the offense occurred, in the days leading up to it, and she essentially testified Mr. Bench was a good worker who caught on quick. Given the jury verdict, Lynn's testimony must have carried more weight with the jury than the more temporally distant testimony of defense witnesses. It would have been important for the jury to hear that Mr. Bench continued to be slow and an incompetent employee just prior to the offense. Impeachment of Ms. Lynn could have created a reasonable probability of a different outcome.

As to the pending lawsuit, the OCCA found that Ms. Lynn was not mentioned in the lawsuit and that Mr. Bench "has not provided any authority establishing that defense counsel would have been able to use this lawsuit to impeach Lynn." *Bench*, 431 P.3d at 975. Therefore, Mr. Bench "failed to establish that counsel's performance was constitutionally deficient." *Id*. The state court's analysis is disingenuous, not to mention it does not comport with the required *Strickland* two-prong analysis. 28 U.S.C. § 2254(d)(1). The Supreme

Court has emphasized the importance of exposing witness bias: "The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.' We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross examination." *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974). The OCCA is simply incorrect that trial counsel could not have attempted to impeach Lynn regarding the lawsuit; witness bias is always a relevant topic for cross-examination. Defense counsel should have asked Ms. Lynn about the civil lawsuit and if the same influenced her testimony.

## III.   Sentencing Stage Ineffectiveness.

### a.   Failure to properly utilize and present mitigation specialist, David Musick, Ph.D.

A critical and mandatory component of any capital defense team is the mitigation specialist. Guideline 10.4 (C)(2)(a)*, American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, reprinted at 31 Hofstra L. Rev. 913, 1000 (2003) (capital defense team must include "at least one mitigation specialist."). The Supreme Court has emphasized that the ABA Guidelines are "guides to determining what is reasonable." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (citing *Strickland*, 466 U.S. at 688, and *Williams*, 529 U.S. at 396); *Rompilla v. Beard*, 545 U.S. 374, 387-88 (2005); *see also Anderson*, 476 F.3d at 1142 (discussing applicability of ABA Guidelines). Here, trial counsel retained a qualified mitigation specialist, Dr. David Musick, but then decided at the last moment, in the midst of trial, not to call him.

Instead, the defense only presented a number of lay witnesses in mitigation. These included Mr. Bench's neighbors and teachers from his childhood in Illinois, Navy personnel, and Mr. Bench's mother and step-father. The problem with this approach was the defense never tied together the complex and sometimes conflicting narratives of these witnesses so as to explain the bigger picture of Mr. Bench. Witnesses took the stand to talk about Mr. Bench, but all these witnesses could provide were "snapshots" of Mr. Bench at different times in his life. *Id*. at 67, 87; Tr. XIV 161.

The challenge of these little snapshots was that they were often conflicting and difficult to place into an overall narrative of Mr. Bench's life. This is where Dr. Musick could have come in. Dr. Musick is an experienced mitigation specialist and social historian. He would assist jurors in understanding the complex forces that impacted Mr. Bench's life trajectory. App. Evi. Hrg., Exh. 3. Without Dr. Musick to explain the diverse and often contradictory lay witness testimony, the case in mitigation was incomplete. "Most juries," as Dr. Musick notes, do not have expertise in psychological or psychiatric issues, "or in the impact of emotional and physical trauma on the life of a child, especially a child with mental health issues." *Id*. at ¶ 50. Yet, trial counsel haphazardly prepared Dr. Musick for trial, and then failed to call him during the sentencing stage. *Id*. at ¶¶ 7, 9-10, 13, 16-17.

Through the fault of counsel, it was hastily decided that Dr. Musick would not testify:

Mr. Solomon told me they were not going to call me as a witness the next day. When I asked why, Attorney Solomon opened my report to page fourteen. Therein, he circled with a writing implement four lines of information I had correctly attributed to the Mr. Bench's maternal grandmother. Mr. Solomon said he did not want the jury to hear that information. Consequently, I would

not be called to testify. I looked directly at Ms. Smith and reminded the attorneys that they had been in possession of my report for several months. I told them that since the four lines of information were not central to my report and conclusions, had I been informed in a timely manner, I could have deleted that information and sent them a revised report. Ms. Smith said nothing in response. Mr. Solomon said there was a slight chance they would call me as a witness the next day and asked me to remain available. . . . I was not called as a witness.

App. Evi. Hrg., Exh. 3, ¶ 16. Dr. Musick was "puzzled by the conversation and explanations provided by the OIDS attorneys," given he believed Mr. Bench "had a strong, multi-faceted mitigation case that the judge and jury should have been allowed to hear." *Id*. at ¶ 17. The noted 4 lines of Dr. Musick's report contained statements by Mr. Bench's mother and grandmother that Mr. Bench "was being called cruel names, like "stupid" and "dummy," by young customers," and after "years and years of taking abuse, he might have reached his limits." *Id*. at Exh. 3, Att. B, p. 14. Such statements don't conflict with the overall defense theory of a psychotic break, and this reason given by counsel was insufficient to constitute a reasonable strategy. Without Dr. Musick, the jury was left with a picture of Mr. Bench as nothing more than a special education kid, who was sometimes bullied by his step-father and was not smart or disciplined enough to make it in the Navy.

The OCCA found counsel was not deficient. *Bench*, 431 P.3d at 976. Such conclusion was unreasonable as to both law and fact. 28 U.S.C. § 2254(d). The state court specifically found:

[Mr. Bench] has neither argued nor shown that counsel's strategic decision to not call Musick as a witness to avoid his being questioned about the 4 lines was objectively unreasonable. We note that these 4 lines were inconsistent with Appellant's first stage defense. We cannot fault counsel for maintaining

49

a consistent defense through both stages of the trial.

431 P.3d at 976.  It was patently unreasonable for trial counsel to abandon its mitigation case and not call Dr. Musick.  What the OCCA classes as strategy could by no means be considered a reasonable exercise of professional judgment. *See Wood v. Allen*, 558 U.S. 290, 304 (2010) (whether decision was strategic is a different question than whether decision itself was Constitutionally reasonable); *Wilson v. Sirmons*, 536 F.3d 1064, 1132 (10th Cir. 2008) (citing *Fisher*, 282 F.3d at 1296); *accord Hooper v. Mullin*, 314 F.3d 1162, 1170-71 (10th Cir. 2002).  This Court must scrutinize trial counsel's decision to omit Dr. Musick.  *See Mayes*, 210 F.3d at 1288 ("We are therefore compelled to insure the sentencing jury makes an individualized decision while equipped with the 'fullest information possible concerning the defendant's life and characteristics,' and must scrutinize carefully any decision by counsel which deprives a capital defendant of all mitigation evidence") (citing *Lockett v. Ohio*, 438 U.S. 586, 603 (1978)).  Further, the OCCA determined the omission was strategic based on its finding that "these 4 lines [of Dr. Musick's report] were inconsistent with Appellant's first stage defense." 431 P.3d at 976.  This fact finding was unreasonable as those 4 lines of the report were not  "central to [Dr. Musick's] report and conclusions. " App. Evi. Hrg., Exh. 3, ¶ 17.  Dr. Musick's report wasn't at odds with Mr. Bench's first-stage defense, rather it helped explain the same in the context of Mr. Bench's entire life experience.

As for prejudice, the OCCA held that Mr. Bench "has also failed to demonstrate prejudice from counsel's decision not to call Musick as a witness." *Bench*, 431 P.3d at 977. Absent from the state court's analysis is any mention of *Strickland's* reasonable probability

standard, such that this decision runs afoul of 28 U.S.C. § 2254(d)(1). *See Williams*, 529 U.S. at 405-06 (explaining how a state court violates § 2254(d)(1) by applying a standard that deviates from *Strickland*). The state court also unreasonably held that Dr. Musick's testimony would have been "cumulative" and "not likely to have had an immense effect on the jury." 431 P.3d at 977. Musick's purpose wasn't to repeat what the lay witnesses said, instead his purpose was to stitch together the little pieces of Mr. Bench's life that each witness presented to provide the jury with a complete picture of Mr. Bench's traumatic life. Finally, the state court erroneously found "Musick's conclusion that Appellant killed Henry as a reaction to years and years of bullying was not so compelling as to have shifted the jury's weighing of the evidence in aggravation and mitigation." *Id.* Musick in both his affidavit and report did not profess to conclude why Mr. Bench killed Ms. Henry, instead Dr. Musick noted that Mr. Bench's lifetime of traumatic experiences, including bullying, had a profound effect on him and his view of the world. *See* App. Evi. Hrg. Exh. 3 and Exh. 3, Att. B. It was unreasonable for the OCCA to cast Dr. Musick's report as detrimental.

   **b.      Failure to present mental illness evidence through an appropriate expert.**

   Trial counsel abandoned the theme of mental illness in the sentencing stage. Just because the jury declined to credit the NGRI defense doesn't mean that Mr. Bench's severe mental illness wouldn't present a powerful mitigating circumstance for the jury to consider. Recall that Dr. Grundy had diagnosed Mr. Bench with schizophrenia, both at the time of his evaluation and at the time of the offense, which was separate and apart from his conclusion that Mr. Bench could not understand the wrongfulness of his actions. Tr. X 31, 42-43.

Dr. Grundy should have testified during the sentencing stage. He could have provided important evidence about Mr. Bench's mental health and his family's mental health history. A mitigation specialist, such as Dr. Musick, and a mental health expert, such as Dr. Grundy, were both necessary to individualize and humanize Mr. Bench in the eyes of the jury. *See, e.g.*, ABA Guideline 10.4(C)(2)(a) and (b), 31 Hofstra L. Rev. at 1000. Instead of continuing the theme of Mr. Bench being severely mentally ill into the sentencing stage, trial counsel abandoned that topic. Counsel didn't even mention the schizophrenia diagnosis in closing argument. *See* Tr. XIV 154-64. Mr. Huff testified about trying to get Mr. Bench mental health treatment after his discharge from the Navy, and a Navy Officer expressed his belief that Mr. Bench was not "mentally stable" and that the Navy psychiatrists "made a mistake" by not finding Mr. Bench unfit for service. Tr. XIV 33-34, 63-64. But trial counsel made no effort to corroborate this information through an appropriate expert witness.

Dr. Grundy could have further explained mental illness and how it runs within Mr. Bench's family. He could have explained that Mr. Bench's grandfather experienced severe mental health symptoms, how Mr. Bench's half-brother Ryan has "mental issues," and that Mr. Bench's mother suffered from manic depression. App. Evi. Hrg., Exh. 4, ¶¶ 16-19. Dr. Grundy could have also explained how Mr. Bench's failures in Navy training and subsequent behavior after leaving the Navy were consistent with the schizophrenia diagnosis. *Id*. at ¶¶ 20-21. Finally, Dr. Grundy could have controverted portions of the state's case in aggravation such as Mr. Bench acting aggressively to women at the Tepee Totem in the days prior to the offense. *See* Tr. XII 44-45, 56, 59. Dr. Grundy could have explained this bizarre

behavior as Mr. Bench entering a "psychotic break" and that Mr. Bench did not only behave oddly with females, but with male customers as well.  App. Evi. Hrg., Exh. 4, ¶ 21.  By omitting a mental health expert, trial counsel left the jury with the wrong impression that Mr. Bench's schizophrenia must no longer be at issue due to the guilty verdict.

The OCCA found that Mr. Bench failed to show "clear and convincing evidence of a strong possibility that counsel was ineffective for failing to utilize or identify the proffered evidence." *Bench*, 431 P.3d at 977.  While this may be the OCCA's standard for granting an evidentiary hearing, the OCCA failed to address *Strickland's* two inquires.  Also, its analysis of Dr. Grundy's proffered affidavit is unreasonable.  As such, the state court decision must not restrict this Court's review. 28 U.S.C. § 2254(d).  Interestingly, the OCCA attempts to ignore the deficiency by claiming "there was no reason for defense counsel to call Grundy in the second stage."  431 P.3d at 977.  Apparently, this is merely because the defense moved to incorporate its first stage evidence into the second stage.[7] *Id.; see* Tr. XIII 6.  Yet defense counsel never once requested the jury recall and consider Dr. Grundy's prior testimony when determining sentence.  Further, it is obvious that Dr. Grundy's second stage testimony would not have been merely "cumulative" to his guilt stage testimony - his objective at sentencing would have been only to give a reason to spare Mr. Bench's life, while his objective in the first stage was to promote the insanity defense. 431 P.3d at 977.

---

[7] The OCCA cites an inapplicable statute for the proposition that it was unnecessary for counsel to incorporate the first stage evidence. *Bench*, 431 P.3d at 977 (citing Okla. Stat. tit. 21, § 701.10a).  However, that statute only applies to capital re-sentencing proceedings following reversal on appeal.

Dr. Grundy's testimony was powerful and could have persuaded at least on juror to spare Mr. Bench's life, which is all that is necessary to show a reasonable probability of a different result. *See Hooks v. Workman*, 689 F.3d 1148, 1202 (10th Cir. 2012).

> c.    **Failure to present neuro-imaging evidence to further substantiate Mr. Bench's mental illness.**

Mr. Bench's schizophrenia could have been corroborated by objective proof, but trial counsel failed to do so. In cases such as this where there is a diagnosis of severe mental illness, but the state contests the same, defense counsel must consider neuro-imaging as a means to corroborate a clinical diagnosis. On appeal, Mr. Bench enlisted the services of Dr. William Orrison, a neuro-radiologist, through the neuroscience consulting group MINDSET. *See* App. Evi. Hrg., Exh. 5, ¶ 4; Exh. 6. Mr. Bench received an MRI of his brain, which produced significant results in support of both his NGRI defense and his case for a sentence less than death. Dr. Orrison found many areas of concern in Mr. Bench's brain. Exh. 5, ¶ 7. He noted a left cerebellar peduncle abnormal signal adjacent to the 4th ventricle of the brain, and often patients with "cerebellar disease have difficulty controlling their behavior and often show impulsivity, difficulty concentrating, compulsive personality disorders, intellectual impairment, aberrant behavior and schizophrenia." *Id*. Also, Dr. Orrison discovered a "small focus of prior hemorrhage" in the pons, and abnormalities in this part of the brain can result in, among other things, "poor cognitive performance." *Id*. Lastly, Dr. Orrison found areas in the occipital lobe that had less brain tissue "than would be anticipated," which could result in "decreased motor control" and "speech/language and

social skills" impairments. *Id.*

Dr. Orrison's observations are consistent with Mr. Bench's behavior and corroborate Dr. Grundy's schizophrenia diagnosis. However, the MRI was not administered to MINDSET's protocol, which requires additional and more detailed images. Exh. 6, ¶ 3. Dr. Orrison recommended further MRI brain evaluation based upon his initial findings.[8] Exh. 5, ¶ 8. Evidence that Mr. Bench's brain is damaged is powerful, relevant to both stages of trial, even without the additional testing. It could have stirred at least one juror's compassion, and it should have been presented.

The OCCA denied this claim for lack of prejudice at both stages of trial. *Bench*, 431 P.3d at 978. The state court did not address deficient performance; thus, this Court may review that prong de novo. *See Hooks*, 689 F.3d at 1188 (finding where state court did not address one of *Strickland's* prongs, federal court may conduct its review of that prong de novo). As for its finding of no prejudice, the same is contrary to and/or an unreasonable application of *Strickland*, as well as based on an unreasonable determination of fact. 28 U.S.C. § 2254(d). First, the state court claimed neuro-imaging evidence like this does not meet the admissibility standards of *Daubert*. 431 P.3d at 978. A case relied on by the OCCA, *Arizona v. Pandeli*, 394 P.3d 2, 11 (Ariz. 2017), is distinguishable. *Id.* In *Pandeli,* the "PCR court" found "IAC" for counsel's failure to substantiate a diagnosis of "frontal lobe impairment" with a "QEEG" scan. 394 P.3d at 10. The appeals court found no IAC because

---

[8] As will be discussed below in relation to ineffective appellate counsel, Mr. Bench was deprived of the additional MRI by the administration at OIDS, despite counsel's request for same.

counsel presented two experts at trial who diagnosed the brain injury, including at least one neuropsychologist. *Id*. at 11. And, the neuropsychologist in *Pandeli* testified that brain scans could produce false positives and he would have to administer tests to confirm a scan. *Id*. Here, Mr. Bench did not utilize a neuropsychologist, nor does he now attempt to offer a QEEG result; instead he is offering MRI results to corroborate his schizophrenia and further explain his behavior. Next, the OCCA claims "the proffered neuro-imaging evidence would have been cumulative." 431 P.3d at 978. This is not so. No images of Mr. Bench's brain were presented at trial; thus, there was no trial evidence which could have objectively corroborated his mental illness and related behaviors such as the proffered MRI evidence.

Lastly with respect to sentencing, the OCCA found "[Mr. Bench] has not shown a reasonable probability that had counsel presented the neuro-imaging evidence ***the jury would have concluded that the balance*** of aggravating and mitigating circumstances did not warrant death." 431 P.3d at 978-79 (emphasis added). This analysis was contrary to law. Mr. Bench need not show unanimous agreement amongst the *jury*; he need only show that the neuro-imaging evidence would have caused "at least one juror" to have struck "a different balance." *Hooks*, 689 F.3d at 1202 (citing *Wiggins*, 539 U.S. at 537).

Counsel was deficient by omitting a neuro-imaging investigation and then presenting the results of same at trial. *See, e.g., Strickland*, 466 U.S. at 690-91 (counsel's choices must be backed by a reasonable investigation). In this capital case, counsel should have pursued all reasonable lines of defense, including obtaining brain imaging. *Stouffer*, 168 F.3d at 1167; *see also United States v. Fields*, 949 F.3d 1240, 1256 (10th Cir. 2019) (discussing

significance of mental impairment and brain damage in the context of capital sentencing). The MRI would have strengthened the NGRI defense considerably and, with respect to the second stage, could have influenced at least one juror to spare Mr. Bench's life.

### d. Failure to present evidence that Mr. Bench's family members valued his life.

Trial counsel failed to humanize Mr. Bench through the available testimony of his mother and grandmother. It was counsel's obligation to present witnesses who would testify about the "adverse impact" Mr. Bench's death would have on them and who could "humanize" him and "portray him positively." ABA Guideline 10.11(F)(4), (F)(5), 31 Hofstra L. Rev. at 1056.[9] Mr. Bench's mother, Dana Huff, and his grandmother, Albertha Bench, provided affidavits on appeal detailing how they could have humanized Mr. Bench. App. Evi. Hrg., Exhs. 7 and 8. These affidavits and attached photos are quite powerful and should be reviewed in their entirety to obtain an idea of the available mitigation omitted by trial counsel.

The OCCA denied the claim, finding Mr. Bench "has failed to overcome the presumption that counsel's omission of the evidence was an objectively reasonable strategic decision." *Bench*, 431 P.3d at 980. The OCCA did not offer a position as to *Strickland's* prejudice prong. The state court's finding of reasonable strategy was unreasonable as to law

---

[9] The commentary to the Guideline further provides that "These witnesses can also humanize the client by allowing the jury to see him in the context of his family, showing that they care about him, and providing examples of his capacity to behave in a caring, positive way . . . None of this evidence should be offered as counterweight to the gravity of the crime, but rather to show that the person who committed the crime is a flawed but real individual rather than a generic evildoer. Guideline 10.11, *Commentary*, 31 Hofstra L. Rev. at 1062.

and fact.  28 U.S. § 2254(d).  First, it is the state of the art now and in 2003, when the ABA

Guidelines were published, that trial counsel present exactly the sort of information contained

the proffered affidavits.  *See Anderson,* 476 F.3d 1131, 1142 (discussing applicability of

ABA Guidelines).  Second, the OCCA was unreasonable in finding that the proffered

information "undercut counsel's overall second stage strategy of emphasizing the upheaval

and dysfunction in [Mr. Bench's] childhood."  431 P.3d at 980.  Contrary to the OCCA, the

Affidavits did not provide that Mr. Bench had a "normal and happy childhood."  *Id.*  Instead

the information serves to present positive circumstances, along with the bad.  This was

precisely the sort of mitigating that would "humanize and explain" Mr. Bench.  *Smith v.*

*Mullin*, 379 F.3d 919, 943 (10th Cir. 2004) (citing *Romano v. Gibson*, 239 F.3d 1156, 1180

(10th Cir. 2001)).  Had counsel presented the proffered evidence, there exists a reasonable

probability that at least one juror would have found it. compelling and spared Mr. Bench.

## IV.  Conclusion.

As shown, trial counsel was Constitutionally ineffective as to both the guilt and

sentencing phases of Mr. Bench's trial.  The Writ should issue.

**<u>Ground Three</u>**       **Appellate counsel was ineffective in violation of Mr. Bench's rights**
**under the Sixth, Eighth, and Fourteenth Amendments.**

In addition to trial counsel's ineffectiveness, Mr. Bench's direct appeal counsel were

Constitutionally ineffective due to their failure to raise numerous meritorious issues.  *See*

*Cargle v. Mullin*, 317 F.3d 1196, 1205 (10th Cir. 2003) ("A sufficiently meritorious omitted

claim certainly can, by itself (or in relation to other issues that counsel did pursue), establish

constitutionally deficient performance by appellate counsel.") Omitted appeal issues include (1) the failure to obtain an *adequate* MRI so as to support the claim that trial counsel were ineffective for failing to obtain and present neuro-imaging evidence at trial and sentencing; (2) the jurisdictional/Indian Country claim; (3) the trial court's violation of statute when answering a jury question about the life without parole sentencing option; and (4) the trial court's erroneous admission of Mr. Bench's custodial statements to Deputy Short. Just as with his Ground Two claims of ineffective trial counsel, Mr. Bench need only satisfy *Strickland's* two prong test by showing appellate counsel was deficient in omitting the claim, and had the claim been raised there exists a reasonable probability that the outcome of the appeal would have been different. Appeal counsel's failure to raise these issues was not reasonable or strategic, and had the issues been raised there exists a reasonable probability that the outcome of the appeal would have been different.

## I.    The state court decision.

Mr. Bench raised ineffective assistance of appellate counsel in Propositions V and IX to his APCR. *See* pp. 35-40, 48-50, OCCA No. PCD-2015-698 (March 15, 2018). Proposition V identified how counsel had been ineffective in presenting the neuro-imaging claim on appeal. Proposition IX identified substantive claims appellate counsel failed to raise on appeal. *Id*. In turn, the underlying substantive claims were raised as separate propositions within the APCR. The OCCA engaged in procedural rulings regarding the underlying substantive claims, but conducted merits review of those same claims when deciding the appellate ineffectiveness claim. *Bench*, 504 P.3d 592, 598; *see also Logan v.*

*State,* 293 P.3d 969, 973 (Okla. Crim. App. 2013) ("a court must look to the merits of the issue(s) that appellate counsel failed to raise") (citing *Malicoat v. Mullin*, 426 F.3d 1241, 1249 (10th Cir. 2005)).  Where the state court engaged in a merits analysis of the omitted claim, such analysis was contrary to or based upon an unreasonable application of clearly established federal law and/or based upon an unreasonable determination of facts. 28 U.S.C. § 2254(d).  Mr. Bench will separately address the OCCA's decisions, or lack thereof, as to the instances of appellate ineffectiveness raised below.

> **a.    Appeal counsel failed to obtain a more specialized MRI to support the claim raised on appeal.**

As discussed in Proposition Two, Part III(c), Mr. Bench raised a claim on direct appeal that trial counsel was ineffective for failing to obtain an MRI and then present the results of same at trial to corroborate his schizophrenia and explain his bizarre behavior. Appeal counsel was also ineffective in their presentation of this claim.  APCR, Prop. V, pp. 35-40.  Appeal counsel had an MRI performed at the O.U. Medical Center in February of 2017; however, that MRI was not performed in accordance with the Protocols of MINDSET, the group hired to evaluate the results.  APCR, Att. 15 pp 2-3.  Dr. Orrison, who reviewed the MRI, was able to discern abnormalities in Mr. Bench's brain; however, he concluded a more specialized MRI, in accordance with the Protocols, was necessary.  *Id*. at Att. 14, pp. 3-6.

Through no fault of Mr. Bench, appeal counsel was unable to obtain the more specialized MRI.  Appeal counsel requested a second, more detailed MRI, but that request

was denied by the OIDS administration.  *Id*. at Att. 13.  Without a sufficiently detailed MRI, Mr. Bench was unable to provide stronger scientific and clinical corroboration on appeal in support of his ineffective trial counsel claim.

OIDS post-conviction counsel also requested a second MRI be conducted.  *Id*. at Att. 18.  This request too was denied by the OIDS administration, due to a lack of funding.  *Id*. at Atts. 12, 18.  It is not Mr. Bench's fault that the first MRI was done incorrectly, nor that OIDS was unable to pay for the second MRI necessary to adequately assist him in his defense.  Due to the ineffective assistance of appeal counsel and insufficient funding of the public defense agency, Mr. Bench was denied the tools necessary to mount an effective defense.  This situation is akin to the deprivation of defense counsel or conflicted defense counsel.  *See United States v. Cronic*, 466 U.S. 648, 656 (1984) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 343 (1980)) ("There can be no equal justice where the kind of trial a man gets depends upon the amount of money he has."); *see also* APCR at 39 (arguing the same and citing same authority).  Because Mr. Bench was constructively denied counsel due to circumstances within OIDS, prejudice must be presumed.  *Cronic*, 466 U.S. at 658-60; *see also Bell v. Cone*, 535 U.S. 685, 695-96 and n.3 (2002) (collecting cases where prejudice was presumed upon Sixth Amendment violation); *Ake v. Oklahoma*, 470 U.S. 68 (1985) (holding that indigent defendants must be provided with expert necessary for an adequate defense).

The OCCA barred the trial counsel ineffectiveness aspect of the claim as having already been raised on direct appeal, and as such, was "res judicata." *Bench*, 504 P.3d at 598.  However, the OCCA misapprehends the claim, which it described as "trial counsel was

ineffective for failing to obtain a specific type of MRI scan of his brain." *Id*. This is incorrect. Trial counsel was ineffective for failing to seek an MRI or *any* neuro-imaging whatsoever. *See* APCR at 47; *see also* Aplnt's Brief, pp. 59-62 , OCCA No. D-2015-462 (Feb. 28, 2017). The MRI obtained by appeal counsel was the first obtained by any defense counsel. Also, the state court's application of res judicata cannot bar this Court's review; instead, "it provides strong evidence that claim has already been given full consideration by the state courts and thus is ripe for federal adjudication." *Cone v. Bell*, 556 U.S. 449, 467 (2009); *accord Wellons v. Hall*, 558 U.S. 220, 222 (2010).

As to appellate ineffectiveness, the OCCA held:

> [A]ppellate counsel raised the claim on direct appeal that trial counsel was ineffective for failing to obtain the more specialized M.R.I. of Petitioner's brain. We denied his claim. Thus, appellant counsel was not ineffective for failing to raise this claim.

*Bench*, 504 P.3d at 599. Again, the OCCA misapprehends the claim.[10] Mr. Bench is not asserting the same claim raised on appeal; instead, he argues that appeal counsel was ineffective for failing to obtain an MRI pursuant to the MINDSET protocols, which would have strengthened his appeal claim that trial counsel was ineffective for failing to pursue neuro-imaging at all. *See* APCR, Ground V, pp. 35-40. The state court did not reach the merits; this court may review this claim de novo. *Byrd v. Workman*, 645 F.3d 1159, 1166–67

---

[10] The OCCA incorrectly describes the claim as "identical" and that Mr. Bench offers the "same evidence" to support them as he did on direct appeal. *Bench*, 504 P.3d at 598. While Mr. Bench included the affidavits from Dr. Orrison and the MINDSET Associate Director with both his direct appeal and APCR, the OIDS Professional Service Request Forms establishing the agency refused to fund the requested MRI were only included with the APCR. *See* APCR at 37 n.14 (identifying and summarizing attachments to Application).

(10th Cir. 2011).

If OIDS had authorized payment, the more specific MRI would have generated additional data allowing further analysis to provide objective evidence of Mr. Bench's mental illness and cognitive impairments.  APCR, Atts. 13, 18, 15 pp. 2-3.  OIDS inability to provide Mr. Bench with this necessary tool resulted in the constructive deprivation of appellate counsel.  *Cronic*, 466 U.S. at 658-60; *see also Strickland*, 466 U.S. at 692 ("Actual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice"); *Penson v. Ohio*, 488 U.S. 75, 88 (1988) ("the presumption of prejudice must extend as well to the denial of counsel on appeal").  Prejudice may be presumed; the Writ should issue.

### b.      Appeal counsel failed to raise the jurisdictional/Indian Country claim.

As discussed in Ground One, Mr. Bench is a member of the Choctaw Nation and the offense occurred on Chickasaw Nation tribal land.  These facts were readily ascertainable by appellate counsel, yet counsel failed to raise the jurisdictional claim on appeal and/or failed to assert trial counsel was ineffective for failing to raise the jurisdictional claim in the district court.  APCR, Prop. IX, pp. 49-50.

The OCCA declined to review the trial counsel ineffectiveness claim because it "could have been ascertained through the exercise of reasonable diligence on or before the time of the direct appeal."  *Bench*, 504 P.3d at 598; *id*. at n.4.  With respect to appellate counsel's failure to raise the jurisdictional claim, the OCCA held:

[W]e determined *McGirt* announced a new rule of criminal procedure, not

> dictated by precedent existing at the time the conviction at issue in *Matloff* was final. Similarly, the *McGirt* ruling did not issue until 2020, long after Petitioner's conviction became final in 2018. Thus, any challenge to jurisdiction would have been unsuccessful at the time of Petitioner's trial and appeal. Counsel cannot have been ineffective for failing to raise a baseless claim.

*Id*. at 599 (citing *Logan,* 293 P.3d at 975). Contrary to the OCCA, Mr. Bench's jurisdictional claim was not baseless, "meritless," or "destined to lose" at the time of trial and appeal. *Logan*, 293 P.3d at 975.

As was discussed in Ground One, Part II, *McGirt* did not announce a new rule, and the OCCA's finding otherwise is an unreasonable application of and/or contrary to *McGirt*, itself, not to mention *Teague v. Lane,* 489 U.S. 288 (1989)*,* and its progeny. 28 U.S.C. § 2254(d)(1). Mr. Bench's claim does not rise and fall upon *McGirt*. Instead, his claim is supported by *Solem v. Bartlett*, 465 U.S. 463 (1984), and related cases. *See Murphy v. Royal*, 875 F.3d 896, 930 n. 6. Thus, the jurisdictional claim would not have been meritless at the time of Mr. Bench's 2015 trial or direct appeal filed in February of 2017. *See* Ground One, Part. III (containing time-line of litigation history and related cases). A demonstration of this point would be *Murphy*, as there the Tenth Circuit granted federal habeas corpus relief, because the OCCA's jurisdictional denial in 2005 was objectively unreasonable. *Murphy*, 875 F.3d at 921-22, 926-28 (finding OCCA decision denying jurisdictional claim contrary to clearly established law). Obviously, given the habeas grant, Mr. Murphy's jurisdictional claim was not meritless when he raised it in his 2004 second post-conviction application; neither is Mr. Bench's claim. *Murphy*, 875 F.3d at 907.

Considering *Solem* had been clearly established for years and that Mr. Bench's status as an Indian, as well as the location of the offense being on tribal land, were easily discernable, appellate counsel was objectively unreasonable in failing to include the jurisdictional challenge on appeal. *Neil v. Gibson*, 278 F.3d 1044, 1057 (10th Cir. 2001) (explaining that appeal counsel is ineffective where they fail to raise claims that have a reasonable probability of success). Here, a reasonable probability exists that the jurisdictional claim would have resulted in reversal of Mr. Bench's conviction on appeal. *Id*. at 1057 n.5. Ostensibly, the OCCA would have followed the Tenth Circuit's directive in *Murphy* by the time it decided Mr. Bench's appeal, considering that the Tenth Circuit first issued *Murphy v. Royal*, 866 F.3d 1164, on August 8, 2017, and Mr. Bench's direct appeal, 431 P.3d 929, was not decided until October 4, 2018. Interestingly, an OCCA judge seems to concede as much in finding the claim could have been raised on direct appeal, but because it was instead raised on post-conviction, it is "appropriately denied." *Bench*, 504 P.3d at 604 (Hudson, J., specially concurring).

Appellate counsel was ineffective for failing to raise the jurisdiction claim on appeal. Oklahoma was without jurisdiction to prosecute Mr. Bench and remains without jurisdiction to imprison him. This Court should grant the Writ.

### c. Appeal counsel failed to raise the trial court's error in answering the jury's question about a life without parole sentence.

Mr. Bench's jury was not set on imposing the death penalty. During its sentencing deliberations, the jury sent out a note asking, "Does life without the possibility of parole

mean that he will <u>never</u> get out of prison?" Cts. Exh. 5 (alteration in original); Tr. XIV 174-177.  Defense counsel simply requested the jury be instructed, "Yes, that is what it means." Tr. XIV 175.  However, the trial court sent a supplemental instruction back to the jury that failed to answer whether Mr. Bench could be released from prison.  The instruction provided "if [Mr. Bench] is sentenced to life imprisonment without the possibility of parole, he will not be eligible for parole."  O.R. 1455.  The trial court failed to require the jury to return to the courtroom to read this supplemental instruction, which was a violation of a state statute that requires the judge's response to a jury note to be read in open court.  Okla. Stat. tit. 22, § 894.  Prejudice is presumed upon violation of this statute.  Yet, appellate counsel failed to include this claim on appeal.

The OCCA found the trial court "plainly violated Section 894," but declined to grant relief.  *Bench*, 504 P.3d at 602.  The state court explained that *Nicholson v. State*, 421 P.3d 890, 895 (Okla. Crim. App. 2018), did away with the presumption of prejudice when jurors are not brought back into the courtroom to have their questions answered.  *Id*.  *Nicholson* further provided that a technical violation of Section 892 is harmless where, as here, neither party requested the juror's presence in the courtroom.  *Id*. (citing 421 P.3d at 896).  Thus, pursuant to *Nicholson*, the OCCA found appellate counsel not ineffective.  *Id*.  This decision was contrary to and/or an unreasonable application of *Strickland*.  28 U.S.C. § 2254(d).

*Nicholson* wasn't decided until 2018.  When Mr. Bench's direct appeal brief was filed in 2017, there still existed a presumption of prejudice for violations of Section 894.  Thus, at the time of appeal, the claim had a reasonable probability of success, and counsel was

deficient for failing to raise it.  *See Neil*, 278 F.3d at 1057.  The OCCA failed to consider this point.   The trial court's failure to follow statutory procedures when answering the single most important question the jury could have asked when deliberating between life without parole or death would have been noticed by effective counsel and an appeal claim lodged.[11]

### d.   Appeal counsel failed to raise the issue that Mr. Bench's statements to Deputy Short were erroneously admitted.

The trial court erroneously admitted Mr. Bench's custodial statements to both Deputy Short and Officer Brown.  The error as to Officer Brown was raised on direct appeal, but appeal counsel failed to include the same claim as to the statements elicited by Deputy Short. *See* Aplnt's Brief, pp. 29-35.  Mr. Bench raised the erroneous admission of his statements to Deputy Short in his APCR, along with alleging appellate counsel was ineffective for failing to include the claim on appeal.  APCR Prop. VII pp. 42-47, Prop. IX p. 49.  For convenience, this claim is discussed in Ground Five, which addresses Mr. Bench's custodial statements to both officers and the OCCA's unreasonable treatment of the same.

### III.   Conclusion.

Appellate counsel was Constitutionally ineffective for failing to raise the above claims.  The Writ should issue.

### Ground Four          The trial court's refusal to instruct on a lesser included offense deprived Mr. Bench of Due Process and a fundamentally fair trial.

Defense counsel requested the trial court instruct the jury as to the lesser included

---

[11] Should the Court only find deficient performance, it should still consider "cumulative prejudice" if counsel is found deficient in two or more respects.  *Hooks*, 689 F.3d at 1188 (citing *Spears v. Mullin*, 343 F.3d 1215, 1251 (10th Cir. 2003)).

offense of second-degree murder, declaring: "[w]e have the testimony that this could be a murder in the second degree." Tr. XI 8. A jury could have found that the state had not met their burden of proving specific intent: "Murder in the second degree is – the state does not have to prove specific intent. It is a general intent crime. I can see a situation where this jury could think that the circumstances that they have heard about in court would fit those elements. . . ." *Id*. at 8. Trial counsel further argued there was adequate evidence to show "the intent to injure greatly but not kill another person, which is carried out by the accused through conduct that causes the person's death, is conduct that is, in the language of the statute, imminently dangerous to another person." *Id*. at 8-9.

Despite facts in evidence that could have supported a conviction of depraved mind murder, the trial court refused to give the instruction, stating, "I don't think there is any middle ground here. I think this is either a murder one case with a specific intent to kill this individual or a situation in which we are dealing with insanity . . . ." *Id*. at 10. This ruling is inapposite. The evidence could have supported a jury finding of either first degree murder or second degree depraved mind murder. However, with the lesser instruction denied, the jury had to make the all or nothing choice between acquittal or capital murder.

## I.   The state court decision.

Mr. Bench raised this claim as Proposition V of his direct appeal brief, pp. 67-71. OCCA No. D-2015-462 (Feb. 28, 2017). The OCCA focused on whether the evidence would have supported the lesser verdict of second degree depraved mind murder *and* an acquittal of first degree murder, deferring to the trial court's finding that there was no evidence to

support an instruction for the lesser crime. *Bench*, 431 F.3d 929, 955. Acknowledging *Beck* as controlling law, the OCCA noted: "However, *Beck* does not require that the jury in a capital case be given a non-capital option where the evidence absolutely does not support that option." *Id.* at 954. Under this standard, the OCCA concluded: "In the absence of any evidence showing both that [Mr. Bench's] conduct evinced a depraved mind in extreme disregard of human life and that he acted without the intention of taking the life of any particular individual, we must conclude that the evidence would not have permitted a rational jury to find [Mr. Bench] guilty of second degree depraved mind murder;" and, "[a]t the same time, we conclude that the evidence would not have permitted a rational jury to acquit [Mr. Bench] of the charged offense of first degree murder." *Id.* at 954 (emphasis added). This decision was contrary to or an unreasonable application of law and/or was based on an unreasonable determination of fact. 28 U.S.C. § 2254(d).

*Beck v. Alabama*, 447 U.S. 625, 627 (1980) requires a jury to be instructed on a lesser included offense if the evidence would permit jury to find the defendant guilty of the lesser offense. This avoids the false dichotomy with which Mr. Bench's jurors were presented. *See Spaziano v. Florida,* 468 U.S. 447, 455 (1984) (overruled on other grounds by *Hurst v. Florida*, 577 U.S. 92 (2016)) (*Beck's* goal was "to eliminate the distortion of the fact finding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence."). When a jury is not allowed to consider guilt of a lesser included non-capital offense, "a sentence of death [may not] constitutionally be imposed." *Hooks v. Ward*, 184 F.3d 1206, 1223 (10th Cir. 1999) (citing *Beck*, 447 U.S. at 627).

**II.** *Beck* **required a second-degree murder instruction be given.**

As the Tenth Circuit has consistently had to remind the OCCA, under *Beck*, jurors must be permitted to consider guilt for a non-capital offense where the evidence could have supported such a verdict, "not just in those cases where the court believes the lesser verdict would be most consistent with the evidence." *Taylor v. Workman*, 554 F.3d 879, 887 (10th Cir. 2009); *see also Phillips v. Workman*, 604 F.3d 1202, 1213 (10th Cir. 2010). In other words, "in order to resolve a *Beck* claim, a court must focus on whether credible evidence admitted at trial warranted a lesser included offense, not whether the evidence was sufficient to prove the greater one." *Hooks*, 184 F.3d at 1232; *see also Darks v. Mullin*, 327 F.3d 1001, 1010 (10th Cir. 2003) (no deference owed where "OCCA did not address the proper question" of whether sufficient evidence supported the lesser offense).

Here, the OCCA determined the facts could only support the conclusion Mr. Bench committed first-degree murder. In so doing, it unreasonably applied *Beck*. Had the state court looked to whether, in addition to evidence of intent, there was evidence a reasonable juror might interpret as that of a depraved mind, the court would have found sufficient evidence warranting a lesser included instruction of second-degree murder. *Hooks*, 184 F.3d at 1233. The OCCA paid only lip service to its duty to focus the inquiry on the lesser-included offense. *See Bench* 431 P.3d at 954 ("we conclude that evidence would not have permitted a rational jury to acquit Appellant of the charged offense"). The state court went on only to recite the way the evidence fit within the first-degree theory. *Id* at 954-955. This is the precise approach the Tenth Circuit has found unreasonable. In *Taylor*, the Tenth

70

Circuit found the OCCA unreasonably applied *Beck* even in light of facts clearly supporting the defendant's intent to kill. *See Taylor,* 554 F.3d at 887 ("The effect of the OCCA's contrary approach is to deny the defendant the benefit of the second-degree murder instruction in precisely the circumstance where it is most important: where the evidence would support conviction for first degree murder but would also support conviction on the lesser-included offense."). In *Hogan v. Gibson*, 197 F.3d 1297 (10th Cir. 1999), the OCCA made "essentially the same error" in denying a *Beck* error where there was "a clear design to effect the victim's death in a cold and calculated manner." *Taylor*, 554 F.3d at 887-88. *Hogan* deemed the OCCA's focus "squarely contrary to the holding of *Beck*." 197 F.3d at 1305. The OCCA's decision here makes *essentially the same error* as in *Taylor* and *Hogan*.

## III.   The OCCA unreasonably determined the facts did not support a second-degree murder instruction.

The OCCA's unreasonable determination of the facts provides "the starting point" and "relevant context" for its unreasonable application of *Beck. Williams v. Taylor*, 529 U.S. 362, 386 (2000). The proper *Beck* inquiry would have required analyzing the facts for "the question *Beck* instructs us to ask: whether the evidence supported a second degree murder instruction." *Taylor*, 554 F.3d at 890. Here, the state emphasized the medical examiners testimony, arguing that Mr. Bench "wanted this young lady . . . dead," "he had the intent . . . he knew what he was doing."   Tr. XI 72.  But, in the context of Mr. Bench's statements upon arrest and Dr. Grundy's findings as to Mr. Bench's mental state at the time of the homicide, the jury could have instead determined the evidence established Mr. Bench

engaged in conduct that was indeed "imminently dangerous," but also was lacking in any specific intent to commit murder.

Both the state and Mr. Bench submitted evidence relevant to Mr. Bench's intent: Dr. Grundy submitted his expert opinion that Miles exhibited "active signs of mental illness at the time of the offense" . . . and "due to these symptoms of schizophrenia," Miles did not "underst[and] the legal wrongfulness of his behavior . . . [Miles] was acting in accordance with his fears and his delusions when he attacked the victim." Tr. X 42-43.  If it had so been permitted, a jury could have concluded that Mr. Bench's fear and delusion caused him to strike the victim, granted, in an "imminently dangerous" way, but without the specific intent of committing murder.  The state submitted that Mr. Bench told Deputy Short, "I think that I fucked up. I may have killed somebody." Tr. VI 124.  The state also called Detention Officer Kendall Brown, who testified that during booking, Mr. Bench allegedly disclosed: "I think I may have blacked out.  I think I may have killed somebody;" and "Hey, I think I might have messed up.  I think may have killed somebody." Tr. VII 61-62.  These statements do not establish Mr. Bench intended to kill the victim; even if he had intended to severely injure someone.   Mr. Bench arguably admitted some culpability, but also expressed uncertainty as to whether he had killed Ms. Henry, indicating that he had not intended to kill her.  And, returning to Dr. Grundy, Mr. Bench inhabited a delusional, imaginary world: "He has delusional beliefs.  A delusion is a false belief that someone has about an event or about their abilities or their lives.  It is a belief that is false and yet is firmly held."  Tr. X 31-32. He had imagined himself Jason Bourne and a military machine; but did he understand the

reality of what was happening - that he was killing someone - or even about his own ability to do so? Dr. Grundy's testimony showed that Mr. Bench engaged in an altercation with Ms. Henry to prevent her from taking him back to the military, which he believed she intended to do, because he was experiencing auditory and visual hallucinations. Tr. X 31-39. He also inexplicably stopped the altercation to put money into the cash register and then to straighten bottles in the stock room. *Id*. at 38.

A jury should have had the opportunity to consider a lesser option. A reasonable juror could have believed Mr. Bench's conduct to be reckless indifference. The OCCA unreasonably determined these facts support only one possibility: Mr. Bench intentionally killed. But "even if the jury believed [Mr. Bench] was intentionally seeking to harm" someone by repeatedly striking them, a rational jury nonetheless could have "concluded [Mr. Bench] had no intent to kill." *Taylor*, 554 F.3d at 891. The OCCA's ignoring the way the facts could have supported a finding of reckless indifference is "unreasonable . . . to the extent [the facts] support[] an alternative inference." *Hogan*, 197 F.3d at 1311.

Here, too, the facts of the homicide could have lent themselves to either rational conclusion; that was a matter for the jury to decide. As in *Taylor*, the evidence does not provide "an unequivocal basis to conclude" intentionality rather than recklessness or a depraved mind, which, as a Constitutional matter, necessitated both options for Mr. Bench's jury. 554 F.3d at 892. The Writ should issue.

**Ground Five**      **The trial court erroneously admitted custodial statements in violation of Mr. Bench's rights under the Fifth, Sixth, and Fourteenth Amendments.**

Mr. Bench allegedly made two inculpatory statements, both of which were used at trial to convict and sentence him to death.  The first statement was elicited by Deputy Quinton Short while Mr. Bench was being taken into custody.  The second statement was elicited by Custer County Detention Officer, Kendall Brown, while being booked into the Jail.

In the late hours of June 6, 2012, after hearing a BOLO for a person in a stolen vehicle with a possible history of mental illness, Deputy Short initiated a traffic stop along I-40.  He was in uniform, drew his weapon, and approached the vehicle ordering Mr. Bench to show his hands outside the car window.  Tr. VI 120.  Deputy Short said he was unaware whether Mr. Bench understood what was happening.  *Id*. at 132.  Instead, while held at gunpoint, Mr. Bench simply complied with the verbal commands shouted at him.  M. Tr. 12/19/14, 64-65.  Deputy Short retrieved his canine and a different officer pointed his gun at Mr. Bench.  Short routinely used his dog to prevent suspects from running, whether the suspect appeared compliant or not.  Deputy Short ordered his dog, an 86-pound Belgian Malinois to "sit on" Mr. Bench as he lay face-down on the pavement.  *Id*. at 67-68, 74.  While prone, face-down on the concrete, along a loud interstate in the middle of the night, with at least one gun aimed in his direction, and a dog "sitting on" him, Mr. Bench was asked by Deputy Short to whom the car belonged.  Mr. Bench did not immediately respond, but then said, "I think I fucked up.  I think I may have killed somebody."  *Id*. at 70; Tr. VI 113-128.  Short's query was directly related to the homicide, and the circumstances surrounding it.  Mr. Bench was not free to leave and had not been given any *Miranda* warnings.  M. Tr. 12/19/14, 66.

Deputy Short transported Mr. Bench to the Custer County Jail.  M. Tr. 12/19/14, 80.

Mr. Bench was brought into the sheriff's office, where Detention Officer Brown spoke with him for 20 to 30 minutes, chit-chatting and intermittently asking booking questions. *Id*. at 41, 44-45. Mr. Bench still had not been given any *Miranda* warnings. Officer Brown denied interrogating Mr. Bench; instead, he claimed Mr. Bench volunteered two inculpatory statements during the booking process. *Id*. at 33, 35. Brown recalled Mr. Bench saying he "messed up and may have killed somebody," and, also, that he "blacked out," asking Officer Brown whether, in his opinion, that could be "cause for pleading insanity." *Id*. at 33-34. Officer Brown stopped the conversation, retrieved a recording device, and started recording Mr. Bench. He then re-asked the previously asked and answered questions to elicit the responses he felt should be preserved for future use by law enforcement. *Id*. at 38, 41-43.

With the recorder on, Officer Brown directed the conversation toward insanity through a conversation he initiated that was entirely unrelated to booking. Mr. Bench asked if Officer Brown ever saw any interesting characters, and Officer Brown says, "interesting, no; but crazy, yes." Brown then describes inmates who have done things he thought crazy, continuing that those who did not believe they were crazy were actually the craziest. State's Ex. 300, 0:39-0:48, 3:04-6:30; Tr. VII 54. Brown continued to discuss matters entirely unrelated to booking, and on the topic of bond, Mr. Bench told Brown he had kind of blacked out, and asked whether, in Brown's opinion, he should go for the insanity plea. *Id.*

Mr. Bench filed pretrial motions to suppress these statements. O.R. 507-08, 1067-1069. Mr. Bench argued the statements were involuntary because neither Deputy Short nor Officer Brown advised him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

The trial court found Mr. Bench had not been interrogated by either, and the statements had been voluntarily made.  O.R. 1250-51; M.Tr. 12/19/14, 55, 103.  At trial, Deputy Brown and Officer Short both testified to the purported admissions over Mr. Bench's objection.  Tr. VI 124; Tr. VII 62.

**I.      The state court decision.**

Mr. Bench challenged the trial court's refusal to suppress his inculpatory statements to Detention Officer, Kendall Brown, as Proposition II of his direct appeal, pp. 29-35, OCCA Case No. D-2015-462 (Feb. 28, 2017).  As for his statements to Deputy Short, Mr. Bench challenged their admission, substantively and as a function of ineffective appellate counsel, in his APCR.  Prop. VII pp. 42-47, Prop. IX p. 49, OCCA No. PCD-2015-698 (March 15, 2018).

The OCCA, with respect to Officer Brown, reviewed the trial court's denial of the suppression motion for an abuse of discretion.  *Bench*, 431 P.3d 929, 948-52.  It applied the test for the admissibility of an inculpatory statement and the test of voluntariness, which is to be "evaluated on the basis of the totality of all the surrounding circumstances."  *Id.* at 949.

The OCCA cited the statement Mr. Bench allegedly made to Deputy Short as its first point supporting its denial of Mr. Bench's claim that his statement later made to Officer Brown was involuntarily made.  The "statements to Brown were preceded by his spontaneous declaration to Deputy Quinton Short,"  *Id.* at 950.  Ultimately, the OCCA found the statements fell within the routine booking questions exception to *Miranda*.  *Id*. at 950-53.  The OCCA's decision to deny Mr. Bench's claim was based upon an unreasonable

76

application of law and/or an unreasonable determination of fact.  28 U.S.C. § 2254(d).

In denying Mr. Bench's post-conviction claim alleging appellate counsel's ineffectiveness for omitting a claim regarding the statements elicited by Deputy Short, the OCCA found the statements voluntary.  It determined Mr. Bench had "blurted out these statements spontaneously and not in response to any questioning by Short." *Bench*, 504 P.3d 592, 603.  This denial, too, was unreasonable.  28 U.S.C. § 2254(d).

## II.     Mr. Bench's statements to Deputy Short and Officer Brown, each made while he was in custody, were involuntary and elicited without *Miranda* warnings.

The OCCA never discussed the evidence showing Officer Brown *had* undertaken actions not normally attendant to arrest and custody and had specifically engaged Mr. Bench in a conversation designed to elicit an incriminating response. The OCCA never considered under the "totality of the circumstances" two essential facts.  One, Officer Brown should have known that stopping the interview to retrieve and ultimately use a recording device, then circling back on questions previously asked, is not "normally attendant to arrest and custody." Tr. VII 58-59; *Rhode Island v. Innis*, 446 U.S. 291, 301(1980). Brown admitted he did this to capture the incriminating statements.  Tr. VII 59-60; M. Tr. 12/19/14 37-38.

Two, in distinguishing the booking process from an interrogation and the *Miranda* rights that inure, the OCCA cited *Innis*, 446 U.S. 291, 301, "[t]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Yet, the

OCCA omitted crucial facts and their bearing on the totality of the circumstances in which the statements were made. *Bench*, 431 P.3d at 950-53.

Officer Brown, not Mr. Bench, was in complete control of the conversation. Brown intentionally re-directed Mr. Bench's questioning about "interesting characters" coming into the jail to discuss "crazy" people, and how they act, evoking, quite logically, Mr. Bench's inquiry into whether Officer Brown thought he might qualify as crazy. State's Ex. 300 0:39-0:48; Tr. VII 54. This was not mere casual "small talk," nor was it "routine booking questions." *Bench*, 431 P.3d at 950-51. These were statements made by a law enforcement officer to elicit something worth recording – not just on the regular jail equipment, but in redundancy, because he knew the elicited information was so powerful and inculpatory that he wanted to be certain he had a record that could later be used against Mr. Bench at trial.

Next, the OCCA supported its finding of the voluntariness of Mr. Bench's statement to Officer Brown in the context of the statements Mr. Bench previously made to Deputy Short. *Bench*, 431 P.3d at 950. Even though Officer Brown claimed he had nothing to do with any of the charges, and that they were not discussed with Mr. Bench, Officer Brown admitted speaking with Deputy Short and other law enforcement personnel, both prior to and during the recording, and receiving "information about the charges." Tr. VII 55. If a suspect had a tendency to speak once about his case, whether voluntarily or not, he might do it again. This *creates* a circumstance upon which Officer Brown knew he could elicit incriminating information; he merely needed to lead Mr. Bench in that direction. The OCCA failed to consider whether, in the totality of the circumstances detailed here, Officer Brown's words

and actions would have elicited an inculpatory response.  *Bench*, 431 P.3d at 950-53.

As for Mr. Bench's inculpatory statements to Deputy Short, the OCCA likewise failed to consider the surrounding circumstances.  *Bench*, 504 P.3d at 602-03.  Mr. Bench stated, "I think I fucked up.  I think I may have killed someone," only in response to questioning from Short about whose car Mr. Bench had been stopped in.  Tr. VI 124.  This questioning came as Mr. Bench lay face down in the road, with a police-dog sitting on him, as well as another officer's gun aimed at him.  *Id*. at 122-24; M. Tr. 12/19/14, 98-99.  The OCCA was unreasonable in finding this statement to be voluntary and "blurted out" "spontaneously." *Bench*, 504 P.3d at 603.  The circumstances of Deputy Short and his dog sitting on Mr. Bench created an environment designed to elicit not only compliance from Mr. Bench, but also an incriminating response.

Finally, the erroneous admission of the statements made to Deputy Short and Officer Brown were not harmless.  Their admission, in the context of the state's arguments of malingering in response to Mr. Bench's NGRI plea had  a "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 506 U.S. 619, 637 (1993).  Mr. Bench's Constitutional rights were violated.  The Writ should issue.

**Ground Six**         **Prosecutorial misconduct deprived Mr. Bench of his rights to Due Process and a fundamentally fair trial.**

The prosecution engaged in misconduct throughout both stages of Mr. Bench's trial. Instances of misconduct included: (1) the knowing use of false or misleading evidence; (2) shifting the burden of proof to Mr. Bench for his insanity defense; (3) bolstering state expert

Dr. Hall's testimony with hearsay; (4) arguing facts not in evidence; (5) misstating evidence; (6) improperly impeaching Dana Huff; and (7) improperly invoking sympathy for the victim. This misconduct was so pervasive that it "so infected [Mr. Bench's] trial with unfairness as to make the resulting conviction [and sentence] a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Mahorney v. Wallman*, 917 F.3d 469, 473 (10th Cir. 1990).

## I.    The state court decision.

On direct appeal, Mr. Bench argued that prosecutorial misconduct had deprived him of a fair trial and reliable sentencing proceeding.  Aplnt's Brief, pp. 74-84, OCCA No. D-2015-462 (Feb. 28, 2017).  The OCCA, under a *plain error* rubric, denied relief as to all but one instance of misconduct.  *Bench*, 431 P.3d 929, 963-69.  It barred review of the prosecution arguing facts not in evidence as to Witness Melissa Lynn, because the claim relied on an outside the record video recording of Lynn's police interview which was provided as an exhibit to Mr. Bench's Application for Evidentiary Hearing.  *Id*. at 964; *see also* App. Evi. Hrg., Exh. 1, OCCA No. D-2015-462 (Feb. 28, 2017).  Mr. Bench asserts the application of procedural bar in this context is inadequate to preclude federal review.  *See, e.g., Brecheen v. Reynolds*, 41 F.3d 1343, 1364 (10th Cir. 1994) (finding bar inadequate where defendant denied any meaningful review of claim).  The state court's application of plain error has the potential to complicate this Court's review in the habeas context. A state court can deny relief on a federal claim via plain error review, because it finds the claim lacks merit under federal law or because the defendant failed to satisfy some independent

state law predicate. *Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003). Here, it appears that the OCCA took the former approach; the state court conducted merits review of each of the instances of misconduct. However, that review was contrary to or an unreasonable application of federal law and/or based upon an unreasonable determination of fact. 28 U.S.C. § 2254(d).

A reviewing court must conduct an "examination of the entire proceedings" or otherwise consider the context in which the alleged misconduct occurred. *Donnelly*, 416 U.S. at 643; *Fero v. Kerby*, 39 F.3d 1462, 1474 (10th Cir. 1994) (quoting *Hopkinson v. Shillinger*, 866 F.2d 1185, 1210 (10th Cir. 1989)). To review misconduct in context, factors considered are the strength of the evidence against the accused such that the alleged statements "could have tipped the scales in favor of the prosecution," *Robison v. Maynard*, 829 F.2d 1501, 1509 (10th Cir. 1987), whether or not the trial judge gave a curative instruction concerning the remarks, *Donnelly*, 614 U.S. at 644, and all complained of conduct must be reviewed in the aggregate because it is possible that harmless prosecutorial errors can add up to make a trial fundamentally unfair. *Le v. Mullin*, 311 F.3d 1002, 1022 (10th Cir. 2002). It is also possible to find fundamental unfairness when errors are considered in conjunction with other prejudicial circumstances within the trial. *Taylor v. Kentucky*, 436 U.S. 478, 487 (1978). Despite its assertion of considering the misconduct "cumulatively," the OCCA failed to actually conduct the constitutionally required *contextual* review, and the misconduct at issue compels the conclusion that Mr. Bench's Constitutional rights were violated. *Bench*, 431 P.3d at 969. Each instance of misconduct will be discussed separately.

### a.    Shifting the burden of proof for the insanity defense to Mr. Bench.

Mr. Bench asserted a NGRI defense.  Once a defendant has presented sufficient evidence to raise the defense, as did Mr. Bench, the state "has the burden to prove beyond a reasonable doubt that the defendant was sane at the time" of the offense.  O.R. 1395, Jury Instruction 14; *Munn v. State*, 658 P.2d 482, 484 (Okla. Crim. App. 1983); Okla. Stat. tit. 21, § 152; *see also Clark v. Arizona*, 548 U.S. 735 (2006) (defendant may only carry burden of persuasion with respect to insanity defense).  Despite this clear directive, the District Attorney argued in final closing:

> Counsel told you - - and look at instruction number fourteen. A person is presumed sane.  The burden is at that table to prove that he is not sane, that he is insane at the time of the crime.  ***The burden is on them.  That burden is beyond a reasonable doubt.  They have not gotten there.***

Tr. XI 57 (emphasis added).  This was egregious misconduct and it went wholly uncorrected by the trial court.  The OCCA found error in the prosecutor's argument, but inexplicably claimed the same was not "blatant."  *Bench*, 431 P.3d at 965.  Given that the jury instructions and defense counsel correctly stated the burden, the misconduct did not rise to the level of "plain or obvious" error.  *Id*.  Sensing this decision might be unreasonable in light of the record, the OCCA disingenuously cleans up the record by claiming the court reporter must have gotten it wrong and the prosecutor didn't really engage in the burden-shifting argument.  *Id*. at 965 n.11.  Mr. Bench invokes  28 U.S.C. § 2254(d)(2) to counter the state court's attempt to disavow the record.

Additionally, the Supreme Court in *Donnelly* acknowledged that a second type of

misconduct occurs when the misconduct infringes a "specific guarantee[] of the bill of rights." 416 U.S. at 643. When prosecutorial misconduct infringes a specific right, a reviewing court should apply the Constitutional standard applicable to that right. *Smith v. Mullin*, 379 F.3d 919, 928 (10th Cir. 2004). The burden shifting that occurred here acted to violate Mr. Bench's right to a jury verdict under the Sixth Amendment and corresponding requirement under the Fifth Amendment that the state prove all elements beyond a reasonable doubt. *Sullivan v. Louisiana*, 508 U.S. 275, 279-80 (1993); *see also Sandstrom v. Montana*, 442 U.S. 510, 524 (1979) (holding unconstitutional jury instructions which shifted burden to defendant). Such an error is structural, resulting in *per se* prejudice. *Sullivan* at 280-81; *Fulminante v. Arizona*, 499 U.S. 279, 291 (1991) (collecting cases). Here, the burden shifting argument acted to both infect Mr. Bench's trial with unfairness and denied him of his specific rights under the Fifth and Sixth Amendments.

### b.    Improper bolstering of Dr. Hall's testimony with hearsay.

Dr. Hall relied on statements from jailer Dallas Cowen that Mr. Bench changed his behavior when his attorneys visited him at the jail. Tr. X 121. It was fine for Dr. Hall to rely on Cowen's statements when forming her expert opinion, but it is quite a different matter that the state then took that hearsay statement of Cowen and encouraged the jury to accept it for the truth of the matter asserted during closing arguments.   The state argued:

> What did Dallas Cowen tell [Dr. Hall]?
> When the doctors and the lawyers show up in the jail, what did Miles Bench do? His behavior changed. He was fine until they got here. He acted different while they were here, and then he was fine when they left.  He is still in that planning stage, folks, period.

Tr. XI, 59.  In effect, the state argued, based upon hearsay, that Mr. Bench was deceptive to his attorneys and was deliberately planning his insanity defense.

The OCCA declined to find any "error, plain or otherwise, occurred."  *Bench*, 431 P.3d at 965.  The OCCA claimed the prosecutor was not arguing Mr. Bench was "deceptive to his own attorneys," instead the prosecutor was "properly summarizing" Hall's testimony. The record doesn't support this reading, as nowhere does the prosecutor identify her argument as a "summary" or otherwise caution the jury not to accept the jailor's statements as true.  *See* Tr. XI 59.  The argument was error, and it must be considered in the context of the entire proceeding.

### c.   Arguing facts not in evidence with respect to the cash register receipts.

Mr. Bench was the only employee present at the Teepee Totem on the night of the homicide.  The cash register tape from this shift was admitted into evidence and was quite bizarre in the way Mr. Bench had inputted items into the register – so bizarre, in fact, that the tape would lead one to believe Mr. Bench simply wasn't of sound mind.  State Ex. 40. Sensing the significance of the incoherent numbers on the tape, the prosecutor injected facts not in evidence into closing arguments, so as to explain away Mr. Bench's behavior.  First, the prosecutor asked the jurors to draw upon their own experiences in evaluating the register tape; he then crossed the line and told the jury that "I have run a business in the past, and I have seen clerks do stuff like that."  Tr. XI 59-60.  Effectively, the prosecutor instructed the jury to consider his own private business dealings to which no witness had testified.

The OCCA found "the comment was improper and constituted an actual error that was

plain or obvious." *Bench*, 431 P.3d at 966.   But, the state court declined to grant relief, finding  no "plain error" because "Appellant was not prejudiced."  *Id*.  The OCCA finding of no prejudice is contrary to *Donnelly* in so much as the state court failed to afford a contextual review.  416 U.S. at 643.  Thus, considering the context of the entire proceedings, Mr. Bench was denied a fair trial through the acknowledged error of the prosecutor arguing facts not in evidence.

### d.    Misstating evidence concerning the crime scene and Mr. Bench's interactions with his Grandfather following the homicide.

State's witness Tammy Wilkerson testified that she observed the floor was a "little wet" near the soda machine when she entered the store following the homicide. Tr. V 70. She didn't think anything awry about the wetness on the floor as it was in the same location as the ice machine.  *Id*. at 80.  Despite Wilkerson's testimony, the prosecutor argued in first stage closing that Wilkerson testified  "[t]he floor around the soda fountain was wet, like it had been mopped." Tr. XI 63.   He then retorted: "You think that is a plan? Yeah." *Id*.  In doing so, the prosecutor grossly misstated the evidence and implied that Mr. Bench had planned the offense, including mopping the floor afterwards.

The prosecutor also misrepresented a conversation between Mr. Bench and his grandfather, Stanley Bench, following the offense.  Mr. Bench said, "Pa, I love you," and his grandfather responded, "I do you, too.  Be careful out there and don't get hurt."  Tr. VI 43. However, the prosecutor wrongly argued Mr. Bench said "Good-bye, Grandpa. I love you. Don't get hurt." Tr. XI 65.  The prosecutor argued "Grandpa, don't get hurt" was a "curious

statement." *Id*. He then voiced his assumption it meant: "Grandpa, I did something really bad, and it is going to hurt you and your name something terrible." *Id*. This purported confession based on the prosecutor's assumption was blatant misconduct. A prosecutor is prohibited from commenting on facts that are not in evidence or misstating the evidence presented. *Miller v. Pate*, 386 U.S. 1, 4-8 (1967) (discussing deliberate misstatements by prosecutor regarding paint-stained undershorts).

The OCCA found that there was no misstatement with respect to mopping the floor around the soda fountain and that such argument was "reasonably based upon the evidence." *Bench*, 431 P.3d at 966. This finding was unreasonable. 28 U.S.C. 2254(d)(2). The state court claims Wilkerson "unmistakably hesitated" when asked if the wetness around the soda machine was uncommon; but there is nothing in the record to support such "hesitation." *Id*.; Tr. V 80. Also, the OCCA fails to explain how Deputy Moore's testimony about a mop and bucket in the store room and a cup of ice and clear liquid next to the soda machine, without more, supports the prosecutor's misstatements. *See* Tr. V 160, 165.

As for the conversation between Mr. Bench and his grandfather, the OCCA did agree that the prosecutor made a misstatement, but concluded the error "did not constitute plain error." *Bench*, 431 P.3d at 966. Again, the OCCA failed to conduct the contextual review required by *Donnelly*.

### e.    Improper impeachment of Dana Huff.

Mr. Bench's mother, Dana Huff, spoke with her husband Farlan after he testified in the second stage and prior to her testimony. The state became aware of the occurrence and

was permitted to voir dire Ms. Huff, in camera.  Ms. Huff said she spoke with Farlan for about a minute in which he told her the questions made him look bad and made it look like Dana wore the pants in the family.  Tr. XIV 83.  She also spoke to another defense witness, who was not called to testify.  *Id*. at 85.  When Ms. Huff testified, the state questioned her about violating the rule of sequestration.  *Id*. at 101-03.  The state then used her violation of the rule to outright call her a liar with respect to numerous other matters.  *Id*. at 103-04.

The OCCA found no error in the prosecutor's conduct.  Despite this finding, the prosecutor outright casting Ms. Huff as a liar, instead of first questioning Ms. Huff about whether she made prior inconsistent statements, should be reviewed contextually, per *Donnelly*, to ensure Mr. Bench's Constitutional rights weren't violated.

### f.    Improper invocation of sympathy for the victim.

The state's closing arguments began with the prosecutor discussing her own daughter and then comparing how the victim's parents must feel not being able to see their daughter again.  The prosecutor argued she was upset the trial prevented her from attending her daughter's livestock show, but then she saw the victim's parents in the courthouse and realized she was being "selfish."  Tr. XIV 141-42.  Next, the prosecutor asked the jurors to put themselves, their children, and relatives in the position of the victim and/or various witnesses:

> ***What would you do?***  You would take action just like these grown women did.
> However, on the other hand, ***what would your kids or your nieces do?  What would those teenagers in your life do?*** . . .
> I submit to you that you may hear and have heard some minimization by the defense of the hand kissing of Jesse Anderson or the pressing himself, his

body, into the side of Breanna Stinchcomb.  Maybe that is not that big of a
deal, they contend.
Ladies and gentlemen, ***if that was your daughter, if that was your niece*** - -

*Id.* at 146-47 (emphasis added).   Counsel objected, but was overruled by the trial court.  *Id.*

at 148.  Next, in final closing, the prosecutor told the jury that Mr. Bench needed to die for

his crime, and then immediately asked the jury to listen for the voice of Braylee Henry:

This man deserves to die for what he did to Braylee Henry, period.  I want you
to take a moment and listen.
Did you hear that? That was the voice that was stomped out by that man.  This
is the voice the will never be heard again.

*Id.* at 146-47.  And, at the end of his argument, the prosecutor further inflamed the jury by

comparing an in-life photo to a post-mortem photograph which resulted in audible gasps

from the gallery.  *Id.* at 172-73.  These photos were effectively the last thing the jury saw

before beginning their deliberations.

The OCCA declined to find plain error in the prosecutor's "borderline" argument

comparing her own circumstances to the plight of the victim's parents and the arguments

directing the jurors to put themselves or their relative in the victim's circumstance.  *Bench*,

431 P.3d at 968.  The state court was unreasonable in finding that "prosecutor did not ask the

jurors in the present case to place either themselves or their relatives in the victim's

circumstances." *Id.*; 28 U.S.C. § 2254(d).  The record demonstrates this is exactly what the

prosecutor did.  Tr. XIV 146-47.  Also, the OCCA erroneously applied plain error to this

aspect of the prosecutor's misconduct, despite trial counsel objecting.  *Id.* at 148.

As for the remaining two invocations of sympathy, the OCCA faulted Mr. Bench for

same in finding that the misconduct "was reasonably based upon the evidence at trial." 431

P.3d at 698-69.  Again, the OCCA's characterization of these arguments is unreasonable in

light of the record, and Mr. Bench contends the arguments were designed to inflame the jury.

 A decision to impose a death sentence must be based on reason, not "caprice or emotion."

*Gardner v. Florida*, 430 U.S. 349, 358 (1977); *see also Moore v. Gibson*, 195 F.3d 1152,

1172 (10th Cir. 1999) ("This court does not condone prosecutorial remarks encouraging the

jury to allow sympathy to influence its decision.").

## II.   Conclusion.

The numerous instances of misconduct, whether considered individually or

cumulatively, deprived Mr. Bench of his Constitutional rights to Due Process and a

fundamentally fair trial and sentencing.  This Court should grant the Writ.

**Ground Seven**          **The Heinous, Atrocious, or Cruel aggravating circumstance is**
                          **Constitutionally vague; and insufficient evidence supports the**
                          **jury's finding of the aggravator.**

To support a finding of the "especially heinous, atrocious, or cruel," (hereinafter

HAC) aggravating circumstance, the state was required to prove beyond a reasonable doubt

*conscious physical suffering* by the victim.  HAC is an historical problem in Oklahoma, and

Mr. Bench's death sentence is invalid because it rests on an aggravating circumstance that

is unconstitutional in both form and application.   Oklahoma's HAC aggravating

circumstance, despite earlier efforts to reform it, remains unconstitutionally vague and overly

broad.  As currently interpreted by the OCCA, it qualifies almost any murder for the death

penalty, save the very few cases in which there is near-instantaneous death.  Once again,

89

Oklahoma has "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Maynard v. Cartwright*, 486 U.S. 356, 363 (1988).

## I.     The state court decision.

Mr. Bench objected to HAC in pretrial motions, which were denied, and again at trial. O.R. 686-92; Tr. XIV 118.  The HAC instructions given at trial were Oklahoma Uniform Jury Instructions 4.72 and 4.73.  *See* O.R. 1437-38 (Instructions 6 and 7).  Mr. Bench raised this claim at Proposition X, pp. 88-93, of his direct appeal brief in two parts: one, challenging the constitutionality of the HAC aggravator; and two, challenging the sufficiency of the evidence.  OCCA No. D-2015-462 (Feb. 28, 2017).

### a.     The OCCA never considered whether Oklahoma's current application of HAC is unconstitutionally vague and over broad.

In denying Mr. Bench's claim that HAC is unconstitutionally vague and over broad, the OCCA declared it "ha[s] repeatedly rejected this claim." *Bench*, 431 P.3d at 962. Without additional explanation or consideration of the current, near-ubiquitous applicability of the aggravator, it summarily "f[ound] that the current uniform instructions defining this aggravating circumstance sufficiently narrow its application to pass constitutional muster." *Id*.  The OCCA ignores its gradual departure from earlier attempts to sufficiently narrow its application of HAC.  It considers only state law and precedent to support its decision.

In his direct appeal brief, Mr. Bench cited *Cartwright*, 486 U.S. 356, 363-64, and a number of Tenth Circuit opinions applying it, to support his argument that "Oklahoma is

currently applying the especially heinous, atrocious or cruel aggravator in a constitutionally vague and overly broad manner, and has failed to give capital juries constitutionally acceptable guidance as to what situations it applies." p. 96, OCCA No. D-2015-462 (Feb. 28, 2017).  The OCCA summarily dismissed the claim without any consideration of federal law.  Nowhere in its opinion on this proposition of error does the OCCA cite to or discuss the Eighth Amendment's requirement for heightened reliability in capital-sentencing proceedings nor any of the Supreme Court cases supporting that proposition.

The ground should be reviewed *de novo*.  *See Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999).  The OCCA never adjudicated the Eighth and Fourteenth Amendment narrowing issue.  Rather, the OCCA's decision only addressed state law and precedent.  The state court never attempts to analyze *Cartwright*, nor any other Supreme Court or even Tenth Circuit authority discussing the standards set therein.  Even assuming, *arguendo*, this court finds the OCCA did adjudicate the Constitutional claims, that adjudication was both contrary to and an unreasonable application of clearly established federal law and/or was based upon unreasonable fact finding. 28 U.S.C. §2254(d).

**b.**   **The OCCA's finding on sufficiency of the evidence**.

The OCCA held "taking the evidence in the light most favorable to the prosecution . . . we find that any rational trier of fact could have found . . . the murder was especially heinous, atrocious or cruel beyond a reasonable doubt."  *Bench*, 431 P.3d at 963; *Jackson v. Virginia*, 443 U.S. 307 (1979).  This decision was unreasonable.  28 U.S.C. § 2254(d).

To support a finding of HAC, the state was required to prove *conscious* physical

suffering by the victim, and to prove it beyond a reasonable doubt. The state called a medical examiner, Dr. Yacoub to testify about the victim's wounds, specifically which wounds occurred pre-mortem, peri-mortem[12], or post-mortem to establish whether the victim was conscious when any of the wounds were incurred. The state's medical examiner, Dr. Yacoub, could not, with any "medical certainty," say that *any* of the wounds were inflicted pre-mortem; at best, Dr. Yacoub said some of the wounds were *either* peri-mortem or pre-mortem, but she could not testify that they occurred prior to, as opposed to simultaneous with, death. Tr. XII 182-197, 206-208. Dr. Yacoub explained, "during the assault, [the victim] became unconscious and died," but she could not say "at what point [the victim] lost consciousness." *Id*. at 208. This is insufficient proof, beyond a reasonable doubt, to sustain the HAC finding. The Writ must issue. *See Brown v. Sanders*, 546 U.S. 212, 220-21 (2006).

## II.   The OCCA's current application of HAC is unconstitutional.

The Eighth and Fourteenth Amendments require an aggravator serve a narrowing function rather than be a standardless catch-all. *Arave v. Creech*, 507 U.S. 463, 474 (1993); *see also Godfrey v. Georgia*, 446 U.S. 420, 428-29 (1980). Aggravating circumstances must sufficiently narrow the class of murderers so juries may "distinguish those who deserve capital punishment from those who do not." *Arave*, 507 U.S. at 474 (citing *Lewis v. Jeffers*, 497 U.S. 764, 776 (1990) and *Godfrey*, 446 U.S. at 433); *see also Richmond v. Lewis*, 506 U.S. 40, 46 (1992).

In *Cartwright*, 486 U.S. at 363-64, the Supreme Court found Oklahoma's HAC

---

[12]"Peri-mortem" means injuries that happen on or around the time of death. Tr. XII 182.

aggravator unconstitutionally vague. HAC "gave no more guidance" than other unconstitutional aggravators which allowed jurors to "believe that every unjustified, intentional taking of human life is 'especially heinous.'" 486 U.S. at 363. *Cartwright* made clear that not every murder could fall under the HAC circumstance and that Oklahoma must provide some principled way to distinguish the few cases in which the circumstance applies from the many cases in which it does not. *Id.*

After *Cartwright,* the OCCA was forced to implement narrowing restrictions for HAC. The OCCA revised its construction of the aggravator, including the requirement of *conscious physical suffering*. For a while, the OCCA applied this narrowing function. The OCCA required that the necessary conscious physical suffering must be more than merely a natural consequence of the killing. *See Cudjo v. State*, 925 P.2d 895, 901-02 (Okla. Crim. App. 1996) ("[T]he manner of the [victim's] killing did not involve any acts of injury or cruelty beyond the scope of the act of killing itself."); *Cheney v. State*, 909 P.2d 74, 80 (Okla. Crim. App. 1995) ("The torture must produce mental anguish in addition to that which of necessity accompanies the underlying killing."). However, the OCCA has strayed from this narrowing, once again creating an aggravator that can and does become applicable in nearly all first-degree murder cases. The OCCA still purports require conscious physical suffering, yet appears to endorse HAC's applicability to every murder that does not result in near-instantaneous death. *See Thomas v. State*, 811 P.2d 1337, 1349 (Okla. Crim. App. 1991).

In the early 2000's, Tenth Circuit decisions warned that Oklahoma was "blur[ring] the common understanding" of conscious physical suffering, "finding [its] existence . . . in

almost every murder." *Romano v. Gibson*, 239 F.3d 1156, 1176 (10th Cir. 2001).  This

problem has derived from the state courts' willingness to affirm HAC based merely on the

brief, chance period of conscious suffering present in virtually all murders.  *See Medlock v.*

*Ward*, 200 F.3d 1314, 1324 (10th Cir. 2000) (Lucero, J., concurring); *Thomas v. Gibson*, 218

F.3d 1213, 1228 n.17 (10th Cir. 2000).  There is immediate concern that Oklahoma's current

interpretation of HAC is again unconstitutional.  *See Pavatt v. Royal*, 859 F.3d 920, 935

(10th Cir. 2017) (*en banc*) (Hartz, J., dissenting) ("I now agree that the Oklahoma HAC

aggravator, as presently construed by the OCCA, does not satisfy the Eighth Amendment .

. . .").  Just like in the pre-*Cartwright* days, Oklahoma is no longer minimizing "the risk of

wholly arbitrary and capricious action."

### III.    Conclusion.

Oklahoma cannot enforce its HAC scheme, nor any death sentence resulting from it,

until its courts resume their Constitutional obligation and apply a principled narrowing

construction to the vague text of the statute.  The specific facts of Mr. Bench's case do not

even matter; even bad facts cannot redeem a bad sentencing scheme.  These facts, even as

tragic as they are, fail to sustain a Constitutional reading of HAC.  The Writ should issue.

**Ground Eight**      **Insufficient evidence supports the jury's finding of the continuing**
                      **threat aggravating circumstance.**

At the time of the offense, Mr. Bench's criminal history consisted of an adjudication

for possession of a stolen vehicle, for which he received probation.  Tr. XII 100-01.  The

state otherwise argued that he posed a continuing threat due to aggressive interactions with

women, a fight with his father after his mother told the two to "duke it out," and an incident in which he removed himself from a restraint chair at the jail.  *Id*. at 80.  This evidence was insufficient to show "a probability that [Mr. Bench] would commit criminal acts of violence that would constitute a continuing threat to society."  Okla. Stat. tit. 21, § 701.12(7).

## I.      The state court decision.

Mr. Bench raised this claim at Proposition IX, pp. 88-93, of his direct appeal brief. OCCA No. D-2015-462 (Feb. 28, 2017).  The OCCA held "taking the evidence in the light most favorable to the State, we find that any rational trier of fact could have found the continuing threat aggravating circumstance beyond a reasonable doubt."  *Bench*, 431 P.3d 929, 961.  This decision was contrary to or an unreasonable application of federal law and/or based upon an unreasonable determination of fact.  28 U.S.C. § 2254(d); *Jackson v. Virginia*, 443 U.S. 307 (1979); *Lewis v. Jeffers*, 497 U.S. 764, 782-83 (1990).

First, the OCCA makes Mr. Bench's teenage fight with his stepfather look much worse than the trial evidence.  *Bench*, 431 P.3d at 959-60.  This was a mutual fight that was spurred on by Mr. Bench's mother, for which the stepfather blamed himself.  Tr. XII, 80, 84-85.  Yet, the state court incorrectly describes the incident as a fighter "trained in hand-to-hand combat, in addition to his naval training" mercilessly attacking his parent.  *Bench*, 431 P.3d at 960.  Mr. Bench wasn't trained in hand-to-hand combat; he took "less than ten" martial arts classes as a child.  Tr. XIV 113.  As for his naval training, Mr. Bench performed poorly and did not complete basic training, as he went AWOL after a few months.  Tr. XIV 66-67.  This one-time fight did not establish Mr. Bench was a continuing threat.

Next, the OCCA overstates Mr. Bench's awkward and aggressive interactions with women. *Bench*, 431 P.3d at 960-61. When Mr. Bench was 13, he shouted obscenities from his bedroom window at a female neighbor while she was swimming. Tr. XII 33. The neighbor thought Mr. Bench was masturbating, but wasn't certain. *Id*. at 35. She conceded that Mr. Bench had never threatened her before or after that incident. *Id*. at 41-42. Three women testified to aggressive interactions with Mr. Bench in and around the convenience store. Mr. Bench came up behind one and put his arms around her, just under her breasts; the woman was offended and slapped him. *Id*. at 45. He approached a teenage girl at the soda fountain, told her she was pretty, and asked if she wanted to go in the back and "exchange life stories." *Id*. at 59. And, he awkwardly flirted with a young lady, who worked at the snow-cone stand across the street from the Teepee Totem, by kissing her hand and asking her on a date. *Id*. at 52-53. None of these women testified to feeling threatened by Mr. Bench. The state court's description of these acts as "sexual assault" and "lewd" acts is unreasonable. *Bench*, 431 P.3d at 960-61. While not condoned, Mr. Bench's behavior with these women is consistent with the often ill-conceived ways in which young men attempt to converse with women and is not indicative of future violence.

Lastly, Mr. Bench's taking a parked car that had the keys in it while going AWOL from the Navy and his escaping from a restraint chair while jailed for this offense were both non-violent incidents that fail to prove a continuing threat. *See id.* at 961.

This evidence, including the circumstances of the homicide, is insufficient to prove beyond a reasonable doubt that Mr. Bench is a continuing threat. Also, the OCCA's finding

otherwise demonstrates that in this case, the continuing threat aggravator failed to perform its Eighth Amendment narrowing function. *See Maynard v. Cartwright*, 486 U.S. 356, 362 (1988). Mr. Bench's death sentence violates the Eighth and Fourteenth Amendments. He is entitled to a new sentencing hearing and requests the Court issue the Writ. *See Brown v. Sanders*, 546 U.S. 212, 220-21 (2006).

**Ground Nine**          **Mr. Bench must be spared from execution due to his young age.**

Mr. Bench was barely 21 years old at the time of the homicide. Society's *evolving standards of decency* compel extending the categorical death penalty prohibition to those 21 and younger. *See Trop v. Dulles*, 356 U.S. 86, 100-01 (1958).

**I.     The state court decision.**

Mr. Bench raised this claim as Proposition IV to his APCR. pp. 32-35, OCCA No. PCD-2015-698 (March 15, 2018). The OCCA found the claim to be waived because it was not asserted in Mr. Bench's direct appeal brief. *Bench*, 504 P.3d at 597. However, the OCCA did so in violation of the rules governing post-conviction applications. *See* Okla. Stat. tit. 22, § 1089(C). Mr. Bench premised his claim upon a American Bar Association Resolution that issued in 2018 after his direct appeal brief was filed, such that he was unable to include the claim on appeal, and if the OCCA chose to follow that Resolution, the outcome of his case would be different. APCR, p. 33 n.12. Through its silence, the OCCA overlooked these circumstances and erroneously waived the claim. The state court's misapplication of its own procedural rule renders its application here inadequate and must not preclude this Court's review. *See, e.g., Fairchild v. Workman*, 579 F.3d 1134, 1141 (10th

97

Cir. 2009) (a state ground will only be considered adequate if evenhandedly applied to similar claims). Since the OCCA did not reach the merits, this court conducts its review de novo. *See Harris v. Poppell*, 411 F.3d 1189, 1196 (10th Cir. 2005).

It is time for the Court to shift the categorical boundary from 18 to 21years of age and younger. Since *Roper v. Simmons*, 543 U.S. 551 (2005)*,* was decided, science has developed to demonstrate that there is no significant difference between the cognitive development of juveniles and those 21 and under, and a national consensus has developed in favor of not executing those 21 and under at the time of their offense. The American Bar Association has resolved that:

> [L]egal, scientific and societal developments strip the continued application of the death penalty against individuals in late adolescence of its moral or constitutional justification. The rationale supporting the bans on executing either juveniles, as advanced in *Roper v. Simmons*, or individuals with intellectual disabilities, as set forth in *Atkins v. Virginia*, also apply to offenders who are 21 years old or younger when they commit their crimes.

APCR, Att. 11, pp. 12-13 (reproducing American Bar Association, Resolution 111 (February 2018)). Given the importance of the ABA within the national legal community, its position should be given particular deference.

Mr. Bench's death sentence for an offense he committed at age 21 offends the Eighth Amendment as cruel and unusual punishment. He requests the Writ issue.

**<u>Ground Ten</u>**          **Cumulative error violated Mr. Bench's rights under the Sixth, Eighth, and Fourteenth Amendments.**

Even if none of the previously discussed errors alone necessitates reversal, their combined effect deprived Mr. Bench of his Constitutional guarantees to a fair trial and a

reliable sentencing proceeding.[13] *Cargle v. Mullin*, 317 F.3d 1196, 1224-25 (10th Cir. 2003); *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990).   And, even if the Court declines to reverse the conviction, the cumulative effect of all errors and omissions at the guilt and sentencing stages resulted in an invalid death sentence.   *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003) (when assessing cumulative error, only first-stage errors are relevant to conviction, but all errors are relevant to sentence).

Here, as in *Cargle*, the constitutional violations "were not isolated, insular errors scattered randomly throughout the proceedings[, but] had an inherent synergistic effect." 317 F.3d at 1221.   For example, Mr. Bench's counsel was woefully deficient in the presentation of the insanity defense; counsel failed to adequately rebut the state's expert who cast Mr. Bench as faking the severity of his mental illness; the state utilized erroneously admitted custodial statements to counter the insanity defense; and the state engaged in prosecutorial misconduct designed to defeat the insanity defense.   And, once the insanity defense failed, errors continued into the second stage, including, counsel inexplicably abandoning its mitigation expert just prior to his anticipated testimony, counsel failing to present Mr. Bench's severe mental illness, schizophrenia, as a mitigating factor, and the prosecution engaging in further misconduct by improperly invoking sympathy for the victim.

The OCCA found on direct appeal that Mr. Bench was "not denied a fair trial or sentencing proceeding by egregious or numerous errors." *Bench*, 431 P.3d 929, 981.   On

---

[13] Mr. Bench raised this claim as Proposition XII on appeal.   Aplnt's Brief, pp. 98-99, OCCA No. D-2015-462 (Feb. 28, 2017).   And, he again raised cumulative error as Prop. X to his APCR. pp. 50-51, OCCA No. PCD-2015-698 (March 15, 2018).

post-conviction, the OCCA held "there is no cumulative error to consider." *Bench*, 504 P.3d

592, 603.  These decisions were unreasonable.  28 U.S.C. § 2254(d).  Further, to the extent,

this Court finds errors which the OCCA did not, its review is de novo.  *See Cargle*, 317 F.3d

at 1224.  If this Court is left in grave doubt as to whether the errors combined to result in

prejudice, the Writ must issue.  *O'Neal v. McAninch*, 513 U.S. 432, 438 (1995); *see also*

*Cargle*, 317 F.3d at 1224-25 (applying *Brecht* to cumulative error claim).

## **REQUEST FOR RELIEF**

Wherefore, Petitioner, Miles Sterling Bench, prays the Court grant him all relief to

which he may be entitled, to include an evidentiary hearing as to any disputed issues or

matters in need of further factual development, and ultimately, a Writ of Habeas Corpus.

Respectfully submitted,

*s/ Robert S. Jackson*
Robert S. Jackson, OBA # 22189
1300 NW 10th Street
Oklahoma City, OK 73106
Telephone:  (405) 602-8614
Facsimile:   (405) 400-2167
bob@bobjacksonlaw.com

*s/Alyssa Donovan Farrell*
Alyssa Donovan Farrell, OBA #32304
P.O. Box 52192
Tulsa, OK 74152
Telephone: (405) 439-1264
alyssa.d.farrell@gmail.com

COUNSEL FOR PETITIONER,
MILES STERLING BENCH

## **CERTIFICATE OF SERVICE**

I hereby certify that on the date of filing, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrant:

Ms. Caroline E.J. Hunt
Assistant Attorney General

*s/ Robert S. Jackson*
Robert S. Jackson