**No. CIV-22-66-G**

**(Capital Case)**

_____

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**
_____

**MILES STERLING BENCH,**

**Petitioner,**

**-vs-**

**CHRISTE QUICK, Acting Warden,
Oklahoma State Penitentiary**

**Respondent.**

_____

**RESPONSE IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS**
_____

**GENTNER F. DRUMMOND
ATTORNEY GENERAL OF OKLAHOMA**

**CAROLINE E.J. HUNT, OBA #32635
ASSISTANT ATTORNEY GENERAL**

**313 NE 21st Street
Oklahoma City, OK    73105
(405) 521-3921; (405) 522-4534 (FAX)
Service email:    fhc.docket@oag.ok.gov**

**ATTORNEYS FOR RESPONDENT**

_____

**March 8, 2022**

## <u>TABLE OF CONTENTS</u>

Page

STATEMENT OF THE FACTS .................................................. 3

STANDARD OF REVEIW .................................................. 6

ARGUMENT AND AUTHORITY .................................................. 9

<u>GROUND ONE</u>

    GROUND ONE DOES NOT WARRANT HABEAS RELIEF ......................... 9

    A.    Background .................................................. 10

    B.    Lack of Clearly Established Law .................................................. 11

    C.    Alternatively, *Wallace* Is an Independent and Adequate Procedural Bar .................................................. 13

        1.    Independence .................................................. 13

        2.    Adequacy .................................................. 15

        3.    Petitioner Cannot or, Alternatively, Has Not Overcome the *Wallace* Bar .................................................. 30

    D.    Alternative § 2254(d)/*De Novo* Analysis .................................................. 32

        1.    This Court Cannot Second-Guess the OCCA's Refusal to Apply *Bosse* and *McClain* Retroactively .................................................. 32

        2.    The *Wallace* Rule Is Not Contrary to, or an Unreasonable Application of, Any Clearly Established Supreme Court Precedent, and Alternatively Relief Should Be Denied Even on *De Novo* Review .................................................. 33

            a.    All of Petitioner's arguments are new and unexhausted .................................................. 33

            b.    *Teague* does not operate as a constitutional mandate for non-constitutional rules .................................................. 34

            c.    *McGirt* is "new" .................................................. 36

i

|  |  | *i.* | *the opinions in* <u>McGirt</u> ................................................. **36** |
|  |  | *ii.* | <u>*McGirt*</u> *was not predictable to all reasonable jurists* ................................................ **38** |
|  | d. | | ***McGirt* is procedural and therefore not retroactive** ........ **49** |
|  | e. | | **Without the benefit of the new rule in *McGirt*, Petitioner's prosecutorial authority claim must fail** ........ **51** |
| E. | **Conclusion** ............................................................ **60** | | |

**GROUND TWO**

**A FAIRMINDED JURIST COULD AGREE PETITIONER'S TRIAL COUNSEL WAS NOT INEFFECTIVE** ............................... **61**

| A. | **Background** ...................................................... **61** | |
| B. | **Standard of Review** ........................................ **61** | |
| C. | **First-Stage Ineffective Assistance Claims** ..................... **62** | |
|  | 1. | **Failure to Object to Alleged Instances of Prosecutorial Error** ..................................... **62** |
|  | 2. | **Alleged Failure to Impeach Dr. Hall** ................ **64** |
|  | 3. | **Alleged Failure to Effectively Cross-Examine Melissa Lynn** ............................................. **74** |
| D. | **Second-Stage Ineffective Assistance Claims** ................... **77** | |
|  | 1. | **Failure to Present Mitigation Specialist at Trial** ......... **77** |
|  | 2. | **Failure to Present Mental Health Expert** ................ **80** |
|  | 3. | **Failure to Prepare and Present Neuroimaging Evidence** ........ **82** |
|  | 4. | **Failure to Present Testimony Regarding Value of Petitioner's Life** ..................................... **84** |
| E. | **Conclusion** ............................................................ **85** | |

**GROUND THREE**

**A FAIRMINDED JURIST COULD AGREE APPELLATE COUNSEL WERE NOT INEFFECTIVE** ..................... 85

A.    Background ........................................................ 85

B.    Clearly Established Law ................................... 85

C.    Argument and Authority ................................ 86

    1.    Failure to Object to Obtain More Specialized MRI ................. 86

    2.    Failure to Raise Prosecutorial Authority Claim ........................ 89

    3.    Failure to Raise Claim as to How Trial Court Answered Jury Question ................. 93

    4.    Failure to Challenge Petitioner's Statements to Deputy Short ........................ 94

D.    Conclusion ........................................................ 96

**GROUND FOUR**

**PETITIONER'S *BECK* CLAIM DOES NOT WARRANT RELIEF** ............. 96

A.    Background ........................................................ 96

B.    The OCCA's Decision Did Not Run Afoul of *Beck* ................................. 96

C.    Conclusion ........................................................ 100

**GROUND FIVE**

**PETITIONER'S CHALLENGE TO THE ADMISSION OF HIS BOOK-IN STATEMENTS DOES NOT SATISFY AEDPA, WHILE HIS CHALLENGE TO THE ADMISSION OF HIS STATEMENTS TO DEPUTY SHORT IS BARRED** ..................... 100

A.    Statements to Detention Officer Brown ................................. 101

B.    Statements to Deputy Short ................................. 103

**C.**     Conclusion ................................................................... **104**

**GROUND SIX**

    **A FAIRMINDED JURIST COULD AGREE WITH THE
OCCA'S REJECTION OF PETITIONER'S PROSECUTORIAL
ERROR CLAIM** ................................................................... **104**

    **A.**     Background .................................................. **105**

    **B.**     Standard of Review .................................... **105**

    **C.**     Alleged Use of False or Misleading Evidence ........... **106**

    **D.**     Alleged Shifting of Burden of Proof ........... **107**

    **E.**     Alleged "Bolstering" of Dr. Hall's Testimony ........... **108**

    **F.**     Arguing Facts Not in Evidence ........... **109**

    **G.**     Misstating the Evidence ........... **110**

    **H.**     Allegedly Improper Impeachment of Ms. Huff ........... **111**

    **I.**     Alleged invocation of sympathy for victim B.H. ........... **112**

    **J.**     Conclusion ........... **115**

**GROUND SEVEN**

    **A FAIRMINDED JURIST COULD AGREE WITH THE OCCA'S
REJECTION OF PETITIONER'S CHALLENGES TO THE HAC
AGGRAVATOR** ................................................................... **115**

    **A.**     Standard of Review .................................... **115**

    **B.**     Facial Vagueness Challenge ........... **116**

    **C.**     Sufficiency Challenge ........... **117**

    **D.**     Conclusion ........... **118**

**GROUND EIGHT**

> **A FAIRMINDED JURIST COULD AGREE THE EVIDENCE
> WAS SUFFICIENT TO SHOW CONTINUING THREAT** ......................... 118

> **A.** **Standard of Review** ................................................. 119

> **B.** **A Fairminded Jurist Could Agree the Evidence was Sufficient** ........ 119

> **C.** **Conclusion** ...................................................... 121

**GROUND NINE**

> **PETITIONER'S CLAIM THAT HE SHOULD BE INELIGIBLE
> FOR THE DEATH PENALTY DESPITE BEING WELL OVER
> *ROPER*'S CUT-OFF IS PROCEDURALLY BARRED** ................................ 122

> **A.** **This Claim Is Barred** ........................................... 122

> **B.** **Conclusion** ...................................................... 123

**GROUND TEN**

> **A FAIRMINDED JURIST COULD AGREE CUMULATIVE
> ERROR RELIEF IS UNWARRANTED** ..................................... 123

> **A.** **Background** ...................................................... 124

> **B.** **A Fairminded Jurist Could Agree with the OCCA's Decision** ........... 124

> **C.** **Conclusion** ...................................................... 125

**CONCLUSION** .............................................................. 125

**CERTIFICATE OF SERVICE** ................................................ 126

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ake v. Oklahoma*,
  470 U.S. 68 (1985) ...................................................................... 88

*Albrecht v. Horn*,
  485 F.3d 103 (3d Cir. 2007) ...................................................... 31

*Alverson v. Workman*,
  595 F.3d 1142 (10th Cir. 2010) ................................................. 89

*Anderson v. Hardman*,
  241 F.3d 544 (7th Cir. 2001) .................................................... 28

*Apprendi v. New Jersey*,
  530 U.S. 466 (2000) .................................................................. 25

*Banks v. Workman*,
  692 F.3d 1133 (10th Cir. 2012) ...................................... 13, 15, 21

*Barajas v. United States*,
  877 F.3d 378 (8th Cir. 2017) .................................................... 30

*Beard v. Banks*,
  542 U.S. 406 (2004) .............................................................. 41, 42

*Beck v. Alabama*,
  447 U.S. 625 (1980) .............................................................. 96, 97

*Bentley v. Harvonek*,
  No. CIV-22-160-C, 2022 WL 1400285 (W.D. Okla. Mar. 30, 2022) ........................ 92

*Berry v. Braggs*,
  No. 19-CV-0706-GKF-FHM, 2020 WL 6205849 (N.D. Okla. Oct. 22, 2020) .......... 33

*Black v. Workman*,
  682 F.3d 880 (10th Cir. 2012) .................................................... 8

*Blakely v. Washington*,
  542 U.S. 296 (2004) ................................................................. 35

*Bland v. Sirmons,*
    459 F.3d 999 (10th Cir. 2006) ................................................................ 109, 121

*Bobby v. Van Hook,*
    558 U.S. 4 (2009) ................................................................................................ 78

*Bouie v. City of Columbia,*
    378 U.S. 347 (1964) ........................................................................................... 28

*Boyde v. California,*
    494 U.S. 370 (1990) ......................................................................................... 108

*Branch v. State,*
    236 So. 3d 981 (Fla. 2018) ............................................................................. 123

*Brecheen v. Reynolds,*
    41 F.3d 1343 (10th Cir. 1994) ....................................................................... 107

*Brumfield v. Cain,*
    576 U.S. 305 (2015) ............................................................................................. 8

*Bullock v. Carver,*
    297 F.3d 1036 (10th Cir. 2002) ....................................................................... 92

*Burt v. Titlow,*
    571 U.S. 12 (2013) .............................................................................................. 69

*Bush v. Carpenter,*
    926 F.3d 644 (10th Cir. 2019) ....................................................................... 124

*Butler v. McKellar,*
    494 U.S. 407 (1990) .................................................................................. Passim

*Byrd v. Workman,*
    645 F.3d 1159 (10th Cir. 2011) ....................................................................... 90

*Cannon v. Gibson,*
    259 F.3d 1253 (10th Cir. 2001) .................................................................. 26, 80

*Cannon v. Johnson,*
    134 F.3d 683 (5th Cir. 1998) ........................................................................... 81

*Carey v. Musladin*,
    549 U.S. 70 (2006) ........................................................................... 13

*Caspari v. Bohlen*,
    510 U.S. 383 (1994) ............................................................ 42, 56, 58, 59

*Chaidez v. United States*,
    568 U.S. 342 (2013) ........................................................................... 41

*Cobb v. Metrish*,
    No. 06-10722, 2008 WL 2831838 (E.D. Mich. July 21, 2008) .................................. 89

*Coleman v. Thompson*,
    501 U.S. 722 (1991) ................................................................... Passim

*Cruz v. Arizona*,
    No. 21-846, 2023 WL 2144416 (U.S. Feb. 22, 2023) ...................................... 27, 29

*Cullen v. Pinholster*,
    563 U.S. 170 (2011) ..................................................................... 62, 93

*Danforth v. Minnesota*,
    552 U.S. 264 (2008) ........................................................................... 12

*Daniels v. United States*,
    254 F.3d 1180 (10th Cir. 2001) ........................................................... 25, 30

*Darden v. Wainwright*,
    477 U.S. 168 (1986) ......................................................................... 105

*Donnelly v. DeChristoforo*,
    416 U.S. 637 (1974) ................................................................... Passim

*Dority v. Farris*,
    560 F. App'x 786 (10th Cir. 2014) ......................................................... 125

*Dunn v. Madison*,
    138 S. Ct. 9 (2017) ............................................................................. 8

*Early v. Packer*,
    537 U.S. 3 (2002) ............................................................................. 116

*Echols v. Kemna*,
    511 F.3d 783 (8th Cir. 2007) ........................................................................... 22

*Edwards v. Vannoy*,
    141 S. Ct. 1547 (2021) ..................................................................... 36, 39, 49, 50

*Espinosa v. Florida*,
    505 U.S. 1079 (1992) ...................................................................................... 38

*Fairbank v. Ayers*,
    650 F.3d 1243 (9th Cir. 2011) ......................................................................... 78

*Fairchild v. Workman*,
    579 F.3d 1134 (10th Cir. 2009) .................................................................. 31, 90

*Fairres v. Elhabte*,
    No. CIV-21-1019-J, 2022 WL 3586214 (W.D. Okla. Aug. 22, 2022) ........................ 20

*Fero v. Kerby*,
    39 F.3d 1462 (10th Cir. 1994) ....................................................................... 106

*Fields v. Gibson*,
    277 F.3d 1203 (10th Cir. 2002) ..................................................................... 120

*Frost v. Pryor*,
    749 F.3d 1212 (10th Cir. 2014) ......................................................................... 8

*Gardner v. Florida*,
    430 U.S. 349 (1977) ..................................................................................... 112

*Gilbert v. Mullin*,
    302 F.3d 1166 (10th Cir. 2002) ......................................................................... 7

*Gilmore v. Taylor*,
    508 U.S. 333 (1993) .............................................................................. 36, 42, 43

*Gonzales v. Jordan*,
    37 F. App'x 432 (10th Cir. 2002) ..................................................................... 22

*Gosa v. Mayden*,
    413 U.S. 665 (1973) .................................................................................. 49, 51

*Grant v. Royal*,
    886 F.3d 874 (10th Cir. 2018) ................................................................ 63, 83

*Grant v. Trammell*,
    727 F.3d 1006 (10th Cir. 2013) .............................................................. Passim

*Greene v. Fisher*,
    565 U.S. 34 (2011) ........................................................................................ 36

*Grissom v. Carpenter*,
    902 F.3d 1265 (10th Cir. 2018) ................................................................... 100

*Hagen v. Utah*,
    510 U.S. 399 (1994) ...................................................................................... 42

*Hamm v. Saffle*,
    300 F.3d 1213 (10th Cir. 2002) ..................................................................... 26

*Hancock v. Trammell*,
    798 F.3d 1002 (10th Cir. 2015) ..................................................................... 31

*Harmon v. Sharp*,
    936 F.3d 1044 (10th Cir. 2019) ............................................. 63, 110, 111, 112

*Harrington v. Richter*,
    562 U.S. 86 (2011) ................................................................................. Passim

*Harris v. Reed*,
    489 U.S. 255 (1989) ................................................................................ 14, 15

*Harvin v. Mahally*,
    No. CV 15-3395, 2019 WL 7606221 (E.D. Pa. Dec. 30, 2019) .......... 102, 103

*Hinton v. Alabama*,
    571 U.S. 263 (2014) ...................................................................................... 77

*Hopper v. Evans*,
    456 U.S. 605 (1982) ...................................................................................... 97

*House v. Hatch*,
    527 F.3d 1010 (10th Cir. 2008) .................................................... 7, 11, 109

*Hurst v. Florida*,
    577 U.S. 92 (2016) ................................................................... 35

*In re Rivero*,
    797 F.3d 986 (11th Cir. 2015) ............................................... 50

*In re Smith*,
    10 F.3d 723 (10th Cir. 1993) ................................................. 47

*Jackson v. Virginia*,
    443 U.S. 307 (1979) ............................................ 115, 119, 120

*James v. Gibson*,
    211 F.3d 543 (10th Cir. 2000) ............................................. 121

*Johnson v. Foster*,
    786 F.3d 501 (7th Cir. 2015) ................................................. 18

*Johnson v. Williams*,
    568 U.S. 289 (2013) ........................................... 88, 111, 116

*Jones v. Mississippi*,
    141 S. Ct. 1307 (2021) .......................................................... 35

*Lambrix v. Sec'y, DOC*,
    872 F.3d 1170 (11th Cir. 2017) ..................................... 32, 35

*Lambrix v. Singletary*,
    520 U.S. 518 (1997) ..................................................... Passim

*Le v. Mullin*,
    311 F.3d 1002 (10th Cir. 2002) ................................. 106, 109

*Lee v. Kemna*,
    534 U.S. 362 (2002) ........................................... 27, 28, 29

*Lewis v. Jeffers*,
    497 U.S. 764 (1990) ............................................................ 121

*Littlejohn v. Trammell*,
    704 F.3d 817 (10th Cir. 2013) ............................................ 108

*Lockhart v. Fretwell*,
   506 U.S. 364 (1993) ........................................................................................ 94

*Lonchar v. Thomas*,
   517 U.S. 314 (1996) ........................................................................................ 12

*Losh v. Fabian*,
   592 F.3d 820 (8th Cir. 2010) .................................................................... 32, 35

*Lott v. Trammell*,
   705 F.3d 1167 (10th Cir. 2013) ...................................................................... 80

*Lyons v. Stovall*,
   188 F.3d 327 (6th Cir. 1999) .......................................................................... 30

*Marcus v. United States*,
   No. 14-CV-5780, 2015 WL 3869689 (E.D.N.Y. June 22, 2015) .................. 64

*Martinez v. Ryan*,
   926 F.3d 1215 (9th Cir. 2019) ................................................................ 18, 122

*Matthews v. Workman*,
   577 F.3d 1175 (10th Cir. 2009) .............................................................. 105, 106

*Maynard v. Cartwright*,
   486 U.S. 356 (1988) .............................................................................. 116, 117

*McCleskey v. Zant*,
   499 U.S. 467 (1991) ........................................................................................ 31

*McDermott v. O'Brien*,
   No. CIV.A. 09-11992-RGS, 2011 WL 5513212 (D. Mass. Oct. 25, 2011) ............... 89

*McGirt v. Oklahoma*,
   140 S. Ct. 2452 (2020) ............................................................................ Passim

*Michigan v. Long*,
   463 U.S. 1032 (1983) ...................................................................................... 15

*Miller v. Mullin*,
   354 F.3d 1288 (10th Cir. 2004) .................................................... 86, 95, 117

*Milner v. Department of Navy,*
    562 U.S. 562 (2011) ................................................................................ 40

*Miranda v. Arizona,*
    384 U.S. 436 (1966) ............................................................... 101, 102, 104

*Mitchell v. Sharp,*
    798 F. App'x 183 (10th Cir. 2019) ..................................................... 116

*Montgomery v. Louisiana,*
    577 U.S. 190 (2016) ................................................................................ 35

*Moore v. Gibson,*
    195 F.3d 1152 (10th Cir. 1999) .......................................................... 113

*Morales v. Giurbino,*
    207 F. App'x 852 (9th Cir. 2006) ....................................................... 108

*Murphy v. Royal,*
    866 F.3d 1164 (10th Cir. Aug. 8, 2017) ............................................. 91

*Murphy v. Royal,*
    875 F.3d 896 (10th Cir. 2017) ..................................................... Passim

*Murphy v. Sirmons,*
    497 F. Supp. 2d 1257 (E.D. Okla. 2007) ............................................. 91

*Murphy v. Oklahoma,*
    140 S. Ct. 2412 (2020) ........................................................................... 48

*Murray v. Carrier,*
    477 U.S. 478 (1986) ........................................................................ 18, 31

*Nebraska v. Parker,*
    577 U. S. 481 (2016) .......................................................... 40, 45, 48, 55

*Neill v. Gibson,*
    278 F.3d 1044 (10th Cir. 2001) .......................................................... 108

*Nixon v. City & Cnty. of Denver,*
    784 F.3d 1364 (10th Cir. 2015) ............................................................ 28

*O'Callahan v. Parker,*
  395 U.S. 258 (1969) ................................................................ 49, 50

*O'Dell v. Netherland,*
  521 U.S. 151 (1997) ........................................................ 39, 52, 112

*Oklahoma v. Castro-Huerta,*
  142 S. Ct. 2486 (2022) ............................................................ 11, 12

*Pacheco v. El Habti,*
  48 F.4th 1179 (10th Cir. 2022) ........................................ 35, 44, 47

*Padilla v. Kentucky,*
  559 U.S. 356 (2010) ..................................................................... 41

*Pavatt v. Carpenter,*
  928 F.3d 906 (10th Cir. 2019) ................................... 115, 118, 119

*Paxton v. Ward,*
  199 F.3d 1197 (10th Cir. 1999) .................................................. 97

*Pelfresne v. Village of Williams Bay,*
  917 F.2d 1017 (7th Cir. 1990) .................................................... 28

*Pennsylvania v. Muniz,*
  496 U.S. 582 (1990) ................................................................... 102

*Phillips v. Calhoun,*
  956 F.2d 949 (10th Cir. 1992) .................................................... 28

*Postelle v. Carpenter,*
  901 F.3d 1202 (10th Cir. 2018) .................................................. 73

*Premo v. Moore,*
  562 U.S. 115 (2011) ........................................................ 68, 82, 84

*Pursell v. Horn,*
  187 F. Supp. 2d 260 (W.D. Pa. 2002) ........................................ 52

*Reed v. Farley,*
  512 U.S. 339 (1994) ..................................................................... 13

*Reedy v. Werholtz,*
   660 F.3d 1270 (10th Cir. 2011) ............................................................... 17, 62

*Reese v. Sec'y, Fla. Dep't of Corr.,*
   675 F.3d 1277 (11th Cir. 2012) ................................................................ 113

*Rhoades v. Paskett,*
   No. CV-97-170-S-EJL, 2005 WL 3576845 (D. Idaho Dec. 29, 2005) ...................... 60

*Rhode Island v. Innis,*
   446 U.S. 291 (1980) ................................................................. 102, 103

*Rompilla v. Beard,*
   545 U.S. 374 (2005) ............................................................................ 63

*Roper v. Simmons,*
   543 U.S. 551 (2005) ......................................................................... 122

*Rountree v. Balicki,*
   640 F.3d 530 (3d Cir. 2011) ................................................................... 73

*Sanders v. Pettigrew,*
   No. CIV 20-350-RAW-KEW, 2021 WL 3291792 (E.D. Okla. Aug. 2, 2021) .......... 44

*Sauceda v. Mondragon,*
   986 F.2d 1429 (10th Cir. 1992) .............................................................. 114

*Sawyer v. Smith,*
   497 U.S. 227 (1990) ................................................................... Passim

*Schriro v. Summerlin,*
   542 U.S. 348 (2004) ..................................................................... 49, 50

*Sexton v. Beaudreaux,*
   138 S. Ct. 2555 (2018) ................................................................. Passim

*Skinner v. Abbott,*
   141 F. App'x 727 (10th Cir. 2005) ........................................................ 28, 29

*Smith v. Duckworth,*
   824 F.3d 1233 (10th Cir. 2016) ............................................................. 124

*Smith v. Mullin*,
   379 F.3d 919 (10th Cir. 2004) ........................................................71

*Smith v. Robbins*,
   528 U.S. 259 (2000) .......................................................................85

*Smith v. Workman*,
   550 F.3d 1258 (10th Cir. 2008) .........................................104, 122

*Soffar v. Cockrell*,
   300 F.3d 588 (5th Cir. 2002) ...........................................56, 59, 60

*Solem v. Bartlett*,
   465 U.S. 463 (1984) ...............................................................Passim

*Stokes v. Anderson*,
   123 F.3d 858 (5th Cir. 1997) .......................................................26

*Strickland v. Washington*,
   466 U.S. 668 (1984) ...............................................................Passim

*Stringer v. Black*,
   503 U.S. 222 (1992) ..........................................38, 46, 47, 55

*Teague v. Lane*,
   489 U.S. 288 (1989) ...............................................................Passim

*Thacker v. Workman*,
   678 F.3d 820 (10th Cir. 2012) ...................................................15

*Thomas v. Loney*,
   134 U.S. 372 (1890) ....................................................................12

*Thornburg v. Mullin*,
   422 F.3d 1113 (10th Cir. 2005) .....................110, 111, 112, 114

*Toles v. Gibson*,
   269 F.3d 1167 (10th Cir. 2001) ...................................................89

*Tryon v. Farris*,
   No. CIV-19-195-J, 2021 WL 3042664 (W.D. Okla. July 19, 2021) ...................88, 89

*Turrentine v. Mullin*,
   390 F.3d 1181 (10th Cir. 2004) ............................................................ 32, 104

*United States v. Becerra*,
   958 F.3d 725 (8th Cir. 2020) .......................................................................... 95

*United States v. Booker*,
   543 U.S. 220 (2005) ........................................................................................ 25

*United States v. Clemons*,
   201 F. Supp. 2d 142 (D.D.C. 2002) .............................................................. 95

*United States v. Cronic*,
   466 U.S. 648 (1984) ........................................................................................ 89

*United States v. Cuch*,
   79 F.3d 987 (10th Cir. 1996) ................................................................ Passim

*United States v. Hooks*,
   780 F.2d 1526 (10th Cir. 1986) ................................................................... 120

*United States v. Hopkins*,
   920 F.3d 690 (10th Cir. 2019) ................................................................. 39, 41

*United States v. John*,
   437 U.S. 634 (1978) ........................................................................................ 12

*United States v. Little*,
   No. 21-CR-162-JFH, 2022 WL 14224529 (N.D. Okla. Oct. 24, 2022) ...................... 57

*United States v. Martinez*,
   139 F.3d 412 (4th Cir. 1998) ........................................................................ 36

*United States v. McBride*,
   656 F. App'x 416 (10th Cir. 2016) .............................................................. 114

*United States v. McVeigh*,
   153 F.3d 1166 (10th Cir. 1998) ..................................................................... 97

*United States v. Moss*,
   252 F.3d 993 (8th Cir. 2001) ........................................................................ 25

*United States v. Orr*,
   172 F.3d 64 (10th Cir. 1999) ...................................................................... 120

*United States v. Patterson*,
   No. 21-7053, 2022 WL 17685602 (10th Cir. Dec. 15, 2022) ......................... 57, 58, 93

*United States v. Ramsey*,
   No. CRIM.A. 01-005-04, 2006 WL 328371 (E.D. Pa. Feb. 10, 2006) ...................... 25

*United States v. Russell*,
   411 U.S. 423 (1973) .................................................................................. 106

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990) .................................................................................... 12

*Ute Indian Tribe v. Utah*,
   773 F.2d 1087 (1985) .................................................................................. 42

*Valdez v. Bravo*,
   373 F.3d 1093 (10th Cir. 2004) ..................................................................... 7

*Wainwright v. Witt*,
   469 U.S. 412 (1985) .................................................................................... 45

*Warren v. Kyler*,
   422 F.3d 132 (3d Cir. 2005) ......................................................................... 33

*Weeks v. Angelone*,
   528 U.S. 225 (2000) .................................................................................. 114

*White v. Woodall*,
   572 U.S. 415 (2014) ..................................................................................... 8

*Williams v. Taylor*,
   529 U.S. 362 (2000) ..................................................................................... 7

*Williams v. Trammell*,
   539 F. App'x 844 (10th Cir. 2013)................................................................. 97

*Williams v. Trammell*,
   782 F.3d 1184 (10th Cir. 2015) .................................................................... 83

*Willis v. Crow,*
  No. CIV-22-92-J, 2022 WL 576559 (W.D. Okla. Feb. 25, 2022) ..............................20

*Wilson v. Sirmons,*
  536 F.3d 1064 (10th Cir. 2008) ..........................................................117, 118

*Wood v. Allen,*
  558 U.S. 290 (2010) .............................................................9, 71, 73

*Woodford v. Visciotti,*
  537 U.S. 19 (2002) ...................................................................83

*Yellowbear v. Wyoming Atty. Gen.,*
  525 F.3d 921 (10th Cir. 2008) ...............................................12

*Zant v. Stephens,*
  462 U.S. 862 (1983) ...............................................................115

## STATE CASES

*Bench v. State,*
  431 P.3d 929 (Okla. Crim. App. 2018) ................................Passim

*Bench v. State,*
  495 P.3d 670 (Okla. Crim. App. 2021) ...............................18

*Bench v. State,*
  504 P.3d 592 (Okla. Crim. App. 2021) ................................Passim

*Bosse v. State,*
  499 P.3d 771 (Okla. Crim. App. 2021) ................................Passim

*Cole v. State,*
  499 P.3d 760 (Okla. Crim. App. 2021) ................................15, 23

*Cruse v. State,*
  67 P.3d 920 (Okla. Crim. App. 2003) .................................24

*Cuesta-Rodriguez v. State,*
  241 P.3d 214 (Okla. Crim. App. 2010) ...............................34

*Ford v. State*,
   630 So. 2d 111 (Ala. Crim. App. 1991) ........................................................ 89

*Martinez v. State*,
   502 P.3d 1115 (Okla. Crim. App. 2021) ...................................................... 16

*Mayes v. State*,
   887 P.2d 1288 (Okla. Crim. App. 1994) ...................................................... 76

*McCarty v. State*,
   989 P.2d 990 (Okla. Crim. App. 1999) ........................................................ 86

*McClain v. State*,
   501 P.3d 1009 (Okla. Crim. App. 2021) ...................................................... 32

*Murphy v. State*,
   124 P.3d 1198 (Okla. Crim. App. 2005) ...................................................... 91

*Nicholson v. State*,
   421 P.3d 890 (Okla. Crim. App. 2018) ................................................... 93, 94

*Ryder v. State*,
   500 P.3d 647 (Okla. Crim. App. 2021) ........................................................ 16

*Smallwood v. State*,
   937 P.2d 111 (Okla. Crim. App. 1997) ........................................................ 86

*State ex rel. Matloff v. Wallace*,
   497 P.3d 686 (Okla. Crim. App. 2021) ................................................ Passim

## FEDERAL STATUTES

18 U.S.C. § 1153 ............................................................................................... 9

28 U.S.C. § 2244 ...................................................................................... 31, 44

28 U.S.C. § 2254 .................................................................................... Passim

## STATE STATUTES

OKLA. STAT. tit. 21, § 701.7 ............................................................................ 2

OKLA. STAT. tit. 22, § 894 ........................................................................ 93, 94

OKLA. STAT. tit. 22, § 1089.....................................................................104, 123

### FEDERAL RULES

Fed. R. Civ. P. 25 ............................................................................................ 1

### STATE RULES

Arizona Rule of Criminal Procedure 32.1....................................................29

Rule 3.10, *Rules of the Oklahoma Court of Criminal Appeals,*
   Title 22, Ch. 18, App.  ..............................................................................34

# IN THE UNITED STATES DISTRICT COURT FOR
# THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **MILES STERLING BENCH,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-22-66-G** |
| | ) | |
| **CHRISTE QUICK, Acting Warden,**[1] | ) | **(Capital Case)** |
| **Oklahoma State Penitentiary,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## RESPONSE IN OPPOSITION TO PETITION FOR WRIT OF HABEAS CORPUS

The Attorney General of the State of Oklahoma, Gentner F. Drummond, by and through Assistant Attorney General Caroline E.J. Hunt, appearing on behalf of the above-named Respondent, hereby responds in opposition to the Petition for Writ of Habeas Corpus on file herein and shows the Court as follows:

1.      Petitioner, Miles Sterling Bench, an inmate in the custody of the Oklahoma State Penitentiary in McAlester, Oklahoma, appearing through counsel, has filed with this Court a Petition seeking federal habeas corpus relief under 28 U.S.C. § 2254, as well as a Motion for Discovery and Brief in Support.  *See* Docs. 19, 20.[2]  In addition to this Response in Opposition, an Objection to Petitioner's Motion for Discovery will also be separately filed in this Court.

---

[1] As this Court previously ordered (Doc. 27), Christe Quick is now Acting Warden of Oklahoma State Penitentiary and has replaced former Warden Jim Farris as party-respondent.  *See* Fed. R. Civ. P. 25(d).

[2] Citations to specific page numbers within documents filed in this Court will be referred to using the original pagination located at the bottom of each page.

2.      The instant habeas petition challenges a Judgment and Sentence entered on May 13, 2015, in the District Court of Stephens County, State of Oklahoma, Case No. CF-2012-172, wherein Petitioner was convicted of First-Degree Murder (Malice Aforethought), in violation of OKLA. STAT. tit. 21, § 701.7(A) (2011), for his murder of sixteen-year-old B.H.  The jury found the existence of two aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel ("HAC"); and (2) Petitioner posed a continuing threat to society.  Petitioner was sentenced to death.

3.      The Oklahoma Court of Criminal Appeals ("OCCA") affirmed Petitioner's conviction and sentence, in OCCA Case No. D-2015-462, in a published opinion issued on October 4, 2018.  *Bench v. State*, 431 P.3d 929 (Okla. Crim. App. 2018) ("*Bench I*"), *cert. denied*, *Bench v. Oklahoma*, 140 S. Ct. 56 (2019).  On December 22, 2021, following a remand to the state district court for an evidentiary hearing, the OCCA issued a published opinion denying Petitioner's application for post-conviction relief.  *Bench v. State*, 504 P.3d 592 (Okla. Crim. App. 2021) ("*Bench II*").  Petitioner did not seek *certiorari* review.

4.      As will be discussed in detail below, although Petitioner did raise his grounds for relief in state court, some grounds are technically exhausted but barred and/or rely on arguments not raised in state court.  Respondent explicitly does not waive exhaustion as to any claim.  *See* 28 U.S.C. § 2254(b)(3).

5.      Counsel for Respondent requested the OCCA to send to the Clerk of this Court all briefs, transcripts, exhibits, original records, and any other relevant filings from Petitioner's direct appeal and post-conviction proceeding by the due date of this response.  On January 13, 2023, the OCCA issued an Order to Transmit Records in both of

Petitioner's cases in that court.  This Court received these transmitted records[3] on January 25, 2023.  Doc. 23.

      6.      Petitioner's habeas petition was filed in this Court on December 22, 2022. Doc. 19.  Respondent now files this response.

## <u>STATEMENT OF THE FACTS</u>

The OCCA presented the facts of this case, which this Court must presume are correct, *see* 28 U.S.C. § 2254(e)(1), as follows on direct appeal:

> [Petitioner] began working at the Teepee Totem convenience store in the town of Velma, Stephens County in May of 2012.  He was twenty-one years old.  [Petitioner] lived outside of town with his grandparents.  His cousin, Clayton Jenson, regularly drove him to work.

> After three weeks of training, [Petitioner] began to close the store by himself.  On June 6th, Jenson drove [Petitioner] to work.  They visited for 2 hours beforehand and discussed [Petitioner]'s plan to go to California so [Petitioner] could be a mixed martial arts ("MMA") fighter.  Jenson dropped [Petitioner] off shortly before 2:00 p.m.  Other than a sore throat, [Petitioner] seemed absolutely normal to Jenson that day.

> Sixteen-year-old [B.H.] drove into Velma around 7:30 p.m. to get an item from the grocery store.  After completing this task, [B.H.] went into the Teepee Totem to get some candy and a soda fountain drink.  Through [Petitioner]'s admissions to his psychological expert, we know that [Petitioner] attacked [B.H.] while she was fil[l]ing a cup at the fountain.  He struck [B.H.] and took her to the ground.  He strangled [B.H.] with a choke hold and dragged her into the store's stockroom.

---

[3] Citations to the Original Records in the state court proceedings will be referred to as (D.A. O.R. __) for the direct appeal record and (P.C. O.R. __) for the post-conviction record. Citations to the transcript of Petitioner's jury trial will be referred to by volume, as (Tr. [vol. #] __), and all other transcripts as ([date] Tr. __).  Citations to exhibits presented by the State at Petitioner's trial will be referred to as (State's Ex. __).  Citations to any pleadings filed in state court will be referred to using original pagination.

[B.H.] played basketball for her school and was in good shape.  Once inside the storeroom, she fought back.  [Petitioner] attacked [B.H.] a second time.  He repeatedly hit her.  [Petitioner] brutally beat [B.H.]'s head, face, neck, and chest.  [Petitioner] dragged [B.H.] across the room causing her head to strike the floor.  He stomped on her head, neck, arm, and upper back with his shoe.  [Petitioner]'s prolonged savagery resulted in [B.H.]'s death.  She asphyxiated on the blood in her lungs and died from the blunt force trauma to her head and neck.

[Petitioner] then took steps to conceal what he had done and flee to California.  He put a sack around [B.H.]'s head and placed her body inside a shopping cart.  [Petitioner] covered [B.H.]'s body with boxes, pushed the cart out to [B.H.]'s car, and placed her body inside the back seat.  [Petitioner] gathered up peanut butter, sunflower seeds, a toothbrush, rubbing alcohol, and razors from the store's shelves and placed them in the car.  He drove [B.H.]'s car to a semi-secluded area on his grandparent's (sic) land and removed her body from the car.  [Petitioner] completely undressed [B.H.] from the waist down and pulled her jacket, tank-top, and sports bra up until they fully exposed her breasts.  He dragged [B.H.]'s body to a muddy spot in the field and partially covered it with dirt and vegetation.

[Petitioner] went inside his grandparent's (sic) home, put a clean shirt over the top of the shirt he was wearing, and collected additional items for his trip, including boots, clothing, hydrogen peroxide, and his wallet.  Recognizing that it was too early for [Petitioner] to be home from work, his grandfather, Stanley Bench, asked [Petitioner] if he had quit or been fired.  [Petitioner] simply responded, "Yes."  [Petitioner] informed Mr. Bench that he was leaving.  He went outside and washed himself in the water spigot.  When he was done, he stuck his head back inside the door and declared; "Pa, I love you."  Mr. Bench responded[:] "I do you too.  Be careful out there and don't get hurt."  [Petitioner] stated, "Okay," and left.

Tammy Wilkerson ventured into the Teepee Totem around 8:15 that evening.  She was alarmed to discover that the clerk was missing from the store.  When she looked into the storeroom she discovered a pool of blood.  Wilkerson called the Velma Police Department and contacted, Melissa Lynn, one of the other store clerks who lived nearby.

When [B.H.] failed to return on time, her mother went looking for her.  She contacted law enforcement when she was unable to find [B.H.]

The Stephen's County Sheriff's Department investigated [Petitioner]'s absence from the store.  Deputy Michael Moore documented

4

the interior of the convenience store and obtained a DNA sample from the pool of blood in the storeroom.  Deputy David Martin went to the home of [Petitioner]'s grandparents to check on [Petitioner]'s welfare.  Using canine officers, Lieutenant Chad Powell discovered [B.H.]'s nude body in the nearby field.  The officers put out a "BOLO" alert for [B.H.]'s car.

Deputy Quinton Short of the Custer County Sheriff's Department received the alert and observed [B.H.]'s vehicle headed west on Interstate 40.  He stopped the car and approached it on foot.  Short observed in plain sight a large amount of blood in the backseat.  He discovered [Petitioner] seated in the driver's seat and ordered him to exit the car.  Once outside the sedan, [Petitioner] spontaneously declared that he was not driving the vehicle.  Slightly confounded by [Petitioner]'s assertion, Short responded[:] "Then whose vehicle is it?"  [Petitioner] then stated; "I think I f****d up, I may have killed somebody."  Deputy Short observed that [Petitioner] had blood on his clothing.  He took [Petitioner] into custody and transported him to the Custer County Jail.

Chief Investigator Robert Short of the Custer County Sheriff's Department observed that [Petitioner] had dirt on his face as well as on the shoulder of his shirt.  He further noticed that [Petitioner] had blood on his shirt, shoes, and socks.  There was a mixture of blood and dirt on the bottom of [Petitioner]'s shoes.  Short further observed that [Petitioner]'s hands were red and swollen.

Detention Officer, Kendall Brown, booked [Petitioner] into the Custer County Jail.  While Brown was gathering [Petitioner]'s information, [Petitioner] interjected several admissions.  [Petitioner] informed Brown[:] "I think I might have messed up. I think I may have killed somebody."  Later, [Petitioner] mentioned[,] "I might have blacked out."  [Petitioner] asked Brown if he would be able to make bond.  After Brown advised [Petitioner] that he did not know, [Petitioner] spontaneously stated[:] "I think I murdered someone.  The officer in the car mentioned manslaughter *** isn't manslaughter murder?"  Still later, [Petitioner] volunteered[:] "I think Stephens County is gonna come get me."

[Petitioner] repeatedly engaged Brown in small talk.  Some of his statements evinced prior knowledge concerning the mental health system.  [Petitioner] volunteered that he had undergone "psych evaluations" while in the military and added that the "dude in the straight-jacket" is usually the one screaming that he is "not crazy."

5

[Petitioner] attempted to develop grounds for an insanity plea from his conversation with Brown; [Petitioner] asked where he was at?  After Brown indicated that he was in Arapaho in Custer County, [Petitioner] stated[:] "If they believe that I don't know where I am at they might believe that I was crazy."  Thereafter, [Petitioner] queried: "Since I blacked out do you think that I should go for an insanity plea or what?"  Brown informed [Petitioner] that he could not give him any legal advice whatsoever.

Investigator Justin Scott of the Stephens County District Attorney's Office executed a search warrant on [Petitioner]'s person.  [Petitioner] also spontaneously volunteered a statement to Scott.  [Petitioner] asked if Oklahoma had the death penalty.  When Scott answered that under certain circumstances they do, [Petitioner] declared that he needed death or needed to be locked away in the big house.  Scott noticed that [Petitioner] had a bite mark on his elbow.

Forensic testing revealed that [B.H.]'s DNA profile matched the DNA profile of the blood discovered in the storeroom.  Similarly, [B.H.]'s profile matched the DNA profile of the blood found on [Petitioner]'s shoes.

*Bench I*, 431 P.3d at 943-44 (paragraph numbering omitted).

Other facts will be discussed as they become relevant.

## STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas relief with respect to a claim adjudicated on the merits by a state court only if the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The threshold question for this Court on habeas review is whether Petitioner seeks to apply a rule of law that was "clearly established" by the Supreme Court at the time of the state court decision. *See House v. Hatch*, 527 F.3d 1010, 1018 (10th Cir. 2008). "[C]learly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*." *Id.* at 1016. Where there is no clearly established federal law, that ends the inquiry under § 2254(d)(1). *See id.* at 1018.

If a clearly established rule of federal law is implicated, however, then this Court must decide whether the state court's decision was contrary to, or an unreasonable application of, that clearly established rule of federal law. *See id.* A state court decision is contrary to clearly established law when it applies a rule that contradicts the governing law set forth in the Supreme Court's cases or decides a case differently than the Court has on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

A state court decision involves an unreasonable application of clearly established law when the state court correctly identifies the governing legal principle but applies it to the facts of the particular case in an unreasonable manner. *Valdez v. Bravo*, 373 F.3d 1093, 1096 (10th Cir. 2004); *Gilbert v. Mullin*, 302 F.3d 1166, 1171 (10th Cir. 2002). The Supreme Court has explained as follows regarding the "unreasonable application" clause:

> In § 2254(d)(1), Congress specifically used the word "unreasonable," and not a term like "erroneous" or "incorrect." Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Williams*, 529 U.S. at 411.

7

The Supreme Court has further held that "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). Federal courts

> may issue the writ only when the petitioner shows there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with the Supreme Court's precedents. Thus, even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable. If this standard is difficult to meet—and it is—that is because it was meant to be. Indeed, AEDPA stops just short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. Accordingly, we will not lightly conclude that a State's criminal justice system has experienced the extreme malfunction for which federal habeas relief is the remedy.

*Frost v. Pryor*, 749 F.3d 1212, 1223 (10th Cir. 2014) (quotation marks and citations omitted, alterations adopted, emphasis in original). This "fairminded jurists" standard applies to the determination of whether there exists clearly established federal law, as well as to the contrary to and unreasonable application clauses of § 2254(d)(1) and to § 2254(d)(2). *See Dunn v. Madison*, 138 S. Ct. 9, 12 (2017) (*per curiam*); *Brumfield v. Cain*, 576 U.S. 305, 313-14 (2015); *White v. Woodall*, 572 U.S. 415, 427 (2014).

In addition, state court determinations of fact "shall be presumed correct" unless Petitioner rebuts the presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Thus, a state court's decision cannot be said to be based on an unreasonable determination of the facts until a petitioner has shown by clear and convincing evidence that the state court's factual determination was incorrect. *Black v. Workman*, 682 F.3d 880,

896-97 (10th Cir. 2012) (refusing to grant relief under § 2254(d)(2) because the petitioner

had failed to present clear and convincing evidence to rebut a state court's factual finding);

*but see Wood v. Allen*, 558 U.S. 290, 300-01 (2010) (declining to decide the relationship

between § 2254(d)(2) and § 2254(e)(1)); *(John) Grant v. Trammell*, 727 F.3d 1006, 1024

n. 6 (10th Cir. 2013) (same).

## ARGUMENT AND AUTHORITY

### GROUND ONE

### GROUND ONE DOES NOT WARRANT HABEAS RELIEF.

In Ground One, Petitioner contends that the State lacked prosecutorial authority in

his case under *Murphy v. Royal*, 875 F.3d 896 (10th Cir. 2017) ("*Murphy* (10th Cir.)"),

*McGirt v. Oklahoma*, 140 S. Ct. 2452 (2020), and the Major Crimes Act ("MCA"), 18

U.S.C. § 1153, because he is an Indian and he murdered B.H. within the boundaries of the

Chickasaw Nation Reservation (hereinafter, "prosecutorial authority claim").  Doc. 19 at

15-31.[4]  Petitioner appears to advance alternative theories of relief for this claim, asserting

---

[4] After the OCCA remanded this claim to the state district court for an evidentiary hearing, the court found that Petitioner "was an Indian defendant" and that, based on *McGirt*, "the subject crime occurred in Indian Country," specifically, the non-disestablished Chickasaw Nation reservation (P.C. O.R. 989-93).  As to Indian status, Petitioner has 1/64 Choctaw blood and is enrolled in the Choctaw Nation (P.C. O.R. 838).  Although Petitioner never provided any proof of whether he was an enrolled member as of the date of the murder in 2012, upon a request for that information by the State, the undersigned received an email from a Choctaw Nation employee stating that Petitioner's "tribal membership was issued 12/20/2011."  Exhibit 1, Emails re: "Verification of Tribal Membership."  The parties also stipulated that victim B.H. had "31/128 Indian blood and was an enrolled member of the federally recognized Choctaw Nation of Oklahoma" at the time of her death (P.C. O.R. 838-39).

9

that the OCCA's denial of relief on his prosecutorial authority claim either ran afoul of
§ 2254(d) or was based on a procedural bar that is neither independent nor adequate.  Doc.
19 at 18, 28-30.   Below, taking these arguments in opposite order, Respondent will
demonstrate that Petitioner is not entitled to relief under either theory.

## A.    Background

On March 15, 2018, based on *Murphy* (10th Cir.), Petitioner raised his prosecutorial
authority claim in his first (and only) post-conviction application.  03/15/2018 *Original
Application for Post Conviction Relief in a Death Penalty Case* at 1-15 (OCCA No. PCD-
2015-698) ("*P.C. App.*").  Meanwhile, Petitioner's direct appeal to the OCCA, which did
not raise a prosecutorial authority claim, concluded when the OCCA affirmed his
conviction and sentence on October 4, 2018.  *Bench I*, 431 P.3d at 983.  His conviction
became final on October 7, 2019, when the Supreme Court denied certiorari review of the
OCCA's direct appeal decision.  *Bench v. Oklahoma*, 140 S. Ct. 56 (2019).

The OCCA ultimately denied relief on Petitioner's prosecutorial authority claim
based on *State ex rel. Matloff v. Wallace*, 497 P.3d 686, 689 (Okla. Crim. App. 2021), *cert.
denied sub nom.*, *Parish v. Oklahoma*, 142 S. Ct. 757 (2022), which held: "[E]xercising
our independent state law authority to interpret the remedial scope of the state post-
conviction statutes, we now hold that *McGirt* and our post-*McGirt* decisions recognizing
these reservations shall not apply retroactively to void a conviction that was final when
*McGirt* was decided."  Respondent will refer to this holding as the "*Wallace* rule."  In this
case, after discussing its *Matloff v. Wallace* decision, the OCCA held, "[a]pplying *Matloff*

to the instant case, we find Petitioner's claim in this post-conviction proceeding warrants no relief." *Bench II*, 504 P.3d at 597 (¶¶ 6-9).[5]

## B.    Lack of Clearly Established Law

As an initial matter, Respondent submits that Petitioner's prosecutorial authority claim fails as a threshold matter for lack of clearly established Supreme Court law. *See House v. Hatch*, 527 F.3d 1010, 1015-18 (10th Cir. 2008). *First*, Petitioner cites no Supreme Court *holding* that federal prosecutorial authority under the MCA is exclusive of state authority. Indeed, *Castro-Huerta* very recently left that issue open. *See Oklahoma v.*

---

[5] Upon the issuance of *Wallace*, the Choctaw Nation released a statement noting, "All Five Tribes wrote in support of this decision, and we are pleased by the ruling. Most importantly, this is a positive result for the victims of crimes and their families, because in many cases it means they will avoid being re-victimized by new trials." Exhibit 2, Grant Stephens, *Oklahoma Court of Criminal Appeals Rules that McGirt Decision Does Not Apply to Past Convictions* at 5 (News On 6 Aug. 12, 2021). Indeed, one of the policies behind non-retroactivity rules is to avoid the substantial injustice visited on crime victims when final convictions are overturned based on new procedural rules that do not implicate guilt or innocence. *Compare Wallace*, 497 P.3d at 694 ("We cannot and will not ignore the disruptive and costly consequences that retroactive application of *McGirt* would now have: the shattered expectations of so many crime victims that the ordeal of prosecution would assure punishment of the offender; the trauma, expense, and uncertainty awaiting victims and witnesses in federal re-trials . . . ."), *with United States v. Cuch*, 79 F.3d 987, 992 (10th Cir. 1996) ("[R]etroactive application would surely visit substantial injustice and hardship upon those litigants who relied upon jurisdiction in the federal courts, particularly victims and witnesses who have relied on the judgments and the finality flowing therefrom." (quotation marks and citation omitted, alterations adopted)). Here, at the post-conviction evidentiary hearing, B.H.'s mother submitted a statement, through the prosecutor and pursuant to Oklahoma's Marsy's Law, that even as an Indian herself, she wished for the State to maintain jurisdiction over her daughter's murder and for Petitioner's claim to be denied and the finality of his conviction be respected (10/05/2020 Tr. 12-15). Through the prosecutor, the mother shared the trauma and grief the family continued to experience in reliving her murder through the trial, appeals, and now the possibility of a federal retrial (10/05/2020 Tr. 12-15).

*Castro-Huerta*, 142 S. Ct. 2486, 2496 (2022) (". . . *even assuming* that the text of the Major Crimes Act provides for exclusive federal jurisdiction over major crimes committed by Indians in Indian country . . . ." (emphasis added)).  While multiple Supreme Court cases have *assumed* that federal prosecutorial authority is exclusive under the MCA—*see, e.g.*, *McGirt*, 140 S. Ct. at 2476; *United States v. John*, 437 U.S. 634, 651 & n. 22 (1978)—the Supreme Court has cautioned lower federal courts against relying on an assumed proposition from its prior case where the case "did not expressly address the proposition," *United States v. Verdugo-Urquidez*, 494 U.S. 259, 272 (1990) ("The Court often grants certiorari to decide particular legal issues while assuming without deciding the validity of antecedent propositions, and such assumptions—even on jurisdictional issues—are not binding in future cases that directly raise the questions.").

*Second*, Petitioner identifies no Supreme Court *holding* that his prosecutorial authority claim is redressable on habeas.  Petitioner briefly invokes the due process clause and *Yellowbear v. Wyoming Atty. Gen.*, 525 F.3d 921 (10th Cir. 2008), Doc. 19 at 15, 20 n. 2, but *Yellowbear* neither is a Supreme Court case nor does it cite any Supreme Court case actually holding that a state prosecution in violation of the MCA violates due process. *See Danforth v. Minnesota*, 552 U.S. 264 (2008) (noting in mere dicta that habeas corpus review was historically limited to claims involving the convicting court's lack of jurisdiction); *Lonchar v. Thomas*, 517 U.S. 314, 322 (1996) (same); *Thomas v. Loney*, 134 U.S. 372, 376 (1890) (finding a state court lacked "jurisdiction" because states may not impose their own punishment for perjury committed in federal court).  Nor has the Supreme Court ever held that a state prosecution in violation of the MCA is cognizable in habeas as

a violation of federal statute.  *See* 28 U.S.C. § 2254(a) ("in violation of the . . . laws . . . of the United States").  Where a *non-constitutional* violation of a federal statute is involved, habeas review is warranted only if "the error qualifies as a fundamental defect which inherently results in a complete miscarriage of justice or an omission inconsistent with the rudimentary demands of fair procedure."  *Reed v. Farley*, 512 U.S. 339, 348 (1994) (plurality) (quotation marks omitted, alteration adopted).  The Supreme Court has never applied the *Reed* test to a habeas claim based on the MCA, so this theory of redressability fails for lack of clearly established law.  *See Carey v. Musladin*, 549 U.S. 70 (2006); *see also United States v. Cuch*, 79 F.3d 987, 992, 994 (10th Cir. 1996) (reasoning that criminal convictions secured based on a misunderstanding of reservation boundaries involved no "unfairness in the procedures by which [the defendants] were charged, convicted, and sentenced," and "no complete miscarriage of justice" (quotation marks omitted)).

## C.     Alternatively, *Wallace* Is an Independent and Adequate Procedural Bar

In *Coleman v. Thompson*, 501 U.S. 722, 750 (1991), the Supreme Court held that "[i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred."

### 1.     Independence

To be independent, a state procedural rule must rely on state law, rather than federal law, as the basis for the decision.  *Banks v. Workman*, 692 F.3d 1133, 1145 (10th Cir. 2012).  Some state-court opinions, as here, "clearly and expressly state[] that [the] judgment rests on a state procedural bar," in which case the ruling is clearly independent.

*Harris v. Reed*, 489 U.S. 255, 263 (1989) (quotation marks omitted).  In this case, the OCCA denied relief based on the *Wallace* rule, citing and discussing *Wallace* and *only Wallace*. *See Bench II*, 504 P.3d at 597.  The OCCA even specifically noted that *Wallace* was based on its "authority under *state* law to constrain the collateral impact of *McGirt* and its progeny."  *Id.* (emphasis added).  Thus, having invoked only its own precedent, specifically, the *Wallace* rule, and expressly specified that its decision was based on state law, the OCCA's decision "clearly and expressly" rested on a state-law rule and is, therefore, independent.  *See Harris*, 489 U.S. at 263.

Petitioner's argument that the bar in his case was not independent rests entirely on the language of *Wallace*—he ignores the language of the OCCA's opinion in *his* case.  Doc. 19 at 28-29.  Even assuming analysis turns to the face of *Wallace* itself, the *Wallace* rule as articulated in that opinion was independent because, again, the OCCA "clearly and expressly" rested its decision on a state-law procedural bar.  *Harris*, 489 U.S. at 263.  Citing state-court precedent, the OCCA began by stating that "[i]n state post-conviction proceedings," the court "ha[d] previously applied its own non-retroactivity doctrine—often drawing on, but independent from, the Supreme Court's non-retroactivity doctrine in federal habeas corpus."  *Wallace*, 497 P.3d at 688 (citations omitted).  That doctrine, the court explained, is based on its "independent authority to interpret the remedial scope of state post-conviction statutes," *id.* at 689, and the court reached that holding by "exercising [that] independent state law authority," *id.*; *see also id.* at 693 (analyzing *McGirt* as part of

14

its "independent exercise of authority to impose remedial constraints under state law"). Under *Harris*, the OCCA's *Wallace* rule is independent of federal law.[6]

### 2.    Adequacy

"To satisfy the adequacy element, a state procedural rule must be strictly or regularly followed and applied evenhandedly to all similar claims." *Banks*, 692 F.3d at 1145 (quotation marks omitted). Even where a state court has not applied a procedural rule in a small number of cases, this does not defeat adequacy where the court *has* applied the rule in "the vast majority of cases." *Thacker v. Workman*, 678 F.3d 820, 836 (10th Cir. 2012) (quotation marks omitted). In *Thacker*, even where the OCCA had failed to apply a rule in four cases, including one unpublished case, the Tenth Circuit refused to find the rule not adequate. *See id.* at 835-36.

Here, the OCCA has applied the *Wallace* rule to all *McGirt* claims of which Respondent is aware, save just one case, that of Jimcy McGirt himself. In fact, the OCCA has not only applied the *Wallace* rule prospectively, it also vacated its prior (stayed) opinions in four capital cases in which it had granted *McGirt* relief on collateral review, including this one, and ultimately issued an opinion applying the *Wallace* rule in each of those cases. *See Bosse v. State*, 499 P.3d 771, 774 (Okla. Crim. App. 2021); *Cole v. State*,

---

[6] Because the OCCA "clearly and expressly" relied on a state-law procedural bar, it did not need to include any clarifying statement that any federal cases were cited only for persuasive value. *See Coleman*, 501 U.S. at 735; *Michigan v. Long*, 463 U.S. 1032 (1983). In any event, even though that it was not required, the OCCA did include such clarifying statements. For instance, as to the OCCA's discussion of *Cuch*, the OCCA plainly stated that it found the decision "very persuasive in our analysis of the state law question today." *Wallace*, 497 P.3d at 689.

499 P.3d 760, 761 (Okla. Crim. App. 2021); *Ryder v. State*, 500 P.3d 647, 649 (Okla. Crim. App. 2021); *Bench II*, 504 P.3d at 597.[7]

Since *Wallace* was decided, the OCCA has further applied the *Wallace* rule in 397 additional cases of which the undersigned is aware, plus one additional published capital case.  *See Martinez v. State*, 502 P.3d 1115, 1120 (Okla. Crim. App. 2021).  Due to the voluminous length of these unpublished orders when compiled together, they are split across three exhibits, which are indexed, Bates stamped, and submitted with this Response.  *See* Exhibit 4, OCCA Orders Applying the *Wallace* Rule, Cases ##1–106; Exhibit 5, OCCA Orders Applying the *Wallace* Rule, Cases ##107–252; Exhibit 6, OCCA Orders Applying the *Wallace* Rule, Cases ##253–397.  All told, including the above-listed capital cases, the *Wallace* case itself, the attached cases, and Petitioner's own case, the OCCA has applied the *Wallace* rule in **<u>403</u>** cases of which the undersigned is aware.  In a review of hundreds of dockets, the undersigned did not locate a single post-conviction case (other than McGirt's case) where the petitioner's conviction became final prior to *McGirt* in which the *Wallace* rule was *not* applied.

Petitioner's arguments for why the *Wallace* rule is inadequate lack merit.[8]  *First*, as to Petitioner's assertion that the *Wallace* rule "is brand new," Doc. 19 at 29, *McGirt* itself

---

[7] Unlike the above-cited capital cases, the OCCA's decision granting relief to McGirt was not stayed; McGirt had already been tried federally and was in federal custody long before *Wallace* issued; and the State failed to file a motion urging the OCCA to vacate its prior decision.  *See* Exhibit 3, *Jimcy McGirt Found Guilty Of Aggravated Sexual Abuse, Abusive Sexual Contact In Indian Country*, Department of Justice Press Release (Nov. 6, 2020).

[8] Beyond the section of his brief devoted to attacking adequacy, Doc. 19 at 29-30, Petitioner also includes a section of this ground arguing that granting habeas relief to him would not require granting relief to any other *McGirt* habeas petitioners because he is not similarly

is new.  That is the whole point of a non-retroactivity bar—to address new rules and appropriately limit their application on collateral review.  *See Wallace*, 497 P.3d at 689. More importantly, the OCCA's general non-retroactivity rule is *not* new, as *Wallace* said repeatedly.  *See id.* at 688-89 ("In state post-conviction proceedings, this Court has previously applied its own non-retroactivity doctrine—often drawing on, but independent from, the Supreme Court's non-retroactivity doctrine in federal habeas corpus—to bar the application of new procedural rules to convictions that were final when the rule was announced." (collecting cases from **as early as 1995**)); *id.* at 689 ("[W]e have long adhered to the principle that the narrow purposes of collateral review, and the reliance, finality, and public safety interests in factually accurate convictions and just punishments, weigh strongly against the application of new procedural rules to convictions already final when the rule is announced.").  In other words, Petitioner—and all other Oklahoma defendants— was on notice at the time of his direct appeal that later-announced rules would have limited application to him on collateral review pursuant to the non-retroactivity doctrine "long adhered" to by the OCCA.  *Id.* at 689.

---

situated to any other habeas petitioner raising a *McGirt* claim, Doc. 19 at 23-27.  The suggested relevance or import of this section is entirely unclear.  Petitioner never explains why it matters that, "[g]iven the unique timing of Mr. Bench's jurisdictional claim, granting him habeas relief would not require the same result in other cases."  Doc. 19 at 23.  As the Tenth Circuit has reasoned before, "If Plaintiffs were pro se, we would construe their pleadings liberally. . . .  But they are represented by counsel, and we expect attorneys appearing before this court to state the issues on appeal expressly and clearly, with theories adequately identified and supported with proper argument."  *Reedy v. Werholtz*, 660 F.3d 1270, 1274 (10th Cir. 2011).  Here, where it is entirely unclear the point of the above section, Petitioner's counseled arguments therein should be deemed waived and/or forfeited from consideration.  *See id.*; *(John) Grant*, 727 F.3d at 1025.  In any event, as Respondent will show in proving adequacy, Petitioner is not uniquely situated.

17

*Second*, Petitioner's argument that the *Wallace* rule should not have been applied to him because of the "unique timing" of when he raised his prosecutorial authority claim—specifically, prior to his conviction becoming final and *McGirt*, Doc. 19 at 29-30—is not properly before this Court.  For starters, Petitioner *never* raised this argument to the OCCA, despite having, and taking, the opportunity to raise other arguments against the application of the *Wallace* rule to his case.  *See* 09/02/2021 *Brief of Petitioner in Support of Motion to Stay Proceedings* at 2 n. 2, 3 n. 3, 4 nn. 4-5 (OCCA No. PCD-2015-698) ("*Stay Brief*").[9] Just as notions of comity and federalism require exhaustion, a defendant should be required, if he is on notice that a state procedural rule will be applied to him and has the opportunity to object, to raise to the state court his reason that he should be exempt from the rule before bringing that reason to federal court.  *Cf. Murray v. Carrier*, 477 U.S. 478, 489 (1986).  Further, the OCCA's determination that Petitioner met the requirements for application of the *Wallace* rule is a matter of state law that this Court is without jurisdiction to second-guess.  *See, e.g.*, *Martinez v. Ryan*, 926 F.3d 1215, 1224 (9th Cir. 2019) (holding that the federal court "lack[ed] jurisdiction" to address petitioner's argument that Arizona "Rule 32.2(a) was not adequate because the PCR court misinterpreted the scope of the rule"); *Johnson v. Foster*, 786 F.3d 501, 508 (7th Cir. 2015) ("[A] federal habeas court is

---

[9] Petitioner had ample notice that the OCCA planned to *Wallace*-bar him because, after the State filed a notice of the *Wallace* decision urging the OCCA to modify its earlier decision granting post-conviction relief, the OCCA issued an order on August 31, 2021, vacating its prior grant of post-conviction relief based on *Wallace* and noting that it would "issue a separate order addressing Petitioner's claims for post-conviction relief at a later time." *Bench v. State*, 495 P.3d 670 (Okla. Crim. App. 2021).  In response, Petitioner filed, in relevant part, the above-cited brief.  The OCCA ultimately issued an opinion denying post-conviction relief on all of Petitioner's claims on December 22, 2021.

not the proper body to adjudicate whether a state court correctly interpreted its own procedural rules, even if they are the basis for a procedural default.").

*Third*, in any event, the *Wallace* rule was *correctly* applied to Petitioner. Again, Petitioner indicates that he should escape application of the *Wallace* rule because he raised his prosecutorial authority claim prior to his conviction becoming final and prior to *McGirt*. Doc. 19 at 29-30. Despite the fact that Petitioner did not raise this argument to the OCCA, the OCCA was clearly aware of and considered this issue. As Judge Hudson explained:

> Our application of *Matloff* may seem unusual considering that Bench's original application for post-conviction relief was filed before his direct appeal was concluded. Under the post-conviction procedure act, Bench was required to file his application for post-conviction relief during the pendency of his direct appeal. *See* 22 O.S.2011, § 1089(D)(1). Bench's post-conviction relief application nonetheless remains a collateral challenge to which *Matloff* applies. We do not review a capital post-conviction relief application unless we first deny relief on direct appeal. The post-conviction procedure act moreover does not authorize a second appeal. *Bosse v. State*, 2021 OK CR 30, ¶ 4, 499 P.3d 771 (citing *Carter v. State*, 1997 OK CR 22, ¶ 2, 936 P.2d 342, 343). Post-conviction review is limited to those claims that were not and could not have been raised on direct appeal. 22 O.S.2011, § 1089(C)(1), (2). Our review on post-conviction is severely constrained by statute to determining, *inter alia*, whether the applicant's grounds were or could have been previously raised. 22 O.S.2011, § 1089(D)(4). There are no similar requirements on direct appeal.

> Because Bench did not raise his Indian country jurisdictional challenge on direct appeal but, instead, in his original application for post-conviction relief, *Matloff* applies and post-conviction relief for this claim is appropriately denied.

*Bench II*, 504 P.3d at 604 (Hudson, V.P.J., specially concurring). Thus, even if Petitioner filed his post-conviction application prior to his conviction becoming final, the fact remains that he raised his prosecutorial authority claim on *collateral* review—which is limited by various procedural restrictions, such as non-retroactivity principles—not on direct appeal,

which he could have done by his own argument. *See* Doc. 19 at 18-23 (contending his claim is based on *Solem v. Bartlett*, 465 U.S. 463 (1984)). Furthermore, as Judge Hudson noted, initial capital post-conviction applications, though filed while the direct appeal is pending, are not decided until *after* the direct appeal concludes. Simply put, even for capital defendants, direct appeal and post-conviction are separate proceedings with different applicable rules. Petitioner can—and does—claim ineffective assistance of counsel for failing to raise his prosecutorial authority claim on direct appeal, and that is the appropriate avenue for him to attempt to obtain relief irrespective of *Wallace*, not a carved-out exception to the *Wallace* rule for a claim raised on collateral review. *Cf. Fairres v. Elhabte*, No. CIV-21-1019-J, 2022 WL 3586214, at *2 (W.D. Okla. Aug. 22, 2022) (unpublished) ("[W]hile Petitioner may have faced an uphill battle arguing that the State of Oklahoma lacked jurisdiction over her crimes (because she was an Indian and the crimes were committed in Indian country) before the *McGirt* ruling, she at least had the *opportunity* to take this path." (quotation marks omitted, emphasis in original)); *Willis v. Crow*, No. CIV-22-92-J, 2022 WL 576559, at *2 (W.D. Okla. Feb. 25, 2022) (same).

Petitioner's argument that *Wallace* does not apply to him further fails because the *Wallace* rule, as articulated by the OCCA, focuses on when a petitioner's conviction became final vis-à-vis *McGirt* and whether the claim is reviewed on direct appeal or collateral review, not the date when he first raised his prosecutorial authority claim. *See Wallace*, 497 P.3d at 687 & n. 1, 689 (holding "that *McGirt* and our post-*McGirt* decisions recognizing these reservations shall not apply retroactively to void a conviction that was final when *McGirt* was decided" and defining when a conviction becomes final). This

makes sense given that non-retroactivity rules, whether based in state or federal law, seek to "validate[] reasonable, good-faith interpretations of existing precedents"—*i.e.*, existing at the point a conviction became final—"made by state courts even though they are shown to be contrary to later decisions." *Butler v. McKellar*, 494 U.S. 407, 414 (1990); *see also Wallace*, 497 P.3d at 693 ("The State's reliance and public safety interests in the results of a guilty plea or trial on the merits, and appellate review according to then-existing rules, are always substantial."). Thus, the relevant question under a non-retroactivity rule is not the date when a defendant first raised his claim, but what was the state of the law at the time his conviction became final and—as Justice Scalia once put it—whether "the unlawfulness of [the defendant's] conviction was apparent to all reasonable jurists" under "then-existing precedent." *Lambrix v. Singletary*, 520 U.S. 518, 527-28 (1997); *see Wallace*, 497 P.3d at 692 (applying "apparent to all reasonable jurists" standard). As Respondent will show below, the unlawfulness of Petitioner's conviction here was *not* apparent to all reasonable jurists when his conviction became final in 2019.

*Fourth*, to the extent that Petitioner argues that the *Wallace* rule is inadequate because it has otherwise been applied only to defendants who did *not* raise their prosecutorial authority claims prior to their convictions becoming final and/or prior to *McGirt*, Doc. 19 at 29-30, he misunderstands the measure of adequacy. As previously stated, a rule is adequate where it is applied "evenhandedly to all *similar* claims," not just *identical* claims. *Banks*, 692 F.3d at 1145 (emphasis added). Relatedly, the issue is *not* whether Petitioner is the only Oklahoma defendant who raised his prosecutorial authority claim prior to *McGirt* and his conviction becoming final, Doc. 19 at 30; it is instead whether

there exists another such defendant **whom the OCCA did *not Wallace*-bar**.  *See Echols v. Kemna*, 511 F.3d 783, 787-88 (8th Cir. 2007) ("None of the cases Echols cites show that a defendant, similarly situated to him, received postconviction appellate review. . . . Echols has not shown that Missouri treated him differently than it would another similarly situated defendant.").  In other words, this Court's ultimate focus is on cases where the OCCA has *not* applied the bar.  *See Gonzales v. Jordan*, 37 F. App'x 432, 435 (10th Cir. 2002) (unpublished).  Petitioner's claim that he is uniquely situated does nothing to show that the OCCA would not also *Wallace*-bar a defendant similarly situated to him.[10]

*Fourth*, even accepting for sake of argument that the relevant class of cases for adequacy purposes is those in which the defendant raised his prosecutorial authority claim pre-*McGirt* and/or prior to his conviction becoming final, the OCCA has applied the *Wallace* rule evenhandedly in such cases.  In an exhaustive review of hundreds of post-conviction dockets, the undersigned located many defendants like Petitioner—*i.e.*, whose convictions became final pre-*McGirt* but who raised his or her prosecutorial authority claim pre-*McGirt* and/or prior to his or her conviction becoming final—and the OCCA

---

[10] The same goes for Petitioner's suggestion that he is the only *Wallace*-barred *capital* defendant who raised his prosecutorial authority claim on first post-conviction and prior to his conviction becoming final, and the only *Wallace*-barred defendant, capital or non-capital, who raised his prosecutorial authority claim in a timely filed habeas petition.  Not only does Petitioner too narrowly define the class of relevant cases, *see Echols*, 511 F.3d at 787-88, but he once again fails to appreciate that the issue is whether there is a capital defendant who raised his prosecutorial authority claim on first post-conviction and prior to his conviction becoming final and who timely filed his habeas petition whom the OCCA did *not Wallace*-bar.  Respondent has located no such defendant.

*Wallace*-barred **all** of these defendants with only **one** exception, Jimcy McGirt himself, who obviously raised his prosecutorial authority claim prior to *McGirt*.

For starters, Petitioner is incorrect when he suggests that all other *Wallace*-barred defendants "waited post-*McGirt* to bring their jurisdictional claims." Doc. 19 at 29. Of the roughly 400 above-referenced cases discussed above, the undersigned located **39** defendants, in addition to Petitioner, who were *Wallace*-barred despite raising their prosecutorial authority claim pre-*McGirt*, based on *Murphy* (10th Cir.) (including two capital defendants). *See Bosse v. State*, 499 P.3d 771, 773 (Okla. Crim. App. 2021); *Cole*, 499 P.3d at 761; Exhibit 7, *Wallace*-Barred Defendants Who Raised Their Claims Pre-*McGirt*.[11] Again, other than McGirt himself, Respondent did not locate any such defendant who was not *Wallace*-barred.[12]

---

[11] Exhibit 7 provides the court filings proving that these defendants raised their prosecutorial authority claims pre-*McGirt*. For the orders by the OCCA *Wallace*-barring these defendants (minus *Bosse* and *Cole*), *see* Ex. 4 at 7-9, 38-40, 41-43, 91-92, 102-03, 104-08, 145-48, 160-62, 172-74, 187-92, 198-201, 216-18, 222-24, 254-56; Ex. 5 at 131-32, 317-18, 326-27, 328-29; Ex. 6 at 3-4, 40-45, 87-88, 127-29, 142-43, 167-69, 174-75, 178-79, 193-94, 199-200, 201-03, 233-35, 273-74, 312-14, 322-29, 330-31.

[12] Contrary to Petitioner's suggestion that he is the only *Wallace*-barred defendant with a timely filed habeas, there are several such defendants pending before this Court's sister courts. *See, e.g.*, *Patterson v. Whitten*, Case No. 18-CV-153-GKF-JFJ (N.D. Okla.); *Cook v. Nunn*, Case No. 21-CV-0461-JFH-SH (N.D. Okla.); *Wilson v. Nunn*, Case No. 21-cv-00445-JFH-SH (N.D. Okla.); *Henson v. Rankins*, Case No. 22-CV-0348-CVE-JFJ (N.D. Okla.); *July v. Dowling*, Case No. 22-CV-393-GKF-CDL (N.D. Okla.); *Johnson v. Crow*, Case No. CIV-22-218-RAW-KEW (E.D. Okla.). Nor does Petitioner explain how this factor—whether a defendant has filed a timely federal habeas petition—has any bearing on the adequacy of the state-law *Wallace* bar.

Next, as to defendants who raised a prosecutorial authority claim *both* prior to their conviction becoming final *and* prior to *McGirt*, the undersigned located **five** such defendants, in addition to Petitioner, and **every single one** of these defendants was *Wallace*-barred.[13]  Once again, Respondent did not locate any such defendant who was not *Wallace*-barred.  These defendants are as follows:

- **Billie Byrd:** On May 29, 2019, while his direct appeal was still pending and pre-*McGirt*, Byrd filed a post-conviction application based on *Murphy* (10th Cir.) alleging that he is Indian and his crime occurred on the Muscogee Nation Reservation. Exhibit 8, *Wallace*-Barred Defendants Who Raised Their Claims Prior to Their Convictions Becoming Final, at 1-7.[14]  On September 19, 2019, the OCCA issued its decision in Byrd's direct appeal, which did not raise any prosecutorial authority claim.  Ex. 8 at 8-13.  After Byrd failed to seek certiorari review, his conviction became final on December 18, 2019.  Ex. 8 at 17.  The OCCA ultimately *Wallace*-barred Byrd's prosecutorial authority claim.  Ex. 3 at 41-43.

- **Jason Cruse:** In his direct appeal, pre-*McGirt*, Cruse alleged that his crime occurred within a "dependent Indian community," making it Indian Country under § 1151(b).  Ex. 8 at 18, 21.  In a published decision issued on April 9, 2003, the OCCA rejected this claim.  *Cruse v. State*, 67 P.3d 920, 923 (Okla. Crim. App. 2003).  Cruse's conviction became final ninety days later, on July 8, 2003.  Ex. 8 at 26.  When Cruse later raised a prosecutorial authority claim on post-conviction under *McGirt*, the OCCA *Wallace*-barred him.  Ex. 4 at 204-05.

- **Tony Gipson:** In his direct appeal, Gipson alleged that he is Indian and his crime occurred within either a reservation or a dependent Indian community.  Ex. 8 at 27-30.  In a decision issued on September 12, 2012, the OCCA rejected this claim.  Ex. 8 at 27-30.  Gipson's conviction became final ninety days later, on December 11, 2012.  Ex. 8 at 37-38.  When, following *McGirt*, Gipson later raised a prosecutorial

---

[13] McGirt did not raise his prosecutorial authority claim prior to his conviction becoming final.  Thus, assuming this Court accepts Petitioner's parameters for what constitutes a similar case, then the OCCA has in fact *Wallace*-barred one hundred percent of such cases, without exception.

[14] Exhibit 8 provides the court filings proving that these defendants raised their prosecutorial authority claims prior to their convictions becoming final.  The orders *Wallace*-barring these defendants are cited in the text at the end of each bullet point.

authority claim on post-conviction, the Okfuskee County District Court *Wallace*-barred him.  Ex. 8 at 39-43.  Gipson did not appeal.  Ex. 8 at 64.

- **Thomas Wahpekeche:** In his direct appeal, Wahpekeche alleged that he is Indian and his crime occurred within a dependent Indian community.  Ex. 8 at 65-66, 70-71.  In a decision issued on April 27, 2017, the OCCA rejected this claim.  Ex. 8 at 70-71.  Wahpekeche's conviction became final ninety days later, on July 26, 2017.  Ex. 8 at 78.  When Wahpekeche later raised a prosecutorial authority claim on post-conviction under *Murphy* (10th Cir.) and pre-*McGirt*, the OCCA ultimately *Wallace*-barred him.  Ex. 5 at 330-31.[15]

- **Garry (a.k.a. Gary) Wilson:** On May 23, 2019, the OCCA issued its decision in Wilson's direct appeal, which did not raise any prosecutorial authority claim.  Ex. 8 at 79-92.  On July 1, 2019, Wilson filed an application for post-conviction relief based on *Murphy* (10th Cir.), alleging that he is Indian and his crime occurred on the Cherokee Nation reservation.  Ex. 8 at 93-97.  On August 21, 2019, Wilson's conviction became final, ninety days after the OCCA's direct appeal decision.  Ex.

---

[15] As the application of the *Wallace* rule to Cruse, Gipson, and Wahpekeche illustrates, a non-retroactivity rule like *Wallace* is an entirely separate thing from a waiver rule for failure to argue an issue at an earlier stage.  Thus, for instance, a federal defendant may face a *Teague* bar on collateral review irrespective of whether he properly preserved a claim on direct appeal and irrespective of whether he has cause for failing to do so.  *See, e.g.*, *Daniels v. United States*, 254 F.3d 1180, 1194 (10th Cir. 2001) (explaining that new case law may provide cause for having not earlier raised a claim but that the claim would still likely be *Teague*-barred: "[I]f one has cause for not raising a constitutional claim in earlier petitions because it is sufficiently 'novel,' that same novelty ensures the claim is barred from application on collateral review as a new rule under *Teague* (unless one of two exceptions applies)."); *United States v. Moss*, 252 F.3d 993, 997-1003 (8th Cir. 2001) (holding that application of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), was not available to the defendant on collateral review both because *Apprendi* is *Teague*-barred and *also* because the defendant waived the claim by failing to raise it on direct appeal, given that, although *Apprendi* was new, defendants had been raising *Apprendi*-type claims for decades); *United States v. Ramsey*, No. CRIM.A. 01-005-04, 2006 WL 328371, at *5 (E.D. Pa. Feb. 10, 2006) (unpublished) (refusing to give the defendant the retroactive benefit of *United States v. Booker*, 543 U.S. 220 (2005), just because the defendant had raised an *Apprendi v. New Jersey*, 530 U.S. 466 (2000), claim on direct appeal because *Teague* does not provide an "exception [for] . . . a defendant who, on direct appeal, successfully anticipated a rule that would be announced by the Supreme Court at some later time").  Likewise, here, even defendants who raised an MCA claim on direct appeal (*i.e.*, prior to their conviction becoming final) were still *Wallace*-barred.

8 at 101-02.  As to Wilson's prosecutorial authority claim raised on post-conviction, the OCCA ultimately *Wallace*-barred him.  Ex. 5 at 167-69.[16]

Clearly, even accepting Petitioner's narrow construction of what constitutes a "similar" case, the *Wallace* rule is adequate.  *See Stokes v. Anderson*, 123 F.3d 858, 861 (5th Cir. 1997) ("In short, Stokes has not pointed to a single case where the Mississippi Supreme Court case has failed to apply the § 99-39-21(1) procedural bar to a claim identical or similar to one of his own procedurally barred claims.").  Indeed, the Tenth Circuit has affirmed the adequacy of an Oklahoma rule even where there existed a smaller pool of cases—four cases total involving a similar claim, including one in which the OCCA had *not* applied the rule at issue.  *See Hamm v. Saffle*, 300 F.3d 1213, 1216-17 (10th Cir. 2002); *see also Cannon v. Gibson*, 259 F.3d 1253, 1268 (10th Cir. 2001) (concluding OCCA's procedural bar was adequate even where OCCA had not applied it in one case, despite there being no explanation for this "aberration").

In addition, to the extent that Petitioner suggests that the *Wallace* rule is not adequate as to him because his conviction became final post-*Murphy* (10th Cir.), he is again

---

[16] Petitioner may try to argue that only Byrd and Wilson are truly *identical* to him, as only they both raised "reservation" claims (as opposed to "dependent Indian community" claims) and did so on collateral review before their convictions became final.  But this distinction actually cuts against Petitioner—Cruse, Gipson, and Wahpekeche all acted with greater diligence than Petitioner, raising § 1151 claims on direct appeal (Cruse even specifically raised a "reservation" argument) and yet they were still *Wallace*-barred.  The application of a non-retroactivity rule to these defendants was entirely proper, *see* fn. 15, *supra*, and regardless it certainly shows that Petitioner—who did not raise his claim until collateral review—should not be heard to complain.  In any event, even assuming analysis is limited to Byrd, Wilson, and Petitioner himself, the OCCA has consistently applied the *Wallace* bar in three out of three cases.  The bar is undeniably adequate.

mistaken.  Respondent located **88** cases in which the defendant's conviction became final post-*Murphy* (10th Cir.), but pre-*McGirt*, and **all** such defendants were *Wallace*-barred— even defendants whose crimes and/or trials/plea hearings *post*-dated *Murphy* (10th Cir.). Exhibit 9, *Wallace*-Barred Defendants Whose Convictions Became Final Post-*Murphy* (10th Cir.), Cases ##1–31[17]; Exhibit 10, *Wallace*-Barred Defendants Whose Convictions Became Final Post-*Murphy* (10th Cir.), Cases ##32–58; Exhibit 11, *Wallace*-Barred Defendants Whose Convictions Became Final Post-*Murphy* (10th Cir.), Cases ##59–88.[18]

*Fifth and finally*, Petitioner has waived and/or forfeited any argument that the *Wallace* rule or his case falls within the "limited category" of "exceptional cases" in which the Supreme Court has held that the "exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question."  *Lee v. Kemna*, 534 U.S. 362, 376 (2002); *see also Cruz v. Arizona*, No. 21-846, 2023 WL 2144416, at *6 (U.S. Feb. 22, 2023) ("[T]his case implicates this Court's rule, reserved for the *rarest* of situations, that 'an unforeseeable and unsupported state-court decision on a

---

[17] Exhibits 9, 10, and 11 provide the court filings proving that these defendant's convictions became final post-*Murphy* (10th Cir.) and, in many instances, that their crimes and/or trials/plea hearings *post*-dated *Murphy* (10th Cir.).  For the orders by the OCCA *Wallace*-barring these defendants, *see* Ex. 3 at 13, 28, 31, 35, 41, 57, 65, 80, 83, 86, 89, 130, 183, 207, 225, 228, 234, 237, 240, 243, 251, 286, 289, 298, 317, 320; Ex. 4 at 3, 6, 15, 17, 31, 39, 42, 90, 95, 122, 129, 156, 164, 166, 176, 208, 214, 232, 250, 276, 293, 295, 303, 305; Ex. 4 at 5, 7, 15, 31, 48, 76, 93, 101, 111, 113, 115, 140, 157, 167, 180, 184, 191, 204, 222, 224, 226, 256, 267, 283, 296, 300, 302, 317, 320.

[18] For the orders by the OCCA *Wallace*-barring these defendants, *see* Ex. 3 at 13, 28, 31, 35, 41, 57, 65, 80, 83, 86, 89, 130, 183, 207, 225, 228, 234, 237, 240, 243, 251, 286, 289, 298, 317, 320; Ex. 4 at 3, 6, 15, 17, 31, 39, 42, 90, 95, 122, 129, 156, 164, 166, 176, 208, 214, 232, 250, 276, 293, 295, 303, 305; Ex. 4 at 5, 7, 15, 31, 48, 76, 93, 101, 111, 113, 115, 140, 157, 167, 180, 184, 191, 204, 222, 224, 226, 256, 267, 283, 296, 300, 302, 317, 320.

question of state procedure does not constitute an adequate ground to preclude this Court's review of a federal question.'" (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964) (emphasis added)); *id.* ("Novelty in procedural requirements cannot be permitted to thwart review in this Court . . . . *This Court has applied this principle for over a century*." (quotation marks omitted, emphasis added)). Petitioner does not even cite *Lee* or any other related case from the Supreme Court.  If he is hinting at an argument that *Wallace* was exorbitantly or unforeseeably applied to him, it is waived and/or forfeited without citation to relevant authority.  *See Nixon v. City & Cnty. of Denver*, 784 F.3d 1364, 1370 (10th Cir. 2015) ("'A brief must contain an argument consisting of more than a generalized assertion of error, with citations to supporting authority.'" (quoting *Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001) (*Nixon*'s alterations adopted)); *Phillips v. Calhoun*, 956 F.2d 949, 953-54 (10th Cir. 1992) ("'A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point.'" (quoting *Pelfresne v. Village of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990) (*Phillips*'s alterations adopted)); *see also Skinner v. Abbott*, 141 F. App'x 727, 731 (10th Cir. 2005) (unpublished) (finding argument based on *Lee* to be inadequately briefed and therefore waived and alternatively without merit).

In any event, as Respondent explained above, Petitioner here did in fact meet the requirements for application of *Wallace*, as he raised his prosecutorial authority claim on collateral review and his conviction became final pre-*McGirt*, and application of the *Wallace* rule serves the quite "reasonable purpose" of validating good-faith interpretations

28

of the law as it existed at the time of finality. *See Skinner*, 141 F. App'x at 731 ("In *Lee*, .

. . [t]he facts demonstrated that counsel met the technical requirements for preservation of

the specific issue at trial and the application of the bar in light of those facts would serve

no reasonable purpose."). Nor is *Wallace* or its application in Petitioner's case an

"exceptional case[] where a state-court judgment rests on a novel and unforeseeable state-

court procedural decision lacking fair or substantial support in prior state law." *Cruz*, 2023

WL 2144416, at *9. As discussed above, *Wallace* is based on a non-retroactivity doctrine

"long adhered" to by the OCCA, giving Petitioner notice at the time of his direct appeal

that later-announced rules would have limited application to him on collateral review.

*Wallace*, 497 P.3d at 689. Moreover, as Respondent also showed, the OCCA has applied

the *Wallace* rule to other identically situated petitioners, including those who raised their

prosecutorial authority claims prior to their convictions becoming final, so the application

of *Wallace* to Petitioner is neither novel nor unforeseeable. Furthermore, as Respondent

additionally will show later, the OCCA did not err under *Teague* in concluding that *McGirt*

announced a new, non-retroactive procedural rule. *Compare Cruz*, 2023 WL 2144416, at

**2-3, 5-6 (Arizona Supreme Court, erroneously and in direct violation of relevant

precedent, ruled that a United States Supreme Court case overturning a line of Arizona

cases did not represent "a significant change in the law" sufficient to allow the filing of a

successive postconviction petition under Arizona Rule of Criminal Procedure 32.1(g)).[19]

---

[19] Petitioner egregiously mispresents *Neasbitt v. Coppedge*, Case No. PR-2021-1478 (Nov.
4, 2022) (unpublished), attached as Exhibit 12, in claiming "[e]ven Judges of the OCCA
have observed problems with *Matloff*." Doc. 19 at 29. *Neasbitt*, and the slew of concurring
and dissenting opinions it generated, concerned whether a state district court had the power

### 3.    Petitioner Cannot or, Alternatively, Has Not Overcome the *Wallace* Bar

Ordinarily, a habeas petitioner can overcome a state court default based on an independent and adequate rule by showing causing and prejudice or a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Here, however, Petitioner cites zero authority suggesting that the *Coleman* doctrine applies to a state court's non-retroactivity rule. In fact, all the law Respondent can locate is to the contrary. As indicated above, a non-retroactivity rule like that in *Wallace* or *Teague* is an entirely separate matter from a waiver rule that can be overcome by cause and prejudice or a fundamental miscarriage of justice. *See, e.g.*, *Barajas v. United States*, 877 F.3d 378, 383 (8th Cir. 2017) ("The *Strickland* exception to procedural default derives from context-specific rationales that do not justify creating a similar exception to *Teague*'s bar on the retroactive application of new rules of criminal procedure."); *Daniels v. United States*, 254 F.3d 1180, 1191-92 (10th Cir. 2001) (even if "petitioner . . . manages to surmount the substantial requirement of cause and prejudice . . . he faces a second, nearly insurmountable, hurdle[] as established by the Supreme Court in *Teague v. Lane* . . . ."); *Lyons v. Stovall*, 188 F.3d 327, 333-34 (6th Cir. 1999) (concluding that "remand to the district court for a hearing on exhaustion and procedural default would be a waste of time because even if these issues were decided

---

to vacate its prior grant of post-conviction relief under *McGirt*, following the issuance of *Wallace*, where the State had not appealed or sought a stay. Exhibit 13 at 2-7. While the OCCA judges certainly disagreed in *Neasbitt* regarding the continuing power of a state district court to vacate its own prior orders, nothing in the various *Neasbitt* opinions calls into question *Wallace*. Moreover, unlike the State in *Neasbitt*, the State in this case did properly obtain a stay of the OCCA's initial decision granting post-conviction relief to Petitioner and, thus, the OCCA's vacatur of Petitioner's conviction and sentence never took effect. *See Bench II*, 504 P.3d at 597.

in the petitioner's favor, this Court would still be barred from hearing the merits of the petitioner's constitutional claim [under *Teague*]"); *McCleskey v. Zant*, 499 U.S. 467, 495 (1991), *superseded on other grounds by* 28 U.S.C. § 2244 ("Application of the cause and prejudice standard in the abuse-of-the-writ context does not mitigate the force of *Teague v. Lane*, . . . which prohibits, with certain exceptions, the retroactive application of new law to claims raised in federal habeas."); *cf. Albrecht v. Horn*, 485 F.3d 103, 126 (3d Cir. 2007) (declining to decide whether "there is a fundamental miscarriage-of-justice exception to *Teague*").

Alternatively, even assuming *arguendo* the *Coleman* exceptions apply to a non-retroactivity rule, the only argument Petitioner offers to overcome the *Wallace* bar is his claim of ineffective assistance of appellate counsel, raised in Ground Three, Doc. 19 at 30-31; any other argument for cause or any argument at all based on a fundamental miscarriage of justice is forfeited and/or waived.  *See Hancock v. Trammell*, 798 F.3d 1002, 1011 (10th Cir. 2015).  Furthermore, as Respondent will show at length in Ground Three, Petitioner's ineffective assistance claim as presented to this Court is so transformed as to render it unexhausted, *see Fairchild v. Workman*, 579 F.3d 1134, 1155 (10th Cir. 2009), and thus it cannot serve as cause, *see Murray*, 477 U.S. at 489.  Alternatively, a fairminded jurist could agree with the OCCA that direct appeal counsel were not ineffective in failing to raise a prosecutorial claim.  *See Bench II*, 504 P.3d at 599.  In particular, appellate counsel filed their opening briefs months before even *Murphy* (10th Cir.) issued, and they were not ineffective for failing to be clairvoyant.  *See Richter*, 562 U.S. at 110.  Because Petitioner has not overcome § 2254(d) on his claim of ineffective assistance of appellate counsel,

same cannot serve as cause for the default of his prosecutorial authority claim. *See Turrentine v. Mullin*, 390 F.3d 1181, 1202-03 (10th Cir. 2004).

## D.    Alternative § 2254(d)/*De Novo* Analysis

Respondent now turns back to Petitioner's argument that the OCCA's decision ran afoul of § 2254(d)(1). Doc. 19 at 18-23. Indeed, some federal courts have viewed a state's retroactivity bar as a merits adjudication subject to § 2254(d) deference. *See Lambrix v. Sec'y, DOC*, 872 F.3d 1170, 1177 (11th Cir. 2017); *Losh v. Fabian*, 592 F.3d 820, 824 (8th Cir. 2010). To the extent this Court concludes the same as to the *Wallace* rule, Respondent will show that the OCCA's rejection of Petitioner's *McGirt* claim was neither contrary to, nor an unreasonable application of, clearly established law. *See* 28 U.S.C. § 2254(d)(1).[20] Respondent will further show that Petitioner's claim fails even under *de novo* review.

### 1.    This Court Cannot Second-Guess the OCCA's Refusal to Apply *Bosse* and *McClain* Retroactively

As an initial matter, Petitioner's crime occurred within the boundaries of the Chickasaw Nation Reservation, not the Muscogee Nation Reservation found to be intact in *McGirt*. Thus, while the OCCA refused to apply *McGirt* retroactively to Petitioner's case, what Petitioner seeks in reality is the retroactive application of *state*-law precedent—*Bosse* and *McClain*, in which the OCCA applied *McGirt* to find the continued existence of the Chickasaw Nation Reservation. *Bosse*, 499 P.3d at 774; *McClain v. State*, 501 P.3d 1009,

---

[20] Petitioner very briefly invokes § 2254(d)(2), seemingly on the argument that the OCCA unreasonably applied *Wallace* to him based on when he first raised his prosecutorial authority claim. Doc. 19 at 18. However, as Respondent already showed above, *Wallace*— and for that matter *Teague*—does not turn on when a petitioner first raised his claim, but on when his conviction became final and whether the case is on direct or collateral review.

1011-12 (Okla. Crim. App. 2021). Viewed that way, Petitioner's claim must fail under § 2254(d). *See Warren v. Kyler*, 422 F.3d 132, 136-37 (3d Cir. 2005) (holding that state court's refusal to apply its own precedent retroactively was not reviewable even though the precedent was predicated on the "state court's interpretation of the United States Constitution"); *see also, e.g.*, *Berry v. Braggs*, No. 19-CV-0706-GKF-FHM, 2020 WL 6205849, at *5 (N.D. Okla. Oct. 22, 2020) (unpublished) ("But *McGirt* said nothing about whether major crimes committed within the boundaries of the Cherokee Nation Reservation must be prosecuted in federal court.").

### 2. The *Wallace* Rule Is Not Contrary to, or an Unreasonable Application of, Any Clearly Established Supreme Court Precedent, and Alternatively Relief Should Be Denied Even on *De Novo* Review

Even if the relevant question is whether any clearly established Supreme Court law required retroactive application of *McGirt* itself, Petitioner still cannot satisfy § 2254(d). Nor, in light of *Teague*,[21] can he prevail on *de novo* review.

### a. All of Petitioner's arguments are new and unexhausted

As previously indicated, when Petitioner was put on notice that the OCCA planned to *Wallace*-bar his prosecutorial authority claim, he filed a brief arguing that he should not be *Wallace*-barred, premised almost exclusively on the repeated argument that the State had waived any argument that *McGirt* was not retroactive. *Stay Brief* at 2 n. 2, 3 n. 3, 4 nn. 4-5. However, Petitioner *never* argued in his brief that *McGirt* was not *Wallace*- or *Teague*-barred because it was a mere application of *Solem* and therefore not new. While

---

[21] *Teague v. Lane*, 489 U.S. 288 (1989) (plurality opinion).

Petitioner did attempt to incorporate this argument by reference to an amicus brief, *Stay Brief* at 4 n. 4, that did not properly place these arguments before the OCCA, *see* Rule 3.10(B), *Rules of the Oklahoma Court of Criminal Appeals*, OKLA. STAT. tit. 22, ch. 18 (requiring a brief in support of a motion to "contain . . . legal authorities in support of the motion"); *Cuesta-Rodriguez v. State*, 241 P.3d 214, 245 (Okla. Crim. App. 2010) (finding that a rule with similar language, applicable to briefs in chief, prohibits incorporation by reference, resulting in waiver). Accordingly, all of the arguments Petitioner raises before this Court for why *McGirt* was allegedly not "new" may not be considered because they were not raised to the OCCA. *See Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2560 (2018).

> **b.** ***Teague* does not operate as a constitutional mandate for non-constitutional rules**

Alternatively, even assuming *arguendo* Petitioner's arguments that *McGirt* is not new are properly before this Court, they fail. Petitioner's § 2254(d)(1) arguments can basically be summed up as this: *McGirt* did not announce a new rule under *Teague v. Lane*, 489 U.S. 288 (1989) (plurality opinion), and its progeny, and therefore the OCCA was required to apply it retroactively. Doc. 19 at 18-23. Petitioner incorrectly assumes that *Teague* operates as a constitutional mandate on state courts. In fact, the Supreme Court has left open whether *Teague* operates as a constitutional mandate with only one narrow exception: "[W]hen a new substantive rule of constitutional law controls the outcome of a case, the Constitution requires state collateral review courts to give retroactive effect to

that rule." *Montgomery v. Louisiana*, 577 U.S. 190, 200 (2016).[22]  But Petitioner has

effectively disavowed any reliance on the *Montgomery* exception, as his position is that

*McGirt* did not announce a "new rule[], whether substantive or procedural."  Doc. 19 at

20; *see also Pacheco v. El Habti*, 48 F.4th 1179, 1191 (10th Cir. 2022) ("*McGirt* announced

no new *constitutional* right." (emphasis added)).  Thus, Petitioner has not shown that

*Teague* and its progeny require retroactive application of *McGirt*.

Moreover, Petitioner has pointed to no other Supreme Court case *requiring* the

OCCA to apply *McGirt* and its progeny retroactively on collateral review, such that his

claim must fail.  *See Lambrix*, 872 F.3d at 1182 (holding that reasonable jurists would not

debate the state court's decision not to apply retroactively *Hurst v. Florida*, 577 U.S. 92

(2016), which invalidated Florida's death penalty scheme, because "[n]o U.S. Supreme

Court decision holds that its *Hurst* decision is retroactively applicable"); *Losh*, 592 F.3d at

822-24 (denying habeas relief where the state court refused to apply retroactively *Blakely*

*v. Washington*, 542 U.S. 296 (2004), because "[t]he Supreme Court has yet to consider

whether *Blakely* applies retroactively to cases that became final before it was decided,"

meaning "no clearly established federal law therefore exists").

In any event, even if this Court applies *Teague* and its progeny to *McGirt*, as

Respondent will demonstrate below, the OCCA's application of its independent state-law

non-retroactivity doctrine did not run afoul of, and was in fact entirely consistent with,

*Teague*.  Thus, assuming this claim is reviewed under § 2254(d), a fairminded jurist could

---

[22] Notably, *Montgomery*'s continuing viability is highly dubious.  *See Jones v. Mississippi*, 141 S. Ct. 1307, 1318 (2021); *id.* at 1323, 1327 (Thomas, J., concurring).

agree with the OCCA's decision.  Assuming the claim is reviewed *de novo*, *McGirt* is *Teague*-barred.  *See Greene v. Fisher*, 565 U.S. 34, 39 (2011) ("[T]he AEDPA and *Teague* inquiries are distinct." (quotation marks omitted)).  Either way habeas relief is not warranted.

### c.    *McGirt* is "new"

The *Teague* anti-retroactivity rule, as recently modified by *Edwards v. Vannoy*, provides that "new constitutional[23] rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced."  *Teague*, 489 U.S. at 310; *see Edwards v. Vannoy*, 141 S. Ct. 1547, 1560 (2021) (eliminating the exception to this rule for watershed rules of criminal procedure).  "The 'new rule' principle validates reasonable, good-faith interpretations of existing precedents made by state courts, and thus effectuates the States' interest in the finality of criminal convictions and fosters comity between federal and state courts."  *Gilmore v. Taylor*, 508 U.S. 333, 340 (1993) (quotations marks and citations omitted).

### i.    the opinions in <u>McGirt</u>

*McGirt* was a 5-4 decision.  The majority, authored by Justice Gorsuch, was joined by Justices Ginsburg, Breyer, Sotomayor, and Kagan.  Chief Justice Roberts authored a dissent joined by Justices Alito, Kavanaugh, and Thomas (except as to a single footnote).  Justice Thomas wrote a separate dissenting opinion to reiterate, in relevant part, "that the

---

[23] Although the *Teague* rule as originally formulated applied to "constitutional" rules, the rule applies to new statutory rules as well.  *See United States v. Martinez*, 139 F.3d 412, 417 (4th Cir. 1998) (collecting cases).

former Creek Nation Reservation was disestablished at statehood." *McGirt*, 140 S. Ct. at 2502 (Thomas, J., dissenting).   The main rub between the majority and Chief Justice Roberts's dissent was whether a series of statutes leading up to Oklahoma's statehood disestablished the Muscogee Nation Reservation.

The majority took an exclusively textual approach, examining the statutes pointed to by Oklahoma one by one and concluding that each one failed to include language "evincing anything like the 'present and total surrender of all tribal interests' in the affected lands." *McGirt*, 140 S. Ct. at 2464.   The majority also refused to consider any factors beyond statutory text because, in its view, consultation of extratextual sources is prohibited where, as the majority believed was the case, there is no statutory ambiguity.  *Id.* at 2469.

Chief Justice Roberts's dissent disagreed not only with the majority's holding but also its interpretation of prior precedent as to the scope of relevant considerations:

> Congress disestablished any reservation in a series of statutes leading up to Oklahoma statehood at the turn of the 19th century.  The Court reaches the opposite conclusion only by disregarding the "well settled" approach required by our precedents.  *Nebraska* v. *Parker*, 577 U. S. 481, ——, 136 S.Ct. 1072, 1078, 194 L.Ed.2d 152 (2016).

> Under those precedents, we determine whether Congress intended to disestablish a reservation by examining the relevant Acts of Congress and "all the [surrounding] circumstances," including the "contemporaneous and subsequent understanding of the status of the reservation." *Id.*, at ——, 136 S.Ct., at 1079 (internal quotation marks omitted).  Yet the Court declines to consider such understandings here, preferring to examine only individual statutes in isolation.

> Applying the broader inquiry our precedents require, a reservation did not exist when McGirt committed his crimes, so Oklahoma had jurisdiction to prosecute him.  I respectfully dissent.

*Id.* at 2482-83 (Roberts, C.J., dissenting).

        ii.     <u>*McGirt*</u> *was not predictable to all reasonable jurists.*

Applications of old rules do apply retroactively because they are not "new." *See,*

*e.g.*, *Stringer v. Black*, 503 U.S. 222, 228 (1992).  Thus, the first relevant question is

whether *McGirt* was merely an application of an old rule or announced a new rule.  *Teague*

said "a case announces a new rule if the result was not *dictated* by precedent existing at the

time the defendant's conviction became final."  *Teague*, 489 U.S. at 301 (emphasis in

original).  In turn, a result is not dictated by precedent unless it "was apparent to all

reasonable jurists."  *Lambrix*, 520 U.S. at 527-28 ("[O]ur first and principal task is to

survey the legal landscape as of [the date Lambrix's conviction became final], to determine

whether the rule later announced in *Espinosa* [*v. v. Florida*, 505 U.S. 1079 (1992) (*per*

*curiam*),] was dictated by then-existing precedent—whether, that is, the unlawfulness of

Lambrix's conviction was apparent to all reasonable jurists.").  A result is not dictated by

precedent merely because the result was "lent general support" by, "congruent" with, or

"inform[ed], or even control[led] or govern[ed]" by, a prior precedent.  *Sawyer v. Smith*,

497 U.S. 227, 236, 241 (1990).  "Courts frequently view their decisions as being

'controlled' or 'governed' by prior opinions even when aware of reasonable contrary

conclusions reached by other courts.  *Butler*, 494 U.S. at 415.[24]

---

[24] Petitioner incorrectly assumes that a decision is not new if it did not overrule a prior
Supreme Court precedent and/or if the majority purports simply to apply prior precedent.
Doc. 19 at 19-22.  Thus, while Petitioner repeatedly suggests that *McGirt* was "dictated"
by prior precedent, he utterly fails to engage with how the Supreme Court defines that
phrase—by reference to how reasonable jurists could have viewed the law at the point of

Respondent's review of the case law reveals five general categories of considerations that bear on whether a result was not dictated by precedent—*i.e.*, whether the Supreme Court has announced a new rule.  An application of these five factors demonstrates that *McGirt* is new.[25]  *First*, while "[t]he starkest example of a decision announcing a new rule is a decision that overrules an earlier case," *Edwards*, 141 S. Ct. at 1555, it is not necessary that a case overturn a precedent to be new, *United States v. Hopkins*, 920 F.3d 690, 699 (10th Cir. 2019).  Here, although *McGirt* did not expressly overrule any precedents, the sharply worded dissenting opinion authored by Chief Justice Roberts stated emphatically that the majority had not faithfully followed the Court's precedents: "Unless the Court is prepared to overrule these precedents, it should follow them."  *McGirt*, 140 S. Ct. at 2488.  In other words, Chief Justice Roberts implied that *McGirt* effectively overruled prior precedent.  *Cf. Edwards*, 141 S. Ct. at 1555.

*Second*, courts look to the reasoning and rationale underlying the decision to determine whether it was dictated by precedent.  *See Lambrix*, 520 U.S. at 528-29.  While the *McGirt* majority certainly purported to apply *Solem* and its progeny in holding the Muscogee Nation Reservation had never been disestablished, *see generally McGirt*, 140 S. Ct. at 2463-73, *McGirt* is still new even if it the majority believed it was controlled by a prior precedent, *see Sawyer*, 497 U.S. at 236, 241.  It is telling that the majority found it

---

finality.  *See Lambrix*, 520 U.S. at 527-28.  He has certainly not shown that the outcome in *McGirt* "was apparent to all reasonable jurists" in 2019, when his conviction became final.

[25] Notably, Petitioner actually carries the burden to show that *McGirt* is *not* "new."  *See O'Dell v. Netherland*, 521 U.S. 151, 156 (1997).  He has not met that burden in failing to marshal any argument as to how the result in *McGirt* was apparent to all reasonable jurists.  *See* fn. 21, *supra*.  In any event, Respondent will show that *McGirt* is new.

necessary to clarify what *Solem* and its progeny had said after admitting that Oklahoma

pointed to some language in *Solem* that supported the State's position:

> To avoid further confusion, we restate the point.  There is no need to consult extratextual sources when the meaning of a statute's terms is clear. Nor may extratextual sources overcome those terms.  The only role such materials can properly play is to help "clear up . . .  not create" ambiguity about a statute's original meaning.  *Milner v. Department of Navy*, 562 U.S. 562, 574, 131 S.Ct. 1259, 179 L.Ed.2d 268 (2011).

*McGirt*, 140 S. Ct. at 2468-69.   *Milner*, as the case caption suggests, was *not* a

disestablishment case.  Rather, it was a case interpreting the Freedom of Information Act

that said, as partially quoted by *McGirt*, "Legislative history, for those who take it into

account, is meant to clear up ambiguity, not create it."  *Milner v. Dep't of Navy*, 562 U.S.

562, 574 (2011).  Tellingly, the majority did not cite a single disestablishment case in

support of this newly "clarified" rule, *see Lambrix*, 520 U.S. at 528-29 (Supreme Court

opinion offered only a single citation, preceded by "cf." in support of its central

conclusion), and prior Supreme Court cases in the disestablishment context plainly stated

that such inquiry involved three considerations, *see, e.g.*, *Nebraska v. Parker*, 577 U.S.

481, 488 (2016) (explaining that the Court's disestablishment inquiry "*start[s]* with the

statutory text," but then proceeds to consideration of, second, "all the circumstances

surrounding the opening of [the] reservation" and, third, "the contemporaneous and

subsequent understanding of the status of the reservation" (quotation marks omitted)).[26]

---

[26] The majority ridiculed Oklahoma's reading of *Solem* to require "approach[ing] the question of disestablishment in[] three 'steps,'" *McGirt*, 140 S. Ct. at 2468, but the Supreme Court's own precedents used that approach, and *Murphy* (10th Cir.) even organized its opinion with subheadings that read, "***Step One***," "***Step Two***," and "***Step***

Furthermore, the *McGirt* majority believed that its holding would *not* result in post-conviction relief, possibly contemplating that its decision was "new." *See McGirt*, 140 S. Ct. at 2479 (predicting that those attempting to vacate their final convictions may be prevented from doing so "thanks to well-known state and federal limitations on postconviction review in criminal proceedings.").[27]

*Third*, a dissenting opinion to a Supreme Court decision can indicate the result was not dictated by precedent. *See Beard v. Banks*, 542 U.S. 406, 414-15 (2004); *Sawyer*, 497 U.S. at 236-37; *Hopkins*, 920 F.3d at 698. Here, *McGirt* was as sharply divided as they come: a 5-4 decision, following the Court's rare failure to reach a decision in *Murphy* the

---

**Three**." *Murphy*, 875 F.3d at 937-60. And *Parker* and *Murphy* both proceeded on to steps two and three even though it concluded that step one—statutory text—revealed no express disestablishment, *see Parker*, 577 U.S. at 490 ("Petitioners have failed at the first and most important step. They cannot establish that the text of the 1882 Act evinced an intent to diminish the reservation. We now turn to the history surrounding the passage of the 1882 Act." (paragraph break and section letter omitted)); *Murphy*, 875 F.3d at 937-60, something *McGirt* later said was prohibited, *McGirt*, 140 S. Ct. at 2468-69. Clearly *McGirt*'s reading of *Solem* as a one-step test was not apparent to all reasonable jurists.

[27] Petitioner appears to suggest that *McGirt* could not have been new because it was decided on collateral review. Doc. 19 at 19. However, the Supreme Court has previously announced a new rule on collateral review—meaning the particular post-conviction petitioner who brought the case to the Supreme Court (Jose Padilla) received the benefit of the new rule on collateral review—but then later held that the new rule did not apply retroactively on collateral review to anyone else. *See Padilla v. Kentucky*, 559 U.S. 356, 360-61, 374 (2010) (holding, on certiorari review of Supreme Court of Kentucky's denial of post-conviction relief, that the Sixth Amendment requires an attorney for a criminal defendant to provide advice about the risk of deportation arising from a guilty plea); *Chaidez v. United States*, 568 U.S. 342, 358 (2013) (holding that *Padilla* announced a new rule that does not apply retroactively on collateral review and that "defendants whose convictions became final prior to *Padilla* therefore cannot benefit from its holding"). Moreover, in the *McGirt* litigation, "Oklahoma . . . put aside whatever procedural defenses it might have and asked [the Court] to confirm that the land once given to the Creeks is no longer a reservation today." *McGirt*, 140 S. Ct. at 2460.

year before.  As *Beard* stated regarding a 5-4 decision, "there is no need to guess" whether "reasonable jurists could have differed" as to the outcome in *McGirt*.  *Beard*, 542 U.S. at 414-15.   In fact, Chief Justice Roberts quite pointedly declared that that majority "**announces a new approach** [to the disestablishment analysis,] sharply restricting consideration of contemporaneous and subsequent evidence of congressional intent." *McGirt*, 140 S. Ct. at 2487-88 (emphasis added).

*Fourth*, whether a decision was dictated by precedent is also informed by prior decisions of lower federal and state courts, especially splits in authority.  *See Caspari v. Bohlen*, 510 U.S. 383, 393-95 (1994); *Butler*, 494 U.S. at 415.  *McGirt* settled a split in authority, as both the OCCA and the Eastern District of Oklahoma had previously declined to find the Muscogee Nation Reservation intact.  *See Wallace*, 497 P.3d at 692 & n. 7.[28]

*Fifth*, institutionalized practice can bear on whether a decision was dictated by precedent.  *See Gilmore*, 508 U.S. at 345 & n. 3 (concluding that decision declaring jury instructions to be unconstitutional was new given that numerous trial courts had relied on the instructions for decades).  Institutionalized practice in Oklahoma strongly supports the

---

[28] It is not clear, but Petitioner appears to argue that the overruling of a prior precedent matters in the *Teague* analysis only if it was a Supreme Court precedent.  Doc. 19 at 22-23.   However, contrary to Petitioner's suggestion, *Hagen* overruled Tenth Circuit precedent, not Supreme Court precedent.  *See Hagen v. Utah*, 510 U.S. 399, 408-09 (1994) (explaining that certiorari review was granted to resolve a conflict between the Tenth Circuit's decision in *Ute Indian Tribe v. Utah*, 773 F.2d 1087 (1985) (en banc), and a contrary decision by the Utah Supreme Court); *see also Cuch*, 79 F.3d at 988-89. Moreover, *Caspari* makes clear that the interpretation of "[c]onstitutional law is not the exclusive province of the federal courts, and in the *Teague* analysis the reasonable views of state courts are entitled to consideration along with those of federal courts."  *Caspari*, 510 U.S. at 393-94.

conclusion that the outcome in *McGirt* was not apparent to all reasonable jurists. *Gilmore*,

508 U.S. at 335 n. 3. As eloquently summarized by Chief Justice Roberts:

> [F]or 113 years, Oklahoma has asserted jurisdiction over the former
> Indian Territory on the understanding that it is not a reservation, without any
> objection by the Five Tribes until recently (or by McGirt for the first 20 years
> after his convictions). The same goes for major cities in Oklahoma. Tulsa,
> for example, has exercised jurisdiction over both Indians and non-Indians for
> more than a century on the understanding that it is not a reservation.
>
> All the while, the federal government has operated on the same
> understanding. No less than Felix Cohen, whose authoritative treatise the
> Court repeatedly cites, agreed while serving as Acting Solicitor of the
> Interior in 1941 that "all offenses by or against Indians" in the former Indian
> Territory "are subject to State laws." In the view of the Department of the
> Interior, such state jurisdiction was appropriate because the reservations in
> the Territory "lost their character as Indian country" by the time Oklahoma
> became a State.
>
> Indeed, far from disputing Oklahoma's jurisdiction, the Five Tribes
> themselves have repeatedly and emphatically agreed that no reservation
> exists. After statehood, tribal leaders and members frequently informed
> Congress that "there are no reservations in Oklahoma." They took the same
> position before federal courts. Before this litigation started, the Creek Nation
> represented to the Tenth Circuit that there is only "'checkerboard' Indian
> country within its *former* reservation boundaries." (emphasis added). And
> the Nation never once contended in this Court that a sprawling reservation
> still existed in the more than a century that preceded the present disputes.
>
> Like the Creek, this Court has repeatedly described the area in
> question as the "former" lands of the Creek Nation. ***Yet today the Court
> concludes that the lands have been a Creek reservation all along—contrary
> to the position shared for the past century by this Court, the United States,
> Oklahoma, and the Creek Nation itself.***

*McGirt*, 140 S. Ct. at 2499-500 (Roberts, C.J., dissenting) (citations and footnote omitted,

final emphasis added). It is hard to imagine a result that was more unpredictable to jurists

43

of reason than when the Supreme Court, the United States, the State of Oklahoma, and the Muscogee Nation itself had all previously believed the Muscogee Nation Reservation was disestablished.[29]

Petitioner suggests that *McGirt* is not new because of dicta in a footnote in *Murphy* (10th Cir.). He claims that the *Murphy* footnote "specifically addressed and dismissed any notion that Mr. Murphy's claim was subject to a *Teague* retroactivity bar." Doc. 19 at 20. Petitioner misunderstands and overstates *Murphy*'s discussion of *Teague*. *Murphy* addressed an entirely different aspect of *Teague* than that invoked by the State here:

> Mr. Murphy's conviction became "final" on April 21, 2003—the date the Supreme Court denied his petition for certiorari following his direct appeal to the OCCA. (This is before the OCCA adjudicated his jurisdictional claim on post-conviction review in 2005.) Mr. Murphy has no need for *Teague*'s exceptions because he does not seek the benefit of a rule that falls within *Teague*'s retroactivity bar. The post-2003 cases we discuss in our de novo analysis are applications of the *Solem* framework. We need not decide whether these cases qualify as "constitutional" and "procedural" under *Teague* because, even if they do, they are not "new." A case does not announce a new rule under *Teague* "when it is merely an application of the

---

[29] Petitioner's reliance on opinions concluding that *McGirt* does not satisfy 28 U.S.C. § 2244(b)(2)(A) or (d)(1)(C), Doc. 19 at 20-21 (collecting cases), is misplaced. Petitioner merely points to cases holding that *McGirt* was a *statutory* decision that did not recognize a new *constitutional* rule or right for purposes of § 2244(b)(2)(A) or (d)(1)(C). In other words, in pointing to language from these decisions stating that *McGirt* did not recognize a "new" rule or right, Petitioner ignores the other adjective in that language: "constitutional." *See, e.g.*, *Pacheco*, 48 F.4th at 1191 ("*McGirt* announced no new constitutional right."). Even assuming some isolated language in unpublished district court opinions supports Petitioner's argument that *McGirt* is not new—*see, e.g.*, *Sanders v. Pettigrew*, No. CIV 20-350-RAW-KEW, 2021 WL 3291792, at *5 (E.D. Okla. Aug. 2, 2021) ("*McGirt* was a mere application of, and was dictated by, existing law.")—*Pacheco* has now settled the issue in concluding that, prior to *McGirt*, "it was not wholly unreasonable to believe that the reservation had been disestablished." *Pacheco*, 48 F.4th at 1190. It necessarily follows that the outcome in *McGirt* was not "apparent to all reasonable jurists" and was, therefore, new. *Lambrix*, 520 U.S. at 527-28.

principle that governed a prior decision to a different set of facts." *Chaidez v. United States*, 568 U.S. 342, 133 S.Ct. 1103, 1107, 185 L.Ed.2d 149 (2013) (brackets and quotations omitted). "[A] rule of general application," that is, "a rule designed for the specific purpose of evaluating a myriad of factual contexts," will only "infrequent[ly] . . . yield[ ] a result so novel that it forges a new rule, one not dictated by precedent." *Id.* (quotations omitted). When a court "appl[ies] a general standard to the kind of factual circumstances it was meant to address, [the resulting decision] will rarely state a new rule for *Teague* purposes." *Id.*; *see also id.* at 1107-08 (explaining "garden-variety applications" of the *Strickland* framework "do not produce new rules"). The post-finality cases we discuss apply the *Solem* framework to factual scenarios for which the test was developed; none of the cases created a new rule. Moreover, even if *Teague* required us to limit our analysis to pre-finality law, we would still reach the same result.

*Murphy*, 875 F.3d at 930 n. 36 (select citation omitted).

*Murphy*'s discussion of *Teague* amounted to a single footnote, without the benefit of briefing. It is non-binding dicta. *See Wainwright v. Witt*, 469 U.S. 412, 422 (1985). Moreover, *Teague* implicates two questions as to retroactivity, but the Tenth Circuit addressed only one of these questions—likely because the State had failed to argue *Teague*. *See Murphy*, 875 F.3d at 930 n. 36. The first question under *Teague* is whether any post-finality Supreme Court decisions relied on by the court announced new rules. The court *did* answer that question, in the negative, finding that the post-finality (*i.e.*, post-2003) precedents it relied on (chiefly, *Nebraska v. Parker*) did not announce any new rules. The court also alternatively concluded that it would reach the same result even if it applied only pre-finality (*i.e.*, pre-2003) precedents, *e.g.*, *Solem*.

But what the *Murphy* court did *not* raise or address—again, due to the State's failure to argue *Teague*[30]—was whether the result it reached in applying those cases (whether pre- or post-finality) to Patrick Murphy's case would have been so unexpected to reasonable jurists in 2003 that the result should be *Teague*-barred:

> When a petitioner seeks federal habeas relief based upon a principle announced after a final judgment, *Teague* and our subsequent decisions interpreting it require a federal court to answer an initial question, and in some cases a second. First, it must be determined whether the decision relied upon announced a new rule. If the answer is yes and neither exception applies, the decision is not available to the petitioner. *If, however, the decision did not announce a new rule, it is necessary to inquire whether granting the relief sought would create a new rule because the prior decision is applied in a novel setting, thereby extending the precedent. The interests in finality, predictability, and comity underlying our new rule jurisprudence may be undermined to an equal degree by the invocation of a rule that was not dictated by precedent as by the application of an old rule in a manner that was not dictated by precedent.*

*Stringer*, 503 U.S. at 227-28 (citation omitted, emphasis added). As quoted above, *Murphy* did not proceed to this second step. Contrary to Petitioner's argument, footnote 36 *never* "specifically addressed and dismissed any notion that Mr. Murphy's claim was subject to a *Teague* retroactivity bar," Doc. 19 at 20; rather, the panel merely concluded that the newer cases it was relying on were not *Teague*-barred, *see Murphy*, 875 F.3d at 930 n. 36 ("The post-finality cases we discuss apply the *Solem* framework to factual scenarios for which the test was developed; none of the cases created a new rule"). Put simply, the panel never examined or decided whether its conclusion—that the Muscogee Nation Reservation was

---

[30] As the *Murphy* panel noted, *Teague* is a waivable defense. *See Murphy*, 875 F.3d at 930 n. 36.

intact—was apparent to all reasonable jurists at the time Murphy's conviction became final in 2003 (the second step under *Stringer*).  *See id.* (failing to say anything like, "applying *Solem* and its progeny here, the result is not unpredictable and does not create a new rule"). Respondent respectfully submits that, had this question been raised by the State and examined by the court, the court would have found relief *Teague*-barred in *Murphy*, for all the same reasons Respondent has shown above that the rule in *McGirt* is new.

Petitioner's suggested interpretation of the dicta in footnote 36 of *Murphy*—*i.e.*, that the non-disestablishment of the Muscogee Nation Reservation was apparent to all reasonable jurists in 2003—is incompatible with the entire history of Oklahoma as a state as recognized in *Pacheco*.  *See Pacheco*, 48 F.4th at 1190 (noting the "[t]housands who had been prosecuted on the mistaken premise that the Cherokee Reservation had been disestablished" and that "the dissent in *McGirt* shows that it was not wholly unreasonable to believe that the reservation had been disestablished").  In other words, when *Pacheco* expressly and clearly states that, *pre*-McGirt, "it was not wholly unreasonable to believe that [the Cherokee Nation] reservation had been disestablished," *Murphy* should not be read to silently suggest—in dicta in a footnote—that, as of 2003, the existence of the Five Tribes' reservations "was apparent to all reasonable jurists," *Lambrix*, 520 U.S. at 527-28. Respondent's reading of *Murphy* avoids this absurd contradiction in Tenth Circuit precedent suggested by Petitioner.

In any event, even if this footnote amounted to something more than dicta and is read as Petitioner urges, this Court must examine the footnote in light of the intervening decision in *McGirt*.  *See In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993) (precedent may lose

its binding status in instance of "superseding contrary decision by the Supreme Court").

Thus, even assuming the *Murphy* panel believed, in 2017, that its result was dictated by

precedent, the robust dissent in *McGirt* proves that this outcome was not apparent to all

reasonable jurists.[31]   *See, e.g., McGirt*, 140 S. Ct. at 2482-83 (Roberts, C.J., dissenting)

("Applying the broader inquiry our precedents require, a reservation did not exist when

McGirt committed his crimes, so Oklahoma had jurisdiction to prosecute him."), *id.* at

2487 (the majority "announces a new approach [to the disestablishment analysis,] sharply

restricting consideration of contemporaneous and subsequent evidence of congressional

intent"), 2499 ("[F]or 113 years, Oklahoma has asserted jurisdiction over the former Indian

Territory on the understanding that it is not a reservation, without any objection by the Five

Tribes until recently.").[32]

---

[31] This robust dissent clearly distinguishes the result in *Murphy*/*McGirt* from that in
*Nebraska v. Parker*, for instance, a unanimous 9-0 decision.  Thus, while *Murphy* (10th
Cir.) footnote 36 may have concluded that *Parker* was dictated by precedent, it is a very
different question—and one unanswered by footnote 36—whether the result in *McGirt* was
apparent to all reasonable jurists.  Indeed, Chief Justice Roberts's dissent, in accusing the
*McGirt* majority of "disregarding the 'well settled' approach required by [the Court's]
precedents," specifically cited *Parker*.   *McGirt*, 140 S. Ct. at 2482; *id.* at 2486
(summarizing *Parker* as providing a three-step test); *see also Parker*, 577 U.S. at 488
(explaining that the Court's disestablishment inquiry "*start[s]* with the statutory text," but
"[u]nder our precedents, we also examine all the circumstances surrounding the opening
of a reservation" (emphasis added, quotation marks omitted)).

[32] Nor can the Supreme Court's affirmance of *Murphy* for the reasons stated in *McGirt* be
construed as an agreement with *Murphy*'s *Teague* analysis.  *See Murphy v. Oklahoma*, 140
S. Ct. 2412 ("The judgment of the United States Court of Appeals for the Tenth Circuit is
affirmed for the reasons stated in *McGirt v. Oklahoma*, ⸺ U.S. ⸺, 140 S.Ct. 2452, ⸺
– L.Ed.2d ⸺ (2020).").  Again, "Oklahoma . . . put aside whatever procedural defenses
it might have" in *McGirt*, 140 S. Ct. at 2460, and thus, the *Teague* question was neither
raised nor considered in *McGirt*.

###### d.     *McGirt* **is procedural and therefore not retroactive**

Post-*Edwards*, the dividing line between retroactive and non-retroactive new rules is simple: substantive rules apply retroactively, procedural rules do not. *Edwards*, 141 S. Ct. at 1562. Because Petitioner argues that *McGirt* is not new, he has not advanced, and has therefore waived, any argument that *McGirt*'s rule is substantive. *See (John) Grant*, 727 F.3d at 1025. Regardless, *McGirt* is clearly procedural.

Substantive rules alter the range of conduct or the class of persons that the law punishes or prohibit a certain category of punishment for a class of defendants because of their status or offense. *See id.*; *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004). Procedural rules, on the other hand, "regulate only the *manner of determining* the defendant's culpability." *Schriro*, 542 U.S. at 353 (emphasis in original). Relevant here, forum-selection rules are considered procedural. In *Gosa v. Mayden*, 413 U.S. 665 (1973), the Supreme Court declined to apply retroactively its ruling in *O'Callahan v. Parker*, 395 U.S. 258 (1969), which held that military courts could not try service members for crimes not "service connected." The *Gosa* Court held that "the validity of convictions by military tribunals, now said to have exercised jurisdiction inappropriately over nonservice-connected offenses is not sufficiently in doubt so as to require the reversal of all such convictions rendered." *Gosa*, 413 U.S. at 676. In so holding, *Gosa* distinguished cases that "dealt with the kind of conduct that cannot constitutionally be punished in the first instance" such that it was "conduct constitutionally immune from punishment in any court," *id.* at 677 (internal marks omitted). The Court explained that the question before it "was not whether [the defendant] could have been prosecuted; it was, instead, one related

49

to the forum." *Id.* In other words, the new rule in *O'Callahan* was clearly not substantive, as it did not bar a defendant from being retried as a substantive rule related to the crime of conviction generally would.

Likewise, as previously indicated, the Tenth Circuit has also found a new rule regarding reservation status to apply only prospectively. *See Cuch*, 79 F.3d at 992-94. *Cuch* reasoned that criminal convictions secured based on a misunderstanding of reservation boundaries "involved conduct made criminal by both state and federal law." *Id.* at 992. The question in such cases solely "focuses on *where* these Indian defendants should have been tried for committing major crimes." *Id.* at 992 (emphasis in original). "There is no question of guilt or innocence" and no "complete miscarriage of justice to these movants that would mandate or counsel retroactive application . . . to invalidate these convictions." *Id.* at 992, 994 (internal marks omitted).

Here, the new rule in *McGirt* is clearly procedural and therefore not retroactive on collateral review. *See Edwards*, 141 S. Ct. at 1562. *McGirt* does not "place[] certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," *Teague*, 489 U.S. at 307 (quotation marks omitted), or "prohibit[] a category of punishment for certain offenders or offenses," *In re Rivero*, 797 F.3d 986, 990 (11th Cir. 2015). Rather, *McGirt* "regulate[s] only the *manner of determining* the defendant's culpability," *Schriro*, 542 U.S. at 353 (emphasis in original), providing that Indian defendants committing major crimes within the boundaries of the Muscogee Nation

50

are subject to federal prosecution.[33]  *McGirt*'s new rule does not "deal[] with the kind of conduct that cannot constitutionally be punished in the first instance" such that it was "conduct constitutionally immune from punishment in *any* court."  *Gosa*, 413 U.S. at 677 (quotation marks omitted, emphasis added).  "There is no question of guilt or innocence." *Cuch*, 79 F.3d at 992.  Rather, it is merely a question of "*where* these Indian defendants should have been tried for committing major crimes."  *Id.* (emphasis in original).

Petitioner—whose conviction became final in 2019—cannot benefit from *McGirt*'s application even if Ground One is reviewed *de novo*.[34]  And Petitioner can certainly not prevail under AEDPA's deferential lens.  Indeed, the Tenth Circuit's own retroactivity decision in *Cuch* is on all fours with *Wallace*, and it is impossible to see how the OCCA could violate § 2254(d), let alone produce an extreme malfunction in the state criminal justice system, when its treatment of a new Supreme Court disestablishment (or, in this case, non-disestablishment) decision is materially indistinguishable from the Tenth Circuit's approach in exactly such a case.  *See Richter*, 562 U.S. at 102-03 ("[H]abeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." (quotation marks omitted)).

> **e.  Without the benefit of the new rule in *McGirt*, Petitioner's prosecutorial authority claim must fail**

---

[33]  As argued above, Respondent does not concede, however, that *McGirt clearly establishes* that this federal prosecutorial authority is exclusive of state prosecutorial authority.

[34]  Petitioner does not dispute that his conviction became final on October 7, 2019, prior to the Supreme Court's July 9, 2020, decision in *McGirt*.

Petitioner repeatedly suggests that he is not *Teague*-barred from relief because he is simply seeking application of *Solem*, a precedent that had long existed at the time his conviction became final in 2019. Doc. 19 at 18-23 & n. 2. But Petitioner cannot prevail under *Solem*—such is a necessary corollary of a finding that *McGirt* is new. As the Supreme Court has explained, "[W]e will not disturb a final state conviction or sentence unless it can be said that a state court, at the time the conviction or sentence became final, would have acted objectively unreasonably by not extending the relief later sought in federal court." *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997). Thus, when a federal court concludes that a rule is "new"—after "survey[ing] the legal landscape as of" the date of finality and concluding that the rule was not "apparent to all reasonable jurists," *Lambrix*, 520 U.S. at 527-28—it necessarily concludes that Petitioner's claim for relief fails under the old rule and habeas relief must be denied on that claim, *see, e.g.*, *Pursell v. Horn*, 187 F. Supp. 2d 260, 372 (W.D. Pa. 2002) ("No cases in existence at the time Pursell's conviction became final compelled the result that he now seeks. In fact, most cases at the time suggested that Pursell's claim was a loser. Under these circumstances, the rule sought by Pursell is new and, therefore, barred under *Teague*. Because *Teague*'s two exceptions clearly do not apply, I will deny Pursell's claim for relief."). This is because, again, "[t]he 'new rule' principle . . . validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." *Butler*, 494 U.S. at 414. The old/new distinction would be meaningless if a habeas petitioner who was barred by *Teague* from reliance on a new rule could simply claim that application of the old rule should yield the same result. Here, in

52

2019, applying *Solem*, the existence of the Chickasaw Nation Reservation was not "apparent to all reasonable jurists," *Lambrix*, 520 U.S. at 527-28, and thus, Petitioner is not entitled to habeas relief.

Indeed, Chief Justice Roberts's dissent in *McGirt* explains why Petitioner's claim must fail under pre-*McGirt* precedent. Although the *McGirt* majority expressly limited its analysis to the Muscogee Nation Reservation, Chief Justice Roberts made it very clear that, according to a faithful application of the Supreme Court's prior precedents, all of "the Five Tribes' prior domains," including, at issue here, the Chickasaw Nation Reservation, "were extinguished." *McGirt*, 140 S. Ct. at 2485 (Roberts, C.J., dissenting):

> Congress decided that it could not maintain an Indian Territory predicated on "exclusion of the Indians from the whites." S. Rep. No. 377, at 6. Congress therefore set about transforming the Indian Territory into a State.

> Congress began by establishing a uniform body of law applicable to all occupants of the territory, regardless of race. To apply these laws, Congress established the U.S. Courts for the Indian Territory. Next Congress systematically dismantled the tribal governments. It abolished tribal courts, hollowed out tribal lawmaking power, and stripped tribal taxing authority. Congress also eliminated the foundation of tribal sovereignty, extinguishing the Creek Nation's title to the lands. Finally, Congress made the tribe members citizens of the United States and incorporated them in the drafting and ratification of the constitution for their new State, Oklahoma.

> In taking these transformative steps, Congress made no secret of its intentions. It created a commission tasked with extinguishing the Five Tribes' territory and, in one report after another, explained that it was creating a homogenous population led by a common government. That contemporaneous understanding was shared by the tribal leadership and the State of Oklahoma. The tribal leadership acknowledged that its only remaining power was to parcel out the last of its land, and the State assumed

jurisdiction over criminal cases that, if a reservation had continued to exist, would have belonged in federal court.

A century of practice confirms that the Five Tribes' prior domains were extinguished. The State has maintained unquestioned jurisdiction for more than 100 years. Tribe members make up less than 10%–15% of the population of their former domain, and until a few years ago the Creek Nation itself acknowledged that it no longer possessed the reservation the Court discovers today. This on-the-ground reality is enshrined throughout the U.S. Code, which repeatedly terms the Five Tribes' prior holdings the "former" Indian reservations in Oklahoma. As the Tribes, the State, and Congress have recognized from the outset, those "reservations were destroyed" when "Oklahoma entered the Union." S. Rep. No. 101–216, pt. 2, p. 47 (1989).

*McGirt*, 140 S. Ct. at 2484-85 (Roberts, C.J., dissenting). For all these reasons described by the Chief Justice, under AEDPA, at least one fairminded jurist could agree that Petitioner's prosecutorial authority claim, with reliance on *McGirt Wallace*-barred, "warrant[ed] no relief." *Bench II*, 504 P.3d at 597; *see Richter*, 562 U.S. at 103. To the extent this claim is reviewed *de novo*, the meritoriousness of Petitioner's prosecutorial authority claim was not apparent to all reasonable jurists at the time of finality and thus relief is *Teague*-barred. *See Lambrix*, 520 U.S. at 527-28.

Petitioner insists that this Court is bound to conclude that he prevails under *Solem* based on *Murphy* (10th Cir.). Doc. 19 at 20 ("[A]ccording to the Tenth Circuit, a jurisdictional claim, such as Mr. Bench's, would require this Court's grant of relief even if only relying on the applicable law as it existed in 2003. . . . [R]elief is required here, just as in *Murphy*, due to *Solem* and related cases, discussed and applied in *McGirt*."). Petitioner once again misunderstands and overstates *Murphy* (10th Cir.). To be clear, *Murphy* never held that no fairminded jurist could agree with the OCCA that the Muscogee

54

Nation Reservation was not intact.  Rather, *Murphy* held that the OCCA's decision in that case—finding the Muscogee Nation Reservation had been disestablished—was contrary to *Solem* because it "applied the wrong law" and did not properly presume "that an Indian reservation continues to exist until Congress acts to disestablish or diminish it."  *Murphy*, 875 F.3d at 927-28.  At that point, the panel found § 2254(d)(1) satisfied, stripped the OCCA's opinion of deference, and reviewed its decision *de novo* without the restriction of § 2254(d)'s "clearly established" law limitation or *Teague*'s non-retroactivity rule.  *See id.* at 928-66.

Of course, as Petitioner points out, footnote 36 of *Murphy* (10th Cir.) discussed *Teague*.  Doc. 19 at 20.  But, again, as Respondent described above, footnote 36—beyond being just dicta formulated without the benefit of briefing—never addressed the *Teague* defense raised here by the State.  True, footnote 36 concluded that the post-2003 precedents relied on by the court (chiefly, *Nebraska v. Parker*) did not announce new rules and, alternatively, that the court would reach the same result even if it applied only pre-2003 precedents.  But that is *not* the *Teague* argument the State is making here.  What the State is arguing here is that, applying the Supreme Court's pre-*McGirt* precedents, from *Solem* to *Parker* (none of which were "new" per *Murphy*), the existence of the Chickasaw Nation Reservation was not "apparent to all reasonable jurists," *Lambrix*, 520 U.S. at 527-28, when Petitioner's conviction became final in 2019 (or, for that matter, when Murphy's conviction became final in 2003)—and *that* is the *Teague* problem.  *See Stringer*, 503 U.S. at 227-28 (*Teague* applies not just to "the invocation of a rule that was not dictated by precedent," but also to "the application of an old rule in a manner that was not dictated by

55

precedent" (citation omitted)).  That question was never raised to, or addressed by, the *Murphy* panel.

Nor does the fact that the 2017 *Murphy* (10th Cir.) opinion pre-dated the finality of Petitioner's conviction entitle him to relief.  Again, pursuant to *Teague*, this Court must view Petitioner's prosecutorial authority claim "[f]rom the point of view of a state court considering petitioner's claim at the time his conviction became final," *Sawyer*, 497 U.S. at 237, and apply only those rules "*dictated* by precedent existing at [that] time," *Teague*, 489 U.S. at 301 (emphasis in original).  In turn, whether a rule was *dictated* by precedent turns on whether it was "apparent to all reasonable jurists," *Lambrix*, 520 U.S. at 527-28, or rather something over which "reasonable jurists could disagree," *Caspari*, 510 U.S. at 395, or "susceptible to debate among reasonable minds," *Butler*, 494 U.S. at 415.  Thus, this Court must "survey the legal landscape as of" October 7, 2019, when Petitioner's conviction became final, "to determine whether the rule later announced in" *McGirt* "was dictated by then-existing precedent—whether, that is, the unlawfulness of [Petitioner's] conviction was apparent to all reasonable jurists."  *Lambrix*, 520 U.S. at 527-28.

The en banc Fifth Circuit has held that, "[i]n order to qualify as existing, a rule must be dictated by Supreme Court precedent, not circuit court precedent."  *Soffar v. Cockrell*, 300 F.3d 588, 598 (5th Cir. 2002) (en banc) (collecting cases).  As to the case before it, the en banc court concluded that, although a particular rule relied on by the habeas petitioner was established by a line of Fifth Circuit cases at the time his conviction became final, that rule had "never been dictated by the Supreme Court," so the court did "not believe a state

court, at the time [the petitioner's] conviction became final, would have felt compelled to follow the holdings of [the Fifth Circuit] cases." *Id.*

Here, as of October 7, 2019, when Petitioner's conviction became final, the OCCA would not "have felt compelled to follow" *Murphy* (10th Cir.). *Id.* In fact, at that time, Oklahoma courts—both state and (some) federal courts alike—did not view *Murphy* (10th Cir.) as even having the force of law due to the mandate being stayed. *See United States v. Patterson*, No. 21-7053, 2022 WL 17685602, at *5 (10th Cir. Dec. 15, 2022) (finding it unnecessary to decide "whether the district court's view of the binding effect of a decision of this court when the mandate has not issued is correct", but agreeing that, in 2019 "Oklahoma courts, including the district court in this case [the Eastern District], did not regard *Murphy* as binding because the Tenth Circuit's mandate in that case had not issued.") (collecting cases); *see also*, *e.g.*, *United States v. Little*, No. 21-CR-162-JFH, 2022 WL 14224529, at *2 (N.D. Okla. Oct. 24, 2022) (unpublished) ("[T]he Tenth Circuit's 2017 *Murphy* decision did not have force of law until after the Supreme Court's 2020 *McGirt* decision."). In fact, the OCCA has stated that "no final decision of an Oklahoma or federal appellate court had recognized *any of the Five Tribes' historic reservations* as Indian Country *prior* to *McGirt* in *2020*." *Bosse*, 499 P.3d at 774 (emphases added). Thus, regardless of whether *Murphy* (10th Cir.) actually did lack the force of law at that point, its binding force was "susceptible to debate among reasonable minds." *Butler*, 494 U.S. at 415.

Moreover, as even the *McGirt* majority acknowledged, *Murphy* (10th Cir.) was alone at that point in its recognition of the continued existence of the Muscogee Nation

Reservation. *See McGirt*, 140 S. Ct. at 2470 ("[U]ntil the Tenth Circuit's *Murphy* decision a few years ago, *no court* embraced [the] possibility" that the Muscogee Nation's lands remained a reservation (emphasis added)). And the OCCA had of course held to the contrary in its own *Murphy* opinion, and during the time *Murphy* (10th Cir.) was pending on certiorari review "reasonable jurists could disagree" over whether the Tenth Circuit's overturning of the OCCA's opinion would ultimately stand. *Caspari*, 510 U.S. at 395.

That "reasonable jurists could disagree" over the binding nature of *Murphy* (10th Cir.) prior to *McGirt* is further evidenced by the fact that Oklahoma, and not the federal government, was continuing to exercise prosecutorial authority over Indians in what would be ultimately declared Indian Country by *McGirt* and its progeny. During the post-*Murphy*/pre-*McGirt* era (*i.e.*, from August 2017 to July 2020), even within the boundaries of the Muscogee Nation Reservation—the very reservation at issue in *Murphy* (10th Cir.)— federal authorities did not start to assume criminal jurisdiction pursuant to § 1151(a), while Oklahoma continued to exercise such jurisdiction. *See, e.g.*, Exhibit 13, *Oklahoma FBI Case Volume Unprecedented*, FBI News (July 8, 2021) ("A year ago, before the United States Supreme Court issued a ruling that affirmed that much of the eastern half of the state of Oklahoma is tribal land, the FBI there handled about 50 criminal cases a year involving Native Americans. Now, the Oklahoma City Field Office manages thousands of cases."); *McGirt*, 140 S. Ct. at 2470 (noting "Oklahoma's long historical prosecutorial practice of asserting jurisdiction over Indians in state court, even for serious crimes on the contested lands"); *Patterson*, 2022 WL 17685602, at **1-2 (detailing how 2019 crime by Indian defendant within Muscogee Nation Reservation was investigated and charged by the State,

with that charge dismissed—and the prosecution assumed by the federal government—only after *McGirt* was decided); *id.* at *5 (observing that, even in 2019, "Oklahoma's long historical prosecutorial practice was for state law enforcement to investigate crimes on the land where the offense here occurred and to prosecute them in state court" (quotation marks omitted)).  Indeed, as noted above in discussing the adequacy of the *Wallace* bar, the undersigned located numerous state prosecutions, many in Tulsa County, of Indian defendants post-*Murphy* (10th Cir.).  *See generally* Exs. 10-12.

If this was the case in the Muscogee Nation Reservation, it was certainly the case in the reservations of the other Five Tribes, including the Chickasaw Nation Reservation where Petitioner murdered B.H.  In fact, it is the undersigned's understanding, as part of the Attorney General team that handled numerous *McGirt* follow-on cases remanded by the OCCA for evidentiary hearings, that the United States Attorneys' Offices would not start prosecuting cases under § 1151(a) in the other Five Tribes' territories until a court had declared those reservations to be intact.  As previously cited, such a ruling did not come for the Chickasaw Nation reservation until the OCCA's original March 11, 2021, opinion in *Bosse*.  Suffice it to say, in October 2019, "reasonable jurists could disagree" over whether the State had prosecutorial authority over Petitioner's case, *Caspari*, 510 U.S. at 395, and the OCCA would not have felt "compelled" to declare the Chickasaw Nation Reservation intact, *Soffar*, 300 F.3d at 598.

In sum, pursuant to *Teague*, given that *McGirt* announced a new rule, Petitioner's prosecutorial authority claim must fail under *Solem*.  As of October 7, 2019, reasonable jurists could have concluded that the Chickasaw Nation Reservation had been

59

disestablished for all the reasons summarized by the Chief Justice. *See McGirt*, 140 S. Ct. at 2484-85 (Roberts, C.J., dissenting). Although *Murphy* (10th Cir.) had been decided at that point, its holding had not yet been dictated by the Supreme Court. *Soffar*, 300 F.3d at 598. Even assuming *arguendo* that this Court rejects the en banc Fifth Circuit's construction of *Teague*, which limits application of rules to those "dictated by Supreme Court precedent, not circuit court precedent," at the time of finality, *id.*, *Murphy* (10th Cir.) was alone insufficient to render the alleged illegality of Petitioner's conviction apparent to all reasonable jurists in 2019, in light of (1) the fact that state and federal courts viewed *Murphy* to not have the force of law, (2) the OCCA's own contrary *Murphy* decision, and (3) the continued exercise of criminal jurisdiction over Indians in Indian Country by the State as opposed to the federal government. *See Sawyer*, 497 U.S. at 237 ("The principle announced in *Teague* serves to ensure that gradual developments in the law over which reasonable jurists may disagree are not later used to upset the finality of state convictions valid when entered."); *Rhoades v. Paskett*, No. CV-97-170-S-EJL, 2005 WL 3576845, at *8-9 (D. Idaho Dec. 29, 2005) (unpublished) (in 1991, when the petitioner's convictions became final, state and federal courts were split regarding the rule at issue and even with "an emerging trend" in favor of the rule, "[g]iven the lack of uniformity, this Court cannot say that a state court would have been compelled to find that the Constitution required the rule that Petitioner now seeks to apply"). Regardless of whether Petitioner's prosecutorial authority claim is reviewed under § 2254(d) or *de novo*, relief is unavailable.

**E.    Conclusion**

For all these reasons, Respondent asks that this Court deny relief on Ground One.

## GROUND TWO

## A FAIRMINDED JURIST COULD AGREE PETITIONER'S TRIAL COUNSEL WAS NOT INEFFECTIVE.

In his second ground for habeas relief, Petitioner claims his trial attorneys were ineffective in a number of respects. A fairminded jurist could agree with the OCCA's rejection of Petitioner's arguments. This ground for relief must be denied.

### A.    Background

Petitioner raised these claims of ineffective assistance on direct appeal. 2/28/2017 *Brief of Appellant* at 40-67 (OCCA No. D-2015-462) ("*D.A. Brief*"). At the outset of adjudicating these claims, the OCCA correctly set out the law governing ineffective assistance claims as provided by *Strickland* and *Richter*. *Bench I*, 431 P.3d at 969-70 (¶¶ 156-157).

### B.    Standard of Review

To establish constitutionally ineffective counsel, Petitioner must show both (1) that his attorney's performance was deficient and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). As to performance, Petitioner bears the burden of proving that counsel's performance was unreasonable, and this Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 687, 689. As to prejudice, Petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112.

61

The *Strickland* standard is highly deferential, and when it applies in tandem with AEDPA deference, the resulting standard of review is "doubly" deferential to the state court's decision. *Id.* at 105. Accordingly, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* Thus, this Court must "determine what arguments or theories supported, or could have supported, the state-court decision and then . . . ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with a prior decision of [the Supreme] Court." *Id.* at 102.

## C.    First-Stage Ineffective Assistance Claims

### 1.    Failure to Object to Alleged Instances of Prosecutorial Error

As on direct appeal, Petitioner first claims that counsel were ineffective for failing to object to a number of instances of alleged prosecutorial error, as later discussed in Ground Six. Doc. 19 at 32-33, 79-89; *D.A. Brief* at 41-42. The OCCA rejected both Petitioner's prosecutorial error claims and, relevant here, his ineffective assistance claim at *Bench I*, 431 P.3d at 970 (¶ 159),[35] indicating that Petitioner could not show *Strickland*

---

[35] Pursuant to this Court's order denying Respondent an enlargement of her page limitation and consistent with this Court's directive, Doc. 27, Respondent deviates from the State's standard practice of quoting in full the state court's adjudication of each claim. *See Cullen v. Pinholster*, 563 U.S. 170, 182 (2011) ("[Section] 2254(d)(1) review focuses on what a state court knew and did."). However, for this Court's convenience, Respondent identifies via parenthetical the relevant paragraph(s) number(s) for each adjudication and briefly summarizes the adjudication where appropriate. Given page constraints, Respondent further focuses narrowly on the particular portions of the OCCA's adjudication challenged by Petitioner. *See Richter*, 562 U.S. at 98 (placing burden of petitioner to show entitlement to relief under § 2254(d)); *Reedy*, 660 F.3d at 1274 (counseled pleadings not entitled to a

prejudice for the same reasons the court rejected the merits of his underlying prosecutorial error claims.[36]

Petitioner offers only the most cursory arguments in support of this proposition, discussing these claims collectively without any individualized arguments as to underlying claims of prosecutorial error. Doc. 19 at 33. Petitioner's claims of ineffective assistance are so inadequately developed as to be waived and/or forfeited. *See (John) Grant*, 727 F.3d at 1025. In any event, Petitioner's generalized arguments are without merit. *First*, Petitioner seems to suggest that the OCCA, although it found various non-prejudicial individual errors in his prosecutorial error proposition, failed to consider the impact of the errors collectively and whether objections by counsel could have produced a reasonable probability of a different result. Doc. 19 at 33. However, the OCCA expressly stated that Petitioner showed no prejudice from "counsel's alleged failures," plural, *Bench I*, 431 P.3d at 970, and the court was not required to expressly discuss each individual sub-claim to receive AEDPA deference, *see Harmon v. Sharp*, 936 F.3d 1044, 1073 (10th Cir. 2019)

---

liberal construction). In so doing, however, Respondent maintains that the OCCA's adjudication of each claim must be considered in its entirety, *see (Donald) Grant v. Royal*, 886 F.3d 874, 906 (10th Cir. 2018) ("[O]ur [§ 2254(d)] inquiry relates to the overall substance of the state court's analysis and the conclusion it thereafter makes."), and does not, in focusing on those portions of the OCCA's opinion specifically attacked by Petitioner, in any way suggest that the portions not discussed are not relevant or not defensible. Moreover, whether quoted by Respondent or not, Respondent submits that every fact finding of the OCCA, or state district court finding as noted in the OCCA's opinions, is subject to a presumption of correctness. *See* 28 U.S.C. § 2254(e)(1).

[36] Respondent recognizes that the Supreme Court has applied *de novo* review to one prong of an ineffective assistance claim where the state court did not expressly discuss the other prong, *see, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 390 (2005), but Respondent preserves the argument that *Rompilla* and its progeny are no longer good law in light of *Richter*, 562 U.S. at 98.

("We presume that when a state court says multiple errors caused the defendant no prejudice, the court considered both the individual and cumulative effect of those errors." (quotation marks omitted, alterations adopted)). *Second*, Petitioner argues that, "absent plain error review" as to the underlying prosecutorial error claims, Petitioner's claims would have warranted relief on direct appeal. Doc. 19 at 33. Not only is this argument not properly before this Court because it was not made to the OCCA, *see Beaudreaux*, 138 S. Ct. at 2560; *D.A. Brief* at 41-42, it is without merit. The measure of prejudice for a claim of ineffective assistance of *trial* counsel is whether there is a reasonable probability of a different result at *trial*, not on *appeal*. *See Richter*, 562 U.S. at 104; *Marcus v. United States*, No. 14-CV-5780, 2015 WL 3869689, at *11 (E.D.N.Y. June 22, 2015) (unpublished) (rejecting habeas petitioner's argument that counsel's failure to object prejudiced him because "the Court of Appeals applied the harsher plain error standard of review," as proper inquiry was "what the outcome would have been *at trial* had the error not been made *during trial*" (emphases in original)).

### 2.    Alleged Failure to Impeach Dr. Hall

As on direct appeal, Petitioner next argues that trial counsel failed to impeach and/or rebut the State's insanity expert, Dr. Hall, on a number of grounds. Doc. 19 at 33-44; *D.A. Brief* at 44-51. Some background on Petitioner's insanity defense is helpful to understanding this claim:

> Appellant presented the testimony of forensic psychologist, Curtis Grundy, Ph.D., and the State presented the testimony of forensic psychologist, Terese Hall, Ph.D., in rebuttal. Both Dr. Grundy and Dr. Hall testified that in forming their respective opinions they relied upon information from people who had interacted with Appellant both before and

64

after [B.H.]'s murder, including Appellant's immediate family members and members of law enforcement. Both also testified that they compared and contrasted the individuals' numerous statements in arriving at their final opinion.

Appellant lived with his grandparents at the time of the offense. Both Dr. Grundy and Dr. Hall related that they had received two different sets of information from Appellant's grandparents. Their accounts had changed over time. Appellant's grandfather, Stanley Bench, testified at preliminary hearing approximately five months after the offense. Mr. Bench advised that there was nothing wrong with Appellant. When he met with Dr. Grundy approximately two years after the offense, Mr. Bench gave a different account. Mr. Bench indicated that a month prior to the offense, Appellant began mumbling to himself; he had trouble sleeping and stayed up all night; he banged on his bedroom wall and spoke in two different voices; and he stopped showering and grooming himself. Mr. Bench further indicated that Appellant advised that he had an implant in his brain like the Manchurian Candidate; a man and a woman from the Navy were after him; they had come into the store trying to kill him; and he was going to have to do something about them if they didn't stop.

Appellant's grandmother, Albertha Bench, initially indicated that Appellant lived in a world of make believe; he thought that he had seen spirits; was sometimes depressed and moody; did not like authority; was easily angered; and believed that he was smarter than everyone else. A few of Mrs. Bench's statements indicated that Appellant may have had some paranoia. She related that Appellant had advised her that he thought someone was after him and he came into her room one night because he thought something was in his room. At preliminary hearing, Mrs. Bench simply described Appellant as "a little mental." When Dr. Grundy evaluated Appellant two years after the offense, Mrs. Bench's relation of mental health concerns about Appellant had substantially grown. Despite the fact that she worked the graveyard shift and did not regularly see Appellant, Mrs. Bench related that Appellant was irrational; went without sleep for 4 or 5 days at a time; hit her bedroom wall at night; did not shower or groom himself; claimed that he was Jason Bourne or a spy; claimed that he had a chip in his head like the Manchurian Candidate; and repeatedly came into her room at night claiming that he was scared. Mrs. Bench indicated Appellant stated that he saw heads coming out of the closet after him, the apparition of a little girl in a white dress, and a man and a woman on these occasions. He further advised her that a man and a woman wanted to kill him, they had a hit out on him, and they had come into the convenience store, again.

65

Dr. Grundy testified that he heavily relied upon the statements of Mr. and Mrs. Bench in reaching the conclusion that Appellant had schizophrenia, suffered a psychotic break with delusions and was legally insane at the time of the offense.  Testifying in rebuttal, Dr. Hall related that although Appellant had some psychological problems she did not see any signs of severe psychosis in him.  She did not believe that he was sufficiently impaired at the time of the crime to render him unable to know right from wrong.  Explaining why she reached a different conclusion than Dr. Grundy, she noted the inconsistencies in the grandparent's statements over time.  Dr. Hall testified that she "discounted" the later statements because she felt that the statements both given under oath and closer in time to the offense were more reliable.

. . .

The evidence at trial strongly indicated that Appellant was sane at the time of the offense.  When Appellant enlisted in the Navy in November of 2011, his mother verified that he did not have any mental health issues.  The Navy had a doctor examine Appellant and he certified that Appellant did not have any psychiatric issues.  After Appellant was discharged for going AWOL, his stepfather had him seen by a mental health professional on two separate occasions.  Neither mental health professional determined that Appellant was a person requiring treatment.

Appellant's actions on the day of the murder evinced his sanity.  Neither Stanley Bench nor Clayton Jenson observed Appellant acting out of the ordinary that night.  Appellant did not report any delusions to them.  Appellant's behavior immediately after killing [B.H.] appeared to be rational, goal-oriented action.  He quickly attempted to conceal the crime by secreting [B.H.] out of the store and hiding her body in a semi-secluded area near his home.  Appellant attempted to escape from the State in [B.H.]'s car after washing himself and covering up his blood soaked clothes.

Appellant acted coherent and rational when he later interacted with the law enforcement officials that night.  He appeared lucid and normal to both Deputy Quinton Short and Detention Officer Kendall Brown.  Dr. Grundy admitted that there was not any independent evidence to corroborate Appellant's claimed delusions.

The audio tape of Appellant's conversation with Brown was convincing.  Appellant did not relate any delusions during the conversation.  He was self-directed and voluntarily initiated a discussion with Brown concerning the viability of an insanity defense.  Appellant's comments

66

illustrated his prior knowledge concerning psychological evaluations and feigning mental illness.

The evidence also strongly suggested that Appellant was feigning mental illness. Although Appellant had passed Dr. Grundy's tests for malingering, Appellant's test results on the MMPI-2 [Minnesota Multiphasic Personality Inventory] tended to indicate that he was feigning or over-reporting symptoms. Appellant took two MMPI-2 tests. Both tests indicated that Appellant was feigning or over-reporting mental health symptoms. When Dr. Hall gave Appellant the MMPI-2 after Grundy's evaluation, the scores indicated that Appellant was exaggerating and over-reporting.[37] Even Dr. Grundy had to admit that Appellant might not be the most truthful person in the world.

Dr. Hall did not see any evidence of severe psychosis in Appellant. At the time of trial, Appellant still maintained that he was not mentally ill. None of the seven separate mental health professionals who had evaluated Appellant found that he was a person requiring treatment. Only Dr. Grundy had diagnosed Appellant as insane on the night of the offense. Despite Grundy's belief that Appellant had schizophrenia and was psychotic when he first evaluated him, Appellant was able to appear at trial and participate in his defense without taking any medication for the condition.

In light of the evidence of Appellant's sanity and feigning we conclude that the evidence would not have permitted the jury to find that Appellant was insane at the time of the offense.

*Bench I*, 431 P.3d at 956-57 (¶¶ 85-88, 175-181).

Petitioner first argues trial counsel should have undercut Dr. Hall's reliance on

pretrial statements by his cousin, Clayton Jenson, indicating his sanity, with cross-

examination of her based on Mr. Jenson's testimony, which he contends supported his

---

[37] Specifically, Dr. Hall testified that the results of the MMPI she administered to Petitioner told her with great confidence that Petitioner was not reporting his mental health symptoms honestly (Tr. X 125-27). "[T]he two scales that assess[ed] for exaggeration or over-reporting of symptoms were extremely, extremely high" (Tr. X 125-27). In fact, Petitioner scored so high that, in a large study involving several thousand people, the *only* study participants who scored as high as Petitioner were part of the comparison group that had been instructed to *simulate* schizophrenia (Tr. X 127).

insanity.  Doc. 19 at 34-36; *D.A. Brief* at 45-46.  The OCCA rejected this argument at *Bench I*, 431 P.3d at 970-71 (¶¶ 161-167), holding counsel was not "ineffective" because Mr. Jenson's testimony and his statements to Dr. Hall were not actually inconsistent and thus his testimony did not "undercut" the statements relied on by Dr. Hall.

Petitioner contends the OCCA's adjudication was contrary to *Strickland* because the OCCA did not decide both prongs.  Doc. 19 at 35-36.  However, *Strickland* itself said "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.  In any event, the OCCA concluded that Petitioner had not demonstrated "ineffective assistance of counsel," *Bench I*, 431 P.3d at 971, which constitutes an adjudication of both prongs of Petitioner's *Strickland* claim, *see Premo v. Moore*, 562 U.S. 115, 123 (2011).  Furthermore, the OCCA's description of the deficient performance standard is entirely consistent with *Strickland*.  *See Strickland*, 466 U.S. at 689 ("[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.").

Petitioner asserts that the OCCA was unreasonable to find that "Jenson's testimony in defense would not have undercut his statements to Hall." *Bench I*, 431 P.3d at 971; Doc. 19 at 36.  However, a fairminded jurist could agree with this determination based on the record.  Overall, Mr. Jenson consistently testified that, although Petitioner made various claims to him that—if true—could indicate mental health issues, he saw no evidence to support these claims in the Petitioner's behavior and did not believe Petitioner had mental health problems (Tr. IX 18-20, 30, 32-33, 35-36).

Petitioner next asserts that trial counsel should have cross-examined Dr. Hall based on her testimony in another case, *Fears v. State*, Case No. F-2004-1279 (Okla. Crim. App. July 7, 2006) (unpublished), attached to Petitioner's direct appeal brief as Exhibit 1.  Doc. 19 at 36-39; *D.A. Brief* at 46-47.  The OCCA addressed this claim at *Bench I*, 431 P.3d at 971 (¶¶ 168-169), holding that Petitioner had not shown deficient performance because "Dr. Hall's testimony from *Fears* is not within the record on appeal," and Petitioner had not shown prejudice because, "[e]ven if we were to consider the statements which Appellant recounts from *Fears*, we would find that it did not undermine Dr. Hall's testimony in the present case," as "Hall's testimony did not materially differ."[38]

Petitioner contends the OCCA unreasonably found, in contrast to *Fears*, that here various witnesses had not seen signs of mental illness or delusions in Petitioner.  Doc. 19 at 38-39; *see Bench I*, 431 P.3d at 971 (reasoning that "the facts in *Fears* actually reveal that Hall's testimony remained consistent" because witnesses reported signs of mental illness in Fears contemporaneous with the crime, whereas "[t]hese were the very circumstances which Dr. Hall cited as missing from Appellant's conversations with [various individuals]").  However, Mr. Jenson unequivocally testified to his perception that Petitioner was acting entirely normal on the day of the murder, aside from a complaint

---

[38] The OCCA did not apply an "overly technical" and "inadequate" bar to this claim.  Doc. 19 at 38.  The OCCA's point was simply that Petitioner had not provided enough information to carry *his* burden of showing deficient performance.  *See Burt v. Titlow*, 571 U.S. 12, 22-23 (2013) (reasonable assistance must be presumed on a silent record).  Further, as the one carrying the burden, Petitioner failed to show that Dr. Hall could be impeached with a summary of her testimony, not written by her and not containing the entirety of her testimony verbatim.  *See id.*

about a sore throat (Tr. VI 18-20).  Deputy Short also found that Petitioner was able to understand him and follow commands (Tr. VI 120-21, 132).  And a fairminded jurist could agree that Petitioner's statement to Deputy Short that he "was not driving the vehicle" (Tr. VI 123-24), sounded not like a delusion, but like a knowing attempt by Petitioner to distance himself from the crime, having been discovered in the victim's vehicle covered in her blood.  Indeed, Petitioner immediately thereafter showed his consciousness of guilt, saying to Deputy Short, "I think I f***** up.  I may have killed somebody" (Tr. VI 124).

Petitioner next alleges, as on direct appeal, that trial counsel should have impeached Dr. Hall with the opinions of Drs. Scott Orth and Peter Rausch, who examined Petitioner for competency to stand trial, because she allegedly reached conclusions inconsistent with those doctors, and by calling Dr. Grundy in surrebuttal.  Doc. 19 at 39-40; *D.A. Brief* at 48-51.  The OCCA rejected these arguments at *Bench I*, 431 P.3d at 971-73, 975-76 (¶¶ 170-181, 194-196), finding neither deficient performance nor prejudice.

Petitioner suggests that the OCCA unreasonably denied relief because, contrary to the OCCA's finding, Drs. Orth and Rausch contradicted Dr. Hall and thus counsel should have impeached Dr. Hall with their opinions.  Doc. 19 at 42.  However, the OCCA recognized that, "[a]lthough Orth's 'conservative opinion' did not exactly match Hall's conclusion that Appellant was malingering," "overall" both Orth and Rausch "tended to corroborate Dr. Hall's testimony." *Bench I*, 431 P.3d at 972; *see also id.* (finding Drs. Orth and Rausch's opinions to be "*more* consistent" with Dr. Hall than Dr. Grundy (emphasis added)).  Petitioner fails to acknowledge or engage with the full context of the OCCA's discussion of the various doctors' opinions, instead presenting his own selective recounting

70

of Drs. Orth's and Rausch's opinions.  Doc. 19 at 39-40.  But even assuming "reasonable minds reviewing the record might disagree about the finding in question," that is insufficient to satisfy § 2254(d)(2).  *Wood v. Allen*, 558 U.S. 290, 301 (2010).  The OCCA's determination that Drs. Orth and Rausch were, overall, more consistent with Dr. Hall than Dr. Grundy was not so incorrect as to be beyond all fairminded disagreement.  *See Bench I*, 431 P.3d at 972 (summarizing how, although Dr. "Orth did not conclusively determine whether Appellant was faking or exaggerating his symptoms," both he and Dr. Rausch believed Petitioner was feigning or over-reporting symptoms and did not actually display substantial symptoms or require treatment).

Petitioner also argues that the OCCA's "finding of no-prejudice was unreasonable" because of "[t]he OCCA's focus on other evidence."  Doc. 19 at 43; *see Bench I*, 431 P.3d at 972 (concluding "Appellant has not shown prejudice from counsel's omission" because the evidence overall "at trial strongly indicated that Appellant was sane at the time of the offense").  However, "the totality of the evidence" approach taken by the OCCA is exactly the one mandated by the Supreme Court.  *Strickland*, 466 U.S. at 695; *see also Smith v. Mullin*, 379 F.3d 919, 935 (10th Cir. 2004) (concluding that counsel's deficiencies in presenting mental health evidence were not prejudicial in light of the overwhelming evidence of the petitioner's guilt).

As noted, Petitioner also challenges the OCCA's rejection of his argument that counsel should have called Dr. Grundy in surrebuttal to counter Dr. Hall's "suggestion that it was easy to fool the Structured Interview of Reported Symptoms ('SIRS')," the test Dr. Grundy administered to Petitioner to detect malingering.  *Bench I*, 431 P.3d at 975.  The

OCCA found that it was only in hindsight that Dr. Grundy believed he should have been called in surrebuttal.  *Id.* ("The affidavit alleges that Dr. Grundy consulted with the defense team after Dr. Hall's testimony and informed them that he would not recommend his testifying in surrebuttal.  Now, in hindsight, Grundy believes that if he had testified he could have challenged Dr. Hall's testimony suggesting that Appellant was 'malingering' or 'faking.'").

Petitioner contends the OCCA unreasonably interpreted Dr. Grundy's affidavit. Doc. 19 at 43.  But consistent with the OCCA's finding, Dr. Grundy's affidavit stated: "At the time of the trial consultation after Dr. Hall's testimony, I recall stating that I would not recommend surrebuttal should I only restate my findings.  However, upon further review of Dr. Hall's testimony, several of her opinions could have been addressed at the time of trial."  2/28/2017 *Application for Evidentiary Hearing on Sixth Amendment Claim* (OCCA No. D-2015-462) ("*3.11 App.*"), Ex. 4 at 2.  Petitioner claims the OCCA's finding was unreasonable because "Dr. Grundy did not unconditionally recommend against his testifying in surrebuttal."  Doc. 19 at 43-44.[39]  At least one fairminded jurist could agree with the OCCA that Dr. Grundy's statement, "I recall stating that I would not recommend surrebuttal should I only restate my findings," meant that he did not recommend surrebuttal

---

[39] Before the OCCA, Petitioner did not make this argument; indeed, he failed to acknowledge Dr. Grundy's statement—buried in the affidavit—that Dr. Grundy and trial counsel had actually discussed whether Dr. Grundy should testify in surrebuttal.  Instead, Petitioner painted counsel's decision not to recall Dr. Grundy as uniformed and inexplicable.  *See D.A. Brief* at 50-51.  Petitioner's transformed arguments in support of this ineffective assistance claim should not be considered.  *See Beaudreaux*, 138 S. Ct. at 2560.

*because* he would only be restating his findings.   Indeed, immediately thereafter, Dr. Grundy indicated that it was only "upon further review of Dr. Hall's testimony" that he identified counterpoints to Dr. Hall's testimony.   That Petitioner can now think of an alternative interpretation of Dr. Grundy's ambiguously worded affidavit does not render the OCCA's interpretation unreasonable.  *See Wood*, 558 U.S. at 301; *Rountree v. Balicki*, 640 F.3d 530, 543 (3d Cir. 2011) ("At bottom, the question of how to read this transcript . . . is a question of fact that can be argued either way.  That the transcript can be read in more than one way does not—by itself—rise to the level of 'clear and convincing evidence,' § 2254(e)(1) . . . .").

Petitioner also asserts "[i]t was up to defense counsel to present Dr. Grundy to counter Dr. Hall's erroneous criticisms of the SIRS test, not simply to restate his findings." Doc. 19 at 43-44.  However, if Dr. Grundy, Petitioner's mental health *expert*, did not at the time of trial identify weaknesses in Dr. Hall's testimony regarding the SIRS that could be exploited in surrebuttal, trial counsel was not unreasonable in failing to identify same.  *See Postelle v. Carpenter*, 901 F.3d 1202, 1216 (10th Cir. 2018) ("[W]e should . . . not expect the lawyer to know more than the clinical neuropsychologist about the fine details of scoring IQ.").

Petitioner next argues that the OCCA's prejudice-prong adjudication was based on the unreasonable factual finding that "Grundy's testimony at trial concerning 'malingering' and 'faking' was consistent with Dr. Hall's trial testimony."  *Bench I*, 431 P.3d at 976; Doc. 19 at 44.  In context, the OCCA was not saying that Dr. Grundy believed like Dr. Hall that Petitioner was malingering.  Doc. 19 at 44.  Instead, responding to Petitioner's direct

73

appeal argument that Dr. Hall had incorrectly defined "malingering and feigning" as "faking" in her testimony, *D.A. Brief* at 48, the OCCA found Dr. Hall and Dr. Grundy were consistent in how they defined malingering/feigning. *Bench I*, 431 P.3d at 976. This finding was fully supported by the record, namely Dr. Grundy's testimony agreeing that faking was an appropriate layperson's definition for malingering (Tr. X 29-30).[40]

### 3.  Alleged Failure to Effectively Cross-Examine Melissa Lynn

Petitioner next claims, as on direct appeal, that trial counsel rendered ineffective assistance in failing to effectively cross-examine Melissa Lynn, one of his Tepee Totem co-workers. Doc. 19 at 44-47; *D.A. Brief* at 43-44; *3.11 App.*, Ex. 1. The OCCA rejected this claim at *Bench I*, 431 P.3d at 974-75 (¶¶ 188-193), finding neither deficient performance nor prejudice in counsel's failure to cross-examine Ms. Lynn regarding statements from her police interview and a civil lawsuit B.H.'s parents filed against the Teepee Totem.

Petitioner first argues that the OCCA made an unreasonable fact finding in attributing trial counsel's decision not to cross Ms. Lynn regarding Petitioner's job performance to avoiding the topic of his habit of approaching females in the store. Doc. 19 at 45[41]; *see Bench I*, 431 P.3d at 975 (noting that, although Ms. Lynn previously stated

---

[40]In a couple places the transcript uses the word "talking" where it is clear from the context that "faking" is meant (Tr. X 29-30).

[41] Notably, this argument was not raised to the OCCA and is not properly before this Court. *See Beaudreaux*, 138 S. Ct. at 2560. Before the OCCA, Petitioner laid behind the log, not mentioning Ms. Lynn's comments during her police interview regarding Petitioner's preoccupation with females, and instead suggested it was inexplicable why trial counsel would fail to cross Ms. Lynn regarding his job performance. *D.A. Brief* at 43-44.

Petitioner "was slow and was not catching on," she "partly attributed [his] slowness to the fact that he was young and liked to flirt with every girl that came into the store," and "[c]learly, the defense wanted to avoid portraying [him] as having approached other young females in the store"). A fairminded jurist could agree with the OCCA's finding. A repeated theme of Ms. Lynn's police interview was that, although Petitioner was "slow" and had trouble remembering things, the root of the problem was that he was distracted by his attempts to flirt with girls who came into the store and that he became "nervous and forgot everything he was doing" when female co-workers were "standing over watching him" work. *3.11 App.*, Ex. 1 17:08-17:23, 23:57-24:15. Although Ms. Lynn waffled at points on how to define Petitioner's awkward interactions with females—whether as flirting or an attempt to prolong their time in the store, Doc. 19 at 45—this was clearly a topic counsel wanted to avoid. The State's theory was—and the evidence showed—that B.H.'s murder was not the result of a psychotic break, but a culmination of Petitioner's "long history of sexually aggressive conduct towards females that escalated over time." *Bench I*, 431 P.3d at 960. The OCCA quite reasonably found that counsel's decision to avoid this line of cross was trial strategy. *See Richter*, 562 U.S. at 108 ("An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense.").

Petitioner further asserts the OCCA unreasonably found a lack of prejudice. Doc. 19 at 46. The OCCA essentially found the information counsel could have elicited from Ms. Lynn—that Petitioner was "slow"—would have been cumulative to testimony from Petitioner's teachers, childhood neighbors, and boot camp instructor. *See Bench I*, 431

P.3d at 975.  While Petitioner argues Ms. "Lynn's testimony must have carried more weight with the jury than the more temporally distant testimony of defense witnesses," Doc. 19 at 46,[42] a fairminded jurist could agree with the OCCA's determination because the "likelihood of a different result must be *substantial*, not just conceivable."  *Richter*, 562 U.S. at 112 (emphasis added).  Although the jury *might* have given more weight to Ms. Lynn's more recent descriptions of Petitioner, following this line of cross also risked Ms. Lynn's attributing Petitioner's slowness to a preoccupation with females in the store, as discussed above, a conclusion that would be undoubtedly harmful to the defense.

Finally, Petitioner challenges the OCCA's determination that counsel was not deficient in failing to cross Ms. Lynn regarding the lawsuit B.H.'s parents filed against the Teepee Totem.  Doc. 19 at 46-47.  Petitioner's complaint that the OCCA did not apply both prongs of *Strickland* is foreclosed by *Strickland* itself.  *See Strickland*, 466 U.S. at 697. The OCCA further reasonably determined that Petitioner had "not provided any authority establishing that defense counsel would have been able to use this lawsuit to impeach Lynn." *Bench I*, 431 P.3d at 975.  While Oklahoma law does not prohibit the introduction of evidence regarding a civil lawsuit in a criminal trial, the lawsuit must be relevant.  *Mayes v. State*, 887 P.2d 1288, 1308-10 (Okla. Crim. App. 1994).  Ms. Lynn was not named in the lawsuit and her testimony was not even clear as to whether she was still employed at the Tepee Totem at the time of trial.  *3.11 App.*, Ex. 2; Tr. V 88.  Thus, Petitioner failed to

---

[42] Again, Petitioner's direct appeal brief failed to acknowledge the testimony of these other witnesses or argue that Ms. Lynn's testimony was of superior weight given its proximity to the murder.  *D.A. Brief* at 43-44; *see Beaudreaux*, 138 S. Ct. at 2560.

76

show that cross-examination regarding the lawsuit would have been permitted and would have actually exposed some bias on Ms. Lynn's part.

**D.    Second-Stage Ineffective Assistance Claims**

**1.    Failure to Present Mitigation Specialist at Trial**

As on direct appeal, Petitioner contends that his trial attorneys should not have decided against calling their mitigation specialist David Musick, Ph.D., to testify.  Doc. 19 at 47-51; *D.A. Brief* at 52-57.  The OCCA disposed of this claim at *Bench I*, 431 P.3d at 976-77 (¶¶ 197-201), finding neither prejudice nor deficient performance.

Petitioner contends that the OCCA unreasonably determined that counsel's decision not to call Dr. Musick was reasonable trial strategy.  Doc. 19 at 50; *see Bench I*, 431 P.3d at 976 ("An appellant must show that capital defense counsel's strategic decision to not call a witness was objectively unreasonable.  Appellant has not made this showing in the present case." (citations and paragraph break omitted)).  But Petitioner admits that counsel retained Dr. Musick and considered Dr. Musick's report before deciding not to put Dr. Musick on the stand, and he has never claimed that counsel's mitigation investigation was inadequate.  Thus, counsel's decision not to call Dr. Musick, "made after thorough investigation of law and facts relevant to plausible options," is "virtually unchallengeable." *Strickland*, 466 U.S. at 690; *Hinton v. Alabama*, 571 U.S. 263, 274-75 (2014) (applying this rule to decisions regarding expert witnesses).  And a fairminded jurist could agree with the OCCA that counsel reasonably decided not to put Dr. Musick on the stand to "maintain[] a consistent defense through both stages of the trial." *Bench I*, 431 P.3d at 976-77 (finding that defense counsel decided not to call Dr. Musick because Dr. Musick's

77

report suggested, based on "4 lines" relating statements from Petitioner's mother and grandmother, that Petitioner committed the murder after being bullied by young customers at the store, which was inconsistent with the first-stage defense); *see Fairbank v. Ayers*, 650 F.3d 1243, 1253 (9th Cir. 2011) (counsel reasonably decided against presenting certain mitigation evidence to maintain credibility with the jury and consistency with his overall trial defense).

Petitioner, in turn, argues that the OCCA unreasonably found that part of Dr. Musick's report was inconsistent with the first-stage defense because the report "helped explain the same in the context of Mr. Bench's entire life experience." Doc. 19 at 50.[43]   A fairminded jurist could agree with the OCCA that Dr. Musick's report introduced a defense theory that was inconsistent with the first-stage defense.  In summarizing his *conclusions* about Petitioner, Dr. Musick noted that, according to Petitioner's grandmother, Petitioner "was being called cruel names, like 'stupid' and 'dummy,' by young customers at the store where he worked" and that his mother felt that after "[y]ears and years of taking abuse, he

---

[43] Petitioner has once again, under the guise of a § 2254(d)(2) argument, introduced a theory of relief not argued to the OCCA.  Before the OCCA, Petitioner argued that calling a mitigation specialist "is, literally, the rule" according to the American Bar Association's ("ABA") guidelines and did not engage with why counsel chose not to call Dr. Musick other than misrepresenting the contents of his affidavit.  *D.A. Brief* at 52-57 (suggesting that counsel made the decision because Dr. Musick had "misattributed" a statement to Petitioner's grandmother).  Now, Petitioner acknowledges that the ABA guidelines are just that—guidelines, and not rules, *see also Bobby v. Van Hook*, 558 U.S. 4, 8 (2009), and acknowledges and claims to be unreasonable the actual reason for counsel's decision as reported in Dr. Musick's affidavit, Doc. 19 at 47-49.  Petitioner's new arguments are not properly before this Court.  *See Beaudreaux*, 138 S. Ct. at 2560; *see also Bench I*, 431 P.3d at 976 ("He has neither *argued* nor shown that counsel's strategic decision to not call Musick as a witness to avoid his being questioned about the 4 lines was objectively unreasonable." (emphasis added)).

might have reached his limits.'"   *3.11 Application*, Ex. 3, Att. B at 14.   Contrary to Petitioner's claim this theory was not inconsistent with the "theory of a psychotic break," Doc. 19 at 49, the first-stage mental illness defense had nothing to do with Petitioner allegedly being a victim of recent bullying or suggestion that B.H. had been cruel to Petitioner; rather, it was that Petitioner suffered from delusions that B.H. was a CIA agent, ultimately turned demon, who was attempting to return him to the Navy because he had gone AWOL (Tr. X 20, 36-37, 114; Tr. XII 95-96).   Petitioner's claim that "Musick in both his affidavit and report did not profess to conclude why Mr. Bench killed [B.H.]," Doc. 19 at 51, ignores that the objectionable portion of Dr. Musick's report was part of his *bottom-line conclusions*, *see Bench I*, 431 P.3d at 977.

Turning to the OCCA's prejudice analysis, Petitioner claims the OCCA's decision was contrary to *Strickland* because the OCCA said he "failed to demonstrate prejudice from counsel's decision," and not that he failed to demonstrate a reasonable probability of prejudice.   Doc. 19 at 50-51; *see Bench I*, 431 P.3d at 977 ("Appellant has also failed to demonstrate prejudice from counsel's decision to not call Musick as a witness."). However, the question is not whether a petitioner has shown a reasonable probability of prejudice—it is whether he has shown a reasonable probability of a *different result*, and *that* equals prejudice.   *Strickland*, 466 U.S. at 694.   Moreover, in arguing that the OCCA unreasonably found a lack of prejudice, Petitioner ignores, and certainly fails to demonstrate the unreasonableness of, the OCCA's main focus—that Dr. Musick's other conclusions could actually be damaging to the defense and reinforce that Petitioner was a continuing threat.   *See Bench I*, 431 P.3d at 977 ("Musick's concluding paragraph in his

79

Report speculated that Appellant could continue to engage in impulsive behavior, lack empathy, and be aggressive in the future if his head injuries were left untreated.  This information also would have likely tended to support the State's allegation that Appellant posed a continuing threat to society."); *see also Cannon v. Gibson*, 259 F.3d 1253, 1278 (10th Cir. 2001) (finding a lack of prejudice from failure to present certain mitigation evidence where it actually "could have strengthened the prosecution's argument that Cannon represented a continuing threat to society").

### 2.      Failure to Present Mental Health Expert

Petitioner next claims, as before the OCCA, that trial counsel were ineffective in not recalling Dr. Grundy in second stage, again based on Dr. Grundy's affidavit that was presented on direct appeal with Petitioner's 3.11 Application. Doc. 19 at 51-54; *D.A. Brief* at 57-59.  The OCCA rejected this claim at *Bench I*, 431 P.3d at 977 (¶¶ 202-203), determining that "Appellant has not shown clear and convincing evidence of a strong possibility that counsel was ineffective for failing to utilize or identify the proffered evidence."

Petitioner first suggests that the OCCA's decision was contrary to *Strickland* because the OCCA applied its "clearly and convincing" Rule 3.11 standard.  Doc. 19 at 53. This argument is foreclosed by binding Tenth Circuit precedent that Petitioner fails to cite. *See Lott v. Trammell*, 705 F.3d 1167, 1213 (10th Cir. 2013).

Petitioner further argues that the OCCA's assessment of Dr. Grundy's affidavit, that it offered evidence cumulative to that presented in first stage, was unreasonable because defense counsel never argued Dr. Grundy's diagnosis in second stage and the diagnosis

would have served a new objective in second stage.  Doc. 19 at 53-54; *see Bench I*, 431 P.3d at 977 ("Grundy's proffered statements are cumulative to the testimony he actually gave in the first stage of the trial.").  Petitioner's arguments ignore counsel's second-stage strategy.  While it is accurate to say that defense counsel shied away from schizophrenia evidence in second stage, it is completely inaccurate to say that "counsel abandoned the theme of mental illness in the sentencing stage."  Doc. 19 at 51.  Defense counsel presented numerous witnesses to show the change that happened in Petitioner during and after his Navy basic training and to describe the unsuccessful efforts to get him mental health treatment (Tr. XIII 21; Tr. XIV 12-13, 26-27, 32-36, 63-64, 79-81, 88-90, 92-94, 99). Further, all of the first stage evidence, including the exhaustive mental health evidence presented, was incorporated into second stage, and whether that step was necessary or not,[44] it signaled to the jury that the first-stage evidence was still relevant to consider (Tr. XII 18; Tr. XIII 6).  The jury was also instructed to consider as mitigating circumstances at least three factors that related to Petitioner's mental health (D.A. O.R. 1445-46).   In presenting a more general mental health mitigation case, trial counsel carefully, and reasonably, crafted a second stage defense that was not inconsistent with first stage but that did not simply repeat a losing strategy.  *Cf. Cannon v. Johnson*, 134 F.3d 683, 686-88 (5th Cir. 1998) (defense counsel, in capital murder retrial, made reasonable strategic decision not to present available mental health evidence in mitigation because, *inter alia*, jury in

---

[44] *See Bench I*, 431 P.3d at 977 ("Although wholly unnecessary, defense counsel explicitly moved to introduce all of the defense's evidence from the first stage of the trial into evidence in the second stage of the trial).

first trial had rejected insanity defense and second stage mental health evidence and imposed death sentence).

### 3.    Failure to Prepare and Present Neuroimaging Evidence

As on direct appeal, Petitioner contends that trial counsel provided ineffective assistance in failing to pursue and present neuroimaging evidence to bolster his schizophrenia diagnosis in both first and second stage. Doc. 19 at 54-57; *D.A. Brief* at 59-62. In support of this claim on direct appeal, Petitioner presented Dr. William Orrison's affidavit regarding his interpretations of a recent Magnetic Resonance Imaging ("MRI") of Petitioner's brain. *D.A. Brief* at 61; *3.11 App.*, Ex. 5. Petitioner noted that, "[e]ven though the MRI was not performed according to the protocols specified by the expert, Dr. Orrison was still able to make a number of significant findings." *D.A. Brief* at 61. Petitioner stated that appellate counsel planned to obtain the more specialized MRI recommended by Dr. Orrison, *D.A. Brief* at 61 & n. 11, indicating that trial counsel should have obtained either a basic MRI or a more specialized MRI as recommended by Dr. Orrison. The OCCA discussed and rejected this claim at length at *Bench I*, 431 P.3d at 977-79 (¶¶ 204-211).

A fairminded jurist could agree with the OCCA that Petitioner did not establish prejudice.[45] Petitioner claims the OCCA unreasonably found the neuroimaging would not have been admissible in first stage. *See Bench I*, 431 P.3d at 978 ("The courts have not

---

[45] While Petitioner claims the OCCA did not decide the deficient performance prong, the OCCA concluded by stating counsel was not "ineffective," *Bench I*, 431 P.3d at 979 (¶ 211), which constitutes an adjudication of both *Strickland* prongs, *see Premo*, 562 U.S. at 123. Alternatively, Respondent again preserves the argument that the OCCA should still receive deference to the deficient performance prong under *Richter*, 562 U.S. at 98.

accepted diagnosis of psychological conditions through neuro-imaging as sufficiently reliable to be admissible under the Daubert[*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993),] standard. This is because neuro-imaging methods cannot readily determine whether a defendant knew right from wrong, maintained criminal intent or suffered from a psychological condition like schizophrenia at the time of the criminal act." (collecting cases) (citations and footnote omitted)). That is a question of state law to which this Court must defer. *See Williams v. Trammell*, 782 F.3d 1184, 1195 (10th Cir. 2015). Further, the OCCA never suggested that the neuroimaging was cumulative because other brain scans had been admitted, Doc. 19 at 56; the OCCA's point was that the neuroimaging was unnecessary and unpersuasive given Dr. Grundy's diagnosis of Petitioner with schizophrenia based on scientifically acceptable measures. *See Bench I*, 431 P.3d at 978 (indicating that methods such as neuropsychological testing, and not neuroimaging, are acceptable for diagnosing schizophrenia).

Regarding second stage, Petitioner suggests that the OCCA's decision was contrary to federal law because it referenced "the jury" instead of "one juror" striking a different balance between the aggravating and mitigating evidence. Doc. 19 at 56; *see Bench I*, 431 P.3d at 978-79 ("[W]e find that Appellant has not shown a reasonable probability that had counsel presented the neuro-imaging evidence the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."). This argument is entirely contrary to this Court's deferential standard of review. *See Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (state courts are presumed to "know and follow the law" and are "given the benefit of the doubt"); *(Donald) Grant v. Royal*, 886 F.3d 874, 905-06 (10th Cir.

2018) ("On habeas review, we properly eschew the role of strict English teacher, finely dissecting every sentence of a state court's ruling to ensure all is in good order.").

### 4.    Failure to Present Testimony Regarding Value of Petitioner's Life

Petitioner lastly argues that trial counsel should have presented second stage testimony from his grandmother and additional testimony from his mother to "humanize" him. Doc. 19 at 57-58; *D.A. Brief* at 62-65. The OCCA disposed of this claim at *Bench I*, 431 P.3d at 979-81 (¶¶ 212-221), discussing that counsel did present extensive humanizing evidence, including "evidence showing that Appellant was a beloved and loving son, grandson and brother," and that any further emphasis on such evidence "would have undercut counsel's overall second stage strategy of emphasizing the upheaval and dysfunction in his childhood."

Petitioner, to begin with, is incorrect that the OCCA failed to adjudicate both prongs of this claim, Doc. 19 at 57, as the OCCA concluded with a general statement that counsel was not "ineffective," *see Premo*, 562 U.S. at 123. Further, Petitioner's suggestion that prevailing professional norms required the presentation of the sort of "humanizing" evidence he proffered on direct appeal, Doc. 19 at 58, entirely ignores—as he did on direct appeal—that counsel did present *exactly* this sort of humanizing evidence. *Bench I*, 431 P.3d at 980 ("Appellant has neither argued nor shown why counsel's chosen avenue was unreasonable."). Finally, a fairminded jurist could agree with the OCCA that any further emphasis on such evidence would have distracted from one of the main themes of the mitigation case. *See id.* Part of trial counsel's strategy was to show that Petitioner was mistreated both at school and at home, did not receive support from his parents in his

education, and experienced a childhood characterized by upheaval and dysfunction (Tr.

XIII 14-15, 19-20, 25, 29-31, 41, 43, 46-47, 52-53, 56; Tr. XIV 8, 10-13, 24, 29-30, 88,

98-99; D.A. O.R. 1446 (instructing the jury to consider as mitigation Petitioner's "negative

emotional and family history")). Introducing evidence that showcased the loving,

supportive, and happy aspects of his upbringing would have undermined this strategy.

## E. Conclusion

For all these reasons, habeas relief should be denied on Ground Two.

**<u>GROUND THREE</u>**

**A FAIRMINDED JURIST COULD AGREE APPELLATE COUNSEL WERE NOT INEFFECTIVE.**

In his third ground for relief, Petitioner raises four sub-claims of ineffective

assistance of appellate counsel. Because the OCCA reasonably denied relief on these

claims, none warrants habeas relief.

## A. Background

In addressing Petitioner's claims challenging appellate counsel's performance, the

OCCA began with correctly providing the standard of review for ineffective assistance of

appellate counsel claims. *Bench II*, 504 P.3d at 598 (¶ 13).

## B. Clearly Established Law

The same two-part *Strickland* standard provided above, in Ground Two, applies to

claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285

(2000). Therefore, Petitioner must show that appellate counsel's performance was

unreasonable and that he suffered prejudice, that is, that there is a reasonable probability

that, had the errors now complained of been raised, the result of his appeal would have been different. *Id*. at 285. If appellate counsel files a brief on the merits, she should not raise every nonfrivolous claim. *Miller v. Mullin*, 354 F.3d 1288, 1298 (10th Cir. 2004). Rather, appellate counsel may select from among claims in order to maximize the likelihood of success. *Id*. Therefore, it is difficult to establish that appellate counsel was ineffective for failing to raise a particular issue. *Id*.[46]

## C.    Argument and Authority

### 1.    Failure to Object to Obtain More Specialized MRI

In his post-conviction application, Petitioner argued, in Proposition VIII, that "[t]rial counsel was ineffective for failing to seek an MRI to provide scientific evidence to support Mr. Bench's insanity defense," and in Proposition V, that appellate counsel was ineffective, although she obtained an MRI, in not obtaining a *more specialized* MRI in support of the trial counsel claim. *P.C. App.* at 35-40, 47. The OCCA barred the trial counsel claim[47] and rejected the appellate counsel claim on the merits at *Bench II*, 504 P.3d at 598-99 (¶ 14), concluding that "appellate counsel raised the claim on direct appeal that trial counsel

---

[46] Here, direct appeal counsel used their full 100-page allowance and raised twelve propositions of error.

[47] Petitioner quibbles with the OCCA over whether his neuroimaging-based trial counsel claim differed at all from direct appeal to post-conviction. Doc. 19 at 61-62. However, his trial counsel claim was addressed by the OCCA on direct appeal (and here in Ground Two), and Oklahoma law is well-settled that recasting a direct appeal claim on post-conviction with new arguments and/or new evidence does not avoid the *res judicata* bar. *See McCarty v. State*, 989 P.2d 990, 995 (Okla. Crim. App. 1999); *Smallwood v. State*, 937 P.2d 111, 115 (Okla. Crim. App. 1997). In other words, while Petitioner is correct that there is a merits adjudication, it was as to the trial counsel claim raised on direct appeal and addressed above.

was ineffective for failing to obtain the more specialized M.R.I. of Petitioner's brain.  We denied his claim.  Thus, appellant counsel was not ineffective for failing to raise this claim."

Petitioner does not contest that, to the extent he claimed that appellate counsel was ineffective for failing to raise a claim that appellate counsel did in fact raise, the OCCA reasonably denied relief.  *See id.*  Rather, Petitioner argues that he previously raised a claim that trial counsel failed to present any MRI, while his claim on post-conviction was different—that appellate counsel was ineffective for failing to obtain a more specialized MRI than that appellate counsel actually did obtain.  Doc. 19 at 62.  The OCCA reasonably concluded Petitioner essentially advanced the same claim twice.  As summarized in Ground Two, Petitioner's direct appeal brief suggested that trial counsel should have obtained either a basic MRI like that appellate counsel obtained *or* a *more specialized* MRI like Dr. Orrison recommended.  *D.A. Brief* at 61 & n. 11.  Moreover, even if on post-conviction Petitioner now focused on *appellate* counsel's failure to obtain the more specialized MRI, the ultimate issue was still whether *trial* counsel should have obtained such a specialized MRI and the effect such would have had on the trial—an issue appellate counsel did raise.  In fact, like appellate counsel, post-conviction counsel was *also* not able to obtain a specialized MRI.  *P.C. App.* at 38-39.  Thus, when on post-conviction Petitioner had still not presented the results of a more specialized MRI—let alone shown what such an MRI would have revealed or how it might have changed the outcome of direct appeal—the OCCA quite reasonably concluded that Petitioner was, at bottom, pressing the same claim

previously asserted, and appellate counsel could not be ineffective for failing to raise a claim they did actually raise.[48]

Before this Court and the OCCA, Petitioner argues that the denial of his funding request for a more specialized MRI by Oklahoma Indigent Defense System ("OIDS") management, on both direct appeal and post-conviction, violated *Ake v. Oklahoma*, 470 U.S. 68 (1985). Doc. 19 at 61; *P.C. App.* at 38-40. To the extent this claim was fairly presented to the OCCA, this Court must presume the OCCA adjudicated same on its merits. *See Johnson v. Williams*, 568 U.S. 289, 298-301 (2013). *Ake* held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." *Ake*, 470 U.S. at 74.

Here, Petitioner was afforded an insanity expert at trial, and he has not alleged a denial of funding by any *court*; moreover, his claim is that he was denied funding on appeal and collateral review, not at trial, and for a more specialized MRI, not a psychiatrist. Regardless of the standard of review, multiple courts have found that such attempts to extend *Ake* are foreclosed by both *Teague* and § 2254(d)(1)'s clearly established law

---

[48] To the extent the claim really was different, Petitioner did not demonstrate appellate counsel's ineffectiveness when, on post-conviction, he had still not presented a more specialized MRI. *See Tryon v. Farris*, No. CIV-19-195-J, 2021 WL 3042664, at \*15-16 (W.D. Okla. July 19, 2021) (unpublished) (denying speculative claim "that appellate counsel was ineffective in not raising a claim based on trial counsel's failure to request funds for neuroimaging" where post-conviction counsel had also not obtained the neuroimaging and thus petitioner failed to carry his burden of showing prejudice).

requirement.  *See, e.g.*, *Toles v. Gibson*, 269 F.3d 1167, 1175 (10th Cir. 2001); *Ford v. State*, 630 So. 2d 111, 112 (Ala. Crim. App. 1991); *Tryon v. Farris*, No. CIV-19-195-J, 2021 WL 3042664, at *15 (W.D. Okla. July 19, 2021) (unpublished); *McDermott v. O'Brien*, No. CIV.A. 09-11992-RGS, 2011 WL 5513212, at *14 (D. Mass. Oct. 25, 2011), *report and recommendation adopted*, No. CIV.A. 09-11992-RGS, 2011 WL 5513194 (D. Mass. Nov. 10, 2011) (unpublished); *Cobb v. Metrish*, No. 06-10722, 2008 WL 2831838, at *8-9 (E.D. Mich. July 21, 2008).[49]

### 2.    Failure to Raise Prosecutorial Authority Claim

Petitioner next argues appellate counsel rendered ineffective assistance in failing to raise his prosecutorial authority claim on direct appeal.[50]  The OCCA rejected this claim at *Bench II*, 504 P.3d at 599 (¶ 15), holding that "the *McGirt* ruling did not issue until 2020, long after Petitioner's conviction became final in 2018.  Thus, any challenge to jurisdiction

---

[49] Nor does Petitioner cite any authority, Supreme Court or otherwise, endorsing his theory that OIDS's denial of funding for a more specialized MRI on direct appeal and post-conviction effectively denied him counsel under *United States v. Cronic*, 466 U.S. 648 (1984).  *P.C. App.* at 39-40; Doc. 19 at 61, 63; *see also Alverson v. Workman*, 595 F.3d 1142, 1162 (10th Cir. 2010) ("[A] defendant is not constitutionally entitled to representation by counsel in state post-conviction proceedings." (quotation marks omitted)).

[50] Petitioner briefly discusses his claim on post-conviction that trial counsel was ineffective in failing to raise the prosecutorial authority claim, Doc. 19 at 63-65, but he has abandoned that claim here, *see* Doc. 19 at 31-58 (raising various trial counsel claims but not this one), 58 ("Appellate counsel was ineffective in violation of Mr. Bench's rights under the Sixth, Eighth, and Fourteenth Amendments." (emphasis omitted)), 63 ("Appeal counsel failed to raise the jurisdictional/Indian Country claim.").

would have been unsuccessful at the time of Petitioner's trial and appeal.[51]   Counsel cannot have been ineffective for failing to raise a baseless claim."

As an initial matter, none of the arguments Petitioner advances to this Court regarding this claim were raised to the OCCA.  Before the OCCA, Petitioner only ever offered *two sentences* of argument in support of this claim, spread across two briefs.  *P.C. App.* at 49 ("Appellate counsel failed to raise the lack of state jurisdiction[.]"); 11/30/2020 *Petitioner's Post-Hearing Brief* at 6 (OCCA No. PCD-2015-698) ("[Should this Court find the prosecutorial authority claim barred, Petitioner] asks this Court to find his appellate counsel ineffective for failing to present the issue and grant relief.").  Having advanced this claim before the OCCA in only the most cursory fashion, Petitioner's far more developed arguments before this Court have so transformed this claim as to render it unexhausted. *See Fairchild*, 579 F.3d at 1155.  Even assuming this Court considers this claim exhausted, this Court must still constrain its review to only those arguments raised to the OCCA.  *See Beaudreaux*, 138 S. Ct. at 2560.

---

[51] While the OCCA stated that "Petitioner's conviction became final in 2018," as opposed to when the Supreme Court denied certiorari review in 2019, Petitioner has not raised, and has therefore waived and/or forfeited, any argument that this was an unreasonable finding. *See (John) Grant*, 727 F.3d at 1025.  In any event, the OCCA's decision was not "based on" this finding, *see Byrd v. Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011); rather, its decision rested on the more general finding that Petitioner's conviction became final *prior to McGirt*.  Further, it is apparent from context what the OCCA meant was that its direct appeal decision issued in 2018.  Clearly, the OCCA's (correct) point was that appellate counsel's performance should not be judged with the distorting effects of hindsight but based on counsel's perspective at the time of direct appeal.  *See Strickland*, 466 U.S. at 689.

Petitioner suggests the OCCA's decision was unreasonable because his prosecutorial authority claim was available, and could have prevailed, on direct appeal based on *Solem*. Doc. 19 at 64. However, Petitioner conflates the question of whether a claim was available with the question of whether no fairminded jurist could agree that no reasonable counsel would have failed to raise it. *See Richter*, 562 U.S. at 105. Petitioner emphasizes that *Murphy* (10th Cir.) was decided before the direct appeal decision in his case, Doc. 19 at 65; this point utterly ignores the relevant timeframe of when appellate counsel were investigating and preparing Petitioner's direct appeal brief. Specifically, counsel filed their opening brief on February 28, 2017, *months* prior to the Tenth Circuit's *Murphy* decision originally issued on August 8, 2017. *See Murphy v. Royal*, 866 F.3d 1164 (10th Cir. Aug. 8, 2017), *amended and superseded on denial of rehearing en banc*, 875 F.3d 896 (Nov. 9, 2017). So, even if Petitioner's prosecutorial authority claim was available before direct appeal, the decisions in *Murphy* (10th Cir.) and *McGirt* were undeniably unexpected. *See McGirt*, 140 S. Ct. at 2499 (Roberts, C.J., dissenting). Indeed, as of February 2017, the OCCA had declined to hold that the Muscogee Nation reservation was intact, *Murphy v. State*, 124 P.3d 1198, 1207-08 (Okla. Crim App. 2005), and this Court's sister court had found "no doubt the historic territory of the Creek Nation was disestablished as a part of the allotment process," *Murphy v. Sirmons*, 497 F. Supp. 2d 1257, 1289-90 (E.D. Okla. 2007). Petitioner never explains to this Court—and certainly not to the OCCA—why appellate counsel, in February 2017, should have thought differently as to the Chickasaw Nation Reservation. Appellate counsel were not required to be clairvoyant, and anticipate these cases would be overturned, to render effective

assistance.  *See Richter*, 562 U.S. at 110 ("Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities."); *Bullock v. Carver*, 297 F.3d 1036, 1052 (10th Cir. 2002) ("When reviewing an ineffective assistance of counsel claim, we must make every effort 'to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct and to evaluate the conduct from counsel's perspective at the time.' . . . Consequently, we have rejected ineffective assistance of counsel claims where a defendant 'faults his former counsel not for failing to find existing law, but for failing to predict future law' and have warned 'that clairvoyance is not a required attribute of effective representation.'" (citations omitted)); *see also Bentley v. Harvonek*, No. CIV-22-160-C, 2022 WL 1400285, at *4-5 (W.D. Okla. Mar. 30, 2022) (unpublished) (report and recommendation finding to be meritless claim of ineffective assistance of appellate counsel for failing to raise an MCA claim when the petitioner's appeal pre-dated *McGirt*).

In fact, as shown in Respondent's *Teague* analysis, a substantial number of defendants who were ultimately *Wallace*-barred were convicted, via trial or plea, *following* the issuance of *Murphy* (10th Cir.) in August 2017.  *See* Exs. 10–12.  A huge portion of these defendants were prosecuted in Tulsa County, within the boundaries of either the Muscogee Nation or Cherokee Nation Reservations.  While some attorneys and even *pro se* petitioners were raising *Murphy*-based claims during this timeframe, it is clear that prevailing professional norms did not mandate the raising of such claims and that courts did not view *Murphy* (10th Cir.) as binding.  *See Richter*, 562 U.S. at 110 ("an attorney

92

may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities"); *Patterson*, 2022 WL 17685602, at \*5. In any event, the fact remains: Petitioner's opening brief was filed *before Murphy* (10th Cir.), and he does not identify even a single case on the books at that time that would have alerted counsel to the possibility of raising a *successful* prosecutorial authority claim. *Cf. Pinholster*, 563 U.S. at 196 (faulting the dissent for "cit[ing] no evidence . . . that [counsel's] approach would have been inconsistent with the standard of professional competence in capital cases that prevailed in Los Angeles in 1984").[52]

### 3. Failure to Raise Claim as to How Trial Court Answered Jury Question

As on post-conviction, Petitioner next contends that appellate counsel rendered ineffective assistance in not raising a claim that the trial court violated OKLA. STAT. tit. 22, § 894 (2011), in how it answered a jury question.  Doc. 19 at 65-67; *P.C. App.* at 40-42, 49.  The OCCA disposed of this claim at *Bench II*, 504 P.3d at 602 (¶¶ 31-32), on grounds that the court eliminated the presumption of prejudice for violations of § 894 in *Nicholson v. State*, 421 P.3d 890 (Okla. Crim. App. 2018), and in any event, such technical violations

---

[52] Even viewing this claim as of October 2018, when the OCCA decided Petitioner's direct appeal, the Supreme Court had granted certiorari review on the State's appeal in *Murphy* (10th Cir.), leaving that decision very much up in the air.  Indeed, even following Supreme Court oral argument in November 2018, the issues in the case were so complicated that the Court ordered supplemental briefing on whether the State might have prosecutorial authority even absent reservation status, *Carpenter v. Murphy*, No. 17-1107, *Order in Pending Case* (Dec. 4, 2018), and ultimately took the almost unprecedented step of declining to decide the case in that term.  Thus, a fairminded jurist could agree that, even as of October 2018, neither prevailing professional norms nor binding precedent dictated that a prosecutorial authority claim should be raised and would be meritorious.

of § 894 are harmless "where, as here, the attorneys were consulted prior to the court's response and neither party requested the jury's presence in the courtroom."

Petitioner claims that the OCCA's decision was contrary to, or an unreasonable application of, *Strickland* because *Nicholson* was decided in 2018, while his direct appeal brief was filed in 2017. Doc. 19 at 66. However, *Nicholson* was decided in April 2018, *before* the OCCA's direct appeal decision issued in this case in October 2018. In any event, the Supreme Court has declined to find prejudice in the ordinary sense when a defendant's attorney failed to raise a claim based on authority that was later overturned. *See Lockhart v. Fretwell*, 506 U.S. 364, 369-70 (1993). Furthermore, even pre-*Nicholson* the OCCA had repeatedly found comparable violations of § 894 harmless even with the presumption of prejudice. *See Nicholson*, 421 P.3d at 895 n. 5 (citing cases from 1977 and 1997).

### 4. Failure to Challenge Petitioner's Statements to Deputy Short

Petitioner further argues, as he did on post-conviction, that appellate counsel rendered ineffective assistance in not arguing that his statements to Deputy Short, the officer who pulled him over in B.H.'s car as he tried to flee Oklahoma, should not have been admitted at trial. Doc. 19 at 67; *P.C. App.* at 42-47, 49. The OCCA rejected this claim at *Bench II*, 504 P.3d at 602-03 (¶¶ 33-38), finding that "[b]ecause Petitioner blurted out [his] statements spontaneously and not in response to any questioning by Deputy Short, their admission at trial was proper. Appellate counsel was not ineffective for failing to raise this claim on direct appeal."

Petitioner offers no argument as to this claim in this ground for relief. Further, while he refers ahead to Ground Five, the underlying substantive claim, that discussion does not

establish that no fairminded jurist could agree that appellate counsel reasonably—in filing a 100-page brief raising twelve propositions, including a challenge to Petitioner's far more extensive statements to booking officer Mr. Brown—decided against raising a challenge to Petitioner's statements to Deputy Short. This ineffective assistance sub-claim is waived and/or forfeited. *See (John) Grant*, 727 F.3d at 1025.

Regardless, looking ahead to Ground Five, Petitioner misreads the record in claiming that the exchange between himself and Deputy Short occurred "as Mr. Bench lay face down in the road, with a police-dog sitting on him, as well as another officer's gun aimed at him." Doc. 19 at 79. While courts have found a defendant to be in custody under similar circumstances as Petitioner describes, *see, e.g.*, *United States v. Clemons*, 201 F. Supp. 2d 142, 144 (D.D.C. 2002) (collecting cases), the exchange here in fact occurred as Deputy Short was having Petitioner lie on the ground, but *before* the backup officer arrived and handcuffed Petitioner and *before* Short retrieved his canine to oversee the handcuffing (Tr. VI 121-23). In any event, it was only after Petitioner blurted out that he was not the one driving the car, that Deputy Short, "confounded," "responded[,] 'Then whose vehicle is it?'", to which Petitioner said he may have killed someone. *Bench I*, 431 P.3d at 944. Thus, Deputy Short's question was a mere "request for clarification of" Petitioner's "spontaneous" and "ambigu[ous]" statement that "did not require *Miranda* warnings." *United States v. Becerra*, 958 F.3d 725, 729 (8th Cir. 2020) (quotation marks omitted). For all these reasons, a fairminded jurist could agree this claim was meritless and counsel was not ineffective in failing to raise it on direct appeal. *See Miller v. Mullin*, 354 F.3d 1288, 1298 (10th Cir. 2004).

**D.     Conclusion**

For all these reasons, habeas relief should be denied on Ground Three.

## GROUND FOUR

### PETITIONER'S *BECK* CLAIM DOES NOT WARRANT RELIEF.

In his fourth ground for habeas relief, Petitioner contends that he was unconstitutionally denied a lesser-included offense instruction on second-degree murder, in violation of *Beck v. Alabama*, 447 U.S. 625 (1980).  Doc. 19 at 67-73.  A fairminded jurist could agree with the OCCA's application of *Beck*.  Habeas relief must be denied.

**A.     Background**

Petitioner raised this claim on direct appeal, *D.A. Brief* at 67-71, and the OCCA denied relief at *Bench I*, 431 P.3d at 953-56 (¶¶ 68-82), holding that the evidence did not support a second-degree murder instruction because, "[i]n the absence of any evidence showing both that Appellant's conduct evinced a depraved mind in extreme disregard of human life and that he acted without the intention of taking the life of any particular individual, . . . the evidence would not have permitted a rational jury to find Appellant guilty of second degree depraved mind murder."

**B.     The OCCA's Decision Did Not Run Afoul of *Beck***

*Beck* held that, under the due process clause, a death sentence may not "be imposed after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict."  *Beck*, 447 U.S. at 627.  As this holding indicates, "due

process requires that a lesser included offense instruction be given *only* when the evidence warrants such an instruction." *Hopper v. Evans*, 456 U.S. 605, 611 (1982) (emphasis in original).

Here, the OCCA's decision did not violate *Beck*.[53]  Despite Petitioner's argument to the contrary, Doc. 19 at 70, the OCCA did not discuss only the evidence of malice and in fact spent *six paragraphs* discussing why the record showed "the absence of any evidence showing both that Appellant's conduct evinced a depraved mind in extreme disregard of human life and that he acted without the intention of taking the life of any particular individual." *Bench I*, 431 P.3d at 954-55.  The OCCA certainly did not repeat "*the same error* as in" cases where the Tenth Circuit granted relief under *Beck*, Doc. 19 at 71 (emphasis in original), and rather, did exactly what the Tenth Circuit has said it should do in deciding a *Beck* claim.  *See Williams v. Trammell*, 539 F. App'x 844, 850 (10th Cir. 2013) (unpublished) (surveying prior cases in which the Tenth Circuit found the OCCA's decision misapplied *Beck* and explaining that the OCCA's repeated error was "focus[ing] on the sufficiency of evidence to support the *capital* offense instead of the sufficiency of evidence to support the *lesser-included* offense" (emphases in original)).

Petitioner next tacitly admits the OCCA determined that the facts did not support a second-degree murder instruction, as he argues same was an unreasonable factual

---

[53] For preservation purposes, Respondent submits that *Beck* does not supply clearly established law for Oklahoma because, unlike in *Beck*, the death penalty is not automatic upon a finding of guilt of capital murder and Oklahoma does not categorically bar the giving of lesser instructions.  *See id.* at 629; *see also, e.g.*, *Paxton v. Ward*, 199 F.3d 1197, 1204-05 (10th Cir. 1999); *United States v. McVeigh*, 153 F.3d 1166, 1197 (10th Cir. 1998).

determination.  Doc. 19 at 71.  However, Petitioner does not acknowledge the OCCA's lengthy discussion of how Oklahoma defines the elements of second-degree murder and list of hypothetical crimes that fit this definition—none of which is remotely similar to the facts of Petitioner's case.  *See Bench I*, 431 P.3d at 954-55 ("Examples of this crime include: (1) shooting into a crowd, where one does not intend to kill any particular person, but where the likelihood of death is probable; (2) steering a speeding vehicle into the oncoming path of another speeding vehicle; (3) throwing a heavy stone into a crowded street; and (3) aiming a gun at the victim's ankles intending to simply injure the victim but, because of poor marksmanship, shooting the victim in the back and killing him.").  As such, Petitioner fails to rebut the OCCA's conclusion that the record indisputably lacks "evidence evincing that Appellant engaged in conduct akin to shooting into a crowd, *i.e.*[,] imminently dangerous conduct done without the intention of taking the life of any particular individual," such that the facts did not support a finding of second-degree murder as a matter of Oklahoma law.  *Id.* at 955.  "When it comes to the question what is required as a matter of law to establish a . . . second degree murder charge, [this Court] may not second guess Oklahoma authorities."  *(John) Grant*, 727 F.3d at 1013.  This Court must further presume the OCCA's factual determinations to be correct.  *See id.* (citing 28 U.S.C. § 2254(e)(1)).

Furthermore, a fairminded jurist could agree with the OCCA that the evidence as developed in support of Petitioner's insanity defense precluded a jury finding that Petitioner acted without the intention of taking B.H.'s life.  *See Bench I*, 431 P.3d at 955 (summarizing evidence introduced through Dr. Grundy that precluded a "rational jury

[from] conclud[ing] that Appellant acted without the intention of taking [B.H.]'s life.");

Doc. 19 at 72. Petitioner's own account of the murder, introduced through Dr. Grundy's

testimony, was that he believed B.H. was a CIA agent who was coming to forcibly return

him to the military and so he hit her in the head, fought with her on the ground, placed her

in a choke-hold, and then had a second struggle with her (Tr. X 34-38, 83-84). Petitioner

and his grandmother claimed that, even days before the killing, he believed that a man and

woman were coming for him, that they wanted to kill him, and that he was going to have

to do something to stop them (Tr. IX 7; Tr. X 111). The defense theory was that Petitioner

purposely killed B.H. but did not understand the wrongfulness of his actions because at the

time he was suffering from a psychotic break and experiencing delusions that B.H. planned

on killing him or returning him to the military (Tr. X 31; Tr. XI 37). While Petitioner

claims he repeatedly "expressed uncertainty as to whether he had killed [B.H.]," Doc. 19

at 72-73, Petitioner's statements to Deputy Short and Mr. Brown that he "may have killed

somebody" were actually part of his concocted claim that he had earlier experienced a

blackout, not an expression of uncertainty as to whether B.H.'s injuries were fatal (Tr. VI

120-24; Tr. VII 61).

Finally, while Petitioner claims he merely "repeatedly [struck]" B.H, this is a gross

understatement. The record fully and indisputably supports the OCCA's finding that "[t]he

medical examiner's testimony established that [Petitioner] subjected [B.H.] to a prolonged,

brutal, and relentless attack." *Bench I*, 431 P.3d at 955. B.H. had extensive and obvious

blunt force trauma to her head, face, scalp, neck, and upper torso, resulting in internal

bleeding (Tr. VIII 17-18, 29). There were also bruises on her legs, arms, and hands (Tr.

99

VIII 17).  Sufficient pressure was placed on B.H.'s neck to fracture her cricoid cartilage, cause bleeding in the lining of her airways, and result in petechiae in her eyes (Tr. VIII 61-63, 65-66, 70).  B.H.'s numerous injuries could not be explained by a single impact (Tr. VIII 53; State's Ex. 501).  Pattern injuries on B.H.'s upper body were consistent with Petitioner's shoes, which had B.H.'s blood on them (Tr. VIII 53-54, 86, 93).  In sum, as B.H. struggled for her life, Petitioner brutally beat and stomped her upper body—including in particular her head, face, neck, and chest—to the point he broke her neck and she choked to death on her own blood, and he then moved her to and left her in an isolated location. The OCCA reasonably concluded that "no juror could have reasonably found that" Petitioner "did not intend to take the life of" B.H.  *Grissom v. Carpenter*, 902 F.3d 1265, 1290-91 (10th Cir. 2018) ("Grissom . . . chased Amber Matthews from the living room of the Kopf's house into a bedroom and, despite her pleas for mercy, proceeded to shoot her not once, but twice in the head at close range.").

## C.    Conclusion

Habeas relief should be denied on Ground Four.

### GROUND FIVE

**PETITIONER'S CHALLENGE TO THE ADMISSION OF HIS BOOK-IN STATEMENTS DOES NOT SATISFY AEDPA, WHILE HIS CHALLENGE TO THE ADMISSION OF HIS STATEMENTS TO DEPUTY SHORT IS BARRED.**

In his fifth ground for relief, Petitioner challenges the trial court's admission of his statements to Custer County Detention Officer Kendall Brown, who booked him in, and to Deputy Quinton Short, who pulled him over in B.H.'s car, based on his right against self-

incrimination.  A fairminded jurist could agree with the OCCA's rejection of Petitioner's challenge to the admission of his statements to Detention Officer Brown.  And the OCCA barred Petitioner's challenge based on his statements to Deputy Short, and Petitioner has not overcome that bar.  Habeas relief should be denied.

## A.     Statements to Detention Officer Brown

As on direct appeal, Petitioner challenges the admission of his statements to Detention Officer Brown as violating his right against self-incrimination.[54]  Doc. 19 at 73-79; *D.A. Brief* at 29-35.  The OCCA rejected this claim at *Bench I*, 431 P.3d at 948-52 (¶¶ 36-58), finding both that Petitioner volunteered various statements and that "Brown's questions to Appellant fell squarely within the 'routine booking question' exception" and were not "interrogation."  The OCCA summarized the conversation between Petitioner and Brown at length, noting the many statements Petitioner volunteered about his crime even as Brown repeatedly admonished him that Brown knew nothing about what charges he might face, could not provide legal advice, and did not know if there was a detective he could speak to about the case.  *Id.* at 950-51.  In fact, at one point, when Petitioner said he thought he had killed someone, Brown responded, "Dude, don't tell me."  *Id.*

Under the Fifth Amendment, police must provide *Miranda* warnings before interrogating a suspect who is in custody.  *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

---

[54] On direct appeal, Petitioner also argued his statements were involuntary in violation of due process, *D.A. Brief* at 34-35, and the OCCA adjudicated that claim, *see Bench I*, 431 P.3d at 948-49, 951-52.  Here, however, although Petitioner refers to facts that could potentially support a due process claim, he has focused on *Miranda* alone, abandoning and waiving and/or forfeiting any due process claim.  *See (John) Grant*, 727 F.3d at 1025.

"Interrogation" means "not only . . . express questioning, but also . . . any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (emphasis added).  Pursuant to the so-called "routine booking exception," *Miranda* warnings are not required for questions to secure the defendant's "biographical data necessary to complete booking or pretrial services," such as questions regarding name, address, height, weight, eye color, date of birth, and current age.  *Pennsylvania v. Muniz*, 496 U.S. 582, 600-02 (1990) (plurality) (quotation marks omitted).  Moreover, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." *Miranda*, 384 U.S. at 478.

Here, contrary to Petitioner's claim, Doc. 19 at 77, the OCCA summarized the conversation between Detention Officer Brown and Petitioner at length and specifically noted the Court was "not persuaded by [Petitioner's] argument" that "Brown went outside the scope of the ordinary booking questions." *Bench I*, 431 P.3d at 950-52.  Petitioner rehashes the argument from direct appeal that Detention Officer Brown's alleged act of "stopping the interview to retrieve and ultimately use a recording device, then circling back on questions previously asked," went beyond the scope of the book-in.  Doc. 19 at 77; *D.A. Brief* at 33-34.  As the OCCA explained, this argument was not supported by the record. *Bench I*, 431 P.3d at 950.  "Repeating factual allegations rejected by the state courts and arguing that the state courts wrongly failed to find them borne out by the evidence does not prove by clear and convincing evidence that the state courts' findings were erroneous." *Harvin v. Mahally*, No. CV 15-3395, 2019 WL 7606221, at *8 (E.D. Pa. Dec. 30, 2019)

102

(unpublished), *report and recommendation adopted*, No. CV 15-3395, 2020 WL 311166 (E.D. Pa. Jan. 17, 2020).

Petitioner next asserts that the OCCA's analysis "omitted crucial facts," specifically that Detention Officer Brown was "in control" of the conversation and "re-directed" it. Doc. 19 at 78. But the OCCA surveyed the evidence in detail and reached a different conclusion—that Petitioner's statements were volunteered and non-responsive to Brown's questions, or even offered when Brown was silent, and any of Brown's "small talk" was "not the kind which an officer should know were reasonably likely to elicit incriminating statements." *Bench I*, 431 P.3d at 952. Petitioner has not overcome these findings by clear and convincing evidence by simply repeating his own interpretation of the record from direct appeal. *See Harvin*, 2019 WL 7606221, at *8. Indeed, specifically as to Detention Officer Brown's comment about "crazy" jail prisoners, *see Bench I*, 431 P.3d at 951, Petitioner never explains how Brown could have had any inkling that stories about "crazy" inmates were "reasonably likely to elicit an incriminating response" from Petitioner, as he did not know what charges Petitioner was facing (in an entirely different part of the state) or that he would eventually pursue an insanity defense. *Innis*, 446 U.S. at 301.[55]

**B.    Statements to Deputy Short**

---

[55] Petitioner's argument that Detention Officer Brown received information about his charges from Deputy Short, Doc. 19 at 78-79, was not raised to the OCCA, *D.A. Brief* at 29-35, and thus is not properly before this Court, *see Beaudreaux*, 138 S. Ct. at 2560. In any event, in the testimony pointed to by Petitioner, Brown merely stated that, *at the end of the book-in*, "I can't remember if it was Short or somebody -- was giving me some information about the charges" (Tr. VI 55).

On post-conviction, in Proposition VII, Petitioner claimed the trial court erred in admitting his custodial statements to Deputy Short because they were involuntary and he had not received *Miranda* warnings.  *P.C. App.* at 42-47.  The OCCA barred this claim at *Bench II*, 504 P.3d at 597 (¶ 10), stating: "Petitioner raises several substantive claims that could have been raised on direct appeal, specifically those contained in Propositions II, III, IV, VI and VII, set forth above.  As these claims could have been raised in the original direct appeal, they are therefore waived." (citing OKLA. STAT. tit. 22, § 1089(C)(1)).

Oklahoma's bar against claims (other than ineffective assistance claims) not raised on direct appeal is indisputably independent and adequate.  *See, e.g.*, *Smith v. Workman*, 550 F.3d 1258, 1274 (10th Cir. 2008).  Petitioner does not acknowledge this claim is barred, Doc. 19 at 77, let alone allege cause and prejudice or a fundamental miscarriage of justice, *see Coleman*, 501 U.S. at 750.  In any event, even giving Petitioner an unwarranted liberal construction, Petitioner's claim of ineffective assistance of appellate counsel cannot serve as cause because, as Respondent stated in Ground Three, Petitioner has waived and/or forfeited any argument that a fairminded jurist could not agree with the OCCA's rejection of that claim, and regardless, the OCCA reasonably found appellate counsel was not ineffective.  *See Turrentine*, 390 F.3d at 1202-03.  Habeas relief must be denied.

## C.    Conclusion

For all the foregoing reasons, habeas relief should be denied on Ground Five.

## **GROUND SIX**

### **A FAIRMINDED JURIST COULD AGREE WITH THE OCCA'S REJECTION OF PETITIONER'S PROSECUTORIAL ERROR CLAIM.**

In his sixth ground for relief, Petitioner claims that prosecutorial error deprived him of a fair trial.  Because a fairminded jurist could agree with the OCCA's rejection of this claim, habeas relief must be denied.

**A.      Background**

As on direct appeal, Petitioner claims prosecutorial error on multiple grounds.  Doc. 19 at 79-89; *D.A. Brief* at 67-71.  The OCCA identified the correct federal standard for prosecutorial authority claims at *Bench I*, 431 P.3d at 963 (¶ 123).[56]

**B.      Standard of Review**

The controlling standard for measuring alleged prosecutorial error was established by the Supreme Court in *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974).  To prevail on a claim based on improper remarks by the prosecutor, a petitioner must show that the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process."  *Id.* at 643-44; *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (reaffirming *Donnelly*'s holding that "[t]he relevant question" in addressing a prosecutorial error claim "is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process" (quotation marks omitted)); *Matthews v. Workman*, 577 F.3d 1175, 1186 (10th Cir. 2009).

---

[56] As an initial matter, to the extent Petitioner claims the OCCA failed to consider all of his prosecutorial error claims "contextually" or collectively, Doc. 19 at 81, this is belied by the OCCA's concluding statements that, "[r]eviewing the entire record, the cumulative effect of the prosecutor's comments and conduct did not deprive Appellant of a fundamentally fair trial or sentencing proceeding.  The evidence strongly supported the jury's determination of both guilt and recommendation as to sentence."  *Bench I*, 431 P.3d at 969.

A prosecutor's remarks are not to be viewed in isolation, but should be taken in the context of the entire trial. *Donnelly*, 416 U.S. at 645; *see also Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002) (considering as relevant context whether defense counsel objected); *Fero v. Kerby*, 39 F.3d 1462, 1474 (10th Cir. 1994) ("To view the prosecutor's statements in context, we first look at the strength of the evidence against the defendant and decide whether the prosecutor's statements plausibly could have tipped the scales in favor of the prosecution."). The mere fact that a prosecutor may have made some inappropriate comments does not warrant relief, so long as the petitioner received a fair trial. *See Matthews*, 577 F.3d at 1186. A proceeding is rendered fundamentally unfair under the Due Process Clause only if it is "shocking to the universal sense of justice." *United States v. Russell*, 411 U.S. 423, 432 (1973).

## C.     Alleged Use of False or Misleading Evidence

Petitioner states that, on direct appeal, he raised a claim regarding "the prosecution arguing facts not in evidence as to Witness Melissa Lynn." Doc. 19 at 80; *see also D.A. Brief* at 74-76. The OCCA found this claim "waived" because it was not supported by anything in the record and instead only by materials proffered in Petitioner's 3.11 Application, which were not properly before the Court. *Bench I*, 431 P.3d at 964. Petitioner contends this bar was inadequate, Doc. 19 at 80, but he never offers any further argument on this claim and certainly does not show he would be entitled to relief under *de*

*novo* review, assuming *arguendo* the bar were inadequate.[57]  Petitioner has waived and/or

forfeited this sub-claim of prosecutorial error.  *See (John) Grant*, 727 F.3d at 1025.

## D.    Alleged Shifting of Burden of Proof

Before this Court and in Proposition VII on direct appeal, Petitioner argues that the

prosecutor improperly shifted the burden of proof for his insanity defense.  Doc. 19 at 82-

83; *D.A. Brief* at 76-78.  The OCCA rejected this claim under plain-error review at *Bench*

*I*, 431 P.3d at 964-65 (¶¶ 126-129), holding that "the prosecutor's comment [in rebuttal

argument] was not a blatant attempt to misstate the burden of proof," "the prosecutor

correctly stated the burdens in her initial argument, defense counsel correctly stated the

State's burden, and the trial court adequately instructed the jury on the issue."

Petitioner suggests the OCCA unreasonably denied relief because the prosecutor

committed "egregious misconduct . . . [that] went wholly uncorrected by the trial court."

Doc. 19 at 82.  A fairminded jurist, however, could agree with the OCCA that the rebuttal

prosecutor did not "blatant[ly]" misstate the burden of proof and that plain error did not

occur based on all the circumstances.  *See Bench I*, 431 P.3d at 964-65.  The opening

prosecutor correctly stated the burden of proof for Petitioner's insanity defense, and the

rebuttal prosecutor correctly noted that Petitioner had the initial burden before, according

to the transcript,[58] incorrectly stating that burden was "beyond a reasonable doubt" instead

---

[57] In any event, Petitioner has not shown he was "denied any meaningful review of [this] claim."  Doc. 19 at 80 (citing B*recheen v. Reynolds*, 41 F.3d 1343, 1364 (10th Cir. 1994)). As discussed in Ground Two, Petitioner was able to receive consideration of Ms. Lynn's police interview via his ineffective assistance claim.  *See Bench I*, 431 P.3d at 974-75.

[58] Petitioner challenges as unreasonable footnote 11 of the OCCA's opinion, which stated: "It is not entirely certain that the court reporter precisely captured the prosecutor's

of "raising a reasonable doubt" (Tr. XI 34-35, 57). Further, both defense counsel and, most importantly, the jury instructions correctly stated the burden of proof (D.A. O.R. 1395; Tr. XI 39-41, 55, 57). Petitioner does not contest that the burden of proof was correctly stated in every other instance, particularly in the jury instructions, and thus his claim must fail. *See Morales v. Giurbino*, 207 F. App'x 852, 854 (9th Cir. 2006) (unpublished) ("[N]o precedent of the United States Supreme Court requires reversal of a conviction when the state court's instructions properly explain the applicable law, but the prosecutor misstates the law in argument."); *Neill v. Gibson*, 278 F.3d 1044, 1053-54 (10th Cir. 2001) ("the prosecutor's single misstatement did not mislead the jury concerning its sentencing role" in light of the totality of the statements by the prosecutor and defense counsel).[59]

## E.      Alleged "Bolstering" of Dr. Hall's Testimony

---

argument. I note that there are numerous instances within the transcripts which give the reader a vague sense that a word was inexactly captured." *Bench I*, 431 P.3d at 965 n. 11; Doc. 19 at 82. However, the OCCA's opinion was clearly not "based on," 28 U.S.C. § 2254(d)(2), this dicta simply noting the authoring judge's personal observation. In any event, as Respondent observed above as to "talking" versus "faking" (Tr. X 29-30), there are in fact some instances in which the transcripts "give the reader a vague sense that a word was inexactly captured," *Bench I*, 431 P.3d at 965 n. 11.

[59] Petitioner's arguments that the nature of this claim warrants a heightened standard of review and a presumption of prejudice were not presented to the OCCA, *see Beaudreaux*, 138 S. Ct. at 2560, and fail for lack of clearly established law, *see Boyde v. California*, 494 U.S. 370, 384-85 (1990) ("This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as having the same force as an instruction from the court."); *Donnelly*, 416 U.S. at 643 (noting that "[t]his is *not* a case in which the State has denied a defendant the benefit of a specific provision of the Bill of Rights," before observing, *in dicta*, that "this Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes [specific guarantees of the Bill of Rights]" (emphasis added)); *Littlejohn v. Trammell*, 704 F.3d 817, 838 & n. 9 (10th Cir. 2013) (rejecting the petitioner's reliance on circuit precedent to argue that his prosecutorial error claim should receive heightened scrutiny).

Petitioner, as before the OCCA, claims the prosecutor improperly bolstered Dr. Hall's testimony with hearsay.  Doc. 19 at 82; *D.A. Brief* at 78.  The OCCA held, on plain-error review, that the prosecutor's comments were proper and did not constitute bolstering.  *Bench I*, 431 P.3d at 965 (¶¶ 130-131).  As Petitioner did not argue that Dr. Hall improperly related the hearsay on which she relied in reaching her expert conclusions, the prosecutor simply and properly summarized the evidence on which Dr. Hall relied.  *Id.*

Petitioner cites zero authority, let alone Supreme Court authority, as to this sub-claim, and he certainly identifies no Supreme Court case holding that a prosecutor commits misconduct by offering argument that *could be construed* to ask the jury to rely on hearsay for the truth of the matter asserted.  *See House*, 527 F.3d at 1016.  Regardless, a fairminded jurist could agree that the prosecutor was properly summarizing the evidence on which the State's expert Dr. Hall relied.  *See Bland v. Sirmons*, 459 F.3d 999, 1028 (10th Cir. 2006) (prosecutor has a right to discuss the evidence in closing).  While Petitioner counters that "nowhere does the prosecutor identify her argument as a 'summary' or otherwise caution the jury not to accept the jailor's statements as true," Doc. 19 at 84, his after-the-fact interpretation of the prosecutor's argument was clearly not apparent to defense counsel, who did not object, *see Le*, 311 F.3d at 1013.

## F.    Arguing Facts Not in Evidence

Petitioner next contends that the prosecutor improperly argued facts not in evidence during a closing argument regarding State's Exhibit 40.  Doc. 19 at 84-85; *D.A. Brief* at 78-79.  The OCCA rejected this claim under plain-error review at *Bench I*, 431 P.3d at 965-66 (¶¶ 132-135), finding that, in part, the prosecutor properly called on the jury to use their

own experience and common sense in assessing the evidence but, in part, improperly injected his own experience into argument.  However, the OCCA found no prejudice because, "[a]s discussed in Proposition VI, the evidence would not have permitted the jury to find that Appellant was insane at the time of the offense." *Id.* at 966 (¶ 135).

Petitioner's only argument as to this sub-claim is that the OCCA's decision was "contrary to *Donnelly* in so much as the state court failed to afford a contextual review." Doc. 19 at 85.  To the contrary, in referring back to Proposition VI's extensive discussion of the evidence bearing on Petitioner's sanity, the OCCA plainly considered the totality of the circumstances as to whether Petitioner's trial was rendered fundamentally unfair.  *See Bench I*, 431 P.3d at 956-58.  In any event, "contextual review" is necessarily an element of Oklahoma's plain-error test.  *See Thornburg v. Mullin*, 422 F.3d 1113, 1125 (10th Cir. 2005) (OCCA's plain-error test is "the same test we apply to determine whether there has been a due-process violation").  Moreover, it must be presumed the OCCA applied the correct test.  *See Harmon*, 936 F.3d at 1073.

## G.    Misstating the Evidence

As on direct appeal, Petitioner contends that in two instances the prosecutor misstated the evidence during first stage closing argument.  Doc. 19 at 85-86; *D.A. Brief* at 79.  The OCCA disposed of this claim under plain-error review at *Bench I*, 431 P.3d at 966 (¶¶ 136-139), determining that one "minor misstatement of fact" was not prejudicial and the other challenged argument was a reasonable inference based on the evidence.

As to the prosecutor's arguments regarding the mopping, Petitioner claims the record does not support the OCCA's finding that Ms. Wilkerson (who discovered the pool

of blood in the Teepee Totem) hesitated when asked if wetness around the soda machine was common. Doc. 19 at 86. *See Bench*, 431 P.3d at 966 (¶ 138) ("The prosecutor's suggestion in the present case that '[t]he floor around the soda fountain was wet, like it had been mopped' was reasonably based upon the evidence at trial. Tammy Wilkerson . . . unmistakably hesitated when defense counsel on cross-examination attempted to secure her affirmation that this was to be expected around a soda fountain."). However, while Ms. Wilkerson readily admitted "Yes" when asked if the soda foundation "is where soda . . . and ice cubes come out," she answered only, "I guess not," when asked if there was "nothing uncommon" about wetness around a soda fountain (Tr. V 80). Moreover, a photograph of the soda fountain area did not reveal any puddle (State's Ex. 21), supporting an inference that the dampness detected by Ms. Wilkerson was diffuse, resulting from mopping. Finally, as to Petitioner's suggestion that the OCCA did not sufficiently explain its finding, Doc. 19 at 86, "federal courts have no authority to impose mandatory opinion-writing standards on state courts," *Johnson v. Williams*, 568 U.S. 289, 300 (2013).

As to the prosecutor's minor misstatement of fact, Petitioner's only argument is, again, that "the OCCA failed to conduct the contextual review required by *Donnelly*." Doc. 19 at 86. This argument is foreclosed by *Thornburg* and *Harmon* as discussed above. *See Thornburg*, 422 F.3d at 1125; *Harmon*, 936 F.3d at 1073.

## H.    Allegedly Improper Impeachment of Ms. Huff

As on direct appeal, Petitioner contends the prosecutor improperly impeached Ms. Huff with her violation of the rule of sequestration. Doc. 19 at 86-87; *D.A. Brief* at 80. Under plain-error review, the OCCA rejected this claim at *Bench I*, 431 P.3d at 966-67

111

(¶¶ 140-142), holding that Ms. Huff violated the rule of sequestration, defense counsel suggested cross as to her credibility to remedy the violation rather than exclusion of her testimony, and thus the prosecutor properly cross-examined her on her violation.[60]

The only § 2254(d) argument Petitioner offers as to this sub-claim is, again, to claim the OCCA failed to conduct "contextual review."  Doc. 19 at 86.  As before, this argument is foreclosed by *Thornburg*, 422 F.3d at 1125, and *Harmon*, 936 F.3d at 1073.

## I.   Alleged invocation of sympathy for victim B.H.

As on direct appeal, Petitioner next alleges that the prosecutors improperly invoked sympathy for B.H. in second stage closing.  Doc. 19 at 87-89; *D.A. Brief* at 81-84.  The OCCA rejected this claim, on plain-error review, at *Bench I*, 431 P.3d at 967-69 (¶¶ 146-150), holding that all but one of the complained-of comments or actions by the prosecutor were not improper attempts to invoke sympathy for the victim, and the one "borderline" comment did not constitute "plain error."

As an initial matter, Petitioner identifies no Supreme Court holding that a prosecutor violates due process in invoking sympathy for the victim in argument.  Doc. 19 at 87-89.[61]

---

[60] On direct appeal, Petitioner raised a second reason the prosecutor's cross of Ms. Huff was allegedly improper, *see Bench I*, 431 P.3d at 967 ("Second, Appellant argues that the State impermissibly implied that Mrs. Huff lied during her son's enlistment with the Navy."), but he does not re-raise that argument here.

[61] *Gardner v. Florida*, 430 U.S. 349, 351 (1977), invoked by Petitioner, Doc. 19 at 89, did not concern prosecutorial error, and Petitioner does not even cite the controlling opinion in that case.  *Compare* Doc. 19 at 89 (quoting Justice Stevens's opinion), *with O'Dell*, 521 U.S. at 162 ("*Gardner* produced seven opinions, none for a majority of the Court.  Taking the view expressed in Justice White's opinion concurring in the judgment as the rule of *Gardner*, the holding is a narrow one—that a [death sentence cannot be based on] secret information relevant to the character and record of the individual offender . . . ." (citation and quotation marks omitted, alterations adopted)).

*See Reese v. Sec'y, Fla. Dep't of Corr.*, 675 F.3d 1277, 1287 (11th Cir. 2012) (regarding claim "that the prosecutor engaged in misconduct when he told the jury that [victim's] experience was 'every woman's wors[t] nightmare,'" "the Supreme Court has never held that a prosecutor's closing arguments were so unfair as to violate the right of a defendant to due process" (citation omitted)); *but see Moore v. Gibson*, 195 F.3d 1152, 1172 (10th Cir. 1999) ("This court does not condone prosecutorial remarks encouraging the jury to allow sympathy to influence its decision.").

In any event, the OCCA reasonably found the prosecutor did not invoke sympathy for the victim or commit plain error. For starters, the record supports the OCCA's finding that the prosecutor did not ask the jurors to place themselves or a relative in the victim's circumstances. Doc. 19 at 88; *see Bench I*, 431 P.3d at 968 (¶ 146) ("Appellant claims that the prosecutor asked the jurors to imagine their daughters and nieces in [B.H.]'s circumstances. . . . Taking the prosecutor's comments in context, we find that Appellant's claim is not supported by the record."). Specifically, the challenged comments came as part of the prosecutor's arguments in support of continuing threat. The prosecutor summarized Petitioner's past encounters with women such as Gina Mercer and pointed out how he had learned that "grown women were off limits,"[62] such that he targeted teenaged girls, who would not know how to respond in the way that grown women would (Tr. XIV 145-47). The prosecutor surmised that the jurors would have acted in that same situation

---

[62] As described further in Ground Eight, regarding continuing threat, Petitioner sexually assaulted Ms. Mercer by groping her breast just days before murdering B.H. *Bench I*, 431 P.3d at 960. Ms. Mercer verbally rebuked and slapped Petitioner away. *Id.*

"like those grown women did," while rhetorically asking what their daughters and nieces would have done (Tr. XIV 147). After a defense objection was overruled,[63] the prosecutor further made the point that Petitioner's past behavior toward females was particularly inappropriate and dangerous because it was directed at children (Tr. XIV 147-48). As shown, the prosecutor's argument made no attempt to have the jurors imagine themselves in the victim's shoes and was not an appeal for sympathy; instead, it was a proper argument, which appealed to the jurors' common experience, based on the evidence in support of the continuing threat aggravator. *See United States v. McBride*, 656 F. App'x 416, 422 (10th Cir. 2016) (unpublished) ("The prosecutor's appeal to the jurors' 'common sense' was not improper. Jurors are permitted to use their common sense to evaluate the evidence.").[64]

---

[63] Petitioner claims the OCCA improperly applied plain-error review because trial counsel did object to the prosecutor's argument. Doc. 19 at 88. Notably, trial counsel did *not* object on grounds the prosecutor was invoking sympathy for the victim; on the other hand, counsel did, inartfully, object on grounds that "[s]he is asking them to put their kids in their place" (Tr. XIV 148). In any event, even under plain-error review, the OCCA's review constituted a merits adjudication entitled to deference. *See Thornburg*, 422 F.3d at 1125.

[64] Petitioner concludes by summarily asserting that the OCCA unreasonably found that the final comments and actions of the prosecution challenged in this sub-claim were based on the evidence and not designed to inflame the jury. Doc. 19 at 88-89. Petitioner's argument is so inadequately developed to be waived. *See (John) Grant*, 727 F.3d at 1025. Regardless, a fairminded jurist could agree that the prosecutor's statement asking "the jurors to listen for a voice that was no longer there," *Bench I*, 431 P.3d at 968, was based on the evidence that Petitioner killed B.H. in part by stomping her head and neck (Tr. VIII 69; Tr. XIV 164-70). As to the prosecutor's display of pre- and post-mortem photographs of B.H. during closing, as these photographs were properly admitted, *see Bench I*, 431 P.3d at 952-53, 969, it follows that the prosecutor did not err in displaying them during closing, *see Sauceda v. Mondragon*, 986 F.2d 1429, *3 (10th Cir. 1992) (unpublished table decision) ("It is axiomatic that since we have decided that the photographs were properly admitted, we cannot conclude that the prosecution improperly emphasized them."); *compare also Bench I*, 431 P.3d at 968 ("The trial court instructed the jurors to not let sympathy, except for the defendant, enter into its deliberations."), *with Weeks v. Angelone*, 528 U.S. 225, 234 (2000) ("A jury is presumed to follow its instructions.").

114

J.      **Conclusion**

For all these reasons, habeas relief should be denied on Ground Six.

### GROUND SEVEN

**A FAIRMINDED JURIST COULD AGREE WITH THE OCCA'S REJECTION OF PETITIONER'S CHALLENGES TO THE HAC AGGRAVATOR.**

In his seventh ground for relief, Petitioner claims that the HAC aggravating circumstance is unconstitutionally vague and overbroad, and that the evidence did not support it here. A fairminded jurist could agree with the OCCA's rejection of both claims, and this ground for relief should be denied.

A.      **Standard of Review**

As to Petitioner's facial challenge to the HAC aggravating circumstance, "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). As to Petitioner's sufficiency challenge, the question is whether the trial evidence, "viewed in the light most favorable to the prosecution," was "sufficient to allow *any* rational trier of fact to have found the essential elements of" the aggravating circumstance "beyond a reasonable doubt." *Pavatt v. Carpenter*, 928 F.3d 906, 917 (10th Cir. 2019) (en banc) (quotation marks omitted, emphasis in original). This "standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Under Oklahoma law, HAC is proven

where "(1) the victim's death was preceded by torture or serious physical abuse; and (2) that the facts and circumstances of the case establish that the murder was heinous, atrocious, or cruel." *Bench I*, 431 P.3d at 962. "Torture . . . may take any of several forms including the infliction of either great physical anguish or extreme mental cruelty." *Id.*

## B.   Facial Vagueness Challenge

As on direct appeal, Petitioner contends the HAC aggravator is unconstitutionally vague and overbroad. Doc. 19 at 89-91, 92-94; *D.A. Brief* at 94-96. The OCCA held at *Bench I*, 431 P.3d at 961-62 (¶ 112) that the court had "repeatedly rejected this claim" and the court "continue[s] to find that the current uniform instructions defining this aggravating circumstance sufficiently narrow its application to pass constitutional muster."

Petitioner's arguments that the OCCA did not adjudicate this claim on the merits because it did not sufficiently discuss the claim or cite federal authority are without merit. *See, e.g.*, *Johnson*, 568 U.S. at 300 ("[F]ederal courts have no authority to impose mandatory opinion-writing standards on state courts."); *Early v. Packer*, 537 U.S. 3, 8 (2002) (AEDPA "does not even require *awareness* of [the Supreme Court's] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." (emphasis in original)). Moreover, as the OCCA correctly observed, the Tenth Circuit has repeatedly—and quite recently—rejected the argument that Oklahoma's HAC aggravator is facially vague and overbroad. *See Mitchell v. Sharp*, 798 F. App'x 183, 192-93 (10th Cir. 2019) (unpublished) (rejecting the petitioner's argument that, although "after *Maynard* [*v. Cartwright*, 486 U.S. 356 (1988)], Oklahoma courts adopted a constitutionally permissible construction of the HAC aggravator," "'Oklahoma has veered off course,

116

returning to its prior, unlawful position,'" because "[t]his circuit has approved [the] narrowing construction" requiring "torture or serious physical abuse"); *Wilson v. Sirmons*, 536 F.3d 1064, 1108 (10th Cir. 2008); *Miller v. Mullin*, 354 F.3d 1288, 1300 (10th Cir. 2004); *see also Maynard*, 486 U.S. at 365 (implying that a construction that limited the aggravator to torture or serious physical abuse would be constitutional). Petitioner's reliance on dissenting and concurring opinions and a majority opinion *footnote*, in cases that are largely two decades old, is unpersuasive. Doc. 19 at 94.

**C.    Sufficiency Challenge**

Petitioner next contends, as on direct appeal, that the evidence was insufficient to support the HAC aggravator. Doc. 19 at 91-92; *D.A. Brief* at 96-97. The OCCA rejected this claim based on a lengthy discussion of the relevant law and record, holding that based on the evidence that Petitioner "subjected [B.H.] to a prolonged, brutal, and relentless attack," during which she experienced conscious physical suffering and mental anguish, "any rational trier of fact could have found that [B.H.]'s murder was especially heinous, atrocious or cruel beyond a reasonable doubt." *Bench I*, 431 P.3d at 962-63 (¶ 113-122).

Petitioner argues the OCCA unreasonably found the evidence sufficient to support HAC because the medical examiner could not say when B.H. lost consciousness. Doc. 19 at 91-92. But other evidence *did* show B.H. experienced conscious physical suffering—an initial struggle by the soda fountain and a second struggle in the storeroom; wounds evidencing that B.H. was alive when dragged; B.H.'s defensive wounds and the bite mark she left on Petitioner; and the air hunger B.H. experienced as she tried to breath with blood-filled lungs. *See Bench I*, 431 P.3d at 962-63. Moreover, Petitioner does not acknowledge

the evidence found by the OCCA of extreme mental cruelty, which independently supported this aggravator. *See id.* at 962-63. A fairminded jurist could agree with the OCCA this aggravator was satisfied. *See Wilson v. Sirmons*, 536 F.3d 1064, 1105-06 (10th Cir. 2008) (evidence sufficient for HAC aggravator, even where first blow from bat could have rendered victim unconscious, because prior to that victim was attacked and dragged into another room and suffered mentally from being held captive and knowing his fate).

**D.      Conclusion**

For all these reasons, habeas relief should be denied on Ground Seven.

## GROUND EIGHT

### A FAIRMINDED JURIST COULD AGREE THE EVIDENCE WAS SUFFICIENT TO SHOW CONTINUING THREAT.

In his eighth ground for relief, Petitioner contends that the evidence was insufficient to establish the continuing threat aggravating circumstance. The OCCA reasonably concluded to the contrary. Habeas relief should be denied.

**A.      Standard of Review**

As with Ground Seven, the question is whether the trial evidence, "viewed in the light most favorable to the prosecution," was "sufficient to allow *any* rational trier of fact to have found the essential elements of" the aggravating circumstance "beyond a reasonable doubt." *Pavatt*, 928 F.3d at 917 (quotation marks omitted, emphasis in original). Continuing threat is proved where the evidence shows "the defendant's behavior has demonstrated a threat to society and a probability that this threat would continue to exist in the future." *Bench I*, 431 P.3d at 959.

118

**B.     A Fairminded Jurist Could Agree the Evidence was Sufficient**

Petitioner raised this claim on direct appeal, *D.A. Brief* at 88-93, and the OCCA concluded, across a fourteen-paragraph discussion that, "any rational trier of fact could have found the continuing threat aggravating circumstance beyond a reasonable doubt." *Bench I*, 431 P.3d at 958-61 (¶¶ 97-111).  The OCCA emphasized Petitioner's "brutal and callous" slaying of B.H. and "[his] treatment of her body after her death"; his prior "violent[] attack[]" of his stepfather, including use of a "'sleeper hold' restricting the circulation in [the stepfather's] neck"; Petitioner's "training in hand-to-hand combat, in addition to his Naval training"; his "long history of sexually aggressive conduct towards females that escalated over time and culminated in him callously slaying [B.H.] and pitilessly leaving her semi-nude body in a field," including, in the days leading up to the murder, the inappropriate touching of two teenaged girls, sexual assault of Teepee Totem customer Gina Mercer, lewd molestation of fifteen-year old customer B.S.; and Petitioner's repeating acts of fleeing, or attempting to escape from, "his unlawful transgressions."  *Id.*

Petitioner's arguments as to continuing threat are based on his own "description of the evidence" that "wholly ignores not only the evidence the jury heard, but also the standard of review mandated by the Supreme Court in *Jackson*," pursuant to which "a reviewing court [must] view the evidence in the light most favorable to the prosecution." *Pavatt*, 928 F.3d at 920 (quotation marks omitted, alterations adopted).  For instance, Petitioner claims his sexually aggressive conduct was "consistent with the often ill-conceived ways in which young men attempt to converse with women," Doc. 19 at 96; however, a jury could reasonably draw a different inference—that Petitioner's pattern of

119

touching women and *girls* without their consent, "culminat[ing] in him callously slaying [B.H.] and pitilessly leaving her semi-nude body in a field," indicated a likelihood of future violence. *Bench I*, 431 P.3d at 960.

Petitioner also, inconsistent with *Jackson*, attempts to parse the evidence and "scrutinize individual pieces of evidence in isolation," rather than "considering the collective inferences to be drawn from the evidence as a whole." *United States v. Orr*, 172 F.3d 64, *1 (10th Cir. 1999) (unpublished table decision). Thus, for instance, while Petitioner claims the "one-time fight" with his stepfather "did not establish [he] was a continuing threat," Doc. 19 at 95, the evidence is not to be viewed "in bits and pieces." *United States v. Hooks*, 780 F.2d 1526, 1532 (10th Cir. 1986) ("Although each item of circumstantial evidence, viewed in isolation, might not be sufficient to sustain appellant's conviction, when the circumstantial evidence is considered in its totality, together with the collective inferences to be drawn therefrom, we are convinced that the evidence is sufficiently probative to sustain the jury's finding . . . ."). The jury could certainly have seen a number of patterns in Petitioner's behavior that showed a likelihood of future violence—repeated use of choke-holds, refusal to accept responsibility for his transgressions through fleeing and/or attempting to escape custody, sexually aggressive and even criminal behavior toward women and girls, and even a stated interest in "high school girl[s]." *Bench I*, 431 P.3d at 959-62 (describing how, after Petitioner groped Ms. Mercer, and she slapped him away, he responded, "I'm sorry. I thought you were a high school girl."); c*f. Fields v. Gibson*, 277 F.3d 1203, 1219 (10th Cir. 2002) (while the prior

violent felony aggravator focuses on a past violent conviction, continuing threat is about "the petitioner's potentiality for future dangerous acts").

Finally, Petitioner fails to acknowledge how all of the above evidence coupled with the "callous and pitiless nature of the slaying" showed he was a continuing threat. *Bench I*, 431 P.3d at 961. Petitioner brutally beat and stomped a 16-year-old girl who weighed more than a hundred pounds less than he did and then dumped her nude body in a field (State's Ex. 300 II 10:30-10:37; State's Ex. 50 at 2). The record is completely void of any sign of remorse by Petitioner, and in fact his only concern upon arrest was his own defense (Tr. VII 61-62). *See James v. Gibson*, 211 F.3d 543, 559 (10th Cir. 2000) ("The most compelling evidence supporting continuing threat can come from the facts surrounding the murder itself. . . . Because a person who acts with utter disregard for human life likely will do so again, attitude is an important factor."). A fairminded jurist could agree that any reasonable factfinder could find Petitioner to be a continuing threat.[65]

## C.    Conclusion

For all these reasons, habeas relief should be denied on Ground Eight.

## GROUND NINE

---

[65] Petitioner's as-applied vagueness challenge, Doc. 19 at 96-97 ("in this case, the continuing threat aggravator failed to perform its Eighth Amendment narrowing function"), was not fairly presented to the OCCA and is thus unexhausted, *see Bland v. Sirmons*, 459 F.3d 999, 1011 (10th Cir. 2006), and regardless is foreclosed by *Lewis v. Jeffers*, 497 U.S. 764, 779 (1990) ("[I]f a State has adopted a constitutionally narrow construction of a facially vague aggravating circumstance, and if the State has applied that construction to the facts of the particular case, then the fundamental constitutional requirement of channeling and limiting the sentencer's discretion in imposing the death penalty has been satisfied." (quotation marks and citation omitted, alterations adopted)).

**PETITIONER'S CLAIM THAT HE SHOULD BE INELIGIBLE FOR THE DEATH PENALTY DESPITE BEING WELL OVER *ROPER*'S CUT-OFF IS PROCEDURALLY BARRED.**

In his ninth ground for relief, Petitioner seeks an extension of *Roper v. Simmons*, 543 U.S. 551, 578 (2005)—which held that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed"—to encompass persons 21 years old or younger.  Doc. 19 at 97-98.  This claim is barred based on an independent and adequate procedural rule that Petitioner has not overcome.  Habeas relief should be denied.

**A.      This Claim Is Barred**

In his post-conviction application, Petitioner argued in Proposition IV that the death penalty was cruel and unusual as applied to him because he was 21 years old when he killed B.H.  *P.C. App.* at 32-35.  The OCCA barred this claim because it could have been raised on direct appeal, at *Bench II*, 504 P.3d at 596-97 (¶¶ 4-5, 10).

As previously stated, this bar is independent and adequate.  *See, e.g.*, *Smith*, 550 F.3d at 1274.  Petitioner claims the OCCA improperly barred this claim because he relied on a 2018 resolution by the American Bar Association ("ABA"), issued after direct appeal briefing had concluded, urging jurisdictions not to impose the death penalty on offenders 21 years old and younger.  Doc. 19 at 97; *P.C. App.* at 33-35 & n. 12.  But a federal court has no power to second-guess a state court's conclusion that an independent procedural bar is applicable to a defendant.  *See, e.g.*, *Martinez*, 926 F.3d at 1224.  In any event, because Petitioner seeks an expansion of *Roper*, issued in 2005, the OCCA correctly concluded that

Petitioner could have reasonably formulated this claim on direct appeal, such that the legal basis for the claim was previously available to him under § 1089(D)(9). *See Bench II*, 504 P.3d at 596-97 ("The capital post-conviction statute recognizes that a ground for post-conviction relief 'could not have been previously raised if' . . . the 'legal basis' was not 'recognized by or could not have been reasonably formulated from a decision of the United States Supreme Court . . . .'" (quoting OKLA. STAT. tit. 22, § 1089(D)(9))); *cf. also Branch v. State*, 236 So. 3d 981, 985-87 & n. 5 (Fla. 2018) (finding that claim relying on 2018 ABA resolution relied on by Petitioner here was previously available to capital defendant based on *Roper* and therefore barred because new (non-judicial) opinions, research studies, articles, and the like do not constitute newly discovered evidence).  Petitioner makes no other attempt to overcome the bar.  *See Coleman*, 501 U.S. at 750.

**B.    Conclusion**

As this ground for relief is barred, habeas relief should be denied.

## <u>GROUND TEN</u>

### A FAIRMINDED JURIST COULD AGREE CUMULATIVE ERROR RELIEF IS UNWARRANTED.

In his tenth and final ground for relief, Petitioner argues cumulative error based on the errors alleged on direct appeal and post-conviction. Doc. 19 at 98-100.  Because a fairminded jurist could agree with the OCCA's decisions rejecting these claims on direct appeal and post-conviction, habeas relief must be denied.

## A.      Background

Petitioner raised a single-paragraph cumulative error claim on direct appeal, *D.A. Brief* at 98-99, which the OCCA rejected because, "[r]eviewing the entire record in the present case, we find that Appellant was not denied a fair trial or sentencing proceeding by egregious or numerous errors." *Bench I*, 431 P.3d at 981 (¶ 226).

Petitioner again raised a single-paragraph cumulative error claim on post-conviction, *P.C. App.* at 50-51, and the OCCA held that, "[b]ecause we have determined that trial and appellate counsel were not ineffective, there is no cumulative error to consider." *Bench II*, 504 P.3d at 603 (¶ 39).

## B.      A Fairminded Jurist Could Agree with the OCCA's Decision

"A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Smith v. Duckworth*, 824 F.3d 1233, 1255 (10th Cir. 2016) (quotation marks omitted).[66]

Here, Petitioner is not entitled to any relief on his cumulative error claim. As an initial matter, Petitioner's new arguments regarding the allegedly "synergistic" effect that various claimed errors had was not raised to the OCCA and is thus not properly before this Court. *See Beaudreaux*, 138 S. Ct. at 2560. In any event, the only errors in the grounds discussed by Petitioner—all centering on his first-stage insanity defense and second-stage, Doc. 19 at 99—were the prosecutor's mistaken comment on the burden of proof for an

---

[66] For appellate purposes, Respondent maintains that there is no clearly established federal law on this issue. *See, e.g.*, *Bush v. Carpenter*, 926 F.3d 644, 686 n. 16 (10th Cir. 2019).

insanity defense and an isolated misattribution of a statement by Petitioner's grandfather to Petitioner.  *See Bench I*, 431 P.3d at 965-66.  However, as noted previously, the OCCA considered Petitioner's prosecutorial error claims collectively and found his trial was not rendered fundamentally unfair in light of the strong evidence in support of guilt and Petitioner's death sentence.  *Bench I*, 431 P.3d at 969.  As Petitioner did not show all fairminded jurists would disagree with that conclusion, no different result is warranted as to his cumulative error claim.  Regardless, given the OCCA's determination that strong evidence supported both the conviction and sentence, the OCCA reasonably concluded that cumulative error relief was not warranted.  *See Dority v. Farris*, 560 F. App'x 786, 791 (10th Cir. 2014) (unpublished) (OCCA reasonably rejected cumulative error claim given that "the evidence of Petitioner's guilt was, if not overwhelming, substantial").

**C.    Conclusion**

For all these reasons, habeas relief is not warranted on Ground Ten.

<u>**CONCLUSION**</u>

Based on the above and foregoing law and reasoning, federal habeas corpus relief is unwarranted.  Petitioner's petition for federal habeas corpus relief should therefore be denied in its entirety by this Court.

Respectfully submitted,

**GENTNER F. DRUMMOND**
**ATTORNEY GENERAL OF OKLAHOMA**

**s/ CAROLINE E.J. HUNT**
**CAROLINE E.J. HUNT, O.B.A. # 32635**
**ASSISTANT ATTORNEY GENERAL**
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Fax: (405) 522-4534
Service email: fhc.docket@oag.ok.gov

**ATTORNEYS FOR RESPONDENT**

## CERTIFICATE OF SERVICE

**X**      I hereby certify that on March 8, 2023, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and a Notice of Electronic filing to the following ECF registrant(s).

Robert S. Jackson
bob@bobjacksonlaw.com

Alyssa Donovan Farrell
alyssa.d.farrell@gmail.com

s/ Caroline E.J. Hunt

126